**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 26-5113**

## United States Court of Appeals
## For the District of Columbia Circuit

———————

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, ET AL.,

*Defendants-Appellants*,

v.

THE NEW YORK TIMES COMPANY, ET AL.,

*Plaintiffs-Appellees*.

———————

On Appeal From The United States District Court
For The District Of Columbia, No. 1:25-cv-4218-PLF,
The Honorable Paul L. Friedman

———————

**APPELLEES' OPPOSITION TO MOTION FOR STAY**

| | |
|---|---|
| Susan M. Pelletier | Theodore J. Boutrous, Jr. |
| Eric Brooks | Katie Townsend |
| GIBSON, DUNN & CRUTCHER LLP | GIBSON, DUNN & CRUTCHER LLP |
| 1700 M Street, NW | 333 South Grand Avenue |
| Washington, DC 20036-5306 | Los Angeles, CA 90071-3197 |
| (202) 955-8500 | (213) 229-7000 |
| SPelletier@gibsondunn.com | TBoutrous@gibsondunn.com |

*Counsel for Plaintiffs-Appellees*
*The New York Times Company and*
*Julian E. Barnes*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. **Parties and amici.**  All parties, intervenors, and *amici* appearing in this court are listed in the Brief for Appellants.

2. **Rulings under review.**  References to the rulings at issue appear in the Brief for Appellants.

3. **Related cases.**  There are no related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee The New York Times Company ("The Times") discloses that it is a publicly traded company, it has no parent company, and no publicly held corporation owns ten percent or more of its stock.  The Times is a global media organization focused on creating and distributing high-quality news and information.

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

STATEMENT ........................................................................................................4

ARGUMENT .........................................................................................................9

I.  The Department Is Not Likely to Prevail on the Merits.................................9

    A.  The district court correctly concluded that the Interim Policy violated its March 20 Order. ...............................................................................9

    B.  The Department's arguments about the purported lawfulness of the Interim Policy are irrelevant and wrong..............................................12

II.  The Department Cannot Show "Certain and Great" Irreparable Harm. .......14

    A.  Journalists have reported from the Pentagon for decades and pose no safety or security risk. ...................................................................14

    B.  The Wilson Declaration is far from evidence of "certain and great" irreparable harm. .........................................................................15

III.  A Stay Will Irreparably Harm The Times and Mr. Barnes and Is Contrary to the Public Interest. ..............................................................................18

CONCLUSION....................................................................................................19

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Am. First Legal Found. v. United States Dep't of Agric.*,
   126 F.4th 691 (D.C. Cir. 2025)...................................................................11

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
   901 F.3d 356 (D.C. Cir. 2018)...................................................................12

*Ateba v. Leavitt*,
   133 F.4th 114 (D.C. Cir. 2025)....................................................................5

*Barber v. Bell*,
   554 F. App'x 2 (D.C. Cir. 2014).................................................................13

*Chiles v. Salazar*,
   607 U.S. ____, 2026 WL 872307 (Mar. 31, 2026)....................................11

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
   331 F.3d 918 (D.C. Cir. 2003)....................................................................17

*Int'l Ladies' Garment Workers' Union v. Donovan*,
   733 F.2d 920 (D.C. Cir. 1984)...................................................................10

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
   119 F.4th 58 (D.C. Cir. 2024)..............................................................9, 14

*Karem v. Trump*,
   404 F. Supp. 3d 203 (D.D.C. 2019)..........................................................10

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)...................................................................19

*Peacock v. Thomas*,
   516 U.S. 349 (1996)...................................................................................11

*Perry v. Sindermann*,
   408 U.S. 593 (1972)...................................................................................12

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
   2016 WL 11681577 (D.D.C. Sep. 30, 2016)............................................13

*Sherrill v. Knight*,
   569 F.2d 124 (D.C. Cir. 1977)..............................................................18, 19

