[ORAL ARGUMENT NOT YET SCHEDULED]

No. 26-5113

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

THE NEW YORK TIMES COMPANY, *et ano*,

*Plaintiffs-Appellees*,

v.

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1: 25-cv-04218-PLF
Hon. Paul L. Friedman, J.

**BRIEF OF *AMICUS CURIAE* PENTAGON PRESS ASSOCIATION
IN SUPPORT OF PLAINTIFFS-APPELLEES' RESPONSE
TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY**

DAVID A. SCHULZ
JOHN LANGFORD
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu

*Counsel for Pentagon Press
Association as Amicus Curiae*

## CERTIFICATE AS TO PARTIES, CORPORATE DISCLOSURE STATEMENT, AND AUTHORITY TO FILE

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Briefs for Appellants and Appellees:

1. The Pentagon Press Association.

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1)(A), *amicus curiae* certifies as follows: the Pentagon Press Association is an unincorporated nonprofit association. It has no parent corporation and no subsidiaries, and it issues no stock.

All parties have consented to the filing of this brief, and amicus files it pursuant to Fed. R. App. P. 29(a)(2) and D.C. Circuit Rule 29(b).

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that no party or counsel for a party authored the brief in part or in whole. Aside from amici or their counsel, no person or entity made a financial contribution to fund the preparation or submission of the brief.

**TABLE OF CONTENTS**

INTEREST OF AMICUS PENTAGON PRESS ASSOCIATION............................1

BACKGROUND ...........................................................................................1

ARGUMENT ...............................................................................................4

I.    EXTRAORDINARY RELIEF IS NOT APPROPRIATE BECAUSE
      COMPLYING WITH THE INJUNCTION POSES NO RISK OF
      IMMEDIATE, IRREPARABLE INJURY......................................................4

      A.    History Severely Undercuts the Department's Claim of
            Immediate Irreparable Injury .................................................5

      B.    The District Court Found No Evidence of Any New Threat to
            National Security That Might Otherwise Warrant a Stay ........9

      C.    The Supplemental Evidence of National Security Risk Offered
            Now By the Department Falls Far Short of Establishing Any
            Imminent and Irreparable Harm ............................................11

II.   THE PUBLIC INTEREST WEIGHS HEAVILY AGAINST ENTRY
      OF A STAY ...........................................................................................14

CONCLUSION ............................................................................................16

ii

# TABLE OF AUTHORITIES

**Page**

## Cases

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006). ................................................................4

*KalshiEX LLC v. CFTC*, 1
    19 F.4th 58 (D.C. Cir. 2024) ....................................................................3

*Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*,
    783 F. Supp. 3d 200 (D.D.C. 2025) .........................................................2

*New York Times v. United States,*
    403 U.S. 713 (1971) ..............................................................................16

*Nken v. Holder*, 5
    56 U.S. 418 (2009) ..................................................................................4

*Wisc. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................4

## Other Authorities

Alfred Goldberg et al., *Defense Studies Series: Pentagon 9/11* (2007),
    https://history.defense.gov/Portals/70/Documents/
    pentagon/Pentagon9-11.pdf ........................................................ 8, 9, 17

Alfred Goldberg, *The Pentagon: The First Fifty Years* (1992) ...........................5, 7

Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*,
    Colum. J Journalism Rev. (Feb. 5, 2025), https://perma.cc/DG6P-CZY9 ...... 7, 19

Brian Stelter, *Pentagon to Swap Traditional Media with Pro Trump
    Outlets Under New Rotational Program for Defense Department
    Workspace*, CNN (Feb. 1, 2025), https://perma.cc/Y7BT-SV4V .........................6

Dep't of Defense, Coronavirus: A Timeline (last visited Apr. 16, 2026),
    https://perma.cc/SA2R-RMEP.............................................................10

iii

Erik Wemple, *New Pentagon Press Corps Test-Drives the Briefing Room*, N.Y. Times (Dec. 02, 2025), https://perma.cc/226E-VNQQ ....................13

Graham Kates, *CBS News and other media outlets won't sign on to new Pentagon press restrictions*, CBS News (October 14, 2025), https://perma.cc/CS3M-CMDN.................................................................7

