**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5113**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF DEFENSE, et al.,

Defendants-Appellants.

—————————————

On Appeal from Final Judgment of the
United States District Court for the District of Columbia
Case No. 25-cv-4218 (Judge Friedman)

—————————————

**BRIEF FOR APPELLANTS**

—————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JACK STARCHER
  *Attorneys*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiffs-appellees are the New York Times Company and Julian E. Barnes.  Defendants-appellants are the United States Department of Defense (also known as the Department of War); Pete Hegseth in his official capacity as Secretary of Defense; and Sean Parnell, in his official capacity as Chief Pentagon Spokesman.

The State of New York, the Pentagon Press Association, the Reporters Committee for Freedom of the Press and 23 other Media Organizations, the American Civil Liberties Union of the District of Columbia, and the American Civil Liberties Union filed amicus briefs in district court.  The Pentagon Press Association filed an amicus brief in support of plaintiffs-appellees at the stay motion stage in this Court and have filed a notice of intention to file an amicus brief at the merits stage as well.  There have been no intervenors.

### B.    Rulings Under Review

The rulings under review are an opinion and order (Dkts. 34, 35) that the district court (Judge Paul L. Friedman) issued on March 20, 2026,

granting plaintiffs' motion for summary judgment, and a subsequent opinion and order granting plaintiffs' motion to compel compliance with the district court's March 20 order (Dkts. 54, 55).  The district court's summary judgment opinion is published at 824 F. Supp. 3d 27.  The district court's compliance opinion is published at 830 F. Supp. 3d 1.

### C.    Related Cases

This case has not otherwise previously been before this Court.  There is one pending related case in this Circuit: *New York Times v. U.S. Department of Defense*, No. 26-5253 (D.C. Cir. filed July 6, 2026).

*/s/ Jack Starcher*
Jack Starcher

ii

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ......................................................................... 5

STATEMENT OF THE ISSUES .............................................................................. 5

STATEMENT ........................................................................................................6

A. DEPARTMENT'S PRESS CREDENTIALS POLICY ............................. 6

B. SUMMARY JUDGMENT DECISION .................................................... 10

C. MARCH POLICY .................................................................................. 12

D. APPEAL ................................................................................................ 16

E. SUBSEQUENT LAWSUIT .................................................................... 16

SUMMARY OF ARGUMENT ...................................................................... 17

STANDARD OF REVIEW ........................................................................... 21

ARGUMENT ........................................................................................21

I. The Physical Access Restrictions Do Not Violate the District Court's Summary Judgment Order .................................................................... 21

A. The District Court's Summary Judgment Order Did Not Address Physical Access Restrictions ........................................ 22

B. The District Court Gave No Other Valid Justification for Enjoining the Physical Access Restrictions ................................. 30

II. The March Policy's New Credentialing Provisions Did Not Violate the District Court's Summary Judgment Order ................................... 34

    A. The District Court's Summary Judgment Order Did Not Bar the Department from Instituting a Revised Policy ........................... 35

    B. The District Court Erred in Assessing Whether the March Policy Is Otherwise Constitutional ............................................... 49

CONCLUSION ............................................................................................ 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ...................................................... 3, 31

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ...................................................................... 30

*Cablevision Sys. Corp. v. FCC*,
649 F.3d 695 (D.C. Cir. 2011) ....................................................... 53

*Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) ....................................................... 29

*Chemical Mfrs. Ass'n v. Department of Transp.*,
105 F.3d 702 (D.C. Cir. 1997) .................................................... 52-53

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .......................................................... 31, 32, 34

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................................................................... 27

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) ...................................................................... 33

*Haig v. Agee*,
453 U.S. 280 (1981) ...................................................................... 51

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ....................................................... 36

*Heartland Reg's Med. Ctr. v. Leavitt*,
415 F.3d 24 (D.C. Cir. 2005) ......................................................... 36

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ....................................................................... 34

*International Ladies' Garment Workers' Union v. Donovan,*
722 F.2d 795 (D.C. Cir. 1983) ................................................................ 47

*International Ladies' Garment Workers' Union v. Donovan,*
733 F.2d 920 (D.C. Cir. 1984) ...................................................... 46, 47, 48

*International Ladies' Garment Workers' Union v. Donovan,*
No. 81-2606, 1984 WL 3160 (D.D.C. Apr. 11, 1984) .................................... 47

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64 (1967) .............................................................. 24, 25

*Minnesota Voters All. v. Mansky,*
585 U.S. 1 (2018) .................................................................................. 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983) ................................................................................ 34

*NAACP v. Donovan,*
737 F.2d 67 (D.C. Cir. 1984) ........................................ 2, 18, 19, 27-28, 36, 48

*Nix v. Billington,*
448 F.3d 411 (D.C. Cir. 2006) ................................................................ 21

*Schmidt v. Lessard,*
414 U.S. 473 (1974) .............................................................................. 24

*Trump v. Hawaii,*
585 U.S. 667 (2018) .............................................................................. 59

*United States v. Armstead,*
116 F.4th 519 (D.C. Cir. 2024) .............................................................. 21

*United States v. Hansen,*
599 U.S. 762 (2023) .............................................................................. 51

*United States v. Morison,*
844 F.2d 1057 (4th Cir. 1988) ................................................................ 51

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,*
  453 U.S. 114 (1981) ............................................................................ 31

**Statutes:**

10 U.S.C. § 2674(a) ............................................................................ 6

10 U.S.C. § 2674(b)(1) ....................................................................... 6

10 U.S.C. § 2674(c)(1) ....................................................................... 6

28 U.S.C. § 1291 ................................................................................ 5

28 U.S.C. § 1331 ................................................................................ 5

**Regulations:**

32 C.F.R. § 234.3(a) ........................................................................... 6

32 C.F.R. § 234.3(d) ........................................................................... 6

32 C.F.R. § 234.4(a) ........................................................................... 6

**Rules:**

Fed. R. Civ. P. 65(d)(1) ..................................................................... 38

Fed. R. Civ. P. 65(d)(1)(B)-(C) ........................................................ 24

## GLOSSARY

| | |
|---|---|
| CNSI | Classified National Security Information |
| CUI | Controlled Unclassified Information |
| Department | The Department of Defense, also known as the Department of War |
| PFAC | Pentagon Facility Alternate Credential |

**INTRODUCTION**

Plaintiffs challenged certain provisions contained in an October 2025 policy issued by the Department of War to ensure that reporters with Department-issued press credentials do not pose security risks.  Those provisions, in sum, required reporters who receive credentials to acknowledge that they could not improperly solicit classified information or other information that could not lawfully be disclosed.  In March 2026, the district court granted plaintiffs' motion for summary judgment, concluding that the provisions of the policy relating to "security or safety risks" were so vague and standardless as to violate the Fifth and First Amendments, and concluding that the policy's approach to such security and safety risks rendered it viewpoint discriminatory in violation of the First Amendment.  The court thus enjoined the challenged provisions of the October policy and directed the Department to reinstate plaintiffs' press credentials.  The Department complied with that order and reinstated plaintiffs' credentials.

Given the important security interests that animated its October policy—security interests that the district court did not dispute or question in granting plaintiffs' motion for summary judgment—the Department

issued a revised policy in March 2026. To address the concerns the court identified, the Department substantially revised the provisions governing the issuance and revocation of credentials. Separately, based on the Department's observation that leaks of classified or other highly sensitive nonpublic information had fallen in the months the October policy was in effect while many journalists reported exclusively from outside of the Pentagon, the Department adopted a new policy requiring that *all* reporters, regardless of what publication they work for or the nature of their reporting, be escorted by a member of the Pentagon's public affairs team when on Pentagon grounds for certain enumerated purposes.