### Other Authorities

Greg Jaffe, et al., *A Harrowing Race Against Time to Find a Downed
   U.S. Airman in Iran*, N.Y. Times (Apr. 5, 2026)......................................17

i

Julian E. Barnes et al., *Iran Could Retrieve Uranium at Site U.S. Bombed Last Year, Officials Say*, N.Y. Times (Mar. 7, 2026)............................17

Julian E. Barnes, et al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, N.Y. Times (Mar. 11, 2026)....................................17

Press Conference, Secretary Hegseth (April 16, 2026), https://www.youtube.com/watch?v=2jw985dGAn8 ..........................................18

**INTRODUCTION**

Twice the district court found that the Department of Defense a/k/a Department of War (the "Department") acted unlawfully to exclude The New York Times Company ("The Times") and its reporter, Julian E. Barnes, from the Pentagon. Twice the district court rejected the Department's baseless invocation of national security as a purported justification for doing so. And twice the district court ordered the Department to restore to The Times's reporters access commensurate with what their press credentials had afforded them prior to the Department's unlawful actions—access no greater than what they and other credentialed members of the Pentagon press corps have had for decades. Now, in seeking a stay, the Department again insists it should not be required to do what the district court ordered and the Constitution commands. This Court should deny the Department's motion.

On March 20, 2026, the district court granted summary judgment in The Times's favor, concluding on the basis of overwhelming evidence and undisputed facts that the Department violated the First and Fifth Amendments when it enacted a new policy pertaining to Pentagon press credentials—Pentagon Facility Alternate Credentials or PFACs—that, among other things, engaged in viewpoint discrimination by seeking "to drive disfavored speakers and their disfavored journalism out of the Pentagon." Merits Op., Attachment B, 28–29. In addition to vacating the unconstitutional provisions of that policy, the district court granted permanent injunctive relief aimed at restoring the status quo. The district court's order directed the Department to immediately reinstate the credentials of Times reporters—relief the

1

district court's opinion made clear meant restoring to them the same access and ability to report from the Pentagon they had before.

The Department responded by accusing the district court of "mischaracteriz[ing]" and engaging in "creative misinterpretations" of its policy. Dkt. 37-2 at 2; Dkt. 37-7 at 5. And the "next business day" after entry of the district court's order, the Department issued an "interim" policy designed to nullify it. Enforcement Op., Attachment D, 4, 15 (stating that "[t]he Department disagrees with the Court's decision and is pursuing an appeal" and is issuing a "revised" policy to apply "[i]n the interim"). In addition to making superficial changes designed to resurrect unconstitutional provisions vacated by the district court—as Cmdr. Timothy Parlatore, the Interim Policy's author, candidly admitted, to "use[] more words to say the same thing," *id.* at 12—the Interim Policy went further in its defiance. It stripped Pentagon press credentials of any effect—shutting down Correspondents' Corridor "effective immediately" and imposing an "escort" requirement for all PFAC holders—while the Department "pursu[ed]" an appeal of the March 20 Order. *Id.* at 4, 6.

The district court appropriately responded by enforcing its March 20 Order. It correctly concluded that the Interim Policy was not a good-faith effort to craft a new policy in compliance with its order but rather a "transparent" effort to evade it. *Id.* at 17. In particular, the district court found:

> [T]he Department has responded to the Court's express instruction to return the PFACs previously held by The Times' journalists and restore the access to the Pentagon that came with those credentials by instead cutting off that access for all journalists. That response flouts the Court's explicit directives and disregards the constitutional principles at the heart of its [Merits] Opinion.

Enforcement Op. 19.

The Department presented "no evidence whatsoever" that either its initial policy or its Interim Policy was meant to address any legitimate safety or security concerns, or that the presence of working journalists from The Times at the Pentagon (access that reporters have had for 80 years and continued to have until three weeks ago) poses any risk to national security. *Id.* at 16.