Hillary Profita, *A Day in the Life of a Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/J8XM-6CXL....................................6

Hope Hodge Sacks, *Pentagon Bars Most Foreign Visitors as More Personnel Contract Virus*, Military.com (Mar. 14, 2020), https://perma.cc/48KJ-229C ......................................................................9

Jackson Barnett, *Pentagon Further Restricts Building Access, Boosting Telework Demand, After Contractor Dies*, Fedscoop (Mar. 23, 2020), https://perma.cc/3FZN-3XX2......................................................................9

James C. Goodale, *Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles* (2013) ...........................................8

John M. Diamond, *The Media: Witness to the National Security Enterprise*, *in The National Security Enterprise: Navigating the Labyrinth* (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017)......................6

Lisa Fernando, NORTHCOM, *FEMA Brief Reporters on COVID Response*, Def. Visual Info. Distrib. Serv. (Feb. 16, 2021), https://perma.cc/7G4N-TT55 ..................................................................9

Mark Thompson, *Pentagon's Correspondents' Corridor Renamed*, TIME (Sept. 27, 2012), https://perma.cc/BC2F-5SRU .........................................7

Memorandum for Senior Pentagon Leadership,  Dkt. 37-2......................................2

*Navy Goes to the Pentagon*, N.Y. Times (Aug. 12, 1948), https://perma.cc/623X-ATRX..................................................................5

*Pentagon – Air Force: Installation Details*, Mil. Installations
(last visited Apr. 16, 2026), https://perma.cc/MC4Y-HUJK ...............................14

*Pentagon Building Security and Emergency Procedures Guide (2003)*,
Pentagon Force Protection Agency (Feb 21, 2003),
https://perma.cc/W3CY-87UD. .............................................................................16

PPA Amicus Brief, Dkt. 15–1 ....................................................................................19

Request for Proposals from Dep't of Defense Concessions Committee
(June 18, 2025), https://perma.cc/G4XR-HS2N. .................................................15

Robert B. Sims, *The Pentagon Reporters* (1983) ......................................... 7, 10, 17

Scott Nover, *Pentagon bars photographers over 'unflattering'*
*Hegseth photos*, Wash. Post (Mar. 11, 2026),
https://perma.cc/3UYW-MH7A ...........................................................................13

*Secretary of Defense Donald H. Rumsfeld Briefs Reporters in the*
*Pentagon*, Dep't of Defense (Sept. 12, 2001),
https://perma.cc/QS4K-KEAK..............................................................................9

Stephen Sorrace, *Hegseth tears into reporters, alleging they 'cheer*
*against Trump, and Iran strikes,'* Fox News (June 26, 2025),
https://perma.cc/D2HT-BFNC................................................................................12

Steve Vogel, *The Pentagon: A History* (2007)...................................................... 5, 18

Ted Johnson, *Pete Hegseth Invokes The Bible To Lash Out At*
*News Media*, Deadline (Apr. 16, 2026), https://perma.cc/MRS9-AU7E............13

Tom Bowman, *Opinion: Why I'm handing in my Pentagon press pass*,
NPR (Oct. 14, 2025), https://perma.cc/3ZPE-XAP7 ..................................... 6, 19

Wilson Aff., Dkt. 58–1 ....................................................................... 14, 15

**GLOSSARY**

| | |
|---|---|
| Department | Department of Defense |
| Gov't Mot. | Government's Emergency Motion for a Stay Pending Appeal |
| PFAC | Pentagon Facility Alternate Credentials |
| PPA | Pentagon Press Association |
| Times | The New York Times Company |

**INTEREST OF AMICUS PENTAGON PRESS ASSOCIATION**

The Pentagon Press Association ("PPA") is a nonprofit association founded in 2010 to promote the interests and protect the rights of journalists who regularly cover the Department of Defense ("Department"). Approximately 100 members of the PPA had their Pentagon press passes revoked on October 15, 2025, for refusing to accept restrictions on routine newsgathering imposed in the new Department press policy vacated by the district court. The journalist members of PPA have a direct stake in the enforcement of the district court order during this appeal and in the restoration of the status quo that existed before the unconstitutional policy was imposed.