The district court enjoined both the new escort policy and the revised credential policy in the guise of "enforcing" its earlier summary-judgment order. That was error in multiple respects. Plaintiffs here challenged provisions of the October policy. As this Court recognized in granting a partial stay pending appeal, it is well-settled that "an agency may respond to an adverse ruling by adopting a revised policy, and it 'need not seek modification of [an] injunction before it initiates' those efforts." Order 4 (Apr. 27, 2026) (alteration in original) (quoting *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984)). The Department developed its new policies in

2

furtherance of doubtless legitimate objectives:  to ensure that the Pentagon is secure and that especially sensitive information is protected.  The Department is not disabled from pursuing those legitimate objectives simply because the district court believed the Department's first effort at doing so was unlawful in some respect, and the court could not properly treat its original summary judgment order as addressing the legality of new and different policies the Department had not yet promulgated.

That error was particularly egregious with respect to the Department's new escort requirement and physical access restrictions. Those restrictions were not part of the October Policy at all, so the district court's summary-judgment order did not—and could not—consider the new restrictions or anything like them.  And that requirement plainly comports with the First Amendment.  "[G]overnment office building[s]" are quintessential "nonpublic forums," and access to such buildings "can be restricted as long as the restrictions are viewpoint neutral and reasonable."  *Ateba v. Leavitt*, 133 F.4th 114, 122-23 (D.C. Cir. 2025) (quotation omitted).  That rule is particularly applicable to the Pentagon— the headquarters of a Department that, by its nature, deals with highly

sensitive materials on a daily basis that relate to the Nation's defense and national security.

The district court also erred in concluding that its earlier order prevented the Department from issuing a revised credentialing policy. Nothing in the court's order prevented—or could have prevented—the Department from revising its policies to address the court's concerns. The revised provisions respond to those concerns by providing greater specificity about the circumstances under which a credential may be denied or revoked, including specific safe harbors for legitimate journalistic activities and language making clear that decisions about denial or revocation will be made solely on the basis of neutral criteria that are not viewpoint discriminatory.

To the extent plaintiffs believe that the new escort policy or the new credentialing policy are unlawful, they could challenge those policies through a new suit. Indeed, after this Court stayed the district court's enforcement order here as applied to the escort policy, plaintiffs did exactly that, and this Court has subsequently stayed a new preliminary injunction issued by the same court after concluding that the policy is likely lawful. *See* Order, *New York Times Co. v. U.S. Dept. of Def.*, No. 26-5253 (D.C. Cir.

July 16, 2026) (per curiam).  But the district court erred in treating its prior judgment as determining the legality of policies the Department had not yet announced — or worse, as indefinitely freezing in place the media credentialing and access policies that were in place before October 2025.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  On March 20, 2026, the district court granted summary judgment to plaintiffs.  JA200-203, JA204-243.  On April 9, the district court filed a subsequent opinion and order granting plaintiffs' motion to compel compliance with the district court's March 20 order.  JA320-342, JA343-362.  Defendants filed a timely notice of appeal on April 10.  JA363-364.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in concluding that the Department's new physical access restrictions violated the court's earlier summary judgment order even though that order did not contemplate or address any such restrictions and the restrictions are independently lawful.

2.     Whether the district court erred in concluding that certain provisions in the Department's revised policy violated the court's summary judgment order or were independently unlawful.

## STATEMENT

### A.     Department's Press Credentials Policy

The Secretary of War has jurisdiction, custody, and control over the Pentagon.  10 U.S.C. § 2674(a).  As part of these duties, the Secretary is required to protect its buildings, grounds, and property.  *Id.* § 2674(b)(1). The Secretary is empowered to prescribe rules and regulations to ensure the safe, efficient, and secure operation of the Pentagon.  *Id.* § 2674(c)(1).

Pursuant to this authority, the Secretary has long restricted access to the Pentagon in order to ensure "the orderly and secure conduct of Department" business.  32 C.F.R. § 234.3(a).  For example, only employees and authorized persons can enter the Pentagon.  *Id.*  Others who wish to enter require an invitation or the consent of authorized personnel.  *Id.* § 234.4(a).  And in order to conduct activities within the Pentagon an individual must file an application, which is provided by the Department and must be submitted in the manner specified by the Department.  *Id.* § 234.3(d).  Failure to abide by the conditions of any permit that allows

special access to the Pentagon may result in loss of that access.  *See* JA170-171.

As part of that general process for managing access to the Pentagon, the Department has instituted a credentialing program for members of the press who wish to access the Pentagon for journalistic purposes.  The program includes various provisions to ensure that press access does not undermine the Department's highest priority—national defense and national security.  Members of the press who participate in the program are issued a Pentagon Facility Alternate Credential (PFAC), which provides access privileges.

In May 2025, the Department issued a memorandum to update physical control measures for press and media access within the Pentagon. JA170-171.  The memorandum affirmed that the highest priority of the Department is the defense of the Nation and national security.  JA170-171. In particular, the memorandum explained that the protection of Classified National Security Information (CNSI) and Controlled Unclassified Information (CUI) is an imperative for the Department.  JA170-171.  In furtherance of those priorities, the memorandum then laid out updated security measures for press aimed at reducing the opportunities for

inadvertent and unauthorized disclosures of protected information.  JA170-171.

In September 2025, the Department implemented the new policy by issuing an initial "Implementation of New Media In-Brief" to all media members who are issued a PFAC.  JA146-164.  As particularly relevant here, the in-brief explained that PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to Department personnel or property.  JA151.  An appendix to the in-brief described that policy in more detail, explaining that a person will be presumed to present a security risk if they have been convicted of an offense involving fraud, deceit, espionage, or other enumerated categories.  JA158.  It also explained that actions other than convictions, such as attempts to improperly obtain CNSI or CUI, or being found in physical possession of such information without reporting it to appropriate officials, may be deemed a security or safety risk.  JA158.

After members of the press expressed concerns with some aspects of that new policy, the Department engaged with the press to hear and respond to their concerns.  In late September, the Department paused

8

implementation of the new policy to allow itself time to clarify certain aspects of the revised policy.

In October 2025, the Department issued an updated policy (the October Policy) meant to clarify the PFAC policies and respond to the concerns raised.  JA125-145.  The October Policy explained that the Department has a duty to safeguard sensitive, non-public information.  The Policy thus provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property" and that "[s]uch an initial determination may result in an immediate suspension of [a journalist's] Pentagon access."  JA136.  That determination could be "based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" CNSI or CUI.  JA136.  Any determination under the Policy, it explained, would be "undertaken on a case-by-case basis reviewing the totality of the circumstances."  JA137.

The October Policy clarified that it does not prohibit members of the press from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories. JA136.  But the Policy stated that the solicitation, receipt, or disclosure of classified

9

information or CUI may lead to a determination that a media member poses a safety or security risk.  JA136.

PFAC holders were required to read and sign the updated in-brief form that outlined the new information security requirements and the Department's expectations of their compliance with safety and security requirements.  *See* JA138.  Failure to sign the acknowledgement would result in the non-issuance of new credentials under the October Policy. Plaintiffs, along with some other credential holders, declined to sign the updated in-brief and relinquished their prior credentials.

### B.    Summary Judgment Decision

Plaintiffs filed this lawsuit in December 2025 seeking an injunction against various provisions of the October Policy, arguing that provisions concerning the denial, revocation, or non-renewal of PFACs violated the First Amendment and were unconstitutionally vague under the Fifth Amendment.  *See* JA11-51.  Plaintiffs also sought reinstatement of PFACs that they held before the Department implemented the new policy but refused to renew because of fears about the implementation of the new policy and reluctance to sign onto its terms.  *See* JA50.  Plaintiffs did not move for a preliminary injunction.