The Department's stay motion paints a remarkably misleading picture of the proceedings below. Simply put, this case has never been about accessing classified information, eliminating security screening of reporters who cover the Pentagon, or whether there is a "constitutional right for reporters … to roam government office buildings," Appellants' Motion 2 ("Mot."). And the only merits question presented by the Department's stay motion is whether the district court had the authority to enforce its own summary judgment order when the Department openly flouted it.

As detailed below, the Department has failed to satisfy each and every requirement for a stay. To grant that extraordinary remedy here would allow the Department to continue to violate the First Amendment and inflict irreparable injury on The Times without *any* showing that the Department will suffer *any* harm, let alone certain and great irreparable harm, absent a stay. The access the district court ordered be restored to The Times's reporters goes no further than what had been the status quo for decades and nothing proffered by the Department calls into question the wisdom of that experience. Especially in light of the overriding public interest in ensuring, for the benefit of the American people, the ability of a free and

3

independent press to report on the Department and the actions of the U.S. military during wartime, the Department's stay motion should be denied.

## STATEMENT

Since the Pentagon opened in 1942, members of the press have reported from the building.  Historically, credentialed journalists have had unescorted access to unrestricted areas of the Pentagon, including the Pentagon Press Briefing Room—access that enabled them to "cover official press briefings, including those called on short notice (or without notice)," "ask questions of Pentagon officials at (and before and after) those briefings," and "engag[e] in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff." Merits Op. 5.  Since the 1970s, the Department also provided workspace for journalists in the Pentagon.  *See* Plaintiffs' SUMF, Dkt. 10-36 at 2 (¶ 7).[1]

In October 2025, the Department issued a new policy to govern press access to the Pentagon. Dkt. 1-1 ("Policy").  The Policy gave Pentagon officials unbridled discretion to determine that a journalist "pose[s] a security or safety risk to [Department] personnel or property" based on any reason, including, specifically, a journalist's or news organization's receipt, publication, or "solicitation" of any "unauthorized" information, regardless of secrecy classification. *Id.* at 9, 13–14.  The Policy provided that such a determination "may result in an immediate suspension of Pentagon access." *Id.* at 9, 13.  The Policy also allowed the Department to suspend or revoke PFACs when Pentagon officials—again exercising standardless discretion—

---

[1] All facts from The Times's statement of undisputed material facts that are cited in this brief were conceded by the Department below.  *See* Dkt. 22-2.

determine journalists have engaged in "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id.* at 16.

Journalists with PFACs at The Times and virtually every other news organization covering the Pentagon declined to sign a mandatory Acknowledgment attesting to their understanding of the Policy and informed Pentagon officials that the Policy violated their constitutional rights. As a result, The Times's reporters' PFACs, along with their access to the Pentagon, were revoked. Merits Op. 11, 30.

The Times and Mr. Barnes filed a Complaint challenging the Policy on First and Fifth Amendment grounds. Following full briefing and a hearing, the district court granted summary judgment in their favor, holding that the challenged provisions of the Policy violated the Constitution multiple times over. *Id.* at 16–39. The Department conceded that the Pentagon's press spaces were a nonpublic forum and, accordingly, that any restrictions it imposed on access to and use of that forum could be neither unreasonable nor viewpoint discriminatory. *See id.* at 25–26; *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025). The district court found that the challenged provisions were both. In particular, it concluded that even if the Policy was "facially viewpoint neutral," its "purpose and its effect" was "to chill speech that the Department perceives as unfavorable or biased." Merits Op. 27, 29 (alterations omitted).