**BACKGROUND**

In this lawsuit brought by The New York Times Company (the "Times"), the district court on March 20, 2026, vacated a new press policy (the "Policy") imposed by the Department that upended more than eight decades of press access to the Pentagon and revoked the Pentagon Facility Alternate Credentials ("PFACs" or "press passes") of more than 300 security-cleared journalists. The court declared that provisions of the new Policy violated both the First and Fifth Amendments, vacated those provisions, and enjoined the Department to restore the Times reporters' Pentagon access to its pre-Policy status. *See* Gov't Mot. Ex. B (hereinafter "March 20 Opinion").

Rather than abide by the court's order vacating the new Policy and obeying the court's injunction, the Department retaliated with even more restrictive limitations on journalists' newsgathering.   The Department announced a new "interim policy" that largely restated the objectionable limitations on newsgathering the district court had declared unconstitutional and added a new press access restriction to further impede the ability of reporters to do journalism in a forum opened to them specifically for that purpose. Memorandum for Senior Pentagon Leadership,  Dkt. 37-2 (the "Interim Policy").[1] The Interim Policy for the first time prohibits security-cleared reporters with Department-issued press passes from walking in the Pentagon's unsecured hallways without a military escort.

When the Times objected, the district court explained to the Department in no uncertain terms that the summary judgment opinion and order had required it to "re-establish the status quo as it existed prior to the unlawful agency action."  Gov't Mot. Ex. D at 14 (citing *Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (internal quotation and citation omitted)). The court held that the new escort requirement and other provisions of the Interim Policy patently violated the March 20 Order and once again enjoined the Department

---

[1] All Dkt. citations herein are citations to the District Court's docket in this case, unless otherwise specified.

2

to return to the status quo by permitting Times reporters holding PFACs to access the Pentagon in the same manner as they could before the new policies were implemented. *Id*.

The Department now seeks a stay of that portion of the district court's injunction requiring it to restore unescorted hallway access to Times' journalists with valid press passes—the same unescorted access that military reporters have had since the building opened in 1942. The request for a stay should be denied because the Department has not credibly established that any imminent threat to national security necessitates the extraordinary equitable relief it now seeks. Worse, the Department's motion elides the substantial public interest that has long been served by the very press access to our nation's military leaders that it now asks this Court to prevent. The historic press access to the Pentagon that the district court restored makes reporting on our military more timely, accurate, and comprehensive, and keeps American citizens better informed. *See* March 20 Opinion at 37.

**ARGUMENT**

I.    **EXTRAORDINARY RELIEF IS NOT APPROPRIATE BECAUSE COMPLYING WITH THE INJUNCTION POSES NO RISK OF IMMEDIATE, IRREPARABLE INJURY**

Any party seeking a stay must demonstrate that it faces immediate irreparable injury absent relief from the court. *See, e.g., KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024).[2] This Court "has set a high standard" for the kind of irreparable injury necessary. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must establish an injury that is "both certain and great; it must be actual and not theoretical," and the injury must be "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* at 297–98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The Department's talismanic and unsubstantiated invocation of "national security" falls far short of demonstrating that restoring the same press access that prevailed for over eight decades—including through every war and military conflict since the Pentagon opened—threatens immediate, irreparable injury to the Department.

---

[2] Demonstration of irreparable harm is necessary but not sufficient to secure emergency relief. A stay constitutes an "intrusion into the ordinary processes of administration and judicial review, . . . and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotations and citations omitted).

4

### A. History Severely Undercuts the Department's Claim of Immediate Irreparable Injury

History demonstrates that there is no reason to believe that restoring Pentagon press access to the status quo ante will irreparably injure the Department. When the military first began moving into the Pentagon in 1942 during World War II, Secretary of War Henry Stimson saw value in granting press access to the new building so reporters could stay close to key "sources of information."[3] Journalists began reporting from the Pentagon before construction was complete. *Id.* at 289–90. By the end of World War II, the Pentagon hosted an established press corps, and a "combined National Defense press room" was opened in the Pentagon on August 11, 1948, meaning the press has had a longer tenancy in the building than the U.S. Navy.[4]

From the outset, reporters were allowed to roam freely through "all but the most secure corridors of the vast building."[5]  The ability to walk the halls enabled reporters to meet and build relationships of trust with senior uniformed officials,

---

[3] Steve Vogel, *The Pentagon: A History* 278–79 (2007).