The case proceeded to summary judgment, and on March 20, 2026, the district court granted plaintiffs summary judgment.  JA200-203.  The court held that the challenged provisions violate both the First and Fifth Amendments.  As to the Fifth Amendment, the court concluded that plaintiffs had a protected liberty interest in their PFACs and that the terms of the new policy rendered it unconstitutionally vague.  JA219-228.  In particular, the court concluded that the October Policy's provisions allowing the Department to take adverse action based on "security or safety risk[s]" were too broad and vague to provide reporters notice of what conduct might be prohibited.  JA221-224.  The court expressed special concern that the Policy's provisions were broad enough to encompass lawful journalistic activities like simply asking questions to Department employees.  JA224-226.  Finally, the court concluded that those concerns were exacerbated because the provisions granted Department officials "unbridled enforcement discretion" by failing to provide "objective and clear standards" for determining whether to deny or revoke a PFAC. JA226-227 (quotation omitted).

As to the First Amendment, the district court concluded based on public statements made about the media by members of the Department's

11

leadership that the October Policy imposed viewpoint-discriminatory restrictions on access to the Pentagon, a non-public forum. JA229-232. The court also held that the Policy was unreasonable because it provided Department officials with "unbridled discretion to suppress expression." JA234-236. The court again relied on its conclusion that the standard provided by the Policy—whether a journalist poses a "security or safety risk"—is vague and "provides no meaningful limitations" on the Policy's reach. JA236 (quotation omitted). The court also noted that, even where that vague standard is met, the Policy gave officials further discretion to revoke or not revoke credentials on a case-by-case basis with no concrete limitations. JA236-238. The court therefore vacated the challenged provisions of the PFAC policy, enjoined enforcement of those provisions against plaintiffs, and ordered the Department to reinstate plaintiffs' PFACs. JA200-203.

## C.    March Policy

The Department complied with the summary judgment order by reinstating PFACs for each of the seven journalists named in the district court's order and rescinding the challenged provisions. On March 23, 2026, the Department issued a new policy (the March Policy) that made

12

numerous changes in response to the concerns the court had identified. JA244-262.

In response to the district court's concern that references to "security or safety risks" were too vague and indefinite, the March Policy removes the entire section addressing "security risks" and all references to taking adverse action based on "security and safety" risks.  Instead, the Policy includes new provisions explicitly delineating the grounds on which a PFAC will be denied or revoked.  *See* JA257-262.  The Policy adds a list of six safe harbors that shield journalists from any penalties for routine newsgathering activities, including unknowingly asking for information that a specific Department employee is legally forbidden to disclose, thereby addressing the court's concern that the October Policy could prohibit First Amendment protected activity.  JA258.  And the March Policy explicitly reaffirms that "[n]o PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism," JA257, thereby addressing the court's viewpoint discrimination concerns.

In addition to changing the credentialing provisions that the district court had vacated, the March Policy made new changes to the Pentagon's

13

physical access policies that restrict the ability of PFAC holders to access the Pentagon unescorted (collectively, the escort policy). *See* JA250. Whereas PFAC holders had previously been allowed unescorted access to the Pentagon, the Department concluded that unescorted access had contributed to the disclosure of classified information and CUI. *See* JA246, JA366-368. The Policy therefore requires PFAC holders to be escorted when accessing the Pentagon building. JA250. The Policy also allows PFAC holders escorted access the Pentagon only for enumerated journalistic purposes, like press conferences, interviews, meetings, or press events. JA250. Finally, the Policy creates procedures for how escorts can be secured in advance, and limits the number of members from the same media outlet that can simultaneously receive escorts to reduce the burden on Department staff. JA251-252. The memorandum accompanying the new escort policy makes clear that PFAC holders will still be able to access the Pentagon for legitimate journalistic purposes such as "scheduled press briefings, press conferences, and interviews arranged through public affairs offices," so long as they are "escort[ed] by authorized [Department] personnel" while inside the Pentagon. JA246.

On March 24, 2026, plaintiffs moved to compel compliance with the district court's summary judgment order, challenging both the revised credentialing provisions and the new escort policy.  On April 9, the court granted plaintiffs' motion, asserting "inherent" authority to enforce the "unambiguous mandate" of its earlier judgment.  JA349 (quotation omitted).  The court concluded that the new escort policy, including the new provision restricting physical access for certain enumerated purposes, violated the court's order to reinstate PFACs to seven named journalists.  The court focused on the timing of the new escort policy and reasoned that, because the new policy was in part a response to the court's order, it was necessarily taken to frustrate or "negate the impact of" the court's order.  JA359-360.

The district court also suggested that its earlier order to reinstate plaintiffs' PFACs had implicitly required the Department both to reinstate those credentials *and* to refrain from changing or reducing any of the privileges that PFACs previously provided.  *See* JA357-359.  The court therefore declared that the escort policy violated the court's earlier order and enjoined the Department from enforcing its restrictions on PFAC

15

holders' access to the Pentagon against plaintiffs, including any journalists associated with the New York Times.

As for the new credentialing policies, the district court again focused on the fact that the Department issued the new policies in response to its earlier order. JA354. It also held that, by vacating the October Policy's credentialing provisions, the court's order prohibited the Department from revising its policies to redress the defects the court had identified. JA353. Finally, the court concluded that the new features of the March Policy's credentialing policies—the removal of discretion, the scienter requirement, and the safe harbors—were independently unlawful because they could still potentially be deployed to punish lawful journalistic practices. JA354-356.

### D.    Appeal

On April 10, the Department appealed the district court's summary judgment order and order compelling compliance. JA363. The Department sought a partial stay pending appeal from this Court focused on the district court's injunction of the physical access restrictions. This Court granted the motion, holding that the Department was likely to

succeed on appeal as to the new requirement that PFAC holders access the Pentagon only with an escort. Stay Order.

### E.    Subsequent Lawsuit

On May 18, 2026, plaintiffs filed a new lawsuit challenging the March Policy. *See New York Times Co. v. Department of Def.*, No. 26-cv-1690 (D.D.C.). Plaintiffs designated it as related to its earlier challenge to the October Policy, and it was assigned to the same district court judge. Plaintiffs quickly moved for a preliminary injunction against the aspects of the March Policy this Court's stay order allowed to go into effect. The district court granted that motion, holding that plaintiffs were likely to succeed in their challenge to the escort requirement because it reflects unconstitutional retaliation against plaintiffs. The Department appealed and sought a stay of that injunction, which this Court granted. *See* Order, *New York Times Co. v. U.S. Dept. of Def.*, No. 26-5253 (D.C. Cir. July 7, 2026) (per curiam). Briefing is ongoing in that appeal.

### SUMMARY OF ARGUMENT

The district court's summary judgment order concluded that certain challenged provisions of the Department's October Policy governing media access were unlawful, vacated and enjoined those provisions, and ordered

17

the Department to reinstate the PFACs of seven named journalists.  JA200-203.  The Department fully complied with those commands.  The Department then issued a new policy—the March Policy—that included an entirely new escort policy and rewrote the credentialing provisions of the October Policy to address the court's concerns.  That course was entirely appropriate; as the stay panel concluded in granting the government's motion for a partial stay pending appeal, it is "settled law" that "an agency may respond to an adverse ruling by adopting a revised policy, and it 'need not seek modification of [an] injunction before it initiates' those efforts."  Stay Order 4 (alteration in original) (quoting *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984)).  The court thus erred in enjoining the new escort policy and credentialing policy in the guise of "enforcing" its prior judgment.

I.     The district court erred in concluding that its earlier order prevented the Department from issuing the escort policy.  Nothing in the court's summary judgment order addressed physical access to the Pentagon at all, nor did the order somehow implicitly prevent the Department from making future changes to the rights and privileges that PFAC holders enjoy.  The October Policy did not contain the escort policy,

18

so neither the court's summary judgment order nor its opinion addressed anything like the new physical access restrictions reflected in the March Policy. And even aside from that fundamental error, the court did not suggest that the escort policy was independently unlawful for any reason. Nor could it have concluded that a generally applicable, viewpoint-neutral restriction on access to the Pentagon was unconstitutional.