The district court reached its conclusion that the Policy was viewpoint discriminatory based on "voluminous" undisputed evidence, including that "Department officials openly complained about reporting" related to "Secretary Hegseth's background and qualifications" that they "perceived as unfavorable"; that "in the

5

weeks and months leading up to the issuance of the Policy," senior Department officials called media outlets "scum" and "garbage" and "called for their 'severe punishment'"; and that after implementing the Policy, Department officials accused excluded journalists and news organizations, like The Times, of being "'propagandists' who 'stopped telling the truth' and who 'continue to lie,'" while simultaneously praising those willing to submit to the Policy as "the absolute best people" who were "on board and willing to serve our commander-in-chief." *Id.* at 27–29. The district court further found that Appellants were interpreting the Policy to prohibit certain conduct by disfavored news organizations while permitting substantially identical conduct by media outlets the Department preferred. *Id.* "In sum, the undisputed evidence reflect[ed] the Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are. That is viewpoint discrimination, full stop." *Id.* at 30 (citation omitted).

The district court vacated the Policy's challenged provisions as to all regulated parties and issued injunctive relief running to The Times and Mr. Barnes. Specifically, it permanently enjoined enforcement of the vacated provisions against Mr. Barnes and six other Times reporters and ordered the Department to "immediately reinstate" their PFACs. *See* Merits Order, Attachment A, 1–3. As the district court explained, this injunction was necessary to "remedy the injury from the loss of a press credential … and the access that comes with it." Merits Op. 37 (citation and alteration marks omitted).

6

In assessing the constitutionality of the Policy and weighing the injunction factors, the district court found that "[t]he regular presence of PFAC holders at the Pentagon … pos[es] no security or safety risk to Department property or personnel," *id.* at 5—a fact expressly conceded by the Department. *Compare* Plaintiffs' SUMF, Dkt. 10-36 at 3 (¶ 11) *with* Defendants' SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "undisputed").  It squarely rejected the Department's "assertion that vacatur would 'compromise the safety of the Pentagon'" as "unfounded."  Merits Op. 39.

Instead of complying with the March 20 Order, the Department "scrambled" over a weekend to put in place an "Interim Policy" to evade it.  Enforcement Op. 17.  Citing what it called the district court's "mischaracterization" of the Policy, the Department "revised" provisions vacated by the district court to "us[e] more words to say the same thing."  *Id.* at 12.  And, with respect to the injunctive relief ordered by the district court, the Department sought to sidestep compliance—while it "pursu[ed]" an appeal—by closing Correspondents' Corridor "effective immediately" and eliminating PFAC holders' unescorted access to any part of the Pentagon, including the Pentagon Press Briefing Room.  *Id.* at 4, 6.  Under the Interim Policy, no more than three reporters per news organization would be allowed to request an escort for a specific, scheduled event, such as a press conference, but would otherwise be barred from the building.  *Id.*; see also Dkt. 37-2 at 7–8.

The Times moved to compel compliance with the March 20 Order.  After hearing argument and considering multiple filings by the parties, including two declarations from the Department, the district court granted the Times's motion on April 9, 2026.  The district court determined that under the Interim Policy, a PFAC did not

provide access "even close to as meaningful as the broad access that PFAC holders had previously been afforded." *Id.* at 17–18. It found the Department had "flout[ed] the Court's explicit directives" to "return the PFACs previously held by the Times' journalists and restore the access to the Pentagon that came with those credentials." *Id.* at 19. The district court further concluded that the Department had done so in violation of the "constitutional principles at the heart of its [March 20] Opinion," finding the Interim Policy was motivated by the same improper purpose to "dictate the information received by the American people, to control the message so that the public hears and sees only what" the Department wants. *Id.*

In ordering the Department to comply, the district court rejected as "nonsense" its unsupported assertion that the Interim Policy had a security rationale, finding "no evidence whatsoever" of any threat posed by the presence of Times journalists, and explaining that "bald assertions of national security cannot excuse the Government's failure to follow the law." *Id.* at 16. As it had in entering its March 20 Order, the district court rejected the baseless notion that it had stripped the Department of the ability to screen PFAC holders, explaining that its March 20 Order effectively reinstated the status quo, "leaving in place requirements that are no less stringent than in the previous regime." Merits Op. 38–39; Enforcement Op. 16 ("The Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders …. The Times' journalists named in the Court's Order have already been screened by the Department… [and] the Court was clear in its [March 20] Opinion that it was leaving intact the security measures that previously existed and 'served [the Department's] proffered interests in safety and security for decades.'").