[4] *Navy Goes to the Pentagon*, N.Y. Times (Aug. 12, 1948), https://perma.cc/623X-ATRX; *see also* Alfred Goldberg, *The Pentagon: The First Fifty Years* 157, 163 (1992) (explaining that the Navy only began moving into the Pentagon on August 11, 1948, with most Navy staff moving in later).

[5] John M. Diamond, *The Media: Witness to the National Security Enterprise*, *in The National Security Enterprise: Navigating the Labyrinth* 353, 355 (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017); Hillary Profita, *A Day in the Life of a Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/J8XM-6CXL.

which greatly assisted them in developing stories and gathering information.[6] Recognizing that maintaining an office in the building reinforces the "journalistic value" of access to the Pentagon,[7] the Department dedicated physical space within the building for press use since the Pentagon's earliest days.[8]  A second floor hallway in the middle ring of the Pentagon provided dedicated press workspaces and allowed reporters to "be in touch with trusted sources throughout the day and be ready to quickly file news stories."[9] In 1972, then-Secretary of Defense Melvin Laird christened the "Correspondents' Corridor" to honor "a free and strong American press" and to memorialize correspondents killed while covering the nation's wars.[10]

---

[6] Tom Bowman, *Opinion: Why I'm handing in my Pentagon press pass*, NPR (Oct. 14, 2025), https://perma.cc/3ZPE-XAP7 (noting the value in "talking to and getting to know officers from all over the globe, at times visiting them in their offices").

[7] Brian Stelter, *Pentagon to Swap Traditional Media with Pro Trump Outlets Under New Rotational Program for Defense Department Workspace*, CNN (Feb. 1, 2025), https://perma.cc/Y7BT-SV4V (statements of Pentagon spokesperson).

[8] *See* Goldberg, *supra* note 3, at 158; Robert B. Sims, *The Pentagon Reporters* 24 (1983) (describing plaque unveiled by Secretary of Defense Robert S. McNamara in 1966 in honor of Baltimore Sun correspondent Mark Watson above the desk he used in the Pentagon).

[9] Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*, Colum. Journalism Rev. (Feb. 5, 2025), https://perma.cc/DG6P-CZY9; Graham Kates, *CBS News and other media outlets won't sign on to new Pentagon press restrictions*, CBS News (October 14, 2025), https://perma.cc/CS3M-CMDN (observing that the press offices were "near the public affairs office and press briefing room to communicate information about the world quickly").

[10] Mark Thompson, *Pentagon's Correspondents' Corridor Renamed*, TIME (Sept. 27, 2012), https://perma.cc/BC2F-5SRU.

Even during periods of crisis, when the Department had strong incentives to keep reporters away, the Pentagon consistently remained open to the press so that journalists could report timely and accurate information. During the Vietnam War and the heated controversy over publication of the Pentagon Papers, for example, the government fought *The New York Times* and *Washington Post* in court, but the Pentagon never even threatened to revoke reporters' credentials.[11]

The Department likewise maintained press access to the Pentagon during the immediate aftermath of the terrorist attack on September 11, 2001. When the strike by a hijacked airliner caused 184 deaths, extensive damage, and a temporary building shutdown, the Department made sure the press was back inside the Pentagon within hours.[12] The press briefing room was up and running the very next day,[13] and journalists were allowed into the wrecked areas of the building even before the grieving families of the victims.[14] Again, when the COVID-19 pandemic

---

[11] *See generally* James C. Goodale, *Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles* (2013) (recounting the legal fight from the perspective of *The New York Times*'s legal team).

[12] Alfred Goldberg et al., *Defense Studies Series: Pentagon 9/11* at 145, 169–70, 204 (2007), https://history.defense.gov/Portals/70/Documents/pentagon/Pentagon9-11.pdf.

[13] *Secretary of Defense Donald H. Rumsfeld Briefs Reporters in the Pentagon*, Dep't of Defense (Sept. 12, 2001), https://perma.cc/QS4K-KEAK.