II.    The district court similarly erred in concluding that the March Policy's new credentialing provisions somehow violated its earlier order.

A.    The district court was wrong to claim that its summary judgment order "expressly forbade" the Department from issuing a revised policy. JA353; *see also* JA357 (referring to this as its "explicit mandate"). The court's summary judgment order did no such thing, and could not have done so consistent with settled law: "an agency may respond to an adverse ruling by adopting a revised policy, and it 'need not seek modification of [an] injunction before it initiates' those efforts." Stay Order 4 (alteration in original) (quoting *NAACP*, 737 F.2d at 72).

Those principles are dispositive. The March Policy is a new policy that made substantial and directly responsive changes to redress the defects identified in the district court's summary judgment order. As

19

understood by the court, the enjoined provisions of the October Policy prohibited "solicitation," relied on general concerns about security, had no scienter requirement to limit its scope, and included no safe harbors for journalistic activity. JA136-137. Instead of forbidding "solicitation," the March Policy prohibits the intentional inducement of unauthorized disclosure, and includes a "knowing" scienter requirement, such that a journalist is only at risk if he seeks out classified or controlled information that he *knows* the specific Department employee at issue is *legally forbidden* to disclose. JA245, JA257-258. The March Policy includes broad safe harbors that ensure it will not reach or chill lawful journalistic activities. JA258. And the Policy specifies that no PFAC determination "shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism." JA257. Those material changes directly redress each of the concerns the court identified in its summary judgment decision.

B.    Those changes at a minimum suffice to demonstrate that the March Policy was a new policy that would be subject to challenge, if at all, only through a new suit. The district court was not entitled to conduct an independent review of entirely new provisions and requirements in the

20

guise of "enforcing" its prior order. Just as the stay panel concluded with respect to the escort policy, features that were not "contemplated by the challenged 2025 policy" were necessarily not addressed by the court's earlier summary judgment opinion and order. Stay Order 4. And even if the court were allowed to consider new legal challenges to new provisions in the context of a motion to enforce its earlier order, the new provisions are lawful.

## STANDARD OF REVIEW

A "district court's interpretation and enforcement of its own orders is typically subject to review only for abuse of discretion." *Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006). A court abuses its discretion if it "act[s] unreasonably or ma[kes] a legal error." *United States v. Armstead*, 116 F.4th 519, 523 (D.C. Cir. 2024).

## ARGUMENT

I.    **The Physical Access Restrictions Do Not Violate the District Court's Summary Judgment Order.**

The district court's order enjoining the Department's new physical access policy as a matter of "compliance" with its earlier order is deeply flawed. Most fundamentally, the court was not entitled to enjoin a lawful

policy solely because, in the court's judgment, the policy was implemented in part as a response to its earlier order. The earlier order had nothing to do with physical access restrictions, and neither of the legal bases for that summary judgment order has any bearing on the post-judgment escort policy, which provides that PFAC holders may not access the Pentagon unescorted. There is nothing unconstitutionally vague about this clear, blanket policy. Plaintiffs have no First Amendment right to unescorted access to a secure federal office building, and the new restrictions are viewpoint-neutral and reasonable in any event.

### A.    The District Court's Summary Judgment Order Did Not Address Physical Access Restrictions.

1.    The district court was wrong to conclude that the new physical access restrictions—including the escort requirement, escort procedures, and the enumerated purposes for which a PFAC holder can obtain an escort (collectively, the escort policy)—were precluded by the court's earlier summary judgment order.

First, and most fundamentally, the summary judgment order did not adjudicate the lawfulness of the escort policy because that policy did not yet exist. As the stay panel observed, "[t]he escort requirement was not

contemplated by the challenged 2025 policy." Stay Order 4. Thus, "the district court's March 20 summary judgment opinion and order did not address that provision or a similar one." *Id.*

Nor did the order expressly or implicitly bar the Department from adopting such a policy. The order says nothing about an escort policy, nor does it contain any language suggesting that the Department was prohibited from altering the kind of access it gives to all PFAC holders. Aside from enjoining provisions of the October Policy related to credentialing—which make no mention of any escort requirement—the order requires that the Department reinstate the PFACs of the enumerated journalists, and the undisputed record reflects that all seven of the reporters listed in the order had their PFACs reinstated within days. JA202. By "immediately reinstat[ing]" those PFACs, JA202, the Department fully complied with that aspect of the district court's order.

It should be no surprise to plaintiffs that the injunction they received did not contain additional language prohibiting the Department from changing its press policies or altering the bundle of privileges enjoyed by PFAC holders as of October 2025: Plaintiffs did not ask for any such injunctive relief in their complaint, JA50, or in the proposed order they

23

asked the district court to enter.  Indeed, plaintiffs litigated this case on the assumption that the reinstated PFACs would be subject to different rules than the PFACs plaintiffs held before the October Policy issued.  That is because plaintiffs never asked for an injunction against the October Policy in its entirety.  They sought only to enjoin certain enumerated provisions of that policy, thereby leaving the remainder in effect.  *See, e.g.*, JA50 (requesting relief against "specified provisions").  The court's order was similarly limited, declaring unconstitutional and enjoining only specific sentences from the October Policy.  JA200-202.  It was therefore clear from the outset that plaintiffs' reinstated PFACs would be subject to a different policy than the one that existed before October 2025.

The absence of any provision in the text of the summary-judgment order that prohibits the escort policy is dispositive.  An injunction must "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(B), (C).  Those "are no mere technical requirements."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam).  "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be

24

understood." *Id.*; *see also International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (federal court must "frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid"). An injunction that lacks that clarity—or a compliance finding based on such an injunction— "cannot stand." *International Longshoremen's*, 389 U.S. at 76.

2.    Unable to identify anything in its summary judgment order that would prohibit the Department from adopting the escort policy, the district court instead suggested that its summary-judgment order had *implicitly* frozen the level of access afforded to PFAC holders at precisely the privileges that were granted before its order. In support of that conclusion, the court relied on the fact that its summary judgment *opinion* noted, in assessing plaintiffs' harms and entitlement to injunctive relief, that "the only way to remedy the injury from the loss of a press credential is to return the credential and the access that comes with it." JA357 (alterations omitted) (quoting JA240). Based on that reasoning, the court concluded that the new physical access restrictions violated the *spirit* of its earlier order, even if there was no conflict with any specific mandate or prohibition in its order. JA357-359.

25

As already explained, that is a non-starter: Errant reasoning in an opinion cannot amend or expand the clear mandate of a court's order. And this Court has — correctly — never accepted the view that parties can violate the "spirit" of an injunction even if the letter of the injunction was not violated. But in any event, the district court's assessment of the harms cannot be abstracted from the constitutional violations the court found. The harm that plaintiffs purportedly demonstrated in support of summary judgment was not the loss of their press credentials in the abstract, but the loss of those credentials *pursuant to* policies that the court found to be unconstitutional. *See* JA239-241. Those conclusions thus say nothing about a lawful future change to policy; even if such a change may inflict "harm," plaintiffs are not excused from the threshold requirement of showing that policy is unlawful before obtaining redress.

Relatedly, the district court's reading of the summary judgment order also bears no relation to the nature of the violations the court described in its summary judgment opinion. The court held that the challenged provisions in the October Policy were unconstitutionally vague and viewpoint discriminatory. But there is nothing vague — let alone unconstitutionally so — about the escort policy, which is a blanket policy

26

that requires all PFAC holders to abide by certain conditions when physically accessing the Pentagon.  And the escort policy does not differentiate based on viewpoint or content; it applies equally to all PFAC holders, regardless of the content of any past or future reporting.

3.    The district court's decision also focused on the fact that the Department adopted the physical access restrictions immediately after the court issued its summary judgment order.  JA357-358.  Based on that proximity in time to the court's summary judgment order, the court concluded that the measures must have been undertaken "to negate the impact" of the court's order, and that the measures therefore violated that order.  JA359.  That conclusion is wrong many times over.