The district court ordered the Department to comply with its March 20 Order to restore to The Times's reporters access to the Pentagon commensurate with the access they previously had. The next day, the Department filed a notice of appeal from both the March 20 and April 9 Orders and moved the district court for a stay pending appeal. The district court granted the Department's request for a fourteen-day administrative stay but otherwise denied its stay motion.

## ARGUMENT

A stay is an "extraordinary" remedy. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted). It is justified only if the applicant makes a "strong showing" of a likelihood of success on the merits, demonstrates it will face "certain and great" irreparable harm absent a stay, shows a stay would not substantially injure other parties, and establishes that a stay is in the public interest. *Id.* at 63–64. The Department fails to satisfy any of these requirements.

## I.   The Department Is Not Likely to Prevail on the Merits.

### A. The district court correctly concluded that the Interim Policy violated its March 20 Order.

The Department seeks a stay of the district court's April 9 Order so that it may implement the Interim Policy during the pendency of its appeal; it does not ask to stay any portion of the March 20 Order. *See* Mot. 3 (seeking a stay of the "*latest* order"). Accordingly, for purposes of the Department's motion, the relevant merits question is whether the district court erred when it concluded, based on the factual record before it, that "the Department's abrupt closure of the Correspondents'

Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon are not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of this Court's [March 20] Order." Enforcement Op. 17.  The district court did not err.

The March 20 Order expressly required the Department to "immediately reinstate the PFACs" of seven Times reporters.  Merits Order 3.  To avoid doing so, the Department eliminated "access for all journalists."  Enforcement Op. 19; *id.* at 9 ("Rather than comply with that Order, the Department has cut off all PFAC holders' meaningful access to the Pentagon.").  As is crystal clear from the district court's ruling: "The point of the Court's injunction was to restore Times journalists' access to the Pentagon, not merely to ensure that they have possession of a physical credential." *Id.* at 17.  Indeed, in issuing that injunctive relief the district court made clear that the constitutional harms inflicted on The Times by the Department's Policy could be remedied only by restoring Times reporters' access to the Pentagon.  Merits Op. 37 (noting that Appellants "do not meaningfully dispute that the remedies available at law are inadequate" and that "[t]he only way to remedy the injury from the loss of a press credential is to return the hard pass *and the access* that comes with it" (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019) (alteration omitted) (emphasis added))).  The district court's conclusion that "[t]he Department did not comply" with that provision of its March 20 Order is unassailably correct.  Enforcement Op. 15; *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984).

The Department's motion ignores that provision of the March 20 Order. It even goes so far as to falsely assert that the March 20 Order "contained just one injunction," Mot. 15, disregarding entirely the district court's additional mandate to reinstate The Times's access. Simply put, the Department's claim that the district court found only that the Interim Policy was a "response to the court's order," was "taken to frustrate or negate the impact of the court's order," and violated the "spirit of the order" is wrong by omission. Mot. 9, 17. The district court found all those things; it *also* found that the Interim Policy violated "the Court's explicit directives." Enforcement Op. 19. Appellants' failure to address the relevant provision of the March 20 Order forfeits any argument that the district court misconstrued its own ruling. *Am. First Legal Found. v. United States Dep't of Agric.*, 126 F.4th 691, 696, n.2 (D.C. Cir. 2025).

In any event, even if Appellants had argued to this Court that the injunction entered below required it only to hand the Times's reporters a useless card with the word "PFAC" on it, it still would fail to demonstrate a likelihood of success on the merits. The district court correctly refused to "embrace such a narrow interpretation of its authority and permit such a blatant attempt to circumvent a lawful order of the Court to succeed." Enforcement Op. 10. After all, "[t]he First Amendment is no word game" and "the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'" *Id.* at 2 (quoting *Chiles v. Salazar*, 607 U.S. ____, 2026 WL 872307, at *9 (Mar. 31, 2026)).