[14] Goldberg et al., *supra* note 11, at 195.

struck, the Pentagon suspended all tours and encouraged telework for employees,[15] but never limited access to journalists.[16]

The Department's past, persistent efforts to support press access to the Pentagon reflect a longstanding consensus across Administrations that a free press and a free country are inseparable.[17] Throughout its history, the Pentagon has remained broadly accessible to journalists from all types of news organizations, without regard to how they did their work, the content of their reports, or the viewpoints they expressed. Reporters working for the Soviet Union wire service TASS were even provided access to the Pentagon at the height of the Cold War, despite the Soviet Union's role as the United States's primary adversary and principal military and intelligence threat.[18]

The unbroken history of press access to the Pentagon through wars and crises squarely rebuts the Department's claim that it will suffer immediate and irreparable

---

[15] Hope Hodge Sacks, *Pentagon Bars Most Foreign Visitors as More Personnel Contract Virus*, Military.com (Mar. 14, 2020), https://perma.cc/48KJ-229C; Jackson Barnett, *Pentagon Further Restricts Building Access, Boosting Telework Demand, After Contractor Dies*, Fedscoop (Mar. 23, 2020), https://perma.cc/3FZN-3XX2.

[16] *See* Lisa Fernando, NORTHCOM, *FEMA Brief Reporters on COVID Response*, Def. Visual Info. Distrib. Serv. (Feb. 16, 2021), https://perma.cc/7G4N-TT55; Dep't of Defense, Coronavirus: A Timeline (last visited Apr. 16, 2026), https://perma.cc/SA2R-RMEP.

[17] *See supra* note 9.

[18] Sims, *supra* note 7, at 12.

injury if a status quo that existed for more than eighty years is restored while this appeal proceeds.

### B. The District Court Found No Evidence of Any New Threat to National Security That Might Otherwise Warrant a Stay

Given the history of press access to the Pentagon, one would expect the Department to proffer compelling evidence of some startling and new—or newly recognized—threat in support of its claim that an abrupt course reversal is necessary to prevent irreparable injury. It did not.

The district court carefully examined the Department's claim that the radical new restrictions on journalists in its revised press Policy were necessary to protect national security and found it meritless. According to the court, undisputed record facts established that "[t]he regular presence of PFAC holders at the Pentagon has . . . *pos[ed] no security or safety risk to Department property or personnel*." March 20 Opinion at 5 (emphasis added). Neither party could identify for the court a single instance where the Department had ever suspended, revoked, or failed to renew a journalist's credentials out of concern over the safety or security of Department personnel or property or based on the content of their reporting. *Id*. at 6. Nor did the Department ever identify any breach of security or other incident as justification for imposing its new newsgathering restrictions on PFAC holders. *Id*. at 7. It did not do so in defense of the Policy adopted last fall, and its explanations

for the Interim Policy are equally devoid of any meaningful security justification for the increased impediments placed on Pentagon reporters.

While finding no evidence that a new national security need justified increased press restrictions, the district court found substantial evidence that the new restrictions were motivated by a desire to curb press criticism of Secretary Hegseth and the Trump Administration.  It found the record "replete with undisputed evidence that the Policy is viewpoint discriminatory," imposed by Department leadership that "has been and continues to be openly hostile to the 'mainstream media' whose reporting it views as unfavorable."[19]  March 20 Opinion at 27.  Until the new policy was first implemented 6 months ago, the only consistent credentialing criteria were the ability to pass a background check and a demonstrated need for frequent building access. March 20 Opinion at 4-5. But under the new policy, experienced military reporters were replaced by conspiracy theorists and presidential cheerleaders.[20]

---

[19] Before the new policy was announced, Secretary Hegseth frequently expressed his disdain for the reporting of the Pentagon press corps, accusing those reporters of "cheer[ing] against Trump so hard, its like in their DNA," and expressing his belief that the credentialed journalists working at the Pentagon just "want [Trump] to be unsuccessful so bad." Stephen Sorrace, *Hegseth tears into reporters, alleging they 'cheer against Trump, and Iran strikes,'* Fox News (June 26, 2025), https://perma.cc/D2HT-BFNC.

[20] *See* Erik Wemple, *New Pentagon Press Corps Test-Drives the Briefing Room*, N.Y. Times (Dec. 02, 2025), https://perma.cc/226E-VNQQ.