There is nothing extraordinary about an agency of any kind issuing a new policy that attempts to achieve the agency's legitimate objectives in a lawful manner after an agency's first attempt has been held unlawful.  *See, e.g.*, *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (observing that an agency may generally "deal with the problem afresh by taking new agency action" (emphasis and quotation omitted)).  Indeed, "[i]t is both logical and precedented that an agency can engage in new rulemaking to correct a prior rule which a court has found defective"

27

and that an agency "need not seek modification of [an] injunction before it initiates new rulemaking to change the regulation."  *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984).  Here, the district court's order enjoined challenged provisions of the October Policy because, in its view, those provisions were impermissibly vague and viewpoint discriminatory.  *See* JA219-231.  Those objections could not possibly justify vacating or enjoining the Department's decision to issue a new escort policy that is both clear and viewpoint-neutral.  *See supra* pp. 13-14.

The district court's reliance on the fact that the new escort policy was issued in furtherance of the same kind of security concerns that animated the PFAC policies, *see* JA357-359, is equally misguided.  It does not matter that, at some level, the escort policy was designed to accomplish the same goal as the enjoined provisions—ensuring the security of the Pentagon and the protection of sensitive information.  Those objectives are plainly legitimate ones, and nothing in the court's order or opinion contested that the Department has a duty to ensure the security of the Pentagon or suggested that the Department could not pursue its security interests through alternative means that are clear and viewpoint neutral.

And as explained in the Department's declarations, the new escort policy was adopted in response to concerns about the frequency with which highly sensitive information, including highly classified national defense information, was reaching journalists.  JA366.  The Department concluded that regular, unauthorized dissemination of sensitive information "posed serious risks to national security."  JA368-369.  And the reinstatement of "unescorted access to the Pentagon for PFAC holders" will, in the Department's judgment, "almost certainly" result in resumption of the patterns of conduct that the Department believes to have contributed to that problem.  JA369.  As this Court recognized in granting the Department's motion for a stay, those declarations "support[] [the Department's] claim that this aspect of its policy furthers important national security interests."  Stay Order 4.  And this Court will "not lightly override the Department's judgments on matters involving national security."  Order at 7, *Anthropic PBC v. Department of War*, No. 26-1049 (D.C. Cir. Apr. 8, 2026) (per curiam); *see also Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.").

29

**B.     The District Court Gave No Other Valid Justification for Enjoining the Physical Access Restrictions.**

The district court's decision to enjoin the escort policy is particularly inappropriate because the court did not conclude that the policy is unlawful on its own terms. As the stay panel observed, in "enforcing" its prior order, the court did not hold that the escort requirement independently violates the First or Fifth Amendment before issuing its order. Nor could it have. There has been, and could be, no suggestion that the escort policy is unclear or vague. And the press has no constitutional right of special access to government facilities beyond that afforded to the general public. The Supreme Court has made clear that reporters are entitled to no special access to information simply because they are members of the press. *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."). And by the same token, "the First Amendment does not guarantee access to property simply because it is owned or controlled by

the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981).[1]

When the government exercises its power to restrict use of its property to only specified business, the property is considered, at most, a nonpublic forum. *See, e.g.*, *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12 (2018). The government is "not required to open such spaces for any speech at all," but, if it does, access "'can be restricted as long as the restrictions are' viewpoint neutral and reasonable." *Ateba v. Leavitt*, 133 F.4th 114, 122-23 (D.C. Cir. 2025) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

To the extent the Pentagon is a forum for journalists at all, it indisputably is no more than a nonpublic forum. *See Ateba*, 133 F.4th at 121-22 (holding that the White House Press Area is a nonpublic forum— "government property that is not by tradition or designation a forum for public communication" (quotation omitted)). Even setting aside its special

---

[1] In issuing a preliminary injunction in plaintiffs' subsequent action challenging the March Policy, the district court did not hold otherwise. Instead, its preliminary injunction order rested on a distinct retaliation theory that the court never addressed in this case. *See* Order, *New York Times Co. v. U.S. Dept. of Def.*, No. 26-5253 (D.C. Cir. July 7, 2026) (per curiam).

status as a military installation, the Pentagon is a federal office building. "The federal workplace, like any place of employment, exists to accomplish the business of the employer," and the government therefore "has [a] right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees." *Cornelius*, 473 U.S. at 805-06.

The escort policy is "viewpoint neutral." *Cornelius*, 473 U.S. at 806. On its face, it applies equally to all PFAC holders, regardless of the viewpoint (or even content) of their reporting. Nor have plaintiffs contended that the policy has been applied in a viewpoint-discriminatory manner. The escort policy is also "reasonable in light of the purpose served by the forum." *Id.* The Pentagon is the headquarters of the Department, which is responsible for the Nation's defense and security. Many of its employees have access to classified or controlled information related to military operations and national security—information that may not lawfully be disclosed without authorization. JA251. It is entirely sensible to restrict civilian access, including press access, when their presence may undermine the Department's military and security functions.

Further, the policy does not eliminate all press access; it allows reporters to enter the Pentagon for press briefings, interviews, and the like—Department business where journalists are appropriately present—so long as they are escorted.  Just as it is obviously reasonable for courts to prohibit journalists from entering judicial chambers unescorted, for fear that the press might induce leaks by law clerks, observe papers left astray, or notice patterns that could give clues regarding case assignments, the Department reasonably restricted journalists' unescorted access to our Nation's military headquarters.  *See* JA366-369.

Nor does the Department's past practice of permitting journalists unescorted access to the Pentagon somehow tie the Department's hands on the question.  The Department concluded that there was a troubling amount of unauthorized disclosure under that past practice, and it determined—based in part on its experience with the October Policy—that requiring an escort would reduce such unauthorized disclosure.  *See* JA365-370.  The Supreme Court has admonished that courts should not second-guess such determinations, which rest on "[p]redictive judgment … by those with the necessary expertise in protecting classified information." *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988).  Rather, "when it comes

33

to collecting evidence and drawing factual inferences" in the national-security context, "conclusions must often be based on informed judgment rather than concrete evidence," and that "evaluation of the facts by the Executive … is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34-35 (2010). And despite the district court's suggestion that in its estimation, unescorted access for PFAC holders poses "no security or safety risk," JA358 (emphasis and quotation omitted), "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum," *Cornelius*, 473 U.S. at 810. The government is entitled to decide how much risk it is willing to tolerate, and a new administration is entitled to make new assessments of the relevant risks and benefits associated with a particular media-access policy. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part).

## II.    The March Policy's New Credentialing Provisions Did Not Violate the District Court's Summary Judgment Order.

In addition to enjoining the new escort policy, the district court also enjoined the revised credentialing policy in the March Policy. That policy spells out the circumstances under which a PFAC may be denied or

34

revoked, including when a reporter has engaged in the knowing inducement of an unlawful disclosure of highly sensitive information. In doing so, the court offered three rationales: (1) that its earlier summary judgment order "mandate[d]" that the Department "start afresh" and "expressly forbade" the Department from issuing a revised policy, JA353, JA356-57; (2) that, in any event, the March Policy was not a new policy, but instead "simply reinstate[d]" the exact provisions that the court had enjoined, JA350, JA354; and (3) that the new features that the March Policy adopted in response to the court's order were independently impermissible for reasons not addressed in the summary judgment order or opinion, JA354-356. None of those rationales withstands scrutiny.

### A. The District Court's Summary Judgment Order Did Not Bar the Department from Instituting a Revised Policy.

1. The Department was not enjoined from revising its policies setting forth the circumstances under which PFACs may be denied or revoked. As relevant to those revised polices, the district court's summary judgment order contains one injunction: the Department is "permanently ENJOINED from implementing or enforcing the Challenged Provisions of the Policy to deny, suspend, revoke, or not renew the PFAC" of plaintiffs

35

or those who are employed by plaintiffs. JA202. Neither the court's opinion nor the order speaks to the Department's ability to reissue press policies or revise its PFAC policies in ways that do not revive the challenged provisions. The Department was therefore not restricted from issuing a new policy.