In short, the district court properly invoked its "inherent power to enforce its judgments" to prevent the Department from succeeding in its "transparent attempts

to negate the impact of th[e] Court's Order." *Id.* at 7, 17 (quoting *Peacock v. Thomas*, 516 U.S. 349, 356 (1996)). The Department is not likely to succeed on the merits of its appeal.

### B. The Department's arguments about the purported lawfulness of the Interim Policy are irrelevant and wrong.

The Department's claim that it had the right to try again after provisions of its Policy were vacated by the district court is neither here nor there. Mot. 15–16. Not only did the district court vacate the Policy's unconstitutional provisions but it also granted injunctive relief, which the Department defied. The Department did not ask the district court to modify its injunction. Indeed, it did not even file a notice of appeal until April 10, 2026. Instead, the Department imposed an escort requirement and "scrambled to close the Correspondents' Corridor in direct response to the Court's directives." Enforcement Op. 17. Such improper conduct is no more immune from enforcement than any other blatant refusal to comply with a lawful court order.

The Department's arguments that the Interim Policy is lawful are likewise irrelevant and, in any event, wrong. Even if its Interim Policy were otherwise permissible, that would not excuse the Department's blatant violation of the March 20 Order. And, more fundamentally, nothing about the Interim Policy is lawful. Whether the Department would ordinarily have authority to alter the nature of a forum for legitimate reasons is irrelevant because the Department is prohibited from doing so arbitrarily, unreasonably, or for an improper purpose. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (even when the government may act "for any

12

number of reasons," it "may not rely … on a basis that infringes [a person's] consti-tutionally protected interests—especially, his interest in freedom of speech"); *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (the gov-ernment violates the First Amendment if it "change[s] the nature of a forum in order to deny access to a particular speaker or point of view"). And, as the district court correctly found on the record before it,[2] the Interim Policy, far from curing the initial Policy's First and Fifth Amendment defects, "disregards the constitutional principles at the heart of [its March 20] opinion." Enforcement Op. 19. In particular, the dis-trict court found that the Interim Policy was motivated by the same viewpoint dis-crimination underlying the Department's earlier Policy and had the same intended effect of excluding Times journalists based on editorial viewpoint. *Id.* at 17, 19. The Interim Policy, like the initial Policy, was "really about[] the attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see." *Id.* at 19.

---

[2] The Department's effort to counter that record via the Wilson Declaration is im-proper. That declaration, which contradicts the district court's express findings based on undisputed facts, was not filed until Appellants sought a stay on April 10. It cannot be considered in assessing their likelihood of success on the merits or for any other purpose. *See Barber v. Bell*, 554 F. App'x 2, 3 (D.C. Cir. 2014) ("[T]his court generally does not consider evidence or arguments that were not presented to the district court at the time of its relevant decision."); *see also Senate Permanent Subcomm. on Investigations v. Ferrer*, 2016 WL 11681577, at *2 (D.D.C. Sep. 30, 2016) ("A motion to stay a court order pending appeal is not a platform to relitigate an issue or to preserve arguments that were not properly raised.").

**II.    The Department Cannot Show "Certain and Great" Irreparable Harm.**

The Department has not and cannot show that permitting Times journalists to work in the Pentagon in the same manner they have for decades—and that other journalists were permitted to do until three weeks ago—will cause the requisite "certain and great" irreparable harm necessary to warrant a stay. *KalshiEX LLC*, 119 F.4th at 64. On that basis alone, the Department is not entitled to a stay.