Shortly after beginning the attacks on Iran, the Department confirmed the viewpoint agenda advanced by its new policy when it barred press photographers from attending briefings about Iran because they had published photos of the Defense Secretary that his staff considered "unflattering."[21]  The animus behind the Pentagon's press restrictions continues to this day. In a jeremiad against the Pentagon press corps on April 16, 2026, Secretary Hegseth again attacked a "legacy Trump-hating press" he considers blinded by "politically motivated animus for President Trump."[22]

In short, the Department's motivation to limit press criticism and its inability to identify any new security risk or misconduct that would necessitate new restraints on newsgathering at the Pentagon further rebut its claim that complying with the district court order to restore the status quo would pose a grave and imminent danger to national security.

### C. The Supplemental Evidence of National Security Risk Offered Now By the Department Falls Far Short of Establishing Any Imminent and Irreparable Harm

Confronted with the absence of record evidence demonstrating a national security need for its new press restrictions, the Department seeks to collaterally

---

[21] *See* Scott Nover, *Pentagon bars photographers over 'unflattering' Hegseth photos*, Wash. Post (Mar. 11, 2026), https://perma.cc/3UYW-MH7A.

[22] *See* Ted Johnson, *Pete Hegseth Invokes The Bible To Lash Out At News Media*, Deadline (Apr. 16, 2026), https://perma.cc/MRS9-AU7E.

11

attack the district court's findings through a declaration that supposedly establishes irreparable harm if the new press hallway restrictions cannot immediately be imposed. The effort is unavailing.

The Wilson affidavit points to ongoing combat operations and "the current national security environment" as requiring the Department to strip from reporters the same unescorted hallway access it allows to thousands of other workers without security clearances who walk freely through the miles of unsecured Pentagon hallways every day.[23] Dkt. 58–1 ¶¶ 12–13 (hereinafter "Wilson Aff."). But she does not explain why the current combat operations create any greater reason to restrict press access than the decade-long War on Terror, including the day after 9/11; the Cold War; the Vietnam War; the Korean War; or World War II. Wilson simply offers up a series of non-specific, subjective, and untested factual allegations about the volume and kind of press inquiries involving "sensitive" information that she has fielded, from which she draws highly questionable conclusions.

---

[23] An estimated 3,000 "non-defense support personnel" work within the Pentagon's 17.5 miles of corridors. *See Pentagon – Air Force: Installation Details*, Mil. Installations (last visited Apr. 16, 2026), https://perma.cc/MC4Y-HUJK. For example, retail establishments with employees currently working in the Pentagon include CVS, AT&T, The Lynch Collection, Greensleeves Florist, The Original Velatis Caramel Company, Lumos Jewelers, Fort America, New York Tailors laundry/dry cleaning, and others. *See* Request for Proposals from Dep't of Defense Concessions Committee (June 18, 2025), https://perma.cc/G4XR-HS2N.

For example, Wilson claims that before the new policy was implemented, journalists contacted her "on a regular basis" regarding "sensitive or classified" information, "with a frequency that raised serious concerns" and says this "changed dramatically" after the new policy was implemented. Wilson Aff. ¶¶ 4–6, 10. She provides no data to support this assertion or allow its truth to be meaningfully interrogated. Nor does this alleged correlation establish any causal connection between reporters' access to hallways and their receipt of sensitive information. Military personnel are trained not to talk in the non-secured hallways of the Pentagon [24] because those hallways are used by thousands of non-military contractors with PFACs that permit the same unescorted access that credentialed reporters have always had. Without providing *some* reasoned explanation for why reporters having unescorted access suddenly poses a new or previously unrecognized serious national security risk, Wilson does not speak to irreparable injury caused by the district court's injunction.

Disclosing certain confidential national security information can undeniably cause serious harm, but the Wilson declaration provides no plausible explanation for why the decades-long tradition of unescorted press access to the Pentagon's hallways

---

[24] *See Pentagon Building Security and Emergency Procedures Guide (2003)*, Pentagon Force Protection Agency (Feb 21, 2003), https://perma.cc/W3CY-87UD.