Nor could the district court have properly restricted the Department from revising its policies in response to the court's summary judgment order. As discussed above, *supra* pp. 22-27, it is "settled law" that "an agency may respond to an adverse ruling by adopting a revised policy, and it 'need not seek modification of [an] injunction before it initiates' those efforts." Stay Order 4 (alteration in original) (quoting *Donovan*, 737 F.2d at 72); *see also Heartland Reg's Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005) ("[T]he usual rule is that, with or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand."); *Harmon v. Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989) (explaining that the agency "of course, remains free to promulgate new, narrower regulations, subject to the review of the district court"). That is exactly what the Department did here. The Department promptly withdrew and vacated the provisions the court enjoined and issued a

36

revised policy that made changes to address every concern the court identified in its summary judgment opinion. *See infra* pp. 39-44. That is not "circumv[ention]" or "evas[ion]," JA351-352—it is good-faith compliance. And that kind of post-judgment attempt to promulgate a new policy that would survive review should be particularly unsurprising where, as here, the court's order turned in significant part on its conclusion that the Department's earlier credential policies were unconstitutionally vague or potentially overbroad.

2.      In granting plaintiffs' motion to compel compliance, the district court claimed that its summary-judgment order enjoined the Department from adopting a revised policy to redress the defects identified in its summary judgment order. JA353, JA357. Thus, by issuing a new policy, the "Department has done precisely what this Court expressly forbade it from doing: it has endeavored to 'cure' the impermissible restrictions on a journalist seeking information not authorized for release by providing 'targeted clarifications.'" JA353.

Even assuming a court could issue an injunction barring an agency from trying to redress the deficiencies identified in an earlier order, *but see supra* pp. 35-36, the district court here did no such thing. Nothing in the

37

court's order prevented the Department from curing the deficiencies the court identified by issuing a new policy. Instead, just as it did in enjoining the physical access restrictions, the court relied on isolated *reasoning* contained in its summary judgment *opinion* to conclude that the Department had somehow run afoul of the spirit of its earlier decision.

In particular, the district court cited the portion of its summary judgment opinion considering whether remand without vacatur was an appropriate remedy. JA353 (citing JA241). In that context, the court declined to exercise its "discretion" to remand without vacatur because it thought the Department was unlikely to be able to easily cure the constitutional defects identified on remand. JA241. And it was based on that analysis that the court asserted that its summary judgment order "expressly forbade" the Department from issuing a revised policy. JA353.

As discussed above, that mode of analysis is inconsistent with black letter law about how injunctions work. *Supra* pp. 24-25. It is the court's order—and terms "specifically" and "in reasonable detail" describing "the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)—that controls. The court cited no support for the idea that isolated reasoning from a court's opinion can be treated like an "explicit mandate," JA357, contained

38

in the text of an injunctive order. By the same token, a motion to compel compliance with an order can only enforce what the order says, not some unwritten and inferred spirit. And the wisdom of that rule is particularly apparent here, where the court asserted that its prior reasoning—which rested in significant part on the asserted vagueness or imprecision of the challenged provisions of the October Policy—controlled as to the new and far more specific March Policy. As with the escort policy, a court cannot properly treat its resolution of challenges to one policy as dictating the outcome for—much less enjoining—a new policy that did not exist at the time of the first decision.

3. Those principles resolve this appeal. The March Policy contains new, meaningfully different provisions than the provisions of the October Policy that the district court enjoined. In particular, the Department made changes that are directly responsive to each of the defects that the district court identified in its summary judgment order. The court therefore erred in enjoining the credentialing provisions in the March Policy as a matter of compliance with its earlier judgment enjoining specific provisions of the October Policy.

39

a.    The district court held that the original policy "does not provide Department officials with the requisite 'objective and clear standards' for determining whether to deny, revoke, or suspend a journalist's PFAC, thereby permitting—and even encouraging—arbitrary and discriminatory enforcement."  JA227; *see also* JA236 (finding that original policy's "operative standard—whether a journalist poses a 'security or safety risk'—provides no meaningful limitations on Department officials").  In particular, the court concluded that the Department was "required to articulate a standard that is more specific and meaningful than mere considerations of 'security.'"  JA223.  The court therefore struck provisions of the October Policy stating that PFACs may be denied, revoked, or not renewed based on a determination that a person poses a security risk.

The March Policy does not reinstate any of the references to "security concerns" that the district court found unconstitutionally vague.  Instead, the Policy makes clear that there are only two grounds that can form the basis of an adverse PFAC decision:  (1) a conviction for certain enumerated offenses, which creates a "rebuttable presumption that the applicant or holder poses a security risk," and (2) engaging in conduct that would

40

constitute one of the enumerated offenses or intentionally inducing disclosure of sensitive information from a Department employee that the reporter knows the employee is not authorized to disclose, so long as substantial evidence supports the determination that such conduct occurred. JA259. The Policy is explicit that these are the "sole grounds" for an adverse determination and "[n]o PFAC shall be denied, revoked, or not renewed on grounds not enumerated in this section." JA259. The March Policy, unlike the October Policy, thus comprehensively identifies all conduct that could lead to an adverse determination.

Relatedly, the district court was concerned that the original policy allowed decisions to be made "on a case-by-case basis reviewing the totality of the circumstances" and will turn on "the unique facts and circumstances of each case." JA237 (quotation omitted). The court enjoined that language, and the March Policy accordingly omits that language.

b.    In granting summary judgment, the district court accepted that the Department could decide to deny or revoke a PFAC if it concludes that a journalist has engaged in the "intentional encouragement of an unlawful act." JA224 (quotation omitted). But the court held that the October Policy

41

did "not clearly distinguish between … impermissible solicitation and plainly lawful journalistic practices," JA225, and that the Policy therefore "provides no way for journalists to know how they may do their jobs without losing their credentials," JA228.  The court enjoined provisions of the Policy that, according to the court, could be read to suggest that protected newsgathering and reporting activity could lead to a reporter losing their PFAC.

The Department rewrote that entire section to address those concerns.  The provisions the district court found vague in original policy used the undefined term "solicitation," had no scienter requirement to limit their scope, and included no safe harbors for journalistic activity.  *See* JA130, JA136-138.  Instead of forbidding solicitation, the March Policy prohibits "intentional inducement of unauthorized disclosure" and includes a "knowingly" scienter requirement, such that a journalist is only at risk if he seeks out classified or controlled information that he *knows* the specific Department employee at issue is *legally forbidden* to disclose. JA257-258.  This mirrors the very language that the district court itself used to describe the difference between "lawful journalistic practices" and "impermissible solicitation" of unlawful acts.  *See* JA224-225 (describing

42

impermissible criminal solicitation as "the intentional encouragement of an unlawful act" (quotation omitted)).  And it addresses the court's concern that "a journalist would have no way of knowing what information has been authorized for release and what has not," JA225, because absent such knowledge, a journalist faces no penalty under the March Policy.

Further, the March Policy includes six safe harbors that, notwithstanding the general definition of "intentional inducement of unauthorized disclosure," will not form the basis for an adverse PFAC action.  JA258.  Each of the safe harbors is designed to address concerns in the Court's opinion: 1) asking questions of specific authorized Department employees regardless of subject matter; 2) receiving unsolicited information, including classified or controlled information; 3) publishing calls for tips or other appeals to the public at large; 4) developing source relationships through independent reporting; 5) communicating with Department personnel through official channels for public disclosure of information; and 6) asking questions of *any* Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.  JA258.

Together, these revisions ensure that under the March Policy, a PFAC will be revoked or denied only in narrow circumstances when a reporter engages in the intentional and knowing solicitation of information that a Department employee is legally forbidden to disclose to the public.

c.      The same changes address the district court's prior holding that the October Policy was viewpoint discriminatory, which the court based in part on its view that the Department did not reasonably respond to concerns that the "prohibition on 'solicitation' was unclear and the Acknowledgment required journalists to confirm their 'understanding' of the Policy's unclear provisions."  JA232.  As noted, the March Policy clarified the prohibition on solicitation in numerous ways.  The court also concluded that the October Policy was viewpoint discriminatory in both "true purpose and practical effect."  JA233.  The Department addressed that concern by including an explicit contrary directive in the March Policy that "[n]o PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism."  JA257.

44

4.      Notwithstanding these changes, the district court concluded that the Department had not in fact "taken 'new' action" by issuing the March Policy.  JA350.  That was error.

a.      The district court first relied on the fact the March Policy expressly noted that it was being issued in response to the court's summary judgment order and that it was intended to "clarif[y]" the aspects of the October Policy that the court had found unconstitutional.  JA350 (quotation omitted).  Based on the fact that the March Policy was issued in response to its earlier order, the court concluded that the Policy simply "reinstate[d]" the earlier policy that the court had found unlawful.  JA350.

The district court's temporal-proximity-based reasoning makes no sense.  Every time an agency is ordered to do something by a court, it must take prompt action in response to that order.  The fact that the new policy was issued after the court's summary judgment order and expressly in response thereto is evidence of run-of-the-mill compliance, not—as the court suggested—*ipso facto* evidence of disobedience or circumvention.

The district court alternatively focused on the fact that the March Policy clarifies and changes the provisions that the court enjoined in its summary judgment order, accusing the Department of "us[ing different]

45

words to do the same thing." JA352. The court focused on the fact that the Policy includes a cover memo explaining that the purpose of the Policy is to "correct the [district court]'s mischaracterization[s]" of the October Policy, and that—according to articles submitted by plaintiffs' in support of their compliance motion—a Department official had described the March Policy as "us[ing] more words to say the same thing and to foreclose creative misinterpretations." JA354 (third alteration in original) (quotation omitted). But the fact that the Policy amends and clarifies the provisions that the court enjoined is unsurprising, both as a basic matter of compliance and because—as discussed above, *supra* pp. 11-12, 39-44—the court repeatedly relied on supposed *ambiguities* in the earlier policy when it granted summary judgment in the first place. It is therefore no surprise that the March Policy more clearly says what was intended all along with respect to the enjoined provisions, because plaintiffs and the court construed the original policy as being broader than intended. In other words, the Policy says "the same thing" as the prior version *as the Department construed it*—but it says something very different than the prior policy *as the court construed it*. Again, that simply reflects good-faith compliance with the court's order and its opinion.

46

b.     The district court also relied (JA349-50, JA352) on this Court's decision in *International Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920 (D.C. Cir. 1984) (per curiam), for the proposition that an agency cannot, on remand, "simply reimplement[] precisely the same rule" that the court vacated. *Id.* at 923. But the *Garment Workers* only highlights the district court's error here.

In *Garment Workers*, this Court had vacated a final Department of Labor rule as arbitrary and capricious because the agency failed to consider alternatives and other important aspects of the question before the agency. *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815-28 (D.C. Cir. 1983). Labor asked this Court to stay its mandate pending a decision from the Solicitor General whether to seek certiorari. *Garment Workers'*, 733 F.2d at 921. This Court denied that motion, and the mandate issued. *Id.* One month later, Labor issued an emergency rule "temporarily" implementing exactly the same policy that this Court had vacated without engaging in notice and comment or addressing any of the defects this Court had identified in its decision. *See id.* In support of that emergency rule, Labor simply asserted that "compliance with the Court of Appeals' decision would cause 'hardship and disruption'" by reimposing

47

the standard that existed before Labor issued the now-vacated rule. *International Ladies' Garment Workers' Union v. Donovan*, No. 81-2606, 1984 WL 3160, at *1 (D.D.C. Apr. 11, 1984). On appeal, this Court observed that "the Secretary has simply reimplemented precisely the same rule that this court vacated as 'arbitrary and capricious' in its first decision," and that "[s]uch an attempt to circumvent a lawful order of this court does not satisfy the requirement of reasoned decisionmaking imposed on the Secretary." *Garment Workers'*, 733 F.2d at 923.

This Court has made clear that *Garment Workers'* holding is limited to those unique facts. In *NAACP v. Donovan*, this Court clarified that *Garment Workers* addressed a situation where the agency "issued, without notice or comment, an 'emergency' rule that suspended the effect of a prior court order," "the only effect" of which "was to avoid compliance with that court order." 737 F.2d at 72. This Court contrasted that with the general rule that it "is both logical and precedented that an agency can engage in new rulemaking to correct a prior rule which a court has found defective," and the "agency need not seek modification of that injunction" to do so. *Id.*

As explained above, *supra* pp. 39-44, the Department's responsive, post-injunction revisions here bear no relationship to Labor's

48

reimplementation of "precisely the same rule" that this Court had vacated in *Garment Workers'*. Rather, as the stay panel already recognized in granting a partial stay, the Department's decision to revise its policy to redress the defects identified in the district court's summary judgment order implicates the general rule that agencies are free to revise an enjoined policy to cure defects identified in an earlier order.

**B.      The District Court Erred in Assessing Whether the March Policy Is Otherwise Constitutional.**

The district court alternatively considered whether new provisions contained in the March Policy are "permissible" independent of the court's summary judgment order. JA354. That, of course, is not grounds for a motion to enforce. The points outlined above are thus sufficient to vacate the court's enforcement order. But even if this Court were to reach the lawfulness of the credentialing provisions of the Policy, the district court's analysis of those provisions is wrong.

1.      For starters, the district court was not entitled—in the posture of a motion to enforce an earlier injunction—to conduct an independent review of entirely new provisions and requirements. The court's compliance analysis focused on features of the March Policy that were not

49

present *at all* in the enjoined provisions from the October Policy, namely, (1) a scienter requirement, (2) an associated presumption that certain conduct would presumptively satisfy that scienter requirement, and (3) a list of categorical safe harbors designed to protect the kind of lawful journalistic activity that the court was concerned about in its original decision. *See* JA354-356. Just as the stay panel concluded with respect to the physical access restrictions, none of those features was "contemplated by the challenged 2025 policy," "[s]o the district court's March 20 summary judgment opinion and order did not address" them, or anything similar. Stay Order 4. Indeed, as the court itself acknowledged, its earlier decision turned on the court's conclusion that the prior policy did not "proscrib[e] only criminal solicitation" *because* it lacked any scienter requirement and therefore did not clearly carve out "plainly lawful journalistic practices." JA353 (quotation omitted).

Of course, if plaintiffs believe the March Policy independently violates the Constitution, they can seek relief by filing a new suit. Indeed, plaintiffs did exactly that shortly after this Court granted the Department's motion for a partial stay pending appeal and sought a preliminary injunction against the escort policy in that new case. The district court

quickly granted that motion, and this Court has since stayed that injunction pending appeal. *See* Order, *New York Times Co. v. U.S. Dept. of Defense*, No. 26-5253 (D.C. Cir. July 16, 2026) (per curiam). But plaintiffs were not entitled to skip those steps and short-circuit orderly judicial review of new policies by seeking to expand the district court's earlier order under the guise of motion for enforcement. And the district court erred in conducting a drive-by review of the March Policy's new provisions in the course of granting that motion.