### A. Journalists have reported from the Pentagon for decades and pose no safety or security risk.

The Department's argument that harm will result absent a stay rests entirely on the same baseless invocation of "security" that the district court properly rejected as "nonsense." Enforcement Op. 16. The district court repeatedly found, based on a full summary-judgment record and multiple declarations filed by the Department, that restoring Pentagon access for the seven Times reporters subject to its injunction would pose no risk of harm. *See* Merits Op. 38–39; Enforcement Op. 16. Correctly so. The Department itself conceded that "journalists from news organizations have covered the Department" since it "opened in 1942," that "the Department has benefitted from the regular presence of reporters" at the Pentagon, and that the Department had "not identif[ied] any breach of physical security or other incident necessitating new safety and security requirements." Plaintiffs' SUMF at 1, 4, 7.

Further, and contrary to the Department's arguments, the district court's orders left "intact the security measures that previously existed for PFAC holders and that 'served [the Department's] proffered interests in safety and security for decades.'" Enforcement Op. 16. Those orders do "not 'remove' or 'excise' the

14

Department's authority to screen PFAC holders" and, as the district court noted, "the Times' journalists named in the Court's [March 20] Order have already been screened by the Department." *Id.* Nor do the district court's orders require allowing PFAC holders to enter federal employees' offices, conference rooms, meeting spaces, SCIFs, or any other areas where "federal employees conduct sensitive work." Mot. 13. And they have no effect on the Department's ability to enforce existing policies, laws, or practices that protect against disclosure of classified or other national security-sensitive or other nonpublic information.

### B. The Wilson Declaration is far from evidence of "certain and great" irreparable harm.

Appellants insist the entire record before the district court and the scope of the district court's orders should be ignored because, in the immediate wake of the district court's April 9 Order, the Department suddenly arrived at the newfound "judgment" that unescorted access raises "very real concerns about the frequency with which sensitive information, including highly classified national defense information, was reaching journalists." *Id.* at 19. The Department bases this purported realization solely on a *post hoc* declaration from the Pentagon Press Secretary who neither wrote the Policy nor the Interim Policy but was, as the district court found, among those officials whose statements evinced the Department's viewpoint-discriminatory motive. Merits Op. 13. Even assuming the Wilson Declaration can properly be considered by this Court for any purpose—and it cannot—it falls far short of demonstrating that "certain and great" harm will result absent a stay.

15

According to Ms. Wilson, in the less than one year that she has been Press Secretary, there was a period when her "office was contacted by journalists … monthly, and sometimes multiple times per month … regarding information they had obtained that was sensitive or classified." Declaration of Kingsley Wilson, ECF 58-1 ¶ 4. She asserts that the frequency of such calls "dropped dramatically" after the Department adopted the Policy and revoked the PFACs of nearly all Pentagon reporters. *Id.* ¶ 10. Ms. Wilson "attribute[s] this reduction" to journalists' exclusion from the Pentagon, *id.* ¶ 11, speculating that "unescorted access to the Pentagon" must have caused reporters to obtain more "sensitive" information because it purportedly "enabled journalists to observe activity patterns" that "could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly." *Id.* ¶ 7. Ms. Wilson's declaration is improper and should be disregarded; in any event, it establishes nothing.

First, to the extent the Department suggests that anything in the Wilson Declaration speaks to the purpose of the Interim Policy, it is contradicted by the record and the district court's repeated findings in both its summary judgment and enforcement opinions.[3] On that basis alone, her averments are entitled to no weight.

Second, even if considered, Ms. Wilson's claims are nothing more than rank speculation. Even if it is true that fewer journalists called her after their PFACs were revoked, that is just as easily attributable to the fact that journalists no longer find it productive to engage with a Press Secretary who described them as "propagandists"

---

[3] The Times has had no opportunity to rebut Ms. Wilson's speculation, disputes the accuracy of her claims, and maintains her declaration should not be considered for any purpose.

who "lie[.]" Merits Op. 13. And the judicially noticeable, near-constant stream of breaking news published by The Times since its journalists' PFACs were revoked belies Ms. Wilson's conjecture that the Department's Policy stopped Times reporters from speaking with sources or gathering what she calls "sensitive" information.[4] While the "loss of PFACs has created an unprecedented impediment to The Times' ability to cover the Department and its leadership, national security and the U.S. military," Merits Op. 14, barring The Times's reporters from the building has not prevented them from reporting on matters important to the American people that the Department would rather shield from public view.