13

can credibly be called an immediate threat to national security.  As Justice Black

warned in the Pentagon Papers case,

> The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic."

*New York Times v. United States,* 403 U.S. 713, 719 (1971) (Black, J., concurring).

## II.    THE PUBLIC INTEREST WEIGHS HEAVILY AGAINST A STAY

The true irreparable harm in this case would be to the public, should the Court

grant the Department's emergency motion. The injunction serves a substantial public

interest in promoting the flow of timely, accurate, and comprehensive information

about military activity at a time when our military is engaged in combat operations

in multiple arenas around the world.  The requested stay, in contrast, would extend

an extraordinary rupture in the press access to the Pentagon that had well-served the

overlapping interests of the public, the press, and the military for more than eighty

years.[25]

---

[25] *See, e.g.*, Sims, *supra* note 7, at 4 (explaining that the Pentagon hosted an established press corps by the end of World War II); Goodale, *supra* note 10 (recounting the legal fight over the Pentagon Papers from the perspective of The New York Times's legal team); Goldberg et al., *supra* note 11, at 145, 169–70, 204, (describing reporters' return to the Pentagon within hours of the terrorist attack on September 11, 2001).

14

Since the Pentagon first opened its doors, credentialed reporters have gathered news from inside the building to advance the public's right to know what the military is doing.  As the district court found,

> Having a consistent presence at the Pentagon has enabled and enhanced the ability of the plaintiffs and other journalists to report on the Department and its leadership during some of the most consequential moments in American history. *Id.* at 1-2 (¶ 3). For The Times, having journalists with access to the Pentagon has enhanced the depth, detail, quality, and accuracy of its coverage of the Department, the U.S. military, and national security issues. *Id*. at 5 (¶ 29).

March 20 Opinion at 3 (citations omitted). Press access has also furthered the Department's own interests in ensuring reliable channels for swift communication, correcting misinformation, and sustaining informed public support.[26] .

The unconstrained freedom to work within the Pentagon has reassured the public of the independence and reliability of reports from the Pentagon press corps and provided the transparency needed to maintain the public's confidence. Accurate reporting is significantly advanced by the daily contact, relationships of trust, and familiar understanding of how the Department functions that come from working in the Pentagon complex. *See* PPA Amicus Brief, Dkt. 15–1 at 9-11, 26.[27]   Trusted

---

[26] *See* PPA Amicus Brief at 3-8; Vogel, *supra* note 2, at 278–79.

[27] *See also* Starr, *supra* note 8; Tom Bowman, *Opinion, Why I'm Handing in My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://perma.cc/N8SG-JQH3.

reporter access can also rapidly dispel damaging public misinformation in fast-moving national security environments. *Id.* at 11-12. Relationships with Pentagon officials, employees, and servicemembers—built through frequent contact and professional trust—atrophy quickly.

Granting a stay would substantially harm the public interest by prolonging an extraordinary deviation from the otherwise uninterrupted history of press access to the Pentagon that has served our nation well.

## CONCLUSION

For all the foregoing reasons, *Amicus* Pentagon Press Association respectfully urges this Court to deny Defendants' request for a stay pending appeal.

Dated: April 17, 2026

Respectfully submitted,

/s/ *David A. Schulz*
David A. Schulz (#459197)
JOHN LANGFORD
MEDIA FREEDOM & INFORMATION
   ACCESS CLINIC
YALE LAW SCHOOL[28]
127 Wall Street
New Haven, CT 06520
(212) 850-6103
david.schulz@yale.edu

*Counsel for Amicus Curiae Pentagon Press Association*

---

[28] Yale Law School students Rick Da ('26), Stephanie Lai ('28), Taylor Maas ('27), and Tony Sjodin ('28) contributed significantly to the drafting, editing, and preparation of this brief. The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

16

## CERTIFICATE OF COMPLIANCE

This brief contains 3,614 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This brief complies with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

April 17, 2026

/s/ *David A. Schulz*
David A. Schulz

**CERTIFICATE OF SERVICE**

I certify that on April 17, 2026, I electronically filed the foregoing Notice with the United States Court of Appeals for the District of Columbia Circuit, using the appellate CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Date: April 17, 2026

/s/ *David A. Schulz*
David A. Schulz