2.      Even assuming it was appropriate for the district court to—in effect—entertain an entirely new constitutional challenge to the March Policy in the context of a motion to enforce its original order, the court erred in concluding that the Policy is unlawful.

a.      As discussed above, the new policy makes clear that PFACs will be denied or revoked only if a journalist knowingly induces a Department employee to violate the law. That conduct is not protected by the First Amendment; there is no constitutional right to knowingly and intentionally bring about an unlawful act. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 783 (2023) ("Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected."). And there

51

is no dispute that Department employees have no constitutional right, for their part, to disclose classified or controlled information when doing so is prohibited by criminal statutes. *Haig v. Agee*, 453 U.S. 280, 308-09 (1981) (the defendant's "repeated disclosures of intelligence operations and names of intelligence personnel" are "clearly not protected by the Constitution"); *United States v. Morison*, 844 F.2d 1057, 1069 (4th Cir. 1988) (government employee who willfully disclosed confidential information to others "is not entitled to invoke the First Amendment as a shield").

The March Policy accords with those established principles by providing that a PFAC may be denied or revoked if the applicant "intentionally encourage[es], induc[es], or request[s] that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclos[e]" under a set of enumerated statutes. JA257. The new policy does not reach protected speech because it only forbids knowing and intentional inducement of unlawful conduct—*i.e.*, an intentional effort to cause a Department employee to violate the law.

As to the scienter element, the March Policy states that "[a] journalist's offer of anonymity or privacy protection to a Department

52

employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." JA257-258. That presumption can be rebutted by evidence that the journalist "did not know that the employee was unauthorized to disclose the information notwithstanding the offer of anonymity." JA257-258. This is lawful too. *See Chemical Mfrs. Ass'n v. Department of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) ("A presumption is normally appropriate when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact … until the adversary disproves it." (quotations omitted)); *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 717 (D.C. Cir. 2011) (upholding rebuttable presumptions against a First Amendment challenge).

And if the scienter requirement itself were not sufficient to ensure the March Policy does not chill protected activities, the Policy goes further by providing categorical safe harbors to ensure the inducement prohibition cannot be understood to reach lawful journalistic practices. JA258. That safe harbor provision provides that, notwithstanding the general definition of prohibited "intentional inducement of unauthorized disclosure" — which

53

includes the presumption—six categories of conduct will never be treated as a basis for revoking or denying a PFAC.  JA258.

Those include asking questions of Department employees who are specifically authorized to speak with the press—like members of the Public Affairs Office, designated spokespersons, and other employees speaking on the record in their official capacity—regardless of the subject matter of the question.  JA258.  A separate safe harbor protects asking questions of any other Department employee "where the journalist does not know that the employee is not authorized to disclose the information sought."  JA258.  Other safe harbors protect other journalistic activities like receiving unsolicited controlled or classified information; publishing general calls for tips; developing source relationships with Department employees; or communicating with Department employees through official channels like press briefings, press conferences, and interviews.  JA258.

b.    In concluding that the March Policy's narrow prohibition could potentially be read to reach lawful journalistic activities, the district court disregarded much of the above, misread the Policy, and imagined ambiguities in the Policy where there are none.

The district court first disregarded the scienter requirement entirely because, in the court's view, that requirement was "illusory" given the rebuttable presumption that a journalist who offers anonymity or privacy protection knew the employee was not authorized to disclose the information sought. JA354. In so concluding, the court concluded both that the presumption was, in practice, un-rebuttable because there is no "clear path" to rebut the presumption, JA354, and that the presumption is unwarranted in the first place because there "are myriad reasons why a source may wish to remain anonymous" other than because they know they are not authorized by law to disclose the information sought, JA355. But those two assertions are inherently contradictory. The March Policy provides clear procedures for denial, revocation, or non-renewal of a PFAC—procedures the court entirely failed to acknowledge--including the right to notification of the proposed adverse decision and the opportunity to rebut any factual basis supporting the proposed denial. JA261-262. If, as the court asserted, there are "myriad" obvious legitimate reasons "why a source may wish to remain anonymous," then there is an equally obvious "clear path" to rebutting the presumption: a journalist can explain why he thought a Department employee might have wanted anonymity or privacy

protection for one of those legitimate reasons. In any event, if the court thought that the presumption alone rendered the new policy defective or overbroad, the proper course would have been to enjoin just the presumption rather than the entire revised credentialing policy.

As for the safe harbors, the district court rejected those out of hand because it concluded that they "do not make clear that engagement in lawful journalistic practices will not trigger the revocation." JA356. But that is exactly what they do. The safe harbors were constructed in direct response to the concerns the court articulated in its summary judgment opinion and make clear that the "lawful journalistic practices" the court identified will never form the basis for an adverse PFAC action. The court nevertheless claimed that the "'safe harbors' explicitly leave open the possibility that '[a]sking questions' on certain topics and to certain officials could trigger the revocation or denial of a PFAC." JA356 (alteration in original). But, as explained above, that is only true to the extent the safe harbors do not protect a journalist who solicits information from a Department employee that he *knows* an employee is legally forbidden to disclose. *See supra* pp. 53-54. The court entirely failed to explain how that "possibility" implicates any "lawful journalistic practices." JA356.

56

More fundamentally, the district court's assessment of the scienter requirement, the presumption, and the safe harbors underscores how far afield the court strayed from enforcing its original summary judgment order—or even the "spirit" of the constitutional analysis articulated in its summary judgment opinion. The court entirely disregarded an entire section of the March Policy setting out "Procedures for Denial," JA261-262, instead simply asserting without meaningful elaboration there is "no clear path to rebut" the presumption, JA354. Based on declarations submitted with plaintiffs' compliance motion, the court rejected the Department's explanation that, in its experience, the single most obvious reason to offer anonymity to an employee is because the journalist knows the employee is not authorized by law to disclose the information sought. It instead credited plaintiffs' declarations and its own assessment of why sources "may wish to remain anonymous." JA355. And it summarily dismissed six expansive safe harbors crafted in direct response to the concerns the court articulated in granting summary judgment as essentially meaningless. JA356.

Even if the district court could have reached those same conclusions in a new case, on a full record, and after full merits briefing, the court badly

57

erred by reaching those conclusions under the guise of enforcing its earlier order enjoining enumerated provisions of the October Policy.

c.      Finally, while the district court concluded that challenged provisions in the October Policy were motivated by viewpoint discrimination, JA228-234, the court did not conclude in its compliance order that the new credentialing policies were similarly viewpoint- or content-discriminatory.  Nor could it have.  As explained, the March Policy expressly provides that "[n]o PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism."  JA257.  The new policies thus make clear that they are not motivated by viewpoint either in effect on purpose.

In its summary judgment decision, the district court concluded that— even though viewpoint neutral on its face—the October Policy was viewpoint discriminatory in both "purpose" and "effect" based on social media posts and reporting supposedly showing Department leadership's general dislike of certain news outlets.  JA229-232.  The court did not repeat that reasoning in its compliance order, and it would have erred if it did so.

The mere fact that certain Department officials have made comments criticizing certain news outlets and coverage does not establish that facially

58

neutral revisions to Department press policies are intended to punish journalists based on viewpoint. The district court's contrary conclusion was error even as to the October Policy. The court cited no case where a viewpoint-neutral policy was implied to be viewpoint-discriminatory in purpose based solely on the kinds of general public statements the court identified. Nor did the court make any serious effort to link the public statements it identified to the development or implementation of the policy, other than to note that some of the general statements (or, in one instance, an emoji) were shared shortly before or after the Policy issued. JA230-231. Certainly that kind of indirect, circumstantial evidence of viewpoint discrimination cannot override an express directive that a policy "shall" not be applied based on "content, viewpoint, or perceived editorial perspective." JA257; *see Trump v. Hawaii*, 585 U.S. 667, 702, 706 (2018) (when a policy is "expressly premised on legitimate purposes," a court cannot simply infer an unlawful motive based on general "extrinsic statements"). The court correctly did not suggest otherwise.

## CONCLUSION

For the foregoing reasons, the district court's decision granting

plaintiffs' motion to compel compliance should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JACK STARCHER
  *Attorneys*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*
  *John.e.starcher@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,572 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Jack Starcher*
Jack Starcher