Finally, even if it were not entirely invented and easily refuted, Ms. Wilson's speculation would not establish irreparable harm. Her belated declaration articulates no legitimate national security concerns. *See Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.,* 331 F.3d 918, 927–28 (D.C. Cir. 2003) (explaining that precedent "counsel[s] deference in national security matters" but only "so long as the government's declarations raise *legitimate* concerns … [about] national security") (emphasis added). At bottom, Ms. Wilson complains that the longstanding tradition of access to the Pentagon that has prevailed for decades enables journalists to ask questions of Department officials and to seek confirmation of information the Department has

---

[4] *See, e.g.*, Julian E. Barnes, et al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, N.Y. Times (Mar. 11, 2026), https://www.ny-times.com/2026/03/11/us/politics/iran-school-missile-strike.html; Greg Jaffe, et al., *A Harrowing Race Against Time to Find a Downed U.S. Airman in Iran*, N.Y. Times (Apr. 5, 2026), https://www.nytimes.com/2026/04/05/us/iran-airman-fighter-jet-rescue-mission.html; Julian E. Barnes et al., *Iran Could Retrieve Uranium at Site U.S. Bombed Last Year, Officials Say*, N.Y. Times (Mar. 7, 2026), https://www.ny-times.com/2026/03/07/us/politics/iran-nuclear-site-uranium-intel.html.

not approved and that may cast its leadership in an unfavorable light—exactly the kind of "editorial viewpoint" discrimination Judge Friedman's March 20 Order condemned.  Merits Op. 30 ("The record evidence supports the conclusion that the Policy discriminates not based on political viewpoint but rather based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership.").  Not only does the Department make no attempt to defend that editorial viewpoint discrimination in its motion, its leadership has continued to make clear its intolerance of journalists not "on board and willing to serve" its agenda.[5]

### III.    A Stay Will Irreparably Harm The Times and Mr. Barnes and Is Contrary to the Public Interest.

A stay would irreparably injure The Times and its reporters by depriving them of relief the district court correctly concluded was necessary to remedy the Department's violation of their First Amendment rights.  Merits Op. 36–37.  As the district court found when issuing injunctive relief, The Times's reporters' exclusion from the Pentagon causes them irreparable harm by denying them opportunities to ask questions, confirm information, obtain the Department's perspective, and receive timely updates about military actions across the globe.  These opportunities will be lost forever.  *Id.* at 37.  This Circuit has recognized that a journalist "arbitrarily

---

[5] At a press conference on April 16, Secretary Hegseth likened journalists covering the war in Iran to "the Pharisees" who criticized Jesus for performing miracles. https://www.youtube.com/watch?v=2jw985dGAn8.  Singling out "the legacy" media, he called reporters "unpatriotic" and said he questioned "what side some of you are actually on," based on what he called "relentlessly negative coverage" of the ongoing war. *Id*.

excluded from sources of information" suffers irreparable First Amendment harm. *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977). That is precisely the harm The Times will suffer if the Department's motion is granted.

The public interest, too, weighs heavily against a stay. The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). And, in this case, the public also has a separate "interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary," and that reporters "not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129–30. Given the ongoing war with Iran, and the public's need for timely, fact-based reporting, the "constitutional interests at stake are hard to overstate." Merits Op. 37.

## CONCLUSION

This Court should deny the Department's motion for a stay.

19

Dated:  April 17, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan M. Pelletier
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
EBrooks2@gibsondunn.com

*Counsel for Plaintiffs-Appellees The New York Times Company and Julian E. Barnes.*

20

## <u>CERTIFICATE OF COMPLIANCE (RULE 32(G)(1))</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5199 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

<u>/s/ Theodore J. Boutrous, Jr.</u>
Theodore J. Boutrous, Jr.
