**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5113**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF DEFENSE, et al.,

Defendants-Appellants.

---

On Appeal from Final Judgment of the
United States District Court for the District of Columbia
Case No. 25-cv-4218 (Judge Friedman)

---

**JOINT APPENDIX**

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JACK STARCHER
*Attorneys*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS


Docket Sheet, No. 1:25-cv-4218 (D.D.C.) ..................... JA1

Complaint for Declaratory and Injunctive Relief,
Dkt. 1 (Dec. 4, 2025) ..................... JA11

Select Attachments to Plaintiffs' Motion for Summary Judgment
Dkt. 10 (Jan. 5, 2026)

Declaration of Julian E. Barnes, Dkt. No. 10-3..................... JA52

Declaration of Robert Burns, Dkt. 10-4..................... JA59

Declaration of Richard W. Stevenson, Dkt. 10-5 ..................... JA67

Declaration of Pete Williams, Dkt 10-6..................... JA72

Exhibit 13, Dkt. 10-21..................... JA78

Statement of Undisputed Material Facts, Dkt. 10-36..................... JA80

Defendants' Response to Plaintiffs' Statement of Undisputed Material
Facts, Dkt. 22-2 (Jan. 30, 2026)..................... JA98

Select Attachments to Plaintiffs' Opposition to Defendants' Cross-
Motion for Summary Judgment, Dkt. 24 (Feb. 18, 2026)

Exhibit 1, Dkt. 24-2..................... JA105

Exhibit 4, Dkt. 24-5..................... JA107

Exhibit 5, Dkt. 24-6..................... JA109

Exhibit 6, Dkt. 24-7..................... JA119

Exhibit 7, Dkt. 24-8..................... JA121

Joint Appendix, Dkt. 29 (Mar. 4, 2026)..................... JA123

Order Granting Plaintiffs' Motion for Summary Judgment,
Dkt. 34 (Mar. 20, 2026) ........ JA200

Opinion Granting Plaintiffs' Motion for Summary Judgment,
Dkt. 35 (Mar. 20, 2026) ........ JA204

Select Attachments to Plaintiffs' Motion to Compel Compliance,
Dkt. 37 (Mar. 24, 2026)

Exhibit 1, Dkt 37-2 ........ JA244

Exhibit 2, Dkt. 37-3 ........ JA263

Exhibit 4, Dkt. 37-5 ........ JA292

Exhibit 5, Dkt. 37-6 ........ JA295

Exhibit 6, Dkt. 37-7 ........ JA301

Declaration of Joel Manuel Valdez,
Dkt. 41-3 (Mar. 27, 2026) ........ JA306

Supplemental Declaration of Julian E. Barnes,
Dkt. 44-1 (Mar. 29, 2026) ........ JA308

Second Supplemental Declaration of Julian E. Barnes,
Dkt. 45 (Mar. 31, 2026) ........ JA314

Supplemental Declaration of Joel Manuel Valdez,
Dkt. 46 (Mar. 31, 2026) ........ JA316

Third Supplemental Declaration of Julian E. Barnes,
Dkt. 48-2 (Apr. 2, 2026) ........ JA328

Second Supplemental Declaration of Joel Manuel Valdez,
Dkt. 51-1 (Apr. 6, 2026) ........ JA333

Order Granting Plaintiffs' Motion to Compel Compliance,
Dkt. 54 (Apr. 9, 2026) ........ JA340

Opinion Granting Plaintiffs' Motion to Compel Compliance
Dkt. 55 (Apr. 9, 2026) .......... JA343

Notice of Appeal, Dkt. 56 (Apr. 10, 2026) .......... JA363

Declaration of Kingsley Wilson in Support of Defendants' Emergency
Motion for Stay Pending Appeal, Dkt. 58-1 (Apr. 10, 2026) .......... JA365

Order Granting in Part and Denying in Part Defendants' Motion for
Stay Pending Appeal, Dkt. 59 (Apr. 13, 2026) .......... JA371

CERTIFICATE OF SERVICE

APPEAL,TYPE−L

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:25−cv−04218−PLF

NEW YORK TIMES COMPANY et al v. DEPARTMENT OF DEFENSE et al
Assigned to: Judge Paul L. Friedman
Case in other court: USCA, 26−05113
Cause: 05:702 Administrative Procedure Act

Date Filed: 12/04/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NEW YORK TIMES COMPANY** represented by

**KatieLynn Boyd Townsend**
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213−229−7839
Email: ktownsend@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Ross Crain**
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
47th Floor
New York City, NY 10166−0193
212−351−2454
Email: lcrain@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Pelletier**
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20895
202−887−3541
Email: spelletier@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229−7804
Fax: (213) 229−6804
Email: tboutrous@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIAN E. BARNES** represented by

**KatieLynn Boyd Townsend**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Ross Crain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Pelletier**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF DEFENSE**
*also known as*
DEPARTMENT OF WAR

represented by **Michael Benjamin Bruns**
DOJ−Civ
1100 L St NW
Washington, DC 20005
202−514−4011
Email: michael.bruns@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
DOJ−Civ
Civil Division
950 Pennsylvania Ave.
Ste 3612
Washington, DC 22202
202−514−3180
Email: sarah.e.welch@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE HEGSETH**
*in his official capacity as Secretary of Defense*

represented by **Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN PARNELL**
*in his official capacity as Chief Pentagon Spokesman*

represented by **Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW YORK**

represented by **Ester Murdukhayeva**
ATTORNEY GENERAL'S OFFICE/NY
28 Liberty Street
New York, NY 10005
212−416−6279
Email: ester.murdukhayeva@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **PENTAGON PRESS ASSOCIATION** | represented by | **David A. Schulz**<br>YALE LAW SCHOOL<br>Media Freedom & Information Access Clinic<br>127 Wall Street<br>New Haven, CT 06511<br>212−663−6162<br>Email: david.schulz@yale.edu<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**<br>*and 23 other Medial Organizations* | represented by | **Bruce D. Brown**<br>REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS<br>1156 15th St, NW<br>Suite 1020<br>Washington, DC 20005<br>(202) 795−9301<br>Fax: (202) 795−9310<br>Email: bruce.brown@rcfp.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA** | represented by | **Scott Michelman**<br>ACLU FOUNDATION OF THE DISTRICT OF COLUMBIA<br>529 14th Street NW<br>Suite 420<br>Washington, DC 20045<br>202−601−4267<br>Email: smichelman@acludc.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION** | represented by | **Scott Michelman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL ( Filing fee $ 405 receipt number ADCDC−12113704) filed by THE NEW YORK TIMES COMPANY, JULIAN E. BARNES. (Attachments: # 1 Exhibit A − Oct. 6, 2025 Policy, # 2 Exhibit B − RCFP Letter to Parnell, # 3 Exhibit C − Parnell Letter to RCFP, # 4 Exhibit D − Redlined Acknowledgment, # 5 Exhibit E − Sept. 18, 2025 Policy, # 6 Exhibit F − Updated Physical Control Measures, # 7 Civil Cover Sheet, # 8 Summons − Attorney General Pamela J. Bondi, # 9 Summons − Department of Defense a/k/a Department of War, # 10 Summons − Pete Hegseth, in his official capacity as Secretary of Defense, # 11 Summons − Sean Parnell, in his official capacity as Chief Pentagon Spokesman, # 12 Summons − Jeanine F. Pirro, U.S. Attorney for the District of Columbia)(Boutrous, Theodore) (Entered: 12/04/2025) |
| 12/04/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE NEW YORK TIMES COMPANY (Boutrous, Theodore) (Entered: 12/04/2025) |

| | | |
|---|---|---|
| 12/04/2025 | 3 | NOTICE of Appearance by Lee Ross Crain on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Crain, Lee) (Entered: 12/04/2025) |
| 12/04/2025 | 4 | NOTICE of Appearance by KatieLynn Boyd Townsend on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Townsend, KatieLynn) (Entered: 12/04/2025) |
| 12/04/2025 | | Case Assigned to Judge Paul L. Friedman. (zhcn) (Entered: 12/04/2025) |
| 12/04/2025 | 5 | SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zhcn) (Entered: 12/04/2025) |
| 12/04/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan M. Pelletier, Filing fee $ 100, receipt number ADCDC−12115912. Fee Status: Fee Paid. by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration of Susan M. Pelletier in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit B − District of Columbia Certificate of Good Standing, # 3 Text of Proposed Order for Admission Pro Hac Vice of Susan M. Pelletier)(Boutrous, Theodore) (Entered: 12/04/2025) |
| 12/05/2025 | 7 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of All Defendants (Bruns, Michael) (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Paul L. Friedman on December 5, 2025. (lcao) (Entered: 12/05/2025) |
| 12/17/2025 | 8 | Joint MOTION for Briefing Schedule / *JOINT MOTION FOR ENTRY OF A BRIEFING SCHEDULE FOR EXPEDITED SUMMARY JUDGMENT AND OTHER RELATED RELIEF* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 12/17/2025) |
| 12/23/2025 | | MINUTE ORDER granting the parties' 8 Joint Motion for Entry of a Briefing Schedule. Defendants shall serve the administrative record on plaintiffs on or before December 23, 2025. Plaintiffs shall file their motion for summary judgment on or before January 5, 2026. Plaintiff−side amicus briefs, if any, shall be filed on or before January 15, 2026. Defendants shall file their response and cross−motion for summary judgment on or before January 30, 2026. Defendant−side amicus briefs, if any, shall be filed on or before February 10, 2026. Plaintiffs shall file their response and reply on or before February 18, 2026. Defendants shall file their reply on or before February 27, 2026. Defendants' deadline to answer the complaint shall be extended until 21 days after the Court rules on the parties' cross−motions for summary judgment. The Court dispenses with the requirement that the parties appear for a Rule 26(f) conference. Signed by Judge Paul L. Friedman on December 23, 2025. (lcao) (Entered: 12/23/2025) |
| 12/23/2025 | | MINUTE ORDER: it is hereby ORDERED that the parties shall appear for oral argument on their cross−motions for summary judgment at 10:00 a.m. on Friday, March 6, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. SO ORDERED. Signed by Judge Paul L. Friedman on December 23, 2025. (lcao) (Entered: 12/23/2025) |
| 12/23/2025 | 9 | NOTICE *of Production of Administrative Record* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (Attachments: # 1 Affidavit certifying AR, # 2 Exhibit AR Index)(Bruns, Michael) (Entered: 12/23/2025) |
| 12/29/2025 | | Set/Reset Deadlines/Hearings: Amicus Brief due by 1/15/2026. Summary Judgment motions due by 1/5/2026. Response to Motion for Summary Judgment due by 1/30/2026. Reply to Motion for Summary Judgment due by 2/18/2026. Cross Motions due by 1/30/2026. Response to Cross Motions due by 2/18/2026. Reply to Cross Motions due by 2/27/2026. Motion Hearing set for 3/6/2026 at 10:00 AM in Courtroom 29A− In Person before Judge Paul L. Friedman. (tj) (Entered: 12/29/2025) |
| 01/05/2026 | 10 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration of Julian E. |

| | | |
|---|---|---|
| | | Barnes, # 4 Declaration of Robert Burns, # 5 Declaration of Richard W. Stevenson, # 6 Declaration of Pete Williams, # 7 Exhibit A, # 8 Declaration of Theodore J.Boutrous, Jr., # 9 Exhibit 1, # 10 Exhibit 2, # 11 Exhibit 3, # 12 Exhibit 4, # 13 Exhibit 5, # 14 Exhibit 6, # 15 Exhibit 7, # 16 Exhibit 8, # 17 Exhibit 9, # 18 Exhibit 10, # 19 Exhibit 11, # 20 Exhibit 12, # 21 Exhibit 13, # 22 Exhibit 14, # 23 Exhibit 15, # 24 Exhibit 16, # 25 Exhibit 17, # 26 Exhibit 18, # 27 Exhibit 19, # 28 Exhibit 20, # 29 Exhibit 21, # 30 Exhibit 22, # 31 Exhibit 23, # 32 Exhibit 24, # 33 Exhibit 25, # 34 Exhibit 26, # 35 Exhibit 27, # 36 Statement of Facts)(Boutrous, Theodore) Modified on 1/7/2026, sealed exhibit pursuant to Theodore Boutrous (mg). Added MOTION for Permanent Injunction on 1/9/2026 (znmw). (Entered: 01/05/2026) |
| 01/06/2026 | 11 | NOTICE of Appearance by Susan Pelletier on behalf of JULIAN E. BARNES, NEW YORK TIMES COMPANY (Pelletier, Susan) (Entered: 01/06/2026) |
| 01/07/2026 | 12 | DECLARATION *of Pete Williams in Support of Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief* by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 10 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief*. (Attachments: # 1 Exhibit A [Redacted])(Boutrous, Theodore) (Entered: 01/07/2026) |
| 01/15/2026 | 13 | AMICUS BRIEF *in support of plaintiff's motion for summary judgment* by STATE OF NEW YORK. (Murdukhayeva, Ester) (Entered: 01/15/2026) |
| 01/15/2026 | 14 | NOTICE of Appearance by David A. Schulz on behalf of Pentagon Press Association (Schulz, David) (Entered: 01/15/2026) |
| 01/15/2026 | 15 | Unopposed MOTION for Leave to File Amicus Brief by Pentagon Press Association. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Text of Proposed Order)(Schulz, David) (Entered: 01/15/2026) |
| 01/15/2026 | 16 | NOTICE of Appearance by Bruce D. Brown on behalf of The Reporters Committee for Freedom of the Press, The Reporters Committee for Freedom of the Press and 23 Other Media Organizations (Brown, Bruce) (Entered: 01/15/2026) |
| 01/15/2026 | 17 | Consent MOTION for Leave to File Amicus Brief by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Memorandum in Support Proposed Amici Curiae Brief)(Brown, Bruce) (Entered: 01/15/2026) |
| 01/15/2026 | 18 | Consent MOTION for Leave to File Amicus Brief*in Support of Plaintiffs* by AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, AMERICAN CIVIL LIBERTIES UNION. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Michelman, Scott) (Entered: 01/15/2026) |
| 01/16/2026 | | MINUTE ORDER granting the Pentagon Press Association's 15 Unopposed Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to the motion [15−1]. Signed by Judge Paul L. Friedman on January 16, 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER granting the Reporters Committee for Freedom of the Press and 23 Other Media Organizations' 17 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to amici's motion [17−1]. Signed by Judge Paul L. Friedman on January 16, 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER granting the American Civil Liberties Union and the American Civil Liberties Union of the District of Columbia's 18 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to amici's motion [18−1]. Signed by Judge Paul L. Friedman on January 16, 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | 19 | AMICUS BRIEF by PENTAGON PRESS ASSOCIATION. (zjm) (Entered: 01/26/2026) |
| 01/16/2026 | 20 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (zjm) (Entered: 01/26/2026) |

| | | |
|---|---|---|
| 01/16/2026 | 21 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA. (zjm) (Entered: 01/26/2026) |
| 01/30/2026 | 22 | Cross MOTION for Summary Judgment by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Bruns, Michael) (Entered: 01/30/2026) |
| 01/30/2026 | 23 | Memorandum in opposition to re 10 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* MOTION for Permanent Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Bruns, Michael) (Entered: 01/30/2026) |
| 02/18/2026 | 24 | Memorandum in opposition to re 22 Cross MOTION for Summary Judgment filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration /Supplemental Declaration of Theodore J. Boutrous, Jr. in Opposition to Defendants' Cross−Motion for Summary Judgment, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Boutrous, Theodore) (Entered: 02/18/2026) |
| 02/18/2026 | 25 | REPLY to opposition to motion re 10 Motion for Summary Judgment,,,,, Motion for Permanent Injunction,,,, filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 02/18/2026) |
| 02/23/2026 | 26 | ORDER directing parties to file a joint report on or before March 4, 2026. See Order for details. Signed by Judge Paul L. Friedman on February 23, 2026. (lccm) (Entered: 02/23/2026) |
| 02/23/2026 | | Set/Reset Deadlines: Joint Report due by 3/4/2026. (tj) (Entered: 02/23/2026) |
| 02/27/2026 | 27 | REPLY to opposition to motion re 22 Motion for Summary Judgment filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Declaration of Christopher C. Garver)(Bruns, Michael) (Entered: 02/27/2026) |
| 03/03/2026 | | MINUTE ORDER: the Court will connect the public−access telephone line for the motions hearing scheduled for March 6, 2026 at 10:00 a.m. Any member of the public or media may access the public−access line by dialing (833) 990−9400 and using meeting ID 492497252. As a reminder, any use of the public−access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on March 3, 2026. (lccm) (Entered: 03/03/2026) |
| 03/03/2026 | 28 | Joint STATUS REPORT *re: March 6, 2026 Hearing on Cross−Motion for Summary Judgment [ECF. 26]* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 03/03/2026) |
| 03/04/2026 | 29 | JOINT APPENDIX *pursuant to LCvR 7* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 03/04/2026) |
| 03/05/2026 | | MINUTE ORDER: The Court adopts the proposal for the March 6, 2026 hearing on the parties' cross−motions for summary judgment outlined in the parties' 28 Joint Status Report. Signed by Judge Paul L. Friedman on March 5, 2026. (lccm) (Entered: 03/05/2026) |
| 03/06/2026 | | Minute Entry for Motions Hearing held on 3/6/2026 before Judge Paul L. Friedman: The matter was before the court on the parties' cross−motions for summary judgment. Theodore J. Boutrous, Jr., KatieLynn B. Townsend, and Susan Pelletier present on behalf of Plaintiffs. David A. Schulz present on behalf of Pentagon Press Association. Michael B. Bruns and Timothy Parlatore present on behalf of Defendants. The matters were fully briefed, argued, and taken under advisement. As stated from the bench, the parties shall file revised proposed orders of relief by the end of day, Monday, March 9, 2026. (Court Reporter Lorraine Herman)(mhp) (Entered: 03/06/2026) |

| | | |
|---|---|---|
| 03/09/2026 | 30 | NOTICE of Proposed Order by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re Motion Hearing,,, Terminate Motion and R&R Deadlines/Hearings,,, Terminate Scheduling Order Deadlines,,, Terminate Trial Management Order Deadlines,, (Bruns, Michael) (Entered: 03/09/2026) |
| 03/09/2026 | 31 | NOTICE of Proposed Order / *FILING OF REVISED PROPOSED ORDER* by JULIAN E. BARNES, NEW YORK TIMES COMPANY (Attachments: # 1 Text of Proposed Order − Revised Proposed Order, # 2 Addendum A)(Boutrous, Theodore) (Entered: 03/09/2026) |
| 03/12/2026 | 32 | NOTICE *of Clarification Regarding Statements Made at Oral Argument* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (Bruns, Michael) (Entered: 03/12/2026) |
| 03/13/2026 | 33 | RESPONSE re 32 Notice (Other) */Plaintiffs' Response to Defendants' "Notice of Clarification"* filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 03/13/2026) |
| 03/20/2026 | 34 | ORDER granting plaintiffs' 10 Motion for Summary Judgment and denying defendants' 22 Cross Motion for Summary Judgment. Defendants shall file a status report on or before March 27, 2026. See Order for details. Signed by Judge Paul L. Friedman on March 20, 2026. (lccm) (Entered: 03/20/2026) |
| 03/20/2026 | 35 | OPINION granting plaintiffs' 10 Motion for Summary Judgment and denying defendants' 22 Cross Motion for Summary Judgment. Defendants shall file a status report on or before March 27, 2026. See Opinion for details. Signed by Judge Paul L. Friedman on March 20, 2026. (lccm) (Entered: 03/20/2026) |
| 03/23/2026 | 36 | TRANSCRIPT OF MOTION HEARING PROCEEDINGS before Judge Paul L. Friedman, held on March 6, 2026. Page Numbers: 1−72. Date of Issuance: March 23, 2026. Court Reporter: Lorraine Herman. Email: Lorraine_Herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/13/2026. Redacted Transcript Deadline set for 4/23/2026. Release of Transcript Restriction set for 6/21/2026.(Herman, Lorraine) Modified to correct judge on 3/23/2026 (znmw). (Entered: 03/23/2026) |
| 03/23/2026 | | Set/Reset Deadlines: Status Report due by 3/27/2026 (tj) (Entered: 03/23/2026) |
| 03/24/2026 | 37 | MOTION to Compel *Compliance with the Court's Order* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration // Second Supplemental Declaration of Theodore J. Boutrous, Jr., # 2 Exhibit 1 − Interim PFAC Policy, # 3 Exhibit 2 − Redline of Interim PFAC Policy, # 4 Exhibit 3 − 3/20/2026 MFIA Letter to AUSA, # 5 Exhibit 4 − 3/21/2026 NYT letter to AUSA, # 6 Exhibit 5 − 3/23/2026 Parlatore Email to NYT, # 7 Exhibit 6 − 3/23/2026 NYT Article, # 8 Exhibit 7 − 3/23/2026 Parnell Tweet, # 9 Exhibit 8 − 3/24/2026 Boutrous Email to Parlatore)(Boutrous, Theodore) (Entered: 03/24/2026) |
| 03/25/2026 | | MINUTE ORDER: Defendants shall respond to Plaintiffs' 37 Motion to Compel on or before 12:00 p.m. on Friday, March 27, 2026. The parties shall appear for a hearing on Plaintiffs' Motion to Compel at 9:30 a.m. on Monday, March 30, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. Signed by Judge Paul L. Friedman on March 25, 2026.(lccm) (Entered: 03/25/2026) |

| | | |
|---|---|---|
| 03/25/2026 | | Set/Reset Hearings: Motion Hearing set for 3/30/2026 at 09:30 AM in Courtroom 29A– In Person before Judge Paul L. Friedman. (tj) (Entered: 03/25/2026) |
| 03/25/2026 | 38 | Consent MOTION for Leave to File Amicus Brief by PENTAGON PRESS ASSOCIATION. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Schulz, David) (Entered: 03/25/2026) |
| 03/25/2026 | | MINUTE ORDER granting the Pentagon Press Association's 38 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion to Compel Compliance. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to the motion [38–1]. Signed by Judge Paul L. Friedman on March 25, 2026. (lccm) (Entered: 03/25/2026) |
| 03/26/2026 | 39 | AMICUS BRIEF *[CORRECTED]* by PENTAGON PRESS ASSOCIATION. (Schulz, David) (Entered: 03/26/2026) |
| 03/26/2026 | | MINUTE ORDER: The Court will connect the public–access telephone line for the hearing now scheduled for March 30, 2026 at 9:30 a.m. Any member of the public or media may access the public–access line by dialing (833) 990–9400 and using meeting ID 492497252. As a reminder, any use of the public–access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on March 26, 2026.(lccm) (Entered: 03/26/2026) |
| 03/26/2026 | 40 | ENTERED IN ERROR.....TRANSCRIPT OF MOTION HEARING PROCEEDINGS before Judge Ana C. Reyes, held on March 23, 2026. Page Numbers: 1–25. Date of Issuance: March 26, 2026. Court Reporter: Lorraine T. Herman. EMAIL: lorraine_herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/16/2026. Redacted Transcript Deadline set for 4/26/2026. Release of Transcript Restriction set for 6/24/2026.(Herman, Lorraine) Modified on 3/26/2026; filed in wrong case (znmw). (Entered: 03/26/2026) |
| 03/27/2026 | 41 | RESPONSE re 37 MOTION to Compel *Compliance with the Court's Order* filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Affidavit of Michael Bruns, # 2 Exhibit A, # 3 Affidavit of Joel Manuel Valdez)(Bruns, Michael) (Entered: 03/27/2026) |
| 03/27/2026 | 42 | NOTICE of Appearance by Sarah Welch on behalf of All Defendants (Welch, Sarah) (Entered: 03/27/2026) |
| 03/27/2026 | 43 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit A Redacted)(Bruns, Michael) (Entered: 03/27/2026) |
| 03/27/2026 | 52 | SEALED DOCUMENT – Exhibit filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. re 41 Response to motion,. (This document is SEALED and only available to authorized persons.)(zjm) (Entered: 04/09/2026) |

| | | |
|---|---|---|
| 03/29/2026 | 44 | REPLY to opposition to motion re 37 Motion to Compel,, *Compliance with the Court's Order* filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration of Julian E. Barnes in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order)(Boutrous, Theodore) (Entered: 03/29/2026) |
| 03/30/2026 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Motion Hearing held on 3/30/2026 re 37 MOTION to Compel *Compliance with the Court's Order* filed by JULIAN E. BARNES and NEW YORK TIMES COMPANY. Oral argument heard, and the court takes the motion under advisement. For reasons stated on the record, the government shall file a declaration by the end of the day on Tuesday, March 31, 2026. (Court Reporter: Rebecca Monroe.) (tj) (Entered: 03/30/2026) |
| 03/31/2026 | 45 | DECLARATION // *Second Supplemental Declaration of Julian E. Barnes* by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 37 MOTION to Compel *Compliance with the Court's Order*. (Boutrous, Theodore) (Entered: 03/31/2026) |
| 03/31/2026 | 46 | DECLARATION *of Joel Manuel Valdez, Supplemental* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re Motion Hearing,. (Attachments: # 1 Exhibit A)(Bruns, Michael) (Entered: 03/31/2026) |
| 04/02/2026 | 47 | NOTICE of Proposed Order by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re 41 Response to motion, (Bruns, Michael) (Entered: 04/02/2026) |
| 04/02/2026 | 48 | MOTION for Leave to File *a Post−Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Post−Hearing Brief, # 2 Declaration − Third Supplemental Declaration of Julian E. Barnes)(Boutrous, Theodore) (Entered: 04/02/2026) |
| 04/02/2026 | 49 | NOTICE of Proposed Order by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 37 MOTION to Compel *Compliance with the Court's Order* (Boutrous, Theodore) (Entered: 04/02/2026) |
| 04/03/2026 | | MINUTE ORDER granting Plaintiffs' 48 Motion for Leave to File a Post−Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order. The Clerk of Court is directed to file on the docket the Post−Hearing Brief that is attached to the Motion [48−1]. Defendants may file a responsive brief of up to five pages on or before April 6, 2026. Signed by Judge Paul L. Friedman on April 3, 2026.(lccm) (Entered: 04/03/2026) |
| 04/03/2026 | 50 | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on 3/30/26 − morning session; Page Numbers: 1 − 61. Date of Issuance:April 3, 2026. Court Reporter: Rebecca Monroe, email: rebecca_monroe@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/24/2026. Redacted Transcript Deadline set for 5/4/2026. Release of Transcript Restriction set for 7/2/2026.(Monroe, Rebecca) (Entered: 04/03/2026) |
| 04/03/2026 | 53 | MEMORANDUM − Post Hearing Brief re 37 MOTION to Compel *Compliance with the Court's Order* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (zjm) (Entered: 04/09/2026) |

| | | |
|---|---|---|
| 04/06/2026 | 51 | REPLY re 48 MOTION for Leave to File *a Post−Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order* filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Affidavit Second Supplemental Declaration of Joel Valdez)(Bruns, Michael) (Entered: 04/06/2026) |
| 04/09/2026 | 54 | ORDER granting 37 Plaintiffs' Motion to Compel. Defendants shall file a status report on or before April 16, 2026. See Order for details. Signed by Judge Paul L. Friedman on April 9, 2026. (lccm) (Entered: 04/09/2026) |
| 04/09/2026 | 55 | OPINION granting 37 Plaintiffs' Motion to Compel. Defendants shall file a status report on or before April 16, 2026. See Opinion for details. Signed by Judge Paul L. Friedman on April 9, 2026. (lccm) (Entered: 04/09/2026) |
| 04/10/2026 | 56 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 54 Order, Memorandum & Opinion, 34 Order,, Memorandum & Opinion, by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. Fee Status: No Fee Paid. (Bruns, Michael) (Entered: 04/10/2026) |
| 04/10/2026 | 57 | Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 56 Notice of Appeal to DC Circuit Court. (zjm) (Entered: 04/10/2026) |
| 04/10/2026 | 58 | MOTION to Stay re 54 Order, Memorandum & Opinion, 34 Order,, Memorandum & Opinion, *pending appeal* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Affidavit of Kingsley Wilson)(Bruns, Michael) (Entered: 04/10/2026) |
| 04/10/2026 | | USCA Case Number 26−5113 for 56 Notice of Appeal to DC Circuit Court filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (zjm) (Entered: 04/13/2026) |
| 04/13/2026 | 59 | ORDER granting in part and denying in part defendants' 58 Motion to Stay Pending Appeal. See Order for details. Signed by Judge Paul L. Friedman on April 13, 2026. (lccm) (Entered: 04/13/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY,
620 Eighth Avenue
New York, NY 10018;

JULIAN E. BARNES,
The New York Times Company
1627 I Street NW, Suite 700
Washington, DC 20006,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
1600 Defense Pentagon,
Washington, DC 20301;

PETE HEGSETH,
in his official capacity as Secretary of Defense, 1600 Defense Pentagon,
Washington, DC 20301;

SEAN PARNELL,
in his official capacity as Chief Pentagon Spokesman, 1600 Defense Pentagon,
Washington, DC 20301,

*Defendants*.

**Civil Case No. 25-4218**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs The New York Times Company ("The New York Times" or the "The Times") and its reporter Julian E. Barnes ("Barnes") bring this action to enjoin provisions of a recently implemented policy of the United States Department of Defense or Department of War ("Department" or "Pentagon") that violates their First and Fifth Amendment rights. If allowed to stand, that policy will upend the longstanding and "healthy adversarial tension between the government, which may seek to keep its secrets" and "the press, which may endeavor to" report them, Alexander Bickel, *The Morality of Consent* at 79 (1977), and will deprive the public of vital information about the United States military and its leadership.

2. On October 6, 2025, the Department promulgated a new policy pertaining to PFACs—Pentagon Facility Alternate Credentials. PFACs (also called Pentagon badges or building passes) are credentials members of the press receive to access the Pentagon. The Times' and its reporters' interests in maintaining their PFACs are exactly the type of "liberty interests" the D.C. Circuit has held "may not be denied without due process of law under the fifth amendment." *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020). And the policy—which vests Department officials with unbridled discretion to immediately suspend and ultimately revoke a reporter's PFAC for engaging in lawful newsgathering, both on and off Pentagon grounds, or for reporting any information Department officials have not approved—is neither reasonable nor viewpoint-neutral. It is exactly the type of speech- and press-restrictive scheme that the Supreme Court and D.C. Circuit have recognized violates the First Amendment. *See City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Ateba v. Leavitt*, 133 F.4th 114, 124–125 (D.C. Cir. 2025); *see also Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11–12 (2018).

3. The policy, in violation of the First Amendment, seeks to restrict journalists' ability to do what journalists have always done—ask questions of government employees and gather information to report stories that take the public beyond official pronouncements. If and when they do and then publish anything that has not been approved by Pentagon officials, the policy permits those officials to, at any time and without any standards to guide their decisions, immediately suspend and ultimately revoke those journalists' PFACs in violation of the First Amendment, the Due Process Clause, and binding D.C. Circuit precedent.

4. Specifically, the policy confers on Pentagon officials the unfettered discretion to determine that a journalist "pose[s] a security or safety risk to [Department] personnel or property," *see* Ex. A (hereinafter the "Policy") at 8, 12, based solely on a journalist's or news organization's receipt, publication, or "solicitation" of any "unauthorized" information, regardless of secrecy classification, *id*. at 12–13. It then provides that such a determination "may result in an immediate suspension of Pentagon access . . . ." *Id*. at 8, 12. The Policy also allows the Department to suspend or revoke PFACs when Pentagon officials—again exercising standardless discretion—determine journalists have engaged in "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id.* at 15; *see Karem*, 960 F.3d at 666.

5. The Pentagon has made clear that lawful, routine newsgathering techniques—asking questions of government employees and interviewing them for stories—whether on or off Pentagon grounds could, in the Department's view, "constitute a solicitation that could lead to revocation" of their PFACs. Ex. A at 11. But such communications are a core journalistic practice and a public good—the kind of basic source work that led to some of the most important news stories in history, including the Pentagon Papers. In addition, the Department has made clear, those journalistic practices that can be sanctioned also include, for example, "public

advertisements or calls for tips," including via "social media." *Id.* at 10. Providing a means for sources to convey information is, likewise, routine. The Times, for instance, has a "tips page" on its website that "offer[s] several ways to get in touch with and provide materials to [Times] journalists."[1]

6. Through the Policy, Pentagon officials have dealt to themselves the power to suspend and eventually revoke journalists' PFACs for publishing stories that Pentagon leadership may perceive as unfavorable or unflattering, in direct contravention of Supreme Court precedent.

7. In issuing the Policy, the Department insisted that journalists sign an "Acknowledgment," Ex. A. at 12, acceding to their "understand[ing]" of the Policy in order to maintain their PFACs. Reporters from every major news organization, including The Times, refused to comply with that demand as a condition to access the Pentagon,[2] and were compelled to turn in their PFACs as a result.[3]

8. While Plaintiffs and many other journalists and news organizations no longer possess PFACs because they refused to accede to a Policy that would restrict independent

---

[1] *See* https://www.nytimes.com/tips.

[2] Erik Wemple, *Several News Outlets Reject Pentagon's Reporting Restrictions*, N.Y. Times (Oct. 13, 2025), https://www.nytimes.com/2025/10/13/business/pentagon-restrictions-news-outlets.html ("Several news organizations, including The Washington Post, The New York Times, Newsmax and NPR, have announced that their journalists will not sign a new set of Pentagon restrictions affecting news gathering in the vast military complex. . . . . Other news outlets, including The Guardian and CNN, have also said they would reject the policy. The announcements reflect the news media's wide-ranging frustration with efforts by Pete Hegseth, the defense secretary, to curtail the physical movement of reporters in the building and impose fresh limits on their activities.").

[3] Erik Wemple, *How the Pentagon Is Blocking Out News Organizations*, N.Y. Times (Oct. 15, 2025), https://www.nytimes.com/interactive/2025/10/15/business/media/pentagon-press-rules.html; David Baudner, *Journalists turn in access badges, exit Pentagon rather than agree to new reporting rules*, Associated Press (Oct. 15, 2025), https://apnews.com/article/pentagon-press-access-hegseth-trump-restrictions-5d9c2a63e4e03b91fc1546bb09ffbf12.

reporting, the Department has welcomed what it calls the "next generation of the Pentagon press corps"[4]—individuals and media outlets strongly supportive of the Trump administration and whose viewpoints the Department favors.[5] Among that group are Mike Lindell, the chief executive of MyPillow, who has promised to "make [the Administration] proud" with his Pentagon coverage; Laura Loomer, an influential pro-Trump activist; and Raheem Kassam, editor in chief of the National Pulse, who described his publication as "basically an industry mag/site for MAGA world."[6]

9. These developments place the purpose and effect of the Policy in stark relief: to fundamentally restrict coverage of the Pentagon by independent journalists and news organizations, either by limiting what kind of information they can obtain and publish without incurring punishment, or by driving them out of the Pentagon with an unconstitutional Policy. While Plaintiffs' enterprising reporting on the military will continue, the Pentagon's Policy ensures the suppression of certain newsworthy information—information, for instance, gathered by directly questioning officials at press conferences or through routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds.

10. The Policy abandons scrutiny by independent news organizations for the public's benefit, and it violates the Constitution's guarantees of due process, freedom of speech, and freedom of the press. The Policy fails to provide fair notice to Plaintiffs and other journalists and news organizations of what, in the Department's "unbridled discretion," will (or will not) be

---

[4] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719.

[5] *See* Ken Bensinger & Erik Wemple, *New Pentagon Press Crew Is All In on Trump*, N.Y. Times (Nov. 4, 2025), https://www.nytimes.com/2025/11/04/business/media/new-pentagon-press-crew-is-all-in-on-trump.html.

[6] *Id.*

deemed improper newsgathering or reporting that warrants the immediate suspension and eventual revocation of a PFAC. *City of Lakewood*, 486 U.S. at 757; *see also Ateba*, 133 F.4th at 125. And its incurably vague language and lack of standards invite arbitrary as well as content- and viewpoint-based determinations as to which reporters and news organizations will be granted or denied access to the Pentagon and for what reasons. Indeed, Department officials have made clear their viewpoint discriminatory aim in promulgating and implementing the Policy: Department officials have publicly derided journalists who declined to sign the Acknowledgement as "activists" and "propagandists" who spread "lies . . . to the American people," while praising individuals approved to receive PFACs under the Policy as free from "a biased agenda."[7]

11. The fact that the Department has conditioned journalists' access on their willingness to attest to their understanding of an inscrutable Policy that targets their exercise of First Amendment rights inflicts separate and additional constitutional harm on top of the Policy's already irreparable chilling effect.

12. As the Supreme Court has recognized, the First Amendment guarantees "a 'right to gather information'" because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). The D.C. Circuit held nearly fifty years ago in the context of media access to the White House that "press facilities having been made publicly available as a source of information for [journalists], the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that . . .

[7] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719; DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302.

access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (citations omitted). The D.C. Circuit has since reaffirmed that "'the interests of a bona fide Washington correspondent in obtaining [such a] pass' is not only 'protected by the first amendment' but also 'undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment.'" *Karem*, 960 F.3d at 660 (second and third alternations in original) (quoting *Sherrill*, 569 F.2d at 130–131).

13. The D.C. Circuit also has made clear that "the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted). Areas of the Pentagon, including the Pentagon Briefing Room, are nonpublic forums under the First Amendment, and therefore any regulation on speech within those forums must be reasonable and not intended to suppress expression based on the speaker's viewpoint. *See Minnesota Voters Alliance*, 585 U.S. at 11–12. The Policy fails that test and violates the First Amendment because it is "an effort to suppress" speech and newsgathering based on viewpoint, and because its restrictions are not reasonable "in light of the purpose served by the forum." *Id*. at 12–13.

14. This binding precedent applies with full force here. There is no legitimate, let alone compelling, justification for the provisions of the Policy targeting lawful newsgathering and reporting—purposefully vague and overbroad provisions designed to give Department officials free rein to grant or deny Pentagon access to journalists and media outlets on the basis of viewpoint and that are wholly untethered to any interest in the "safe, efficient and secure operation of the Pentagon Reservation." 10 U.S.C. § 2674(c)(1). Those provisions violate the First Amendment. *City of Lakewood*, 486 U.S. at 757; *see also Ateba*, 133 F.4th at 125. Further, because the Policy permits the immediate suspension of a PFAC without providing reporters procedural protections,

it plainly violates the Due Process Clause. *See Karem*, 960 F.3d at 660; *Sherrill*, 569 F.2d at 130–131.

15. The Policy marks a radical departure from longstanding tradition, violates the Due Process Clause and the First Amendment, and is inflicting irreparable harm on The Times and its reporters, including Barnes, and on the American public. By this Complaint, Plaintiffs seek a declaration that the provisions of the Policy targeting the exercise of First Amendment rights are unlawful and an order preliminarily and permanently enjoining Defendants from enforcing those provisions of the Policy.

## PARTIES

16. The New York Times Company is a privately owned for-profit corporation located in New York. The Times is headquartered at 620 8th Avenue, New York, NY 10018. The Times' Washington Bureau is located at 1627 I Street NW, Suite 700, Washington, DC 20006. Prior to the implementation of the Policy, six Times journalists, including Barnes, held PFACs. The Times and its reporters, including Julian E. Barnes, are eligible to and, if the challenged portions of the Policy were enjoined, would reobtain their PFACs.

17. Julian E. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes has been with The Times since June 2018. Prior to that, Barnes covered the Pentagon for other news organizations including U.S. News and World Report, The Los Angeles Times, and The Wall Street Journal. He was first issued a PFAC in 2004. With the exception of an approximately 18-month period in 2016 and 2017, Barnes continuously held a PFAC from 2004 until the end of August 2025, when it lapsed. Though he was eligible to and invited to do so, Barnes did not seek to renew his PFAC due to the Policy. As a result of the Policy, Barnes was compelled to turn in his lapsed PFAC on October 15, 2025. Barnes resides in the District of

Columbia and is assigned to The Times' Washington Bureau.

18. Defendant United States Department of Defense, also known as the Department of War, is an executive agency of the U.S. federal government tasked with overseeing the U.S. Armed Forces. The Department is headquartered at the Pentagon and maintains offices and facilities in Washington, DC, and conducts a substantial amount of official business in and relating to this District. The Department's address is 1400 Defense Pentagon, Washington, DC 20301.

19. Defendant Pete Hegseth is the U.S. Secretary of Defense. He is sued in his official capacity. Secretary Hegseth is responsible for overseeing the operations and administration of the Department of Defense and the U.S. Armed Forces, which include the Army, the Navy, the Marine Corps, the Air Force, and the National Guard, as well as developing national defense policy. He has ultimate authority over all Department policies, including the Policy at issue here, and he conducts a substantial amount of official business in and relating to this District. As a member of the President's Cabinet, Secretary Hegseth regularly performs his official duties within the District of Columbia.

20. Defendant Sean Parnell is the Chief Spokesman for the Pentagon and Assistant to the Secretary of Defense for Public Affairs and conducts a substantial amount of official business in and relating to this District. He is sued in his official capacity. Parnell serves as the Department's principal spokesperson responsible for providing timely and accurate information about the Department to the media, the U.S. Congress, and the public. He also coordinates and conducts press briefings with members of the media. He issued the "Memorandum for Senior Pentagon Leadership" ("Memorandum") that, together with the "Pentagon Reservation In-Brief for Media Members" ("In-Brief"), constitute the Policy and, on information and belief, is responsible for implementation of the Policy.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States and federal statutes, 28 U.S.C. § 1331, and because the individual Defendants are U.S. officials sued in their official capacities, 28 U.S.C. § 1346(a)(2).

22. The Court is authorized to grant the requested relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, Rule 65 of the Federal Rules of Civil Procedure, and pursuant to its inherent equitable powers.

23. Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e)(1) because Barnes resides in this District, because The Times and its journalists, including Barnes, regularly engage in newsgathering and reporting in this District, including at The Times' Washington Bureau, and because Defendants conduct a substantial amount of official business in this District, and a substantial part of the events giving rise to the claims occurred in the District of Columbia. In particular, among other things, Secretary Hegseth, as a member of the President's Cabinet, "'performs a significant amount of his official duties in the District of Columbia,'" *Bartman v. Cheney*, 827 F. Supp. 1, 2 n.2 (D.D.C. 1993) (citation omitted); *see also Chin-Young v. Esper*, 2019 WL 4247260, at *5 (D.D.C. Sep. 6, 2019), and the Department's decision-making with respect to the development and implementation of the Policy occurred, in substantial part, within this District.

## FACTUAL ALLEGATIONS

### The Pentagon Announces a New PFAC Policy

24. There is a long tradition of journalists covering the military from the grounds of the Pentagon. That access has enabled, among other things, real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the

Pentagon itself—coverage the Department has lauded.[8] Indeed, the ability of journalists to cover the military from Pentagon grounds benefits the American public, in part, because it gives Department officials the ability to correct misinformation and get accurate information to journalists and, in turn, to the public quickly when there is a crisis.

25. Since the Pentagon opened in 1942, Department officials have afforded qualified members of the press, including reporters with The Times, access to the Pentagon complex to report on the military and other defense activities.[9] Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize in 1943 for his coverage of World War II, for example, routinely visited the Pentagon to gather news and speak with Department sources.

26. Historically, the press has had unescorted access to areas including the Pentagon Press Briefing Room. As Times opinion columnist Maureen Dowd described in an October 18, 2025 column about the Policy, journalists from The Times and other media outlets previously "could stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story."[10] In addition, since the 1970s, the Pentagon provided reporters with dedicated office space in the building,

---

[8] *See, e.g.*, Jim Garamone, *Senior Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://www.war.gov/News/Feature-Stories/Story/Article/2765676/senior-cnn-pentagon-correspondent-recalls-911/ (Department press office interview with then-ABC News producer Barbara Starr recounting her coverage of 9/11 from the Pentagon).

[9] Eleanor Watson, *CBS News Ends Over 60-Year Presence at Pentagon After Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025), https://www.cbsnews.com/news/cbs-news-pentagon-60-year-presence-press-requirements/.

[10] Maureen Dowd, *Fraidy-Cat at the Pentagon*, N.Y. Times (Oct. 18, 2025), https://www.nytimes.com/2025/10/18/opinion/pentagon-journalists-news-hegseth.html.

known as the Pentagon News Room, where reporters set up desks and TV network booths. Qualified members of the press, including Times journalists, have had access to such areas within the Pentagon building for more than eight decades. That access, which was not conditioned on the perceived viewpoint of journalists and their news organizations, or the content of their reporting, served the interests of the American public and posed no security or safety risk to Pentagon property or personnel.

27. Since Secretary Hegseth took office—and, in particular, since March of 2025, when Secretary Hegseth and other top officials inadvertently disclosed details regarding imminent U.S. airstrikes in Yemen to journalist Jeffrey Goldberg of *The Atlantic* by adding him to a group chat on the messaging platform Signal—the Department has sought to impose increasingly stringent and unprecedented restrictions on journalists covering the Department and its leadership.[11]

28. On May 23, 2025, Secretary Hegseth issued what he called "Updated Physical Control Measures for Press/Media Access Within the Pentagon," imposing restrictions on journalists' access to specific areas of the building, including in the vicinity of his office, and requiring journalists to be accompanied by official "escorts" when visiting certain areas. *See* Ex. F at 1–2. These changes were not precipitated by any security or safety incident involving a PFAC holder. On the contrary, according to the "Memorandum for Resident and Visiting Press Assigned to the Pentagon," these "updated security measures" were purportedly "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." *Id.*; *see also* Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y. Times (Oct. 10, 2025) ("Under [Secretary Hegseth's] leadership, the [D]epartment has removed national news outlets

---

[11] *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151/.

from a shared media workspace . . . ; [and] has scaled back reporters' ability to roam Pentagon corridors.").[12] These restrictions coincide with other efforts by the Department to restrict the flow of newsworthy information to the public, both via the press,[13] and via Congress.[14]

29. On September 18, 2025, Parnell issued a "Memorandum for Senior Pentagon Leadership" ("September 18 Memorandum") attaching a "Pentagon Reservation In-Brief for Media Members" ("September 18 In-Brief"; together, the "September 18 Policy"). In the September 18 Memorandum, which purported to implement the Department's "Updated Physical Control Measures for Press/Media Access Within the Pentagon," Parnell announced new policies governing the issuance, renewal, suspension, and revocation of PFACs that went even further than the newly instituted "physical control measures." Ex. E at 3–10.

30. The September 18 Memorandum explained that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." Ex. E at 1.

31. In addition to setting out specific requirements for physical presence within the facility, including restrictions on journalists' access to certain floors of the Pentagon, Ex. E at 4, the September 18 In-Brief also included provisions addressed to the "unauthorized" disclosure of

---

[12] https://www.nytimes.com/2025/10/10/business/media/hegseth-pentagon-press-access.html.

[13] *See, e.g.*, Dan Lamothe & Ellen Nakashima, *Hegseth team told to stop polygraph tests after complaint to White House*, Wash. Post (July 26, 2025), https://www.washingtonpost.com/national-security/2025/07/26/pete-hegseth-leak-investigation-trump/.

[14] *See, e.g.*, Ben Finley & Konstantin Toropin, *Hegseth changes policy on how Pentagon officials communicate with Congress*, Wash. Post (Oct. 21, 2025), https://www.washingtonpost.com/politics/2025/10/21/defense-department-pentagon-hegseth-congress/90711972-aef4-11f0-ab72-a5fffa9bf3eb_story.html.

information. Specifically, it stated that "[Department] information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" because "[u]nauthorized disclosure of CNSI [classified national security information] or CUI [controlled unclassified information] poses a security risk that could damage the national security of the United States and place [Department] personnel in jeopardy." *Id.* at 5.

32. The September 18 iteration of the In-Brief was followed by an "Acknowledgment" that required PFAC holders to agree that they could be "determined to pose a security or safety risk . . . based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of [classified national security information] or [controlled unclassified information]," and to initial next to other statements, including that "PFACs are a courtesy." Ex. E at 11.

33. The September 18 In-Brief also set forth a process for PFAC issuance, renewal, and termination. It provided that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[.]" Ex. E at 6, 11. It further provided that "[a]n initial determination of security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination," which "may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information. *Id.* at 6; *see id.* at 11.

34. An Appendix to the September 18 Policy provided that the grounds for determining whether a journalist poses a security or safety risk "include, but are not limited to," convictions for certain offenses or "actions other than conviction . . . such as attempts to improperly obtain" Department information, or "being found in physical possession of" such information "without reporting it." Ex. E at 13. This Appendix also stated that a PFAC holder would be notified of a

decision to deny, revoke, or not renew a PFAC in writing, including the basis for the decision, after which the journalist would have 30 days to appeal that decision. *Id.* at 13–14.

**Members of the Press Object to the Policy**

35. The Department's announcement of its new Policy sparked widespread confusion and concern among news organizations and journalists who cover the Pentagon. On September 22, the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "RCFP") sent a letter to Parnell asking for clarification as to how the Policy's restriction on disclosure would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Department approval. Ex. B.

36. In a response letter dated September 24, Parnell wrote to "clarif[y]" that the restriction against disclosure in the Policy is one that Pentagon personnel must follow, and "does not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." Ex. C at 1, 3. According to Parnell, "it informs PFAC holders of [the Department]'s internal policies and the process for managing building access, which is a privilege extended to facilitate responsible coverage." *Id.* The letter disclaimed any attempt to require that "reporters . . . seek [Department] approval for their stories or endorse any viewpoint on pre-authorization," and stated that "[j]ournalists remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, or unsolicited tips, and to publish as they deem newsworthy." *Id.* at 2.

37. This letter, however, provided cold comfort. According to Parnell, the "focus" of the Policy was "on preventing active solicitation that encourages [Department] personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment." Ex. C at 2. Parnell also confirmed that the First Amendment-protected receipt and publication of

unsolicited, classified or protected information "could factor" into the Department's wholly "discretion[ary]" decision to revoke a reporter's PFAC. *Id.*

38. On September 28, 2025, Timothy Parlatore—Secretary Hegseth's private attorney and advisor[15]—circulated a redlined, revised version of the Acknowledgement to members of the media integrating language from the Parnell letter. Ex. D. The revisions included a number of statements that appeared designed to characterize the Policy, including the Acknowledgment requirement, as "not impos[ing] any obligations on [PFAC holders] to refrain from constitutionally protected journalistic activities." *Id.* at 2. But these statements contradicted other specific statements in the Policy that do in fact directly intrude on "constitutionally protected journalistic activities." *Id.* For example, the Policy as revised continued to expressly claim that Department officials had uncabined "discretion[]" to immediately suspend a PFAC based on a determination that activities protected by the First Amendment, including lawful newsgathering and publication, posed a "security or safety risk." Ex. A at 10. And, according to the redlined Acknowledgement, any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips"—typical, lawful newsgathering techniques that journalists routinely utilize—would constitute "solicitation" in violation of the Policy. Ex. D at 2.

39. News organizations and PFAC-holding journalists from numerous outlets, including The Times, informed Pentagon leadership that the September 28, 2025 revisions to the Policy did not cure its constitutional defects and that they could not sign the Acknowledgement consistent with their rights and responsibilities as members of the press.

---

[15] *See* Dan Lamothe, *Hegseth's legal fixer at the center of Pentagon's new media restrictions*, Wash. Post (Oct. 15, 2025), https://www.washingtonpost.com/national-security/2025/10/15/hegseth-media-restrictions-tim-parlatore/.

**The Pentagon Announces Its Final Policy and Mandates That PFAC Holders Sign the Acknowledgement**

40. On October 6, 2025, the Department issued its final Policy, a true and correct copy of which is attached hereto as Exhibit A.

41. The current and final version of the Policy includes an Acknowledgment that states:

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

Exhibit A at 14.

42. Even though the Policy invokes the Secretary's statutory authority under 10 U.S.C. § 2674 to safeguard the physical property of the Pentagon itself, the Policy was neither motivated by nor narrowly tailored to any such interest. To the contrary, the Policy reaffirms the Department's position that it possesses unbridled discretion to rescind a PFAC based on First Amendment-protected newsgathering and reporting wherever it occurs. Specifically, the In-Brief states that while allowing that "the receipt of unsolicited" classified or unclassified information "and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC," if a journalist "solicit[s] the disclosure of such information or otherwise encourages [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk." *Id*. at 12.

43. With respect to what constitutes improper "solicitation" in the Department's view, the In-Brief states that "solicitation" in violation of the Policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for

tips . . ." and it cites "an advertisement or social media post by an individual journalist or social media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. Ex. A at 12–13.

44. The Policy also takes an expansive approach to what "non-public information" the Department may view as being off limits, and if "solicited," obtained or published could result in the denial, suspension or revocation of a reporter's PFAC. According to the Policy, such unclassified information "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." *Id.* at 6. And purportedly "[t]o ensure the safety of U.S. personnel," the Policy instructs journalists "who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information]" to "discuss those materials with the [Pentagon Press Operations] prior to publication." *Id.*

45. In addition to reiterating the Department's view that "members of the news media do not possess a legal right to access the Pentagon" and that "such access is a privilege subject to the discretion of government authorities," Ex. A, at 3, the Policy explains that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." *Id.* at 12.

46. The Policy further states that Pentagon officials have the discretion to "deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or

safety risk to [Department] personnel or property." Ex. A at 15. It explains that "[p]ersons presumed to present such a risk include, *but are not limited to*, those who have been convicted of any offense involving," among other things "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id.* (emphasis added). The Policy does not explain what type of "conviction" it refers to with respect to "[u]nprofessional conduct," and expressly notes that "actions other than conviction may be deemed to pose a security or safety risk." *Id.*

47. The Policy expressly states that an "initial determination" that a journalist "pose[s] a security or safety risk . . . may result in an immediate suspension" of a PFAC "while the procedures preceding a final determination are pending." Ex. A at 12.

48. Following its issuance of the Policy on October 6, the Department gave PFAC holders until October 14 to review and sign the Acknowledgment.

49. The decision to issue the Policy, as well as related decisions regarding the content of the Policy, were made either in full or in substantial part by Secretary Hegseth and other Department officials and advisors located in the District of Columbia.

**The Department Revokes Reporters' Access**

50. Prior to the Department's deadline, journalists with PFACs at The Times and virtually every other major news organization covering the Pentagon uniformly declined to sign the Acknowledgment. Instead, they informed Pentagon officials that they believed the Policy, and the Department's insistence that they sign the Acknowledgment, violated their First Amendment rights. As a result, on October 15, 2025, they were compelled to turn in their PFACs. On information and belief, of the 56 news outlets represented in the Pentagon Press Association (PPA), only one agreed to sign the Acknowledgement.

**The Department Selects a New "Pentagon Press Corps" Based on Viewpoint**

51. Within days, Parnell took to his official X account to "announce the next generation of the Pentagon press corps." In describing the "[n]ew media outlets" willing to accede to the Department's "media access policy," Parnell wrote that they "circumvent the lies of the mainstream media and get real news to the American people," and "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—journalists "in the mainstream media" whom Parnell described as "activists who masquerade as journalists."[16]

52. New PFAC recipients include the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States, who is now affiliated with One America News.[17] Many have expressed ideological support for the Trump administration or indicated that they do not intend to report critically on the Pentagon.[18] For example, Libby Emmons, the editor-in-chief of Human Events and the Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly," and Tim Pool, who

---

[16] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719.

[17] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n.5; David Bauder, *Some friendly, some on-the-news questions at first briefing for new Pentagon press corps*, AP News (Dec. 2, 2025), https://apnews.com/article/pentagon-press-corps-access-journalists-96163e7ac0c8a73a44178fb5bb852863.

[18] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

disclosed that his outlet would be getting a credential, explained that his is "not an investigative news organization" and he did "not intend to maintain a significant presence in the Pentagon."[19]

53. Earlier this week, the Department held its first in-person press events on Pentagon grounds since the Policy went into effect, which included a press briefing and a "meet-and-greet" event with Secretary Hegseth.[20] In welcoming what she called the "official new members of the Pentagon Press Corps," Pentagon Press Secretary Kingsley Wilson ("Wilson") specifically focused on the Department's preference for their First Amendment activities. She criticized journalists and news organizations, like Plaintiffs, who had previously held PFACs, calling them "propagandists" who "stopped telling the truth," and she praised those the Department had selected to cover the Pentagon, asserting that they "actually reach Americans, ask real questions, and don't pursue a biased agenda."[21]

54. Similarly, in determining when solicitation of unapproved information is permissible, the Department has already drawn distinctions based on favored and disfavored content and speakers. In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC."[22] When

---

[19] *Id*.

[20] Scott Nover, *Pentagon's right-wing, pared press corps gets a meet-and-greet*, Wash. Post (Nov. 29, 2025), https://www.washingtonpost.com/business/2025/11/29/pentagon-press-policy-hegseth/.

[21] DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302.

[22] Laura Loomer (@LauraLoomer), X (Nov. 3, 2025, at 11:13 PM), https://x.com/LauraLoomer/status/1985560924720124414.

asked whether Loomer's "request for tips violates its new press policy,"[23] the Department responded that it did not. Through a statement attributable to Wilson, the Department stated:

> Unlike [the Washington Post's] solicitation, which explicitly and exclusively targets military personnel and DoW employees, Laura Loomer's X post regarding tips to her news outlet is a general tip line, which is constitutionally permissible. Therefore it does not violate the Pentagon's media access policy. This distinction was explained in detail to the Pentagon Press Association before they chose to engage in a dishonest and performative walk out. If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is.[24]

This explanation came on the heels of another statement from Wilson in which she asserted that "we have seen a lot of the mainstream media continue to lie."[25]

55. In another instance, at the first official press conference held by Wilson on December 2, 2025, James O'Keefe, founder of the conservative group Project Veritas, noted that he had surreptitiously recorded a high-level Pentagon official making unguarded statements that were plainly unapproved by Department leadership—newsgathering now ostensibly prohibited by the Policy. Wilson, however, praised O'Keefe's work, which appeared to expose a critic of President Trump, noting: "That's why the work you all do is so important."[26]

56. While the Pentagon has opened its press room to those who are willing to report only the official line, the need for independent reporting has been underscored by the ongoing public controversies involving the Pentagon. For example, on December 1, 2025, The Times

---

[23] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 1:53 PM), https://x.com/ScottNover/status/1985782401755128207.

[24] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036.

[25] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

[26] *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU; *see also* James O'Keefe (@JamesOKeefeIII), X (Apr. 23, 2025 at 3:46 PM), https://x.com/JamesOKeefeIII/status/1915175452404035624.

reported that the U.S. military's strikes on a boat in the Caribbean Sea, which occurred on September 2, 2025, were made in response to a directive by Secretary Hegseth that the strike should kill the people on board and destroy the vessel and its contents, including a purported cargo of drugs.[27] The Times' reporting was based on information gathered from "five U.S. officials, who spoke separately and on the condition of anonymity."[28]

57. In recent weeks, The Times also has reported, *inter alia*, on efforts by Secretary Hegseth to fire or sideline generals and admirals,[29] the Pentagon's inquiry into Senator Mark Kelly's remarks urging members of the military not to follow illegal orders,[30] and significant changes to United States military personnel policies and training requirements.[31]

58. While reporters from The Times and other news organizations without PFACs have continued and will continue to gather news and publish important stories about the Department and the United States military, the Policy ensures that certain stories will no longer be available to those journalists and news organizations—and to the public that relies on their reporting. As one new PFAC recipient put it earlier this week when asked why he was reporting from the Pentagon:

---

[27] Charlie Savage, Julian E. Barnes, Eric Schmitt & John Ismay, *Hegseth Ordered a Lethal Attack but Not the Killing of Survivors, Officials Say*, N.Y. Times (Dec. 1, 2025), https://www.nytimes.com/2025/12/01/us/hegseth-drug-boat-strike-order-venezuela.html.

[28] *Id*.

[29] Greg Jaffe, Eric Schmitt & Helene Cooper, *Hegseth Is Purging Military Leaders With Little Explanation*, N.Y. Times (Nov. 7, 2025), https://www.nytimes.com/2025/11/07/us/politics/hegseth-firing-military-leaders.html.

[30] Greg Jaffee, *Pentagon Opens Inquiry Into Senator Mark Kelly Over What Hegseth Calls 'Seditious' Video*, N.Y. Times (Nov. 24, 2025), https://www.nytimes.com/2025/11/24/us/politics/mark-kelly-pentagon-investigation.html.

[31] *See, e.g.*, Dave Phillipps, *Veterans See Costs and Risks in Hegseth's Military Rewind to 1990*, N.Y. Times (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/us/hegseth-military-veterans-standards.html; John Ismay, *What Women Heard in Hegseth's Remarks About Physical Standards*, N.Y. Times (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/us/politics/women-military-hegseth-physical-standards.html.

"Press have always worked at the Pentagon. . . . Correspondents place themselves at the buildings so when a major story breaks they're there to cover it."[32]

59. Stories based on routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds, stories based on probing questions asked at press briefings and news conferences, stories built from follow-up questions posed to officials by reporters from other outlets, and stories that capture the mood and atmosphere within the Pentagon during times of consequential military operations are all examples of what Plaintiffs can no longer report. In-person, and often spontaneous exchanges, in which reporters can judge the demeanor of government officials as they respond to questions in real time and press for more information on the spot, are different in kind and can elicit different information than inquiries by phone or by email. Without their PFACs, Plaintiffs and other journalists and news organizations are deprived of unique, newsworthy information that can only be obtained in person and through such exchanges. *Cf. ABC, Inc. v Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.").

## <u>CLAIMS FOR RELIEF</u>

### COUNT I
### Violation of the Due Process Clause (Void for Vagueness)
### (APA, 5 U.S.C. § 706)

60. Plaintiffs incorporate by reference the allegations of the preceding paragraphs of the Complaint.

61. The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

---

[32] Cam Higby (@camhigby), X (Dec. 1, 2025, at 4:45 PM), https://x.com/camhigby/status/1995655541474165162.

The Times and its reporters, including Barnes, have both a liberty and a property interest in their PFACs.

62. The Policy violates the Due Process Clause because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). In both respects the Policy is unconstitutionally vague.

63. "A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (quotations omitted). The vagueness doctrine serves to ensure that "regulated parties [] know what is required of them so they may act accordingly" and "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54; *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'").

64. It is "[a] fundamental principle in our legal system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Karem*, 960 F.3d at 664 (quoting *Fox Television*, 567 U.S. at 253). As the D.C. Circuit has recognized, "[s]uch '[e]lementary notions of fairness' . . . 'dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the

government] may impose.'" *Id.* (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) (alternations in original)). Simply put, as the Supreme Court has made clear, "the Due Process Clause does not permit" the Department "to classify arbitrariness as a virtue." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 59 (O'Connor, J., dissenting) (explaining that the government "can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim")). These principles carry special force in the First Amendment context, *Karem*, 960 F.3d at 660, and alone warrant injunctive relief, *id*. at 668.

65. "[T]he suspension of a hard pass, like the denial of a hard pass, 'implicate[s]' 'important first amendment rights,'" and therefore must be "evaluate[d] . . . under a particularly 'stringent vagueness [and fair-notice] test.'" *Karem*, 960 F.3d at 665 (quoting *Sherrill*, 569 F.2d at 130). To afford adequate process, the government must provide sufficient advance notice through "explicit and meaningful standard[s]" that are "formally articulated or published," and specifically describe both the conduct that would warrant sanctions and the severity of the sanctions that may be imposed. *Id.* at 660 (quoting *Sherrill*, 569 F.2d at 130–31).

66. The Policy fails to provide fair notice. Instead, it makes immediate suspension and eventual revocation of a PFAC a wholly discretionary determination such that Department officials "may" (or may not) determine that a PFAC holder is a "safety or security" risk based on a number of factors, including the lawful newsgathering and reporting that Plaintiffs engage in every day and intend to continue to engage in. *See* Ex. A at 12–13. The Policy also threatens to revoke PFACs when Pentagon officials in their sole discretion conclude journalists have engaged in "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id.* at 15. The Policy is also internally contradictory; it claims not to target constitutionally protected activities but

creates a system that, on its face, does just that. The Policy's lack of objective, discernible enforcement standards, coupled with its inherently contradictory provisions, deprive PFAC holders of the requisite "fair notice" to satisfy the demands of Due Process.

67. The Act is independently void for vagueness because the law "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

68. In each respect, the Policy violates the Fifth Amendment facially and as applied to Plaintiffs.

69. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

70. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

71. The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

**COUNT II**

**Violation of the First Amendment (Unbridled Discretion)**
**(APA, 5 U.S.C. § 706)**

72. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

73. The Supreme Court has long recognized "the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood*, 486 U.S. at 757. "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a

license or permit from a government official in that official's boundless discretion." *Id*. at 764. That is because "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship" and that "danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id*. at 763.

74. The Policy has established a licensing regime that conditions Plaintiffs' ability to gather news on Pentagon grounds on obtaining a PFAC that can be suspended, denied, or revoked in the Department's "boundless discretion," including for speech and newsgathering that takes place off Pentagon grounds. *Id.* at 764.

75. The Policy expressly permits Pentagon officials to determine that a journalist "pose[s] a security or safety risk to [Department] personnel or property," based on that journalist's receipt, publication, or "solicitation" of any "unauthorized" information, Ex. A at 12–13, without limitation, and expressly provides that such a determination "may result in an immediate suspension of Pentagon access . . . ." *Id*. at 8, 12. This determination is made by Department officials based on "the unique facts and circumstances of each case," "on a case-by-case basis," and considering "the totality of the circumstances." *Id*. at 12–13. The Policy thereby vests Department officials with unbridled discretion to suspend and/or revoke reporters' access to the Pentagon for engaging in lawful newsgathering or for reporting any information not approved by Department officials—regardless of whether such newsgathering occurs on or off Pentagon grounds, and regardless of whether the information at issue is classified or unclassified. *Id.*; *see also* Ex. C. at 2.

76. By vesting Department officials with unbridled discretion to cause the "immediate suspension of [reporters'] Pentagon access" and to "den[y], revoke[], not renew[], or suspend[]" a

reporter's PFAC based on the information that reporter has "solicited," received, written, or published, Ex. A at 8, 12–13, 15, the Policy constitutes precisely the kind of "prior restraint" described in *City of Lakewood*, 486 U.S. at 757. "[T]he mere existence of the [Department's] unfettered discretion, coupled with the power of prior restraint," is designed to "intimidate[] parties into censoring their own speech, even if the discretion and power are never actually abused." *Id*. The Policy is "unconstitutional, because without standards governing the exercise of discretion," the Department "may decide who may" access the Pentagon and "who may not based upon the content of the speech or the viewpoint of the speaker." *Id*. at 763–64.

77. The risk of discretionary punishment based on protected newsgathering and publication chills the exercise of First Amendment rights. The Policy as written necessarily forces news organizations and journalists, including Plaintiffs, to weigh the risk of suspension or revocation of their Pentagon access against the public interest in engaging in lawful newsgathering and reporting. *Id.* at 757–58. In this way, the Policy impermissibly chills speech and "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *See Counterman v. Colorado*, 600 U.S. 66, 68 (2023) (quoting *Rogers v. United States*, 422 U.S. 35, 48 (1975) (quoting *Sullivan*, 276 U.S. at 270)).

78. In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

79. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

80. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

81. The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

**COUNT III**
**Violation of the First Amendment (Unconstitutional Denial of Access to Nonpublic Forum)**
**(APA, 5 U.S.C. § 706)**

82. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

83. News organizations and journalists, including Plaintiffs, have historically had access to the Pentagon, including to the Pentagon Press Briefing Room, and such access has not posed any risk to the safety or security of Pentagon property or personnel.

84. "Although the government is not required to open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted). Areas of the Pentagon, including the Pentagon Briefing Room, are nonpublic forums for First Amendment purposes. *See Ateba*, 133 F.4th at 121–22 (holding that White House press area was a nonpublic forum for First Amendment purposes); *see also United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (United States Capitol buildings are nonpublic forums for First Amendment purposes).

85. As the Supreme Court has recognized, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minnesota Voters Alliance*, 585 U.S. at 11–12.

86. Because the Policy is "an effort to suppress" speech and newsgathering on Pentagon grounds by members of the press, including Plaintiffs, whose reporting and perceived viewpoints the Department disfavors, the Policy violates the First Amendment. *Id.*

87. The Policy also violates the First Amendment because its provisions targeting Plaintiffs' newsgathering and reporting are not reasonable "in light of the purpose served by the forum." *Minnesota Voters Alliance*, 585 U.S. at 12–13 (citation omitted). Those provisions of the Policy were not prompted by any specific security or safety concern or security incident involving a PFAC holder and are unrelated to the "security or safety" of "[Department] personnel or property," objectives they purport to further. Ex. A at 12.

88. That the Policy provides that a PFAC can be suspended, denied, or revoked in the Department's standardless and "boundless discretion," *City of Lakewood*, 486 U.S. at 764, alone makes the provisions targeting Plaintiffs' newsgathering and reporting unreasonable. *See Minnesota Voters Alliance*, 585 U.S. at 21–22 (holding that a state's "indeterminate prohibition" on certain apparel in polling places—nonpublic forums—was unreasonable and therefore violated the First Amendment including because it failed to include "objective, workable standards" for enforcement); *see also Ateba*, 133 F.4th at 125 (explaining that "the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable" (citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth*. 901 F.3d 356, 364 372 (D.C. Cir. 2018))).

89. In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

90. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

91. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

92. The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

**Count IV**

**Violation of the First Amendment (Content-Based and Viewpoint-Based Restraint on Newsgathering and Publication)**
**(APA, 5 U.S.C. § 706)**

93. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

94. "The First Amendment guarantees a free press primarily because of the important role it can play 'as a vital source of public information.'" *Zerilli v. Smith*, 656 F.2d 705, 710 (D.C. Cir. 1981) (quoting *Grosjean v. American Press Co*., 297 U.S. 233, 250 (1936)). "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices," and "journalists frequently depend on informants to gather news." *Id.* at 711. The First Amendment protects not only the right to publish but also journalists' "right to gather information" because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers, Inc.*, 448 U.S. at 576 (quoting *Branzburg*, 408 U.S. at 681).

95. The First Amendment right to gather information protects reporters' ability to receive information, including by developing and speaking to sources. *In re Grand Jury Subpoena*, *Judith Miller*, 438 F.3d 1141, 1168 (D.C. Cir. 2006) (Tatel, J., concurring in judgment) (explaining that the "public harm that would flow from undermining all source relationships would be immense").

96. The newsgathering and publication of information about the Department and its leadership that Plaintiffs engage in routinely, including the publication of stories based on information PFAC holders learn from sources and newsgathering efforts off Pentagon property,

are protected by the First Amendment. Plaintiffs have continued and intend to continue to engage in such First Amendment-protected activity, including lawful speech and newsgathering that the Department deems in violation of its Policy.

97. In its "inevitable effect" and "stated purposes," the Policy is a content-based and viewpoint-based restriction on such newsgathering and publication; it is therefore subject to strict scrutiny. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (citation omitted); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (explaining that content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination").

98. The In-Brief explains that Plaintiffs' "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." Ex. A at 8, 12. In describing what might make an individual "a security or safety risk," the Policy adopts a content-based standard: such a "determination may be based on factors including, but not limited to[,]" the "solicitation" or "unauthorized disclosure" of classified or unclassified information. *Id.* at 12. The Policy thus permits Department officials, in their discretion, to cause the "immediate suspension of [Plaintiffs'] Pentagon access" and to "den[y], revoke[], not renew[], or suspend[]" Plaintiffs' PFACs based on that First Amendment-protected activity. *Id*. at 8, 12–13, 15.

99. The Policy is intended to and is being implemented to restrain and chill the speech and newsgathering activity of journalists and news organizations, including Plaintiffs, on the basis of content and perceived viewpoint. In a recent X post, Parnell explained that the Policy forced

journalists and news organizations, including Plaintiffs, to "self-deport[]" from the Pentagon, asserted that those journalists and news organizations "lie[]," do not report "real news" and are "activists who masquerade as journalists," and called them less "effective and balanced" than their "new media" replacements,[33] who have evinced support for the Trump administration.[34] Such "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotations omitted).

100. The Department has made clear that for certain disfavored journalists and news organizations, providing a means for potential sources to give their journalists tips violates the Policy. Ex. D at 2. At the same time, the Department has made clear that this same activity, when engaged in by a favored journalist or media outlet, will not be considered by the Department to be a violation.[35]

101. The provisions of the Policy that target speech and newsgathering by members of the press, including Plaintiffs, are not narrowly tailored to any compelling government interest.

102. There is an unbroken history of journalists, including journalists with The Times, reporting from Pentagon grounds without posing any risk to the safety or security of Pentagon personnel or property and the Policy was not motivated by or implemented to address any legitimate, specific safety or security concern. The Policy is wholly untethered to any legitimate interest in preventing "security or safety risk[s] to [Department] personnel or property," Ex. A at

---

[33] Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM).

[34] *See* Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

[35] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036; *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU.

15, and it fails to leave open adequate "alternative observation opportunities," *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017).

103. Even if the Policy did address a legitimate concern about safety or security at the Pentagon, it is hopelessly overbroad. It seeks to restrain and chill constitutionally protected newsgathering and reporting that occurs both on and off Pentagon grounds, including "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips . . . ." Ex. A at 12–13; *see also, e.g.*, *Grayned*, 408 U.S. at 114 ("A clear and precise enactment may nevertheless be 'overbroad' if, in its reach it prohibits constitutionally protected conduct.").

104. The Policy's ever-present threat of PFAC suspension or revocation for "soliciting," receiving, or publishing information about the Department that has not been officially approved chills the exercise of First Amendment rights in multiple ways. It imposes a gag on all Department employees' communications with the press outside of pre-approved situations. It also states that a "security or safety risk" determination—warranting potential suspension or revocation of a PFAC—can be based on "unauthorized access [or] attempted unauthorized access" of classified or unclassified information. Ex. A at 12. And it provides for potential suspension or revocation of a PFAC if a reporter "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information." *Id.*

105. As the Supreme Court has recognized, "self-censorship w[ill] result," if government is permitted to sanction the use of "routine newspaper reporting techniqu[es]." *The Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989). And "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.*, 443

U.S. 97, 102 (1979). The Department has no legitimate justification, let alone a compelling one, for the Policy's restrictions on Plaintiffs' exercise of their First Amendment rights.

106. In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

107. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

108. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

109. The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT V

### Violation of the Due Process Clause (Lack of Adequate Pre-Deprivation Process) (APA, 5 U.S.C. § 706)

110. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111. The Policy violates the Due Process Clause because it deprives reporters of adequate pre-deprivation process by allowing Department officials to immediately suspend a PFAC before providing the PFAC holder any opportunity to be heard.

112. A PFAC "undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the [Fifth Amendment]." *Sherrill*, 569 F.2d at 130–31. The degree of pre-deprivation process to which someone is entitled under the Due Process Clause "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970); *see Nat'l Council*

*of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205–08 (D.C. Cir. 2001) (affording due process prior to government action depriving organization of "protected property right").

113. Given PFAC holders' weighty interest in avoiding a loss of access relative to the government's non-existent interest in abrogating such access, PFAC holders are entitled to meaningful pre-deprivation process, including notice and a meaningful opportunity to be heard prior to any suspension, at least outside of situations in which the government can credibly demonstrate a threat of physical harm. *See Goldberg*, 397 U.S. at 267–68. Indeed, the D.C. Circuit has expressly applied this requirement to the press pass context, holding that prior to a suspension or revocation, the government must provide "notice of the factual bases for denial [of access], an opportunity for the applicant to respond to these, and a final written statement of the reasons for denial." *Sherrill*, 569 F.2d at 130.

114. In contravention of this requirement, the Policy provides for the immediate suspension of access prior to any opportunity for a PFAC holder to be heard.

115. In this respect, the Policy violates the Fifth Amendment facially and as applied to Plaintiffs.

116. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

117. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

118. The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

**COUNT VI**

**Violation of the First and Fifth Amendments – Unconstitutional Condition (APA, 5 U.S.C. § 706)**

119. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

120. The Department's requirement that PFAC holders sign an "Acknowledgement" attesting to their "understanding" of the Policy imposes an unconstitutional condition on reporters' Pentagon access. Ex. A at 14. The Policy requires reporters to confirm they "understand[]" its vague and standardless provisions and misstatements of governing First Amendment standards.

121. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (omission in original); *see also City of Lakewood*, 486 U.S. at 764 ("[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion.").

122. In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

123. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

124. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

125. The Court should therefore declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT VII

### Violation of the Administrative Procedure Act—Arbitrary & Capricious Action (APA, 5 U.S.C. § 706)

126. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

127. The Department's adoption of the Policy is arbitrary and capricious in violation of the Administrative Procedure Act.

128. Agency action is arbitrary and capricious if the agency has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). The Department has not offered, and cannot offer, any "rational connection" between the "safety" and "security" of Department personnel and property and the provisions of the Policy targeting First Amendment-protected speech and newsgathering. *Id.*; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (If an agency "depart[s] from a prior policy," it "must show that there are good reasons for the new policy.").

129. Further, in adopting the Policy, the Department failed to consider less burdensome "alternative way[s] of achieving [its] objectives." *State Farm*, 463 U.S. at 48; *see also, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

130. The Department also took into account impermissible factors in crafting the Policy, which in purpose and effect discriminates against journalists and news organizations, including Plaintiffs, on the basis of content and perceived viewpoint. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (Courts "cannot ignore the disconnect between the decision made and the explanation given" as they are "not required to exhibit a naiveté from which ordinary citizens are

free." (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))). Agency action is arbitrary and capricious if the agency, as here, "relied on factors" it is not empowered "to consider." *State Farm*, 463 U.S. at 43.

131. In this respect, the Policy violates the Administrative Procedures Act.

132. Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

133. The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

134. The Court should therefore declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs respectfully request an order:

a. Declaring that the provisions of the Policy targeting Plaintiffs' protected newsgathering and speech and all actions implementing those provisions are unlawful and unconstitutional;

b. Vacating and preliminarily and permanently enjoining the Defendants from implementing or seeking to enforce those provisions of the Policy;

c. Ordering Defendants to reinstate PFACs formerly held by Barnes and The Times' other reporters;

d. Entering judgment in favor of Plaintiffs;

e. Awarding Plaintiffs their reasonable costs and attorney's fees in accordance with law; and

f. Issuing any other relief that the Court deems just and proper.

Dated: December 4, 2025

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York
(212) 351-4000
LCrain@gibsondunn.com

Susan Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes*

**pro hac vice application forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 25-cv-4218<br><br>**DECLARATION OF JULIAN E. BARNES** |

**DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

***My career as a reporter.***

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion for Summary Judgment.

3. I have worked for The Times since June 2018. I reside in the District of Columbia and am assigned to The Times' Washington Bureau.

4. My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects. I am one of seven Times reporters who held Pentagon Facility Alternate Credentials ("PFACs") issued by the Department of Defense (the "Department") as recently as summer or fall 2025.

5. Before I joined The Times, I covered the Pentagon for other news organizations including U.S. News and World Report, the Los Angeles Times, and The Wall Street Journal.

***My access to the Pentagon.***

6. I first obtained a PFAC in 2004, when I worked for U.S. News and World Report. I held a PFAC continuously from 2004 until August 2025 with the exception of a period of approximately 18 months in 2016 and 2017 when I did not regularly access the Pentagon because I was based in Brussels, Belgium. After I joined The Times in June 2018, I held a PFAC continuously until August 2025.

7. When I first obtained a PFAC, I was required to renew it every few months. After my initial renewals, I was required to renew it only annually. In my experience, this was typical of reporters who held PFACs: As long as you had been a continuous PFAC holder for an extended period of time, you would renew on an annual basis. At no point between 2004 and August 2025 was my PFAC ever denied, suspended, revoked, or not renewed. I am also not aware of any incident involving me or any other PFAC holder that occurred during my time covering the Pentagon that placed the safety or security of Department personnel or property at risk.

8. Between 2004 and 2025, I regularly accessed the Pentagon in the course of my work as a national security and intelligence reporter. As a reporter, there are myriad benefits to being at the Pentagon. Being onsite at the Pentagon enabled me to attend press briefings held at the Pentagon—which are often held on short notice and sometimes announced less than an hour before they occur. I also could and would regularly visit the Public Affairs offices of the United States military branches, which are housed at the Pentagon, to converse with Public Affairs staff and ask questions about United States military operations, the Department, or other topics pertinent to my reporting. I also sometimes met with intelligence officials at the Pentagon for background briefings or off-the-record discussions related to topics I was covering. I attended hundreds of

press briefings at the Pentagon and had countless discussions at the Pentagon with Department employees and officials.

9. Being at the Pentagon and, in particular, the ability to have face-to-face conversations with Pentagon officials and staff, has been integral to my reporting about the Department, national security, and United States intelligence agencies.

10. In my view, the longstanding tradition of press access to the Pentagon and to its personnel has helped provide the American public with a more in-depth, nuanced understanding of the United States military that has been beneficial to the press, the public, and to the Pentagon itself. I think that the American public has greater respect for the military because Pentagon leadership has in the past fostered a culture of permitting and even facilitating press access, which has led to a better understanding of military operations among the public.

***The Department's new policy leads to the loss of my PFAC.***

11. In May 2025, the Department announced new restrictions on reporters' physical access to certain parts of the Pentagon. As a result of those restrictions, even with my PFAC, I was no longer able to access spaces within the Pentagon that I had previously accessed routinely for years. Even with those new restrictions on physical access, however, I continued to report regularly from the Pentagon because it significantly benefitted my reporting to be in the building—both in order to cover formal proceedings, like press conferences, and to converse with Department personnel.

12. In or around August 2025, I learned that Department leadership was preparing to issue additional new restrictions relating to the press and, specifically, new rules relating to reporters' PFACs. I found this deeply concerning. In particular, I was concerned that under those new rules, the Department and its leadership would have free rein to suspend or revoke PFACs on

the basis of what journalists and news organizations reported, and that if they disliked something I had written for The Times, they would find a basis to suspend or revoke my PFAC.

13. My PFAC lapsed on August 31, 2025. At that time, I was—and I still am—a member in good standing of the Pentagon Press Association. I also was covering and still actively cover the Pentagon. Despite the lapse of my PFAC, a Department official invited me to renew it. Normally I would have renewed it without hesitation, as I had nearly every year dating back to 2004, but in August and September of 2025, I was concerned about the new rules that I understood at the time were going to be put in place by the Department regarding PFACs. Accordingly, I decided that I would wait to renew my PFAC until any new rules were announced. If not for the new rules relating to PFACs that were announced by the Department in September and October of 2025, I would have renewed my PFAC and expect that the Department would have granted my renewal, as it had for nearly twenty years.

14. In September 2025, the Department announced a new PFAC policy that confirmed my concerns: the policy gave Department officials broad discretion to suspend or revoke reporters' PFACs (or to refuse to renew or issue PFACs) if it did not approve of information that a reporter had "solicited," obtained, attempted to obtain, or published. The Department announced and then implemented an updated version of that policy in early October 2025, which I reviewed shortly after it was issued. The updated version did not address the parts of the policy that I and other reporters who cover the Pentagon found concerning and unworkable.

15. I was particularly concerned by portions of the new PFAC policy that appeared to grant Department officials the discretion to suspend, revoke, or refuse to issue PFACs based on newsgathering or the content of reporting. For example, the policy gives Department officials the discretion to suspend or revoke a journalist's PFAC if that journalist gathers and reports

information that isn't classified or secret but that the Department leadership does not want reported, which happens frequently. Under the policy, I do not know what standards Department officials would apply to determine whether or not to revoke, suspend, or refuse to issue a PFACs to me or any other reporter. Under the policy, as I read it, my PFAC could be suspended or revoked (or the Department might refuse to renew it) simply because I did things that are fundamental to my job as a reporter, like asking questions of Department personnel and writing articles that reflect the information I gather. It is not clear to me, based on the language of the new PFAC policy, what steps I would need to take to ensure that my PFAC was not subject to revocation, suspension, or non-renewal—other than to stop reporting on the Pentagon and the United States military.

16. Because of the new Policy, I did not renew my PFAC after it lapsed on August 31, 2025. In order to renew, I would have been required to sign the "Acknowledgment" form that is part of the Department's new PFAC policy, which would have required me to confirm that I "underst[ood]" and acknowledged the new policies and procedures regarding PFACs. I was not willing to sign that Acknowledgment because I did not understand, agree with, or agree to be bound by the new rules. If not for the new PFAC policy and the requirement that I sign the Acknowledgment, I would have renewed my PFAC.

17. The Department revoked the PFACs of PFAC holders who did not agree to sign the Acknowledgment. I gave my lapsed PFAC to my colleague at The Times, John Ismay, who handed in my PFAC, along with his, to the Department on October 15, 2025. All of the reporters at The Times who held PFACs turned them in.

***The Department's policy has limited my access and reporting opportunities.***

18. I have not been back to the Pentagon since the Department implemented its new policy pertaining to PFACs in early October 2025. Because my Times colleagues and I no longer

have PFACs, we cannot access the Pentagon as we did before. While the Pentagon permits non-PFAC holding members of the press to apply for a "day pass," it is not clear whether, as a former PFAC holder who refused to sign the Acknowledgment, I would be viewed as eligible for a day pass. In any event, applications for day passes must be submitted at least 48 hours in advance and are thus not particularly useful given the rapid-pace news cycle in which we report.

19. There have been press events at the Pentagon since October 15, 2025 that I would have attended had I still had a PFAC but that I was not able to attend because I no longer have a PFAC. For example, on December 2, 2025, the Pentagon held a news conference on less than one day's notice—which meant that even if I were eligible to obtain a day pass, I would not have been able to obtain one in time to cover the news conference. At the December 2, 2025 news conference, Pentagon staff discussed Defense Secretary Pete Hegseth and Admiral Frank M. Bradley's involvement in a military strike on a Venezuelan boat that occurred on September 2, 2025. This topic was (and continues to be) the subject of extensive news coverage, and I am one of the reporters covering it for The Times. In fact, at the December 2, 2025 news conference, Pentagon press staff, speaking from the podium, discussed a story I had published and mischaracterized my reporting. It would have been very valuable to my further coverage efforts if I could have attended the news conference to ask follow-up questions and also to address the mischaracterizations of my reporting. Because I no longer have a PFAC, I was not able to attend that press conference.

20. Relatedly, over the weekend, the United States military launched what President Trump called a "large scale strike" on the nation of Venezuela, capturing its leader Nicolás Maduro and his wife, and bringing them to the United States. I am one of The Times reporters covering that operation—what the United States military has named "Operation Absolute Resolve"—and my colleagues and I are currently working to learn as much as we can about that operation and its

larger implications for national security, so that we can inform the American public. It would have been very valuable to my reporting efforts and those of my colleagues to be at the Pentagon both before at the time that operation was carried out, and it would be beneficial to our reporting to be there now. But because I no longer have a PFAC, and because my colleagues at The Times no longer have PFACs, we cannot have a regular presence in the Pentagon.

21. Because of the Pentagon's new PFAC policy, I and other reporters whose job it is to provide independent and probing coverage of the Pentagon and the United States military that goes beyond official pronouncements are being prevented from accessing press events at the Pentagon and from engaging in newsgathering and reporting onsite. As a result, the Pentagon's new PFAC policy is causing significant harm to reporters like me who cover national security and the Pentagon, to the news organizations like The Times, and to the American public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4 day of January 2026 in Washington, D.C.

Julian E. Barnes

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE, *et al.*,

*Defendants*.

Civil Case No. 25-cv-4218

**DECLARATION OF ROBERT BURNS**

**DECLARATION OF ROBERT BURNS**

I, Robert Burns, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

***My career as a Pentagon reporter.***

2. I retired from The Associated Press ("AP") in May 2022 after 45 years as a reporter. I served as President of the Pentagon Press Association ("PPA") from 2012 until my retirement in 2022. Over the more than four decades I worked as a journalist, I spent more than thirty years covering national security and the Department of Defense (the "Department"). In 2013, I won the AP Gramling Journalism Award, the AP's highest honor, for my reporting on topics including the high rate of military suicides, attacks on U.S. troops by Afghan allies, and dysfunction in the Pentagon office charged with collecting the remains of wartime MIAs.

3. I first began reporting from the Pentagon in 1990 when the AP assigned me to cover the implications of the fall of the Berlin Wall. Thereafter, I reported broadly on national security matters, including assignments covering the White House and U.S. intelligence agencies. In 1999,

I became the AP's full-time Pentagon correspondent. I covered the Pentagon during multiple administrations spanning at least ten Secretaries of Defense.

4. I reported from the Pentagon frequently over the course of my career. I attended innumerable press briefings, background sessions, briefings specific to certain branches of services within the military, informal gatherings, and other engagements with civilian employees of the Department and military officials on Pentagon grounds.

***Reporters' access to and physical presence in the Pentagon.***

5. When I began covering the Pentagon in 1990, AP maintained a small workspace in the Pentagon press room that I understood journalists had used since the building's early years. After the September 11, 2001 terrorist attack and the Pentagon's renovation, the press area was relocated, but the basic arrangement remained the same: the Department provided the physical workspace and news organizations supplied their own materials and communications equipment.

6. In the immediate wake of September 11, 2001 terrorist attack the AP had three reporters at the Pentagon around the clock. Over time, that was reduced to two.

7. Reporting on-site at the Pentagon typically gave me and other reporters different types of opportunities to interact with government officials, including formal press briefings, whether regular or *ad hoc*. During these briefings, representatives from the Department or specific branches of the armed services would provide information and updates to the reporters who were present and would typically take questions. At times, these press briefings were led by the Secretary of Defense. At other times, they were led by senior press officials or leaders from different parts of the Department or branches of the military. These appearances routinely provided detail and nuance beyond what was included in statements issued to the public or press more broadly.

8. While beneficial, these briefings had some practical limitations: time for questions was limited, only a portion of substantive topics could be addressed, and questioning of senior officials often produced incomplete information that required follow-up. Accordingly, I and other reporters routinely engaged in additional and follow-up conversations immediately before or after briefings with senior officials or their aides. These conversations—sometimes on the record, sometimes on background, and sometimes off the record—in my experience were an essential part of obtaining the detail and clarity necessary to report accurately on defense policy and operations.

9. Reporting on-site at the Pentagon also gave me access to short-notice and no-notice briefings. Secretaries of Defense occasionally convened news conferences with little advance warning, sometimes to announce personnel decisions or respond to unfolding events. Certain Secretaries of Defense, including Secretary Robert Gates, at times provided very short notice—sometimes only an hour or two—before holding a significant press conference. Reporters who were not already in the building could miss these opportunities entirely. Physical presence in the building was essential to covering news in real time.

10. Reporting from the Pentagon also gave me an opportunity for semi-formal interactions with Department officials, including service-specific (*e.g.*, Army or Navy) background briefings, structured meetings outside the press room, and the like. For example, Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions. For those kinds of discussions, being physically present in the building was the only way to attend and to know what transpired.

11. Finally, physical presence at the Pentagon also enabled informal interactions. Over time, reporters built professional relationships with mid-ranking and senior officials and could occasionally obtain helpful context or an understanding or sense of developing issues. On occasion,

for example, trusted officials would indicate that a reporter "might want to stay a little late today," signaling that significant news might emerge. Such cues did not convey sensitive information, but they reflected long-established professional trust. These sorts of informal interactions proved invaluable to me and other reporters, press outlets, and the Department, by ensuring news was timely reported with appropriate precision and nuance.

12. Physical presence also provided intangible situational awareness. Activity within the building—the tone of conversations, movements of personnel, or general atmosphere—often indicated that something significant was occurring before it was publicly announced. After the 2000 attack on a U.S. Navy ship, for example, I sensed the seriousness of the situation immediately upon entering the Pentagon. Remote reporting could not have provided me with that context or allowed me to prepare to report on unfolding events in the same manner.

13. Across my decades in the Pentagon, reporters, including myself, respected physical and professional boundaries within the building. For example, the National Military Command Center and most of the Joint Chiefs area were off limits, and reporters did not enter offices without invitation. These longstanding rules were in my long experience at the Pentagon and as President of the PPA consistently adhered to. I never observed or heard of a reporter attempting to enter a restricted area improperly.

14. Well-settled professional norms also governed reporter conduct within the Pentagon. For example, reporters wore Pentagon Facilities Alternate Credentials or, as they are more colloquially known, press badges. If at any time a reporter's press badge was not visible, the Pentagon's internal police force would remind the reporter to display it. These reminders were cordial, and reporters followed them without issue.

***The Pentagon credentialing process.***

15. Throughout my time at the Pentagon, the credentialing process for Pentagon reporters was straightforward and, as I recall, consistent. Because the process was never an issue of concern or contention, it is difficult to recall its exact metes and bounds over my more than thirty years covering the Pentagon. That said, my recollection is that the process generally required reporters to provide a letter confirming their employment and assignment and to undergo standard background checks. Later—in or around the 2000s—the Department asked reporters to sign a one-page form that set forth some basic, noncontroversial information and building security requirements relating to PFACs. That form stated, for example, that PFACs "must be visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should be immediately reported to the Public Affairs Operations." After September 11, 2001, certain security offices were reorganized, but these changes did not materially affect credentialing for journalists.

16. As President of the PPA, I expect that I would have been aware of any credentialing issues affecting reporters or news organizations. I am not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on any security or safety issue. I am also not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on content of their reporting. That is true even of reporting that was critical of Department or other government officials or pertained to the disclosure of sensitive, secret, or confidential information. To the best of my knowledge and recollection, credentials were revoked only when a reporter was no longer actively reporting from the Pentagon.

17. During my tenure reporting from the Pentagon, I published a number of stories that were sensitive or could be seen as critical of the Department. For example, in the mid-2010s, I

published a series of articles about systemic problems in the Air Force's nuclear missile enterprise, including inspection failures, morale issues, training deficiencies, and misconduct. Although that reporting covered extraordinarily sensitive issues and was, at least initially, unwelcome by some officials, I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that my reporting would trigger retaliation. In fact, the Department later undertook reviews and instituted reforms to address issues identified in my reporting.

***The Department's new access policy will damage the public's interest.***

18. I have grave concerns about the Department's new policy and what it portends for national defense coverage, the Department, and the American public. Although I am confident that reporters covering the Department will continue working to uncover and report on important stories to the best of their abilities whether or not physically present at the Pentagon, I also know based on my own experience that the restriction or elimination of meaningful and equal press access to the Pentagon—which the new policy appears designed to accomplish—harms the American public. It results in reporters with different areas of focus and varied experience being unable to ask timely follow-up questions, attend short-notice briefings, and engage in the informal and semi-formal interactions that have long provided important context.

19. It is also likely that reporting on issues of importance that might otherwise be ignored will be curtailed or eliminated as a consequence of the new policy. For example, when I was covering the Pentagon, I spent an unusual amount of time reporting on how to recover remains of missing service members. It was a significant issue to service members' families, though not necessarily a subject of Department press announcements. But being in the building allowed me to have in-depth conversations with individuals responsible for this work and to learn the details

and nuances of this and other topics. In short, excluding a wide range of Defense-beat reporters from the Pentagon or limiting their access will cause their reporting on the Department to lose the depth, scope, and accuracy that comes from observing events as they unfold and speaking directly with officials.

20. The public will also lose out. The Department of Defense is the largest federal agency, responsible for global operations, substantial public expenditures, and a wide range of military, personnel, and policy decisions. Understanding the scope of the Department's activity requires sustained interaction with the officials who carry out this work. Because all, or nearly all, experienced Pentagon reporters are now without access to the Pentagon, both the sort of institutional knowledge and the coincident relationships they have are at risk of being lost. And if new reporters do not seek to build those relationships—perhaps because they are not regularly present, they fear losing their access, or they are content to let the Department speak unchallenged—reporting will be considerably impoverished to the detriment of the public. Simply reiterating official statements amounts to little more than stenography and leaves the public less safe and secure and with a narrower and less textured understanding of critical issues and events.

21. During my career, officials expressed to me on a number of occasions that interactions with reporters across a variety of news organizations helped them understand what issues were receiving attention and why. In other words, it served as a kind of intelligence-gathering tool for the Department. In addition, regular formal and informal interactions allowed the Department to clarify misunderstandings, provide additional context, better anticipate how policy decisions might be interpreted publicly, and help ensure its own voice was heard. These exchanges—after briefings, through periodic background discussions, and so forth—were an

important part of how the Department kept its pulse on reporting and shaped its communications to all cross sections of the American public.

22. Reporting made possible by physical access to the Pentagon also helped identify structural and personnel issues that the Department was prompted to address and improve. For example, my reporting on issues within the Air Force's nuclear missile enterprise, although perhaps unwelcome by Department leadership at the time, contributed to the Department's decision to undertake broad reviews and ultimately to reform. Along similar lines, during my travels with Secretaries of Defense to military bases, servicemembers would sometimes approach me or other reporters to express appreciation for our work. There are many other such examples, all of which underscore that sustained, informed, and sometimes critical press coverage can illuminate problems and support improvements in readiness, morale, and policy.

23. In sum, the longstanding press access structure at the Pentagon has benefitted reporters, the Department, and the public. The new policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of December 2025 in Reston, Virginia.

[signature]
Robert Burns

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 25-cv-4218<br>**DECLARATION OF RICHARD W. STEVENSON** |

**DECLARATION OF RICHARD W. STEVENSON**

I, Richard W. Stevenson, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. I make this declaration in support of Plaintiffs' Motion for Summary Judgment. If called to do so, I could and would competently testify to these matters under oath.

2. I am an editor and Washington bureau chief with The New York Times ("The Times"). I have worked for The Times since 1985, and I have been primarily based in The Times Washington bureau since 1996.

3. As of November 2025, The Times had more than 12 million subscribers across all of its print and digital products, including news. Website traffic data consistently indicates that The Times' website receives more visits than the website of any other news organization in the United States.

4. As part of my responsibilities as the Times' Washington bureau chief, I oversee coverage of the federal government, including the Department of Defense (the "Department" or "Pentagon"). I manage the work of reporters at The Times, including reporters who cover the Pentagon and who held Pentagon Facility Alternate Credentials ("PFACs") as recently as October 2025.

5. Since I joined The Times in 1985 until October 2025, The Times has consistently had multiple reporters with PFACs who have regularly accessed the Pentagon in the course of their work. In my view, as an editor at The Times, the ability of Times reporters to access the Pentagon on a regular basis has enhanced the depth, detail, and quality of The Times' coverage of the Pentagon, the Department, the United States military, and national security issues. It has enabled Times reporters to speak face-to-face with Department officials, attend press conferences and briefings, ask questions of public affairs staff and Department leadership, develop relationships with Department personnel, and provide immediate, in-person coverage of events that occur at the Pentagon.

6. In my experience, Times reporters who cover the Pentagon and national security have consistently strived to be accurate, independent, probing, and fair in their coverage. One aspect of those reporters' job is to report on the official pronouncements of the Department and the information that Department leadership wants to convey to the public. But it is also important that those reporters seek information beyond what the Department deems to be in its interests to make public. And it is also important that reporters seek to contextualize, investigate, and fact-check the Department's official pronouncements, which includes gathering and reporting information that may contradict or cast doubt on Department leaders' statements, and to sometimes report information that Department leadership does not intend to make public at all. All of this reporting is integral to ensuring that the American public understands what its government and military are doing, and to ensuring that Department leaders are accountable for their actions and statements.

7. To my knowledge, no Times reporter has ever had their PFAC suspended, revoked, or not renewed because the Department concluded they posed a threat to the safety or security of Department personnel or property.

8. In May 2025, I learned that the Department was imposing new restrictions on reporters' physical access to parts of the Pentagon. These new restrictions impeded Times reporters' ability to access unsecure parts of the building that they had regularly visited in the past, and it reduced their face-to-face interaction with certain Department offices and personnel, including Public Affairs personnel. I am not aware of any security incident or other incident involving a PFAC holder that precipitated these new restrictions.

9. In September and October 2025, the Department announced new rules governing reporters' PFACs. I read the first version of this new PFAC policy shortly after it was announced in September, and read the final policy, as revised, when it was issued in early October. The new PFAC policy states that a reporter or news organization who sought out, acquired, or published information that Department officials had not approved—even if that information was not classified—could be deemed a "security or safety risk" and could lose their PFAC immediately, without warning. That meant that the Department could suspend or revoke a reporter's PFAC if that reporter or his or her news outlet gathered or published information that the Department viewed as unflattering or critical of it or its leadership. I viewed this policy to be intolerable and inconsistent with The Times' journalistic standards and practices.

10. Under the new PFAC policy, reporters with PFACs were required to either sign an "Acknowledgment" confirming that they "acknowledge[d]" and "underst[ood]" the new policy and its provisions by October 15, 2025, or else their PFACs would be revoked. I did not believe at the time, and do not believe now, that Times reporters can fulfill the ethical and professional responsibilities of their jobs—which include an obligation to seek out and report the truth, regardless of whether it is convenient or inconvenient for those in positions of power—while also acknowledging a policy that restricts their rights to gather and report information the Department

has not formally approved by granting Department officials the unlimited power to immediately suspend or revoke those reporters' PFACs.

11. Ultimately, all seven Times reporters who held PFACs as of August 2025, Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, Julian Barnes, and Bill Hennigan, decided not to sign the Acknowledgment and were compelled to surrender their PFACs as a result. Even though it is a significant detriment to The Times and its mission to no longer have reporters at the Pentagon regularly, I agreed with and support that decision. It is my understanding that, if not for the new PFAC policy and the Department's mandate that reporters sign the Acknowledgment to maintain their PFACs, reporters with The Times would have continued to hold PFACs and to regularly access the Pentagon for newsgathering and reporting.

12. While the Pentagon permits non-PFAC holding members of the press to apply for a "day pass," it is not clear whether Times reporters whose PFACs were revoked because they refused to sign the Acknowledgment would be viewed as eligible for a day pass. In any event, applications for day passes must be submitted at least 48 hours in advance. At least two Times reporters have applied for day passes since October 15, 2025, and their applications were denied.

13. Since on or around October 15, 2025, no Times reporter has held a PFAC. This has created an unprecedented and significant impediment to Times reporters' ability to cover the Pentagon, Department leadership, national security, and the United States military. For example, the Pentagon held a press conference in the Pentagon Press Briefing Room on December 2, 2025 that Times reporters were unable to attend because they no longer have PFACs. Because they were not present at that press conference, Times reporters did not have an opportunity to ask questions of the Pentagon Press Secretary that would be relevant to their reporting. Times reporters are also unable to have face-to-face interactions with Department officials and personnel without a

prearranged meeting away from the Pentagon, which is more difficult and time-consuming to arrange. While The Times has continued to provide in-depth coverage of the Pentagon since October 15, 2025, that reporting has been made more difficult and burdensome because no Times reporter has a PFAC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of January 2026 in Chevy Chase, Maryland.

Richard W. Stevenson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants*. | Civil Case No. 25-cv-4218<br><br>**DECLARATION OF PETE WILLIAMS** |

## DECLARATION OF PETE WILLIAMS

I, Louis Alan (Pete) Williams, hereby declare as follows:

1. I am over 18 years of age and I make this declaration based upon my own personal knowledge. If called to do so, I could and would competently testify to these matters under oath.

***My professional background.***

2. I am a journalist and former public servant. I started my career in journalism in the 1970s as a local radio and television broadcaster in Casper, Wyoming, where I grew up, after graduating from Stanford University with a degree in journalism. I later served as press secretary for then-Congressman Dick Cheney from 1986 until 1989, when I went to work at the Department of Defense (the "Department") under then-Secretary of Defense Cheney. I served as Assistant Secretary of Defense for Public Affairs, a Senate-confirmed position, from May 1989 until January 1993.

3. After leaving the Defense Department, I became a justice correspondent for NBC News in late March 1993. I retired from NBC News in July 2022. During my nearly 30 years at the network, spanning five U.S. presidential administrations, I covered both the Department of Justice and the Supreme Court of the United States.

4. During my time as Assistant Secretary of Defense for Public Affairs, I interacted with reporters at the Pentagon every day, both formally in press briefings, and informally. My office was just down the hall from where the journalists' workspaces were located.

***My experience as Assistant Secretary of Defense for Public Affairs.***

5. During my time at the Pentagon, the Department had a process for providing journalists with press credentials—now called Pentagon Facility Alternative Credentials or PFACs—that enabled them to have a regular presence at the Pentagon. My recollection is that the process for obtaining a press credential was relatively straightforward and involved undergoing a background check. When I was at the Department, we did not decide who was eligible to obtain or maintain a press credential based on whether we thought a particular reporter or news organization would report favorably about the Department or its leadership.

6. In my experience, it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon. During my time as Assistant Secretary of Defense for Public Affairs, I frequently would talk to reporters who were present in the building as their stories were being developed and, in that way, get a sense of what was important to them and what issues would be at the forefront for the American public. I could also help provide guidance to journalists if I thought they were not headed in the right direction on a story; I could help correct mistakes or misunderstandings or provide additional context where needed.

7. For instance, during the Gulf War, many of the more experienced Pentagon and national security reporters were reporting from the Gulf, so news organizations had less experienced reporters working at the Pentagon. It was helpful both for those reporters and for the Department to have them in the building, where they were able to ask questions, confirm facts,

and learn information that would help them avoid making mistakes in their reporting. Always, but especially during times of war or national crises, it benefits everyone to ensure that timely, accurate information is being conveyed to the American public.

8. The regular presence of reporters in the Pentagon also helped develop respect and trust between those reporters and Department officials. While it did not prevent those journalists from writing critical stories about the Department and its leadership, the trust that was built up over time between journalists and Department officials was mutually beneficial. I recall instances where I asked journalists to hold back specific pieces of information they had learned because we believed, if it was made public right away, it would damage operational security. The reporters that I encountered regularly at the Pentagon would often consider and honor those requests. In those situations, it was vital that journalists and Department officials trusted one another.

9. During my service as Assistant Secretary of Defense for Public Affairs, some Department officials may have found it inconvenient or challenging to have journalists in the building covering the Department and the United States military. For example, there were times when journalists published critical stories or reported information that Department officials believed had come out too soon or wished had not been made public. But Department leadership understood and respected the role of an independent press in our democracy, and cutting off access to the Pentagon for journalists could never stop reporting that was critical of the Department. We would never have considered suspending, revoking, or not renewing a journalist's press credential in response to a critical story.

10. During my time as Assistant Secretary of Defense for Public Affairs, I did not encounter any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon. To the contrary, in my experience, journalists were very sensitive to security

considerations and cared deeply about the safety of men and women in the United States military. I do not recall the Pentagon suspending, revoking, or not renewing any journalist's press credential because of a safety or security concern.

***My experience as a journalist covering the Department of Justice and Supreme Court.***

11. As a correspondent covering the Department of Justice for NBC News, I had a long-term "hard" building pass issued by the Justice Department's Office of Public Affairs and frequently reported from Justice Department headquarters.

12. As was the case when I was at the Pentagon, when I was covering the Justice Department, credentialed journalists had desks in the building and places where cameras were set up to allow journalists to report live. As a credentialed journalist covering the Justice Department, I could walk unescorted to areas in the building, including where the offices of the Attorney General and Deputy Attorney General were located, that were not restricted or secure. Similarly, when I was Assistant Secretary of Defense for Public Affairs, journalists could go anywhere in the Pentagon where they did not require clearance—only secure areas, like the National Military Command Center, were off limits.

13. I found it beneficial as a reporter to be in the building both when I was covering the Justice Department and the Supreme Court. I learned things by being there on a regular basis that improved my reporting. Reporters get to know the rhythms of the building and can sense when something newsworthy is happening.

14. When I was covering the Justice Department, being in the building gave me ready access to experts—people who could answer questions about, for example, the wording in a federal criminal statute, and help me better understand how a particular procedure or process worked. By being present in the building, I was also able to quickly verify information, which is critical for

good journalism. In my view, trying to cover the Justice Department or the Pentagon without regularly being present in the building is like trying to write a restaurant review without going to the restaurant and trying the food.

***The Department's new policy harms the American public.***

15. I am familiar with changes that have been made by the Department to press access under Secretary Hegseth, and I have read the policy concerning press credentials at issue in this litigation. Based on my experience both as a journalist and as Assistant Secretary of Defense for Public Affairs, I believe these measures are counterproductive for the Department and will ultimately harm the American public.

16. In early February 2025, after learning that the Department had announced that it would be shifting news organizations out of the Pentagon press room, I wrote to then-chief Pentagon spokesman John Ullyot to share my view that such a move would not be in the Department's best interests. Among other things, I pointed out that when I was in his position, I had found it essential to have journalists close at hand when I needed to reach them to urge corrections, suggest approaches in reporting, or provide guidance to avoid mistakes. I also noted that journalists from three of the news organizations singled out to vacate their spaces in the Pentagon—The New York Times, NBC, and NPR—had died covering United States military operations abroad. A true and correct copy of my email is attached hereto as Exhibit A.

17. The press credential policy put into the place by the Department in October 2025 is, in my view, even worse and even more counterproductive for the Department. The policy states that the Department can take away a press credential if a journalist reports even unclassified information that the Department hasn't approved for release. That is offensive and counter to the role of an independent press. Journalists should not risk the loss of their credentials simply because

they are doing their job as reporters. And by promulgating that policy, the Department forced knowledgeable and experienced national security and defense reporters out of the building entirely—journalists from news organizations that reach a large and broad segment of the American public.

18. As fewer Americans have any involvement with or direct connection to the United States military, it is more important than ever for the Department to be transparent and to build and maintain trust with the American people. Interacting with the press is an important way to build and maintain that trust. Unfortunately, the Pentagon's new press credential policy will only undermine it.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: December 19, 2025, Washington, D.C.

Louis Alan (Pete) Williams

# EXHIBIT 13

X

Post

**Sean Parnell**
@SeanParnellASW

Today, the Department of War is announcing the next generation of the Pentagon press corps.

We are excited to announce over 60 journalists, representing a broad spectrum of new media outlets and independent journalists, have signed the Pentagon's media access policy and will be joining the new Pentagon press corps. Twenty-six journalists across 18 outlets were among the former Pentagon press corps who chose to sign the DOW media access policy.

New media outlets and independent journalists have created the formula to circumvent the lies of the mainstream media and get real news directly to the American people. Their reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon. Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media. We look forward to beginning a fresh relationship with members of the new Pentagon press corps.

1:21 PM · Oct 22, 2025 · **4.8M** Views

4.4K 5.7K 21K 732

**Read 4.4K replies**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | **Civil Case No. 25-cv-04218 (PLF)** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h)(1), Plaintiffs The New York Times Co. ("The Times") and Julian E. Barnes ("Barnes") respectfully submit the following statement of material facts that are not in genuine dispute.

## I. Journalists and News Organizations Have Reported from the Pentagon for Decades.

1. A Pentagon Facilities Alternate Credential ("PFAC") is a credential that members of the press are issued to access the Pentagon. Decl. of Theodore J. Boutrous, Jr. ("Boutrous Decl.") ¶ 3, Ex. 1.

2. Since the Pentagon opened in 1942, journalists from news organizations across the country have covered the Department of Defense (the "Department" or "Pentagon") from Pentagon grounds. Boutrous Decl. ¶ 4, Ex. 2.

3. Having a consistent presence at the Pentagon has enabled and enhanced the ability of Plaintiffs and other members of the press to report on the Department and its leadership during

some of the most consequential moments in American history. Decl. of Richard W. Stevenson ("Stevenson Decl.") ¶ 5; Decl. of Julian E. Barnes ("Barnes Decl.") ¶ 9; Decl. of Robert Burns ("Burns Decl.") ¶ 7.

4. Journalists' presence at the Pentagon made possible real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself. Boutrous Decl., ¶ 5, Ex. 3.

5. For decades, the Department has had a process for issuing press credentials that included a standard background check and the submission of a letter confirming a reporter's employment and assignment. Burns Decl. ¶ 15; Decl. of Pete Williams ("Williams Decl.") ¶ 5.

6. The Department's PFAC process prior to October 2025 was similar to the credentialing process for other secure federal government buildings like the White House, Congress, and the Supreme Court. Boutrous Decl. ¶ 6, Ex. 4; *Sherrill v. Knight*, 569 F.2d 124, 126-27 & n.3 (D.C. Cir. 1977); *Karem v. Trump*, 960 F.3d 656, 660–61 (D.C. Cir. 2020).

7. For decades, the Department provided dedicated physical workspace for news organizations within the Pentagon. Burns Decl. ¶ 5; Williams Decl. ¶ 4.

8. Beginning in or around the 2000s, reporters who received PFACs were also asked to sign a one-page form that set forth certain "basic, noncontroversial" requirements relating to PFACs, including that they be "visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should immediately be reported to the Public Affairs Operations." Burns Decl. ¶ 15.

9. When Pete Williams ("Williams") was Assistant Secretary of Defense for Public Affairs, he worked down the hall from reporters' dedicated workspace and interacted with reporters on a daily basis. Williams Decl. ¶ 4.

10. When Robert Burns ("Burns") was covering the Pentagon for The Associated Press from 1999 through 2022, reporters with PFACs were restricted from accessing certain secure areas within the Pentagon and respected those boundaries. Burns Decl. ¶¶ 2–3, 13.

11. The regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations, including Plaintiffs, to keep Americans informed about the United States military, while posing no security or safety risk to Department property or personnel. Stevenson Decl. ¶ 5; Barnes Decl. ¶ 9; Burns Decl. ¶¶ 8–10; Williams Decl. ¶¶ 8, 10, 13–16.

12. From the Pentagon, reporters have historically been able to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings. Burns Decl. ¶¶ 7–12.

13. Reporters at the Pentagon can also engage in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff; such in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations. Burns Decl. ¶ 8; Barnes Decl. ¶ 19; Williams Decl. ¶¶ 6–10.

14. For example, former Secretary of Defense Donald Rumsfeld regularly invited reporters into his office on weekend mornings for wide-ranging, off-the-record discussions. Burns Decl. ¶ 10.

15. In-person interactions allow reporters at the Pentagon to build professional relationships and develop trust with Department officials. Burns Decl. ¶ 11; Williams Decl. ¶¶ 6–8.

16. Professional relationships between reporters and Department officials facilitate and enhance reporting and benefit not only journalists but also the Department. Burns Decl. ¶¶ 11, 21; Williams Decl. ¶ 6.

17. The Department has benefitted from the regular presence of reporters from news outlets that reach a broad and diverse population of Americans. Williams Decl. ¶ 6.

18. During Williams' tenure as Assistant Secretary of Defense for Public Affairs, he was able to glean from reporters regularly present at the Pentagon what issues were at the forefront for the American public, help confirm facts, provide guidance, supply additional context, and correct mistakes or misunderstandings. Williams Decl. ¶¶ 6–7.

19. There have been times when journalists with PFACs have published critical stories or reported information that Department officials believed had come out too soon or would have preferred had not been made public. Such stories have led to scrutiny by lawmakers and the public, and sometimes spurred beneficial reforms. Williams Decl. ¶¶ 8–9; Burns Decl. ¶¶ 17, 22.

20. During Williams' tenure as Assistant Secretary of Defense for Public Affairs, even when Department leadership disliked a journalist's or news organization's reporting, they did not consider suspending, revoking, or not renewing their press credentials in response to that reporting. Williams Decl. ¶ 9.

21. Reporters who spent decades covering the Pentagon, as well as former Pentagon officials, are not aware of any journalist's press credential being suspended, revoked, or not renewed due to a concern over the safety or security of Department personnel or property. Williams Decl. ¶ 10; Burns Decl. ¶¶ 16–17; Barnes Decl. ¶ 7.

22. For more than forty years, The Times has had multiple reporters with PFACs regularly working at the Pentagon. Stevenson Decl. ¶ 5.

23. For most of 2025, seven Times reporters, including Barnes, held PFACs. Stevenson Decl. ¶ 11; Barnes Decl. ¶ 6.

24. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes Decl. ¶¶ 2, 4.

25. Barnes has held a PFAC almost continuously since 2004. Barnes Decl. ¶ 6.

26. In the last two decades, Barnes has attended hundreds of Pentagon press briefings, and has had countless discussions with Department employees and officials in connection with his reporting. Barnes Decl. ¶ 8.

27. Barnes's access to and regular presence at the Pentagon allowed him to attend press briefings that were scheduled on short notice, ask follow-up questions of Department spokespeople during and after press conferences, and ask questions of the Public Affairs representatives of every branch of the United States military. Barnes Decl. ¶¶ 8–9.

28. The Times solicits tips via a "tips page" on its website that "offer[s] several ways to get in touch with and provide materials to [Times] journalists." Boutrous Decl., ¶ 29, Ex. 27.

29. For The Times, having journalists with access to the Pentagon has enhanced the depth, detail, quality, and accuracy of its coverage of the Department, the United States military, and national security issues. Stevenson Decl. ¶ 5.

30. Covering the Pentagon accurately, independently, and fairly requires that Times journalists not only report on the Department's official pronouncements, but also that they contextualize, investigate, and fact-check those official pronouncements—and sometimes that they gather and report information that Department leadership does not intend to make public at all. Stevenson Decl. ¶ 6.

31. Times reporters' ability to access the Pentagon facilitates their reporting and enhances the quality of their journalism. Stevenson Decl. ¶ 6.

## II. <u>The Pentagon Announces New Restrictions on Journalists' Access to the Pentagon Including a Revised PFAC Policy</u>.

32. On November 12, 2024, then President-elect Donald Trump named Defendant Pete Hegseth as his nominee for Secretary of Defense. Boutrous Decl. ¶ 7, Ex. 5.

33. Hegseth was confirmed as Secretary of Defense on January 24, 2025. Boutrous Decl. ¶ 9, Ex. 7.

34. Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience. Boutrous Decl. ¶ 8, Ex. 6.

35. Secretary Hegseth and other Department officials have openly complained about reporting they perceive as unfavorable to them and the Department. Boutrous Decl. ¶ 10, Ex. 8.

36. In or around February 2025, the Department announced that it was requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, the Hill, and the War Zone—to give up their dedicated working spaces in the Pentagon as part of a new so-called "rotation" system. Williams Decl., ¶ 16; Boutrous Decl. ¶ 11, Ex. 9.

37. The Department's decision to require specified news outlets to give up their dedicated workspaces in the Pentagon press room was criticized, including by former Defense Department officials. Williams Decl. ¶ 16; Boutrous Decl. ¶ 12, Ex. 10.

38. In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," that imposed new restrictions on

journalists' physical access to specific areas within the Pentagon. Administrative Record ("AR"), at NYTIMES-DOW-25cv04218-000000018.

39. According to the memorandum, these "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." AR at NYTIMES-DOW-25cv04218-00000018.

40. The memorandum prohibited journalists from being present in the areas around the Secretary's office and required official-escort-only access to other sections of the building, including the public affairs offices of the military service branches. AR at NYTIMES-DOW-25cv04218-00000018-19; Barnes Decl., ¶ 11; Boutrous Decl. ¶ 12, Ex. 10.

41. Under Secretary Hegseth's leadership, the Department made plans to implement random polygraph testing of Department personnel in a purported effort to stop "leaks." Boutrous Decl. ¶ 13, Ex. 11.

42. On September 18, 2025, chief Pentagon spokesperson Sean Parnell ("Parnell"), issued a memorandum to agency personnel that purported to implement the Department's Updated Physical Control Measures. AR at NYTIMES-DOW-25cv04218-00000022–36 (the "September 18 Memorandum").

43. The September 18 Memorandum stated that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." AR at NYTIMES-DOW-25cv04218-00000022.

44. The Department did not identify any breach of physical security or other incident necessitating new safety and security requirements. Journalists, including Barnes and Burns, the

former-President of the Pentagon Press Association, are not aware of any such incident. Burns Decl., ¶ 16; Barnes Decl., ¶ 7; Stevenson Decl., ¶¶ 7–8.

45. The "Reservation In-Brief" ("September In-Brief") attached to the September 18 Memorandum announced new rules relating to PFACs. AR at NYTIMES-DOW-25cv04218-00000024–36.

46. The September In-Brief stated that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[,]" and that a reporter could be deemed a "security or safety risk" "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information, and on grounds that "include[d], but [were] not limited to," "attempts to improperly obtain" Department information, or "being found in physical possession of" Department information "without reporting it." AR at NYTIMES-DOW-25cv04218-00000024–35.

47. The September In-Brief included an "Acknowledgment" that journalists would be required to sign as a condition to obtaining or maintaining a PFAC. AR at NYTIMES-DOW-25cv04218-00000032–33.

## III. <u>Members of the Press Object to the New PFAC Policy</u>

48. On September 22, 2025, the Reporters Committee for Freedom of the Press (the "Reporters Committee") sent a letter to Parnell regarding the September In-Brief. The Reporters Committee's letter asked for clarification as to how the new PFAC policy would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Pentagon approval. AR at NYTIMES-DOW-25cv04218-00000044–45.

49. In a response letter dated September 24, 2025, Parnell stated his intent to "clarify" that the September In-Brief's requirement that "information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified," was directed at Pentagon officials, and did "not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." AR at NYTIMES-DOW-25cv04218-00000041–43.

50. Parnell's September 24, 2025 letter to the Reporters Committee stated that the Policy's "focus" was "on preventing active solicitation that encourages [Department] personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment." AR at NYTIMES-DOW-25cv04218-00000042.

51. Parnell's September 24, 2025 letter to the Reporters Committee stated that the Department considers any "attempts to improperly obtain" Department information, including unclassified information, or "being found in physical possession" of such information, even "without reporting on it[,]" to be violations of the Policy that could, if the Department so chooses, prompt the immediate suspension of a PFAC. AR at NYTIMES-DOW-25cv04218-00000034, NYTIMES-DOW-25cv04218-00000042–43.

52. Parnell's September 2024, 2025 letter to the Reporters Committee stated that in "rare, extreme cases," the "[r]eceipt of unsolicited information and subsequent publication" "could factor into" the "discretionary" decision to revoke a PFAC. AR at NYTIMES-DOW-25cv04218-00000042.

53. The Times, along with other media organizations, informed the Pentagon that these provisions of the new PFAC policy were incompatible with their First Amendment rights and responsibilities as members of the press, and that they could not sign the Acknowledgement.

Stevenson Decl. ¶¶ 10–11; Barnes Decl. ¶¶ 16–17; AR at NYTIMES-DOW-25cv04218-00000050–74.

## IV. The Pentagon Promulgates its Final Policy and Mandates that PFAC Holders Sign an "Acknowledgement."

54. On October 6, 2025, the Department promulgated a final new PFAC policy, including final versions of the In-Brief and Acknowledgment (the "Policy"). AR at NYTIMES-DOW-25cv04218-00000001–17.

55. The Policy promulgated by the Department provides that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property" and that "[s]uch an initial determination may result may result in an immediate suspension of [a journalist's] Pentagon access while the procedures preceding a final determination are pending." AR at NYTIMES-DOW-25cv04218-000000012.

56. The Policy states that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." AR at NYTIMES-DOW-25cv04218-000000012.

57. The Policy states that "[a]ll determinations under th[e] Policy are undertaken on a case-by-case basis reviewing the totality of the circumstances[.]" AR at NYTIMES-DOW-25cv04218-000000013.

58. The Policy provides that a journalist's receipt, publication, or "solicitation" of "controlled unclassified information[,]" which "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information[,]" may result in the immediate suspension or revocation of a PFAC. AR at NYTIMES-DOW-25cv04218-00000006, NYTIMES-DOW-25cv04218-00000012.

59. The Policy states that, "[t]o ensure the safety of U.S. personnel, news media who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information] should discuss those materials with the [Pentagon Press Operations] prior to publication." AR at NYTIMES-DOW-25cv04218-00000006.

60. The Policy states:

> Solicitation may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips encouraging [Department] employees to share non-public [Department] information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation. Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

AR at NYTIMES-DOW-25cv04218-000000012–13.

61. The Policy includes an Appendix, which states that "[p]ersons presumed to present" a "security or safety risk to [Department] personnel or property" will "include, but are not limited to, those who have been convicted of any offense involving," *inter alia*, national defense, theft, trespassing, fraud, deceit, and "[u]nprofessional conduct that might serve to disrupt Pentagon operations." AR at NYTIMES-DOW-25cv04218-000000015.

62. The Appendix further states: "Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the [In-Brief]." AR at NYTIMES-DOW-25cv04218-000000015.

63. The Appendix sets forth "[p]rocedures for [d]enial, [r]evocation, or [n]on-[r]enewal" of a PFAC, including written "notification[.]" AR at NYTIMES-DOW-25cv04218-000000015–16.

64. The procedures set forth in the Appendix allow for an appeal after the "immediate suspension" of a reporter's PFAC. AR at NYTIMES-DOW-25cv04218-000000008, NYTIMES-DOW-25cv04218-000000012, NYTIMES-DOW-25cv04218-000000015–16.

65. The procedures set forth in the Appendix authorize the Department to "conduct such inquiry as deemed appropriate" after receipt of a reporter's "written or oral response to the proposed denial, revocation, or non-renewal," prior to making a "final decision." AR at NYTIMES-DOW-25cv04218-00000016.

66. The procedures set forth in the Appendix do not include a deadline for the Department to make a "final decision." AR at NYTIMES-DOW-25cv04218-00000016.

67. The Policy includes an Acknowledgment that states:

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

AR at NYTIMES-DOW-25cv04218-00000014.

68. Following the issuance of the Policy, PFAC holders, including Barnes and other reporters at The Times, were informed that their PFACs would be revoked if they did not sign the Acknowledgement by October 15, 2025. Stevenson Decl. ¶ 10.

69. Seven Times journalists, including Barnes, and the majority of other journalists from other news organizations that held PFACs at the time, refused to sign the Acknowledgement. Stevenson Decl. ¶ 11; *see also* Boutrous Decl. ¶ 14, Ex. 12.

70. On or about October 15, 2025, Barnes and his Times colleagues turned in their PFACs. Barnes Decl. ¶ 17; Stevenson Decl. ¶ 11.

71. Barnes has not been back to the Pentagon since October 15, 2025. Barnes Decl. ¶ 18.

72. Since October 15, 2025, two Times reporters have applied for "day passes" to access the Pentagon for specific press events, but their applications were denied. Stevenson Decl. ¶ 12.

## V. The Department Selects a New "Pentagon Press Corps."

73. On October 22, 2025, in a post on his official X account, Parnell "announce[d] the next generation of the Pentagon press corps." Boutrous Decl. ¶ 15, Ex. 13.

74. In his October 22, 2025 X post, Parnell wrote that the "[n]ew media outlets" that "signed the . . . media access policy" "circumvent the lies of the mainstream media and get real news to the American people[.]" Parnell also wrote that "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—former PFAC holders that Parnell called "activists who masquerade as journalists." Boutrous Decl. ¶ 15, Ex. 13.

75. The new PFAC recipients selected by the Department were individuals and media outlets who had expressed ideological agreement with and support for the Trump administration in the past. Boutrous Decl. ¶¶ 16–18, Exs. 14–16.

76. The new PFAC recipients selected by the Department include the National Pulse, which its editor-in-chief describes as an "industry mag/site for MAGA world." Boutrous Decl. ¶ 16, Ex. 14.

77. The new PFAC recipients selected by the Department include Laura Loomer ("Loomer"), an "influential pro-Trump activist." Boutrous Decl. ¶ 16, Ex. 14.

78. The new PFAC recipients selected by the Department include Matt Gaetz, President Trump's one-time choice for Attorney General of the United States. Boutrous Decl. ¶¶ 17–18, Exs. 15–16.

79. The new PFAC recipients selected by the Department include James O'Keefe ("O'Keefe"), who pleaded guilty to federal charges for entering federal property under false pretenses and was under federal investigation for an unrelated offense. Boutrous Decl. ¶¶ 16, 18, 28, Exs. 14, 16, 26.

80. New PFAC recipient Mike Lindell, CEO of MyPillow and current candidate for Governor of Minnesota, promised to make the Trump administration "proud" with his Pentagon coverage. Boutrous Decl. ¶ 16, Ex. 14.

81. New PFAC recipient Libby Emmons, editor-in-chief of Human Events and the Post Millennial, who received an "unsolicited invitation to apply for credentials," stated that there "should be a place for reporting on what they are doing [at the Pentagon] without always trying to expose the dark underbelly[.]" Boutrous Decl. ¶ 16, Ex. 14.

82. Conservative political commentator and podcaster Tim Pool said that his outlet, which received a PFAC, was "not an investigative news organization" and did "not intend to maintain a significant presence in the Pentagon." Boutrous Decl. ¶ 16, Ex. 14.

83. On December 2, 2025, Pentagon Press Secretary Kingsley Wilson ("Wilson") described the new recipients of PFACs as people who "actually reach Americans, ask real questions, and don't pursue a biased agenda." Boutrous Decl. ¶ 19, Ex. 17.

84. During the December 2, 2025 press conference, Wilson called journalists and news organizations who had previously held PFACs "propagandists" who "stopped telling the truth."

Wilson also stated that "a lot of the mainstream media continues to lie." Boutrous Decl. ¶ 19, Ex. 17.

85. On December 3, 2025, new PFAC holder Cam Higby posted to his X account a video of an interview with Wilson, under the header "MSM Journalists wreaked havoc on the Pentagon during their time in the building. Pentagon Press Sec Kingsley Wilson explains the hostile work environment created for DoW staff by adversarial media." Boutrous Decl. ¶ 21, Ex. 19.

86. In her December 3, 2025 interview with Cam Higby, Wilson said members of the "former Pentagon press corps" engaged in "unprofessional behavior," including coming to her office to speak with her. Boutrous Decl. ¶ 21, Ex. 19.

87. In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC." Boutrous Decl. ¶ 22, Ex. 20.

88. In response to a question regarding whether Loomer's "request for tips violates" the Policy, on November 4, 2025, the Department issued a statement attributed to Wilson which said that Loomer's call for tips is "a general tip line, which is constitutionally permissible." The Department stated that a tip line frequently published alongside Pentagon-related stories by the Washington Post does violate the Policy because it "targets military personnel and [Department] employees." Boutrous Decl. ¶¶ 23–24, Exs. 21–22.

89. The November 4, 2025 statement attributed to Wilson also stated: "If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is." Boutrous Decl. ¶ 24, Ex. 22.

90. O'Keefe, founder of the conservative group Project Veritas and a new PFAC holder, surreptitiously recorded a Pentagon official making unguarded criticisms of President Trump that were plainly unapproved by Department leadership and then reported that official's statements. Boutrous Decl. ¶ 26, Ex. 24.

91. At the December 2, 2025 Pentagon press conference, in response to a question O'Keefe asked regarding his recording of a Pentagon official's criticisms of President Trump, Wilson stated: "That's why the work you all do is so important. . . . [W]e want to make sure that we have the absolute best people working in it to protect Americans . . . [and] that they're on board and willing to serve our commander in chief." Boutrous Decl. ¶¶ 25, 27, Exs. 23, 25.

## VI. <u>The Loss of Their PFACs Has Harmed and is Continuing to Harm Plaintiffs.</u>

92. As of November 2025, The Times had more than 12 million subscribers across all of its print and digital products, including news. Stevenson Decl. ¶ 3.

93. The Times website is the most visited news website in the United States. Stevenson Decl. ¶ 3.

94. The Times has multiple reporters dedicated to covering national security, the Department, and the United States military. Stevenson Decl. ¶ 5.

95. Since October 15, 2025, no Times reporter has held a PFAC. Stevenson Decl. ¶ 13.

96. The loss of PFACs has created an unprecedented and significant impediment to The Times' ability to cover the Department and its leadership, national security, and the United States military. Stevenson Decl. ¶ 13.

97. For example, the Pentagon has held press events, including a press conference in the Pentagon Press Briefing Room, that Times reporters have been unable to attend because they no longer have PFACs. As a result, those reporters have been unable to ask questions of Department leadership that are important to their reporting. Stevenson Decl. ¶ 13.

98. At the December 2, 2025 press conference at the Pentagon, Department officials, speaking from the podium, referred to Barnes's reporting about Department leaders' involvement in a military strike on a Venezuelan boat. It would have been valuable to Barnes's coverage efforts to attend the news conference, ask follow-up questions, and address what Department officials said about his reporting—but without a PFAC, he could not attend. Barnes Decl. ¶ 19.

99. Beginning in the early hours of January 3, 2026, Barnes and other reporters at The Times reported on what President Trump called a "large scale strike" on Venezuela by the United States military, which resulted in the capture of Venezuelan President Nicolás Maduro and his wife. Barnes Decl. ¶ 20.

100. As reporters covering the news about the United States military's capture of Maduro for The Times, Barnes and his colleagues would have found it very valuable to be reporting from the Pentagon before, during, and in the hours and days after that military operation. Barnes Decl. ¶ 20.

101. Because Barnes and other national security reporters with The Times no longer have PFACs, they cannot have a regular presence at the Pentagon. Barnes Decl. ¶ 20.

102. Barnes and other Times reporters are also unable to have face-to-face interactions with Department officials and personnel without a prearranged meeting away from the Pentagon, which is more difficult and time-consuming to arrange. Stevenson Decl. ¶ 13.

103. While The Times and Barnes have continued to cover the Pentagon since October 15, 2025, that reporting has been made more difficult and burdensome because no Times reporter has a PFAC. Stevenson Decl. ¶ 13; Barnes Decl. ¶¶ 13, 20.

January 5, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

**admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, et al.,<br><br>*Defendants*. | Civil Action No. 1:25-cv-04218-DLF |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants hereby respond to the statements of material facts filed by Plaintiffs as in support of their motions for summary judgment [ECF No. 10-36]. Preliminarily, Defendants note that this Response is solely designed to respond to Plaintiffs' statements by identifying which of the factual grounds for Plaintiffs' respective motions are disputed. In light of Defendants' separate motion for summary judgment, the use of the word "disputed" or similar references herein should not be construed to mean that Defendants believe that there are genuine issues of fact that would necessitate a trial. Rather, such language simply means that Defendants dispute Plaintiffs' statement regarding that matter. Defendants maintain their position that there are *no* genuine issues of material fact with respect to the grounds entitling Defendants to summary judgment.

Additionally, having examined the statements of undisputed material facts submitted by Plaintiffs, Defendants dispute Plaintiffs' inclusion of numerous allegations and purported facts that are not material to the outcome of this suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 ("As to materiality, the substantive law will identify which facts are material. Only

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.”).

Defendant hereby responds to the statement of facts [ECF No. 10-36]:

1. Undisputed.
2. Undisputed.
3. Undisputed.
4. Disputed, in that this paragraph does not set forth uncontroverted facts that are material to the outcome of this suit. *See Anderson*, 477 U.S. at 247-48.
5. Undisputed.
6. Disputed. This paragraph is a conclusion. *Sherrill v. Knight*, 569 F.2d 124, 126-27 & n.3 (D.C. Cir. 1977); *Karem v. Trump*, 960 F.3d 656, 660–61 (D.C. Cir. 2020), and the Administrative Record speak for themselves.
7. Undisputed.
8. Undisputed.
9. Undisputed.
10. Undisputed.
11. Undisputed.
12. Undisputed.
13. Undisputed.
14. Undisputed.
15. Undisputed.

16. Disputed, in that this paragraph does not set forth uncontroverted facts that are material to the outcome of this suit. *See Anderson*, 477 U.S. at 247-48.
17. Disputed, in that this paragraph does not set forth uncontroverted facts that are material to the outcome of this suit. *See Anderson*, 477 U.S. at 247-48.
18. Undisputed.
19. Undisputed.
20. Undisputed.
21. Undisputed.
22. Undisputed.
23. Undisputed.
24. Undisputed.
25. Undisputed.
26. Undisputed.
27. Undisputed.
28. Undisputed.
29. Undisputed.
30. Undisputed.
31. Undisputed.
32. Undisputed.
33. Undisputed.
34. Undisputed.
35. Undisputed.
36. Undisputed.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. Undisputed.

41. Undisputed.

42. Undisputed.

43. Undisputed.

44. Undisputed.

45. Undisputed.

46. Undisputed.

47. Undisputed.

48. Undisputed.

49. Undisputed.

50. Undisputed.

51. Undisputed.

52. Undisputed.

53. Undisputed.

54. Undisputed.

55. Undisputed.

56. Undisputed.

57. Undisputed.

58. Undisputed.

59. Undisputed.

60. Undisputed.

61. Undisputed.

62. Undisputed.

63. Undisputed.

64. Undisputed.

65. Undisputed.

66. Undisputed.

67. Undisputed.

68. Undisputed.

69. Undisputed.

70. Undisputed.

71. Undisputed.

72. Undisputed.

73. Undisputed.

74. Undisputed.

75. Undisputed.

76. Undisputed.

77. Undisputed.

78. Undisputed.

79. Undisputed.

80. Undisputed.

81. Undisputed.

82. Undisputed.

83. Undisputed.

84. Undisputed.

85. Undisputed.

86. Undisputed.

87. Undisputed.

88. Undisputed.

89. Undisputed.

90. Undisputed.

91. Undisputed.

92. Undisputed.

93. Undisputed.

94. Undisputed.

95. Undisputed.

96. Undisputed.

97. Undisputed.

98. Undisputed.

99. Undisputed.

100. Undisputed.

101. Undisputed.

102. Undisputed.

103. Undisputed

DATED: January 30, 2025 Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Michael Bruns*____
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

# EXHIBIT 1

Post

**Pete Hegseth**
@PeteHegseth

👋

**NYTimes Communications** @NYTimesPR · Oct 10, 2025

A statement from The New York Times on the Pentagon's press pass policy:

"Journalists from The New York Times will not sign the Pentagon's revised press pass policy, which threatens to punish them for ordinary news gathering protected by the First Amendment. Since the policy was first announced, we have expressed concerns that it constrains how journalists can report on the U.S. military, which is funded by nearly $1 trillion in taxpayer dollars annually. The public has a right to know how the government and military are operating. The Times is dedicated to pursuing the public interest through deep, fair reporting and an unwavering pursuit of the facts."

– Richard Stevenson, Washington Bureau Chief

The New York Times

2:49 PM · Oct 13, 2025 · **1M** Views

1.8K 2.6K 25K 284

**Read 1.8K replies**

# EXHIBIT 4

Post

**Deputy Press Sec Joel Valdez**
@JoelValdezDOW

WaPo intentionally published sensitive details of @SecDef's security detail for him and his family - putting their safety at risk.

There should be severe punishment for what @TaraCopp, @DanLamothe, and @AlexHortonTX are doing.

> **Dan Lamothe** @DanLamothe · Aug 20, 2025
> Replying to @DanLamothe
> Pete Hegseth's expansive security requirements tax Army protective unit
>
> With @TaraCopp @AlexHortonTX and others
> ...

8:56 AM · Aug 20, 2025 · **320.4K** Views

301 759 1.9K 26

**Read 301 replies**

# EXHIBIT 5

The Intercept_ SUPPORT US

# PETE HEGSETH IS MAD THE MEDIA WON'T CELEBRATE U.S. WAR WITH IRAN

"How about we talk about how special America is?" Hegseth asked. He's not the first U.S. official to demand pro-war propaganda.

Nick Turse

June 27 2025, 12:48 p.m.



Secretary of Defense Pete Hegseth arrives for a briefing with members of Congress at the Capitol in Washington, D.C., on June 27, 2025. Photo: Graeme Sloan/Bloomberg/Getty Images

**SECRETARY OF DEFENSE** Pete Hegseth had a meltdown on Thursday during a Pentagon press conference, excoriating reporters for failing to act as cheerleaders for his boss, President Donald Trump. In a briefing about U.S. strikes on Iran, Hegseth criticized the press for not following the Pentagon line and called on journalists to "wave an American flag."

His statements harken back to past Pentagon calls for fawning coverage in the name of patriotism.

"The press corps," Hegseth complained, "cheer against Trump so hard, it's like in your DNA and in your blood to cheer against Trump because you want him not to be successful so bad." Hegseth's tantrum stemmed from reporting that cast doubt on Trump's assertion that recent U.S. air strikes had "obliterated" Iranian nuclear facilities last Saturday.

The Intercept reported on skepticism about Trump's claims by current and former defense officials on Monday. On Tuesday, multiple media outlets disclosed information from a preliminary classified Defense Intelligence Agency, or DIA, report that said the attacks set back Iran's nuclear program by only a few months.

"You have to cheer against the efficacy of these strikes. You have to hope," Hegseth said at his second-ever news conference, claiming that the media assembled "half truths, spun information, leaked information" to "manipulate … the public mind over whether or not our brave pilots were successful."

Before and after Hegseth's atomic meltdown on Thursday, Trump unleashed a paroxysm of posts on Truth Social. "FAKE NEWS CNN IS SO DISGUSTING AND INCOMPETENT. SOME OF THE DUMBEST ANCHORS IN THE BUSINESS!," he shout-typed. "Rumor is that the Failing New York Times and Fake News CNN will be firing the reporters who made up the FAKE stories on the Iran Nuclear sites because they got it so wrong. Lets see what happens?"

It remains unclear whether the U.S. strikes significantly damaged Iran's nuclear program – which, according to American intelligence organizations, did not involve an active effort to produce a nuclear weapon. "To me, it still appears that we have only set back the Iranian nuclear program by a handful of months," Sen. Chris Murphy, D-Conn., said following a classified briefing on Thursday. "There's no doubt there was damage done to the program. But the allegations that we have obliterated their program just don't seem to stand up to reason."


**MOST READ**



**Marine Detained in Minneapolis Says Feds Copied His Phone Without a Warrant**
Austin Campbell



**The Woman Alex Pretti Was Killed Trying to Defend Is an EMT. Federal Agents Stopped Her From Giving First Aid.**
C. Frances



**Pam Bondi Admits DOJ Has a Secret Domestic Terrorist List**
Nick Turse


**COMPLAINTS BY THE** White House about the press during unpopular wars have a long history. As TV news increasingly showed the Vietnam War to be an intractable stalemate, if not an outright failure, President Lyndon Johnson complained about their coverage, "I can prove that Ho Chi Minh is a son-of-a-bitch if you let me put it on the screen," he told a group of reporters, referring to the leader of North Vietnam, but said that the networks "want me to be the son-of-a-bitch." His successor, Richard Nixon, was even more vitriolic about coverage of the war – and more succinct in his criticism. "Our worst enemy seems to be the press!" he barked in 1971.

In 1965, CBS News sent Morley Safer to Vietnam to cover the escalating American war. In July, Marines entered the village of Cam Ne and met stiff resistance, suffering three dead and four wounded. The next

month, with Safer and a cameraman in tow, the troops set out for the area in armored vehicles. Safer recalled:

> *The troops walked abreast toward this village and started firing. They said that there was some incoming fire. I didn't witness it, but it was a fairly large front, so it could have happened down the line.*
>
> *There were two guys wounded in our group, both in the ass, so that meant it was "friendly fire." They moved into the village and they systematically began torching every house — every house as far as I could see, getting people out in some cases, using flamethrowers in others. No Vietnamese speakers, by the way, were among the group with the flamethrower.*

About 150 homes in Cam Ne were burned; others were bulldozed, as Marines razed two entire hamlets. Artillery was then called in on the wreckage. According to reports, one child was killed and four women were wounded. In actuality, many more may have died. Safer's segment, "The Burning of Cam Ne Village," sparked public outrage.



Related

**U.S. Blamed the Press for Military Looting in Cambodia**

The Defense Department demanded CBS recall Safer from Vietnam, and Johnson called CBS President Frank Stanton. "Are you trying to fuck me," the U.S. president barked. "Who is this?" Stanton asked, according to reporting by David Halberstam and others. Johnson replied, "Frank, this is your president and yesterday your boys shat on the American flag."

A year later, Safer wrote a newspaper column about a visit to Saigon by Arthur Sylvester, the assistant secretary of defense for public affairs.

Per Safer, Sylvester laid into the press:

"I can't understand how you fellows can write what you do while American boys are dying out here," he began. Then he went on to the effect that American correspondents had a patriotic duty to disseminate only information that made the United States look good.

A network television correspondent said, "Surely, Arthur, you don't expect the American press to be the handmaidens of government."

"That's exactly what I expect," came the reply.

Sylvester also told the reporters: "Look, if you think any American official is going to tell you the truth, then you're stupid. Did you hear that? Stupid."

Sylvester later denied the "handmaiden" comment, but others present backed Safer. "Sylvester engaged specific correspondents in near name-calling, twice telling Jack Langguth [of The New York Times] he was stupid," another attendee noted. "At one point Sylvester actually made the statement he thought press should be 'handmaiden' of government."

**IN HIS PRESS** conference, Hegseth called on journalists to publish stories lauding troops for doing their jobs, asking rhetorically if outlets had written on the difficulty of flying a plane for 36 hours, manning a Patriot missile battery, or executing mid-air refueling.

"Time and time again, classified information is leaked or peddled for political purposes to try to make the president look bad. And what's really happening is you're undermining the success of incredible B-2 pilots and incredible F-35 pilots and incredible refuelers and incredible air defenders who accomplish their mission," he groused. "How about we celebrate that?"



Related

**The Trump DOJ Loved Leaking, as Long as It Was to Rupert Murdoch's Newspapers**

"Premising entire stories on biased leaks to biased publications trying to make something look bad," Hegseth, a former Fox News personality, griped. "How about we take a beat, recognize first the success of our warriors, hold them up, tell their stories, celebrate that, wave an American flag, be proud of what we accomplished."

The Intercept followed up with the Pentagon to ask if Hegseth would help facilitate this type of reporting. A Pentagon spokesperson instead offered the opportunity to speak with Pentagon Press Secretary Kingsley Wilson off the record.

When The Intercept called to set up a time to speak with Wilson, a Pentagon spokesperson refused to do so. "Kingsley will reach out to you if she's got anything to provide you," said the official. "I would just stand by. That's the best thing I can offer you right now."

The Office of the Secretary of Defense refused to provide further clarification about Hegseth's views on the role of the press and how the media ought to cover him, the president, and the military. "We have nothing more to provide," a spokesperson said after providing nothing.



Related

**U.S. Intel Says Iran Isn't a Nuclear Threat. Israel Wants the U.S. to Bomb It Anyway.**

Hegseth is, notably, calling on the press to celebrate a war which Americans are overwhelmingly against. Americans disapprove of the

strikes on Iran 56 percent to 44 percent, according to a CNN/SSRS poll conducted after the strikes. An even greater number distrust Trump's decision-making on the use of force in Iran, with 58 percent saying the strikes will make Iran more of a threat to the U.S. and only 27 percent believing the attacks will lessen the threat.

A Quinnipiac University poll released Thursday found only 39 percent of Americans approve of Trump's handling on the Israel–Iran war, while 53 percent disapprove.

**HEGSETH'S ANTAGONISM TOWARD** the news media began well before Thursday's press conference. Since his appointment, he has conducted a war on whistleblowers despite the fact that he inadvertently shared detailed attack plans — of far more import than the DIA report because they preceded military strikes — with a journalist on a messaging app.

Hegseth has reportedly accused high-ranking military officers of leaks and threatened to subject them to polygraph tests.

Joe Kasper, Hegseth's former chief of staff, called out "unauthorized disclosures of national security information involving sensitive communications with principals within the Office of the Secretary of Defense" and threatened that parties found responsible would be "referred to the appropriate criminal law enforcement entity for criminal prosecution," in a March memo.

Speaking in April with quasi-journalist Megyn Kelly, another former Fox News host, ex-Hegseth aide Colin Carroll said that the secretary and his team have been "consumed" by his leaky Department of Defense. "If you look at a pie chart of the secretary's day, at this point, 50 percent of it is probably a leak investigation," Carroll said.

The FBI is now investigating how the DIA report became public. "We are doing a leak investigation with the FBI now, because this information is for internal purposes – battle damage investigation – and CNN and others are trying to spin it to try and make the president look bad when this was an overwhelming success," Hegseth told reporters.

At his Thursday press conference, Hegseth urged the media to do more to herald American exceptionalism, at least in terms of military prowess.

"How about we talk about how special America is, that we – only we – have these capabilities? I think it's too much to ask, unfortunately, for the fake news," said Hegseth in aggrieved tones. "So, we're used to that, but we also have an opportunity to stand at the podium and read the truth of what's really happening."


**RELATED**



**Democrats Had a Shot at Protecting Journalists From Trump. They Blew It.**



**Mainstream Media Was Afraid to Compare Trump to Hitler. Now the Press Has No Excuse.**



**How the U.S. Makes Its Wars Invisible**



**Daniel Ellsberg Wanted Americans to See the Truth About War**

The Intercept_

© THE INTERCEPT. ALL RIGHTS RESERVED

# EXHIBIT 6

YouTube Search




# WATCH LIVE: Hegseth holds briefing on Israel-Iran war

PBS NEWS PBS NewsHour
5.16M subscribers

Subscribe 90 Share

PBS is an American public broadcast service. Wikipedia ↗

**14K views Streamed 7 months ago**
Watch PBS News for daily, breaking and live news, plus special coverage. We are home to PBS News Hour, ranked the most credible and objective TV news show.
**...more**

# EXHIBIT 7

Post

**Sean Parnell**
@SeanParnellASW

FOR IMMEDIATE RELEASE:
4/20/25

STATEMENT:

Another day, another old story—back from the dead. The Trump-hating media continues to be obsessed with destroying anyone committed to President Trump's agenda. This time, the New York Times — and all other Fake News that repeat their garbage — are enthusiastically taking the grievances of disgruntled former employees as the sole sources for their article. They relied only on the words of people who were fired this week and appear to have a motive to sabotage the Secretary and the President's agenda.

There was no classified information in any Signal chat, no matter how many ways they try to write the story. What is true is that the Office of the Secretary of Defense is continuing to become stronger and more efficient in executing President Trump's agenda.

We've already achieved so much for the American warfighter, and will never back down.

**Rate proposed Community Notes**

9:54 PM · Apr 20, 2025 · **1.7M** Views

1.3K 4.8K 16K 414

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | **Civil Case No.** 25-cv-04218 (PLF) |

**JOINT APPENDIX**


Brett A. Shumate
Assistant Attorney General

Joseph E. Borson
Assistant Branch Director

Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

**admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

## INDEX TO THE JOINT APPENDIX


| Record Citation No. | Document Description | Document Date |
|---|---|---|
| **AR 01-21** | Department's revised memorandum entitled "Implementation of New Media In-Brief" with attached "Pentagon Reservation In-Brief for Media Members" | Oct. 6, 2025 |
| **AR 22-40** | Department's initial memorandum entitled "Implementation of New Media In-Brief" with attached "Pentagon Reservation In-Brief for Media Members" | Sep. 18, 2025 |
| **AR 41-43** | Sean Parnell's letter response to Reporters Committee for Freedom of the Press regarding "Implementation of New Media In-Brief" | Sep. 24, 2025 |
| **AR 44-45** | Reporters Committee for Freedom of the Press's letter to Sean Parnell regarding "Implementation of New Media In-Brief" | Sep. 22, 2025 |
| **AR 46-47** | Department's "Updated Physical Control Measures for Press/Media Access Within the Pentagon" | May 23, 2025 |
| **AR 48** | Email correspondence between journalists and Department personnel regarding concerns about new In-Brief | Sep. 26, 2025 |
| **AR 49** | Email from the Department to media colleagues regarding an update on the "Pentagon Reservation In-brief for Media Members" | Sep. 30, 2026 |
| **AR 50** | Email correspondence between journalists and Department personnel regarding the Pentagon Press Association | Oct. 7, 2025 |
| **AR 51-64** | Email correspondence between journalists and Department personnel regarding revisions to the In-Brief | Sep. 29, 2025 |
| **AR 65-69** | Email correspondence between journalists and Department personnel regarding the Pentagon Press Association | Sep. 29, 2025 |
| **AR 70-74** | Email correspondence between journalists and Department personnel regarding revisions to the In-Brief for Media Members | Oct. 8, 2025 |

ASSISTANT TO THE SECRETARY OF WAR
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

OCT 0 6 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of New Media In-brief

The attached documents implement the Secretary of War memorandum, "Updated Physical Control Measures for Press/Media Access Within the Pentagon," dated May 23, 2025. All members of the press requesting to be issued a Pentagon Facility Alternate Credential (PFAC), will be required to read and sign the updated in-brief form outlining information security requirements, the new physical control measures, and Department of War expectations of their compliance with safety and security requirements. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated September 18, 2025.

The package that will be provided to the member of the press as part of the in-brief includes the following:

- Pentagon Reservation In-brief for Media Members
- Appendix A, "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials"
- Appendix B, "Additional Press Identifier Badge"
- Appendix C, SW memo, "Updated Physical Control Measures for Press/Media Access Within the Pentagon"
- Appendix D, graphic showing the areas on the first and second floor of the Pentagon where press do not require a new escort
- Appendix E, graphic showing the route that press can take to access the River Entrance on weekends and holidays

In addition to the Additional Press Identifier Badge depicted in Appendix B, the Pentagon Force Protection Agency (PFPA) will begin issuing new PFACs to the press in coming weeks. Priority of issuance of the new PFACs will be to members of the news media, including equipment crew members, with existing PFACs expiring by October 31, 2025, and will run through October 31, 2025. Beginning November 1, 2025, PFPA will then commence issuing new PFACS for members of the news media with existing PFACS expiring after October 31, 2025, starting with resident members (i.e., those with current authorized workspace in the Pentagon), followed by non-resident members. The new PFACs will have "PRESS" clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon.

I request your assistance in ensuring that all personnel in your Component are aware of the physical control measures, including the requirement to provide escorts for media coming into your spaces for approved interviews. Additionally, if personnel see any news media outside of the areas depicted in Appendix D that do not have an escort, they should direct them back to the designated no-escort required areas and alert the Pentagon Press Operations office at 703-697-5131.

My POC for this action is Mr. Christopher Garver, Pentagon Press Operations, christopher.c.garver.civ@mail.mil or 703-695-3886.

Sean Parnell

Attachments:
As stated

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME: ______________________________ DATE: ____________________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to abide by these rules may result in suspension or revocation of your PFAC and loss of access. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege, subject to the discretion of government authorities and is regulated by federal law and Department of War policy. Legally, the press has no greater right of access than the public. While members of the news media may be granted access under certain conditions, this is a privilege extended by the government and not a constitutionally protected right.

Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. This framework establishes that access is not open to the public or the press as a matter of right but is instead a controlled privilege.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or

foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACs must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACs should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.DutyOfficer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBs serve only as an additional visual identifier. APIBs are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025

(Appendix C), new physical security restrictions have been enacted for news media, including those with valid, current PFACs:

- News media are not authorized to be anywhere on the 5th Floor, 4th Floor, 3rd Floor, Basement, or Mezzanine levels, including all corridors and rings, at any time without an escort from an authorized DoW official.
- On the 2nd Floor, news media are authorized unescorted access in the Pentagon for the below areas. For all other areas of the 2nd Floor not included below, except as otherwise addressed in this in-brief, news media must have an escort from authorized DoW personnel:
  - Rings A through E between Corridors 1, 10 and 9 (from the Metro Entrance on the E Ring through the Concourse to the A Ring);
  - E Ring from the Metro Entrance to Corridor 9;
  - E Ring from the River Entrance directly to Corridor 9;
  - Corridor 9 from the E Ring to the A Ring; 951-999
  - At the Apex of Corridors 9/10, the exit to the Courtyard;
  - A Ring from the Apex of Corridors 9/10 to the Mall Corridor between Corridor 6 and 7 and the Mall Corridor to the Mall Entrance for the purpose getting to and from the Mall Entrance for stand-ups
- On the 1st Floor, news media are authorized unescorted access to the Center Courtyard and the Food Court between Corridors 1 and 10.
- See Appendix D for a graphic of the areas where the news media are authorized unescorted access.
- News media are not authorized access to the Pentagon Athletic Center.

If news media require access to other areas or offices within the Pentagon for in-person interviews or other engagements, they must be escorted to and from those spaces by authorized DoW personnel.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. You have been briefed on the physical control measures for news media access and understand which areas require escort even though you have a PFAC. When in an area requiring an escort, you must remain with your escort at all times.

The list of authorized areas is expected to be modified within the next three months, as DoW intends to upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps.

<u>Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information</u>

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard

classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing non-public information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. §1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. §552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, these are the laws and regulations that apply to military members and DoW civilian employees and contractors. Members of the news media are not required to submit their writings to DoW for approval. However, they should understand that DoW personnel may face adverse consequences for unauthorized disclosures (see, e.g., Uniform Code of Military Justice Article 92 (10 U.S.C. 892); 18 U.S.C. 1905; 5 U.S.C. 552a(i)). Any solicitation of DoW personnel to commit criminal acts would not be considered protected activity under the 1st Amendment.

Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy. To ensure the safety of U.S. personnel, news media who find themselves in possession of information that appears to be CNSI or CUI should discuss those materials with the PPO prior to publication.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon 24 hours a day and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in

advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

A PFAC also affords escort privileges for media members who are U.S. citizens for up to three visiting family members for special events, such as the Bring Your Child to Work Day, subject to the approval of the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). Family members 18 years and older must be entered into the PFPA Visitor Management System (VMS) by the sponsoring public affairs office no later than 24 hours in advance for U.S. citizens and no later than 48 hours in advance for non-U.S. citizens.

PFAC holders escorting other media members or family members must stay with their visitor(s) at all times. Failure to do so may result in loss of the PFAC issued to you.

PFAC holders who are not U.S. citizens do not have escort privileges.

<u>PFAC Issuance and Renewals</u>

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period and who have not posed a security or safety risk to DoW personnel or property will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period and who have not posed a security or safety risk to DoW personnel or property during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACs.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times,

renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, or is not meeting the frequency requirements. An initial determination of a security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination. A determination that an individual poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. See Appendix A for information on the applicable standard and the process for denying, revoking, or non-renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email, phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 — Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance

to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.

- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.

- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.

- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil. You can download a DD Form 2798 here: https://www.esd.whs.mil/Directives/forms/dd2500_2999/DD2798/

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACs.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Security Risks

A PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, in accordance with the standards and procedures outlined in Appendix A. Such an initial determination may result in an immediate suspension of your Pentagon access while the procedures preceding a final determination are pending.

This in-brief and its Appendices address DoW policy and the potential bases for such a determination and do not prohibit you as a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Such determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI, convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Such a determination is based on a reasonable assessment informed by the unique facts and circumstances of each case--such as whether the conduct is willful or repeated, versus isolated and unintentional—and incorporates due process (e.g., written notice of the basis, a 30-day appeal period, an opportunity for personal appearance, and a final, reviewable determination).

For clarity, the receipt of unsolicited CNSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC. However, if you solicit the disclosure of such information or otherwise encourage DoW personnel to violate laws and policies concerning the disclosure of such information, such conduct may weigh in the consideration of whether you pose a security or safety risk.

There is a critical distinction between lawfully requesting information from the government and actively soliciting or encouraging government employees to break the law. The First Amendment does not permit journalists to solicit government employees to violate the law by providing confidential government information. The press's rights are not absolute and do not override the government's compelling interest in maintaining the confidentiality of sensitive information. Soliciting or encouraging government employees to break the law falls outside the scope of protected newsgathering activities.

Solicitation may include direct communications with specific DoW personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share non-public DoW information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets DoW personnel to disclose

non-public information without proper authorization would constitute a solicitation that could lead to revocation.

Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

All determinations under this policy are undertaken on a case-by-case basis reviewing the totality of the circumstances to ensure the policy is narrowly tailored to safeguard sensitive information without unduly restricting speech and are informed by factors such as convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Moreover, determinations will take into account whether such conduct is willful or repeated, as opposed to isolated and unintentional.

No Waiver of Rights

Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 U.S.C. 113, Secretary of Defense; 42 U.S.C. Chapter 23, Development and Control of Atomic Energy; Executive Order 13526, Classified National Security Information; Executive Order 13556, Controlled Unclassified Information; 32 C.F.R. Part 234, Conduct on the Pentagon Reservation; DoD Directive 5122.05, Assistant to the Secretary of Defense for Public Affairs (ATSD(PA)).
**PRINCIPAL PURPOSE:** To inform members of the news media being granted access to the Pentagon Reservation and issued a Pentagon Alternative Facilities Alternative Credential (PFAC) of the rules regarding conduct on the Pentagon Reservation and the rules and procedures concerning termination of such access.
**ROUTINE USE(S):** In certain circumstances, it may be necessary to disclose this record outside of the Department of Defense. For example, this record may be disclosed to a component of the Department of Justice for the purpose of representing the Department of Defense, or its components, officers, employees, or members in pending or potential litigation to which the record is pertinent; or to an appropriate law enforcement authority when the record, either alone or in conjunction with other information, indicates a violation or potential violation of law, whether criminal, civil, or regulatory in nature. For a complete list of routine uses, refer to the applicable system of records notice: DPAD 12.0, DoD Media Pool and Pentagon Correspondent Files, at https://www.federalregister.gov/documents/2021/05/03/2021-09211/privacy-act-of-1974-system-of-records
**DISCLOSURE:** Voluntary; however, failure to complete this acknowledgement may result in limiting DoD's ability to grant access to the Pentagon Reservation.

---

NAME: ______________________________ DATE: ____________________

Acknowledgement

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which addresses the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief describes DoW policies and procedures. My signature represents my acknowledgement and understanding of such DoW policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

______________________________ ______________________________
Signature -- Administering Official Signature -- Media Member

New Badge Expiration Date________________

Email address______________________________

Work phone___________________ Cell phone_____________________

**APPENDIX A:** DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS.

A. Reason for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to DoW personnel or property. Persons presumed to present such a risk include, but are not limited to, those who have been convicted of any offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).

(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).

(3) Unlawful manufacturing or distribution of drugs.

(4) Threatening or harassing communications.

(5) Theft, embezzlement, trespassing, or property destruction.

(6) Fraud or deceit.

(7) Prostitution or other prohibited sexual conduct.

(8) Engaging in operations and activities that are unsafe, fail to abate an identified hazard, endanger others, or create a condition immediately dangerous to life health.

(9) Unprofessional conduct that might serve to disrupt Pentagon operations.

Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the Pentagon Reservation In-Brief for Media Members

B. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit. When an individual's PFAC has been denied, revoked, not renewed, or suspended for the reasons outlined above, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to any security or safety risk, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.

(2) The applicant will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).

(3) If the applicant or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.

(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant may receive a DoW Building Pass at that time.

(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant and must be signed by the applicant or representative under oath or affirmation.

(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or representative may request, and shall normally be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial. The Director, PFPA, or designee, shall exercise final review authority in the matter.

(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.

(a) If a decision is made that no such inquiry is necessary, a final decision shall be issued.

(b) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry as deemed appropriate.

(8) Upon receipt of the applicant's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon completion of any additional inquiry, a final decision shall be expeditiously made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision. This section does not confer any rights on any individual or entity and is intended only as internal guidance for the administration of the Department of War.

# Appendix B

## Additional Press Identifier Badge

FRONT




BACK



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 2 3 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency, the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E, without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1st Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in-person"

OSD005511-25/CMD007129-25

## Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 2nd Floor



## Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 1st Floor




Case 1:25-cv-04218-PLF Document 29 Filed 03/04/26 Page 22 of 77

JA144


River Entrance
CVS Pharmacy
ort America Pentagon
Starbucks
Mug Handle
River Rd
Richmond Hwy
Boundary Dr
Potomac Heritage National Scenic Trl
Connector Rd
HRP Lp
HRP
Grassy Hill
Google
Layers
Personnel access control point on pedestrian bridge
Weekday route to River Entrance
Personnel turnstile at vehicle access control point
Press parking
Weekend route to River Entrance

**Appendix E**

**ASSISTANT TO THE SECRETARY OF WAR**
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

18 SEP 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of New Media In-brief

Effective September 18, 2025, the attached documents implement the Secretary of War memorandum, "Updated Physical Control Measures for Press/Media Access Within the Pentagon," dated May 23, 2025. All members of the press issued a Pentagon Facility Alternate Credential (PFAC), will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and Department of War expectations of their compliance with safety and security requirements.

The package that will be provided to the member of the press as part of the in-brief includes the following:

- Pentagon Reservation In-brief for Media Members
- Appendix A, "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials"
- Appendix B, "Additional Press Identifier Badge"
- Appendix C, SW memo, "Updated Physical Control Measures for Press/Media Access Within the Pentagon"
- Appendix D, graphic showing the areas on the first and second floor of the Pentagon where press do not require a new escort
- Appendix E, graphic showing the route that press can take to access the River Entrance on weekends and holidays

In addition to the Additional Press Identifier Badge depicted in Appendix B, the Pentagon Force Protection Agency (PFPA), will begin issuing new PFACs to the press in coming weeks. Priority of issuance of the new PFACs will be to resident members of the media through September 30, 2025. Non-resident members of the media and crew badging begins effective October 1, 2025. These new PFACs will have "PRESS" clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press.

Request your assistance in ensuring that all your personnel are aware of the physical control measures, including the requirement to provide escorts for any media coming into your spaces for approved interviews. Additionally, personnel should be aware that if they see any news media outside of the areas depicted in Appendix D that do not have an escort, they should direct them back to the designated no-escort required areas and alert the Pentagon Press Operations office at 703-697-5131.

My POC for this action is Sue Gough, Pentagon Press Operations, susan.l.gough.civ@mail.mil or 703-697-1254.

Sean Parnell

Attachments:
As stated

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME: ______________________________ DATE: ____________________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to abide by these rules may result in suspension or revocation of your building pass and loss of access. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

<u>General Security</u>

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building is subject to random checks of personal belongings. A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

<u>PFAC Security</u>

Maintaining the security of your PFAC is an individual responsibility.

PFACs must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or

on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACs should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.DutyOfficer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBs serve only as an additional visual identifier. APIBs are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), new physical security restrictions have been enacted for news media, including those with valid, current PFACs:

- News media are not authorized to be anywhere on the 5th Floor, 4th Floor, 3rd Floor, Basement, or Mezzanine levels, including all corridors and rings, at any time without an escort from an authorized DoW official.
- On the 2nd Floor, news media are authorized unescorted access in the Pentagon for the below areas. For all other areas of the 2nd Floor not included below, except as otherwise addressed in this in-brief, news media must have an escort from authorized DoW personnel:
    - Rings A through E between Corridors 1, 10 and 9 (from the Metro Entrance on the E Ring through the Concourse to the A Ring);
    - E Ring from the Metro Entrance to Corridor 9;
    - E Ring from the River Entrance directly to Corridor 9;
    - Corridor 9 from the E Ring to the A Ring; 951-999
    - At the Apex of Corridors 9/10, the exit to the Courtyard;
    - A Ring from the Apex of Corridors 9/10 to the Mall Corridor between Corridor 6 and 7 and the Mall Corridor to the Mall Entrance for the purpose getting to and from the Mall Entrance for stand-ups
- On the 1st Floor, news media are authorized unescorted access to the Center Courtyard and the Food Court between Corridors 1 and 10.
- See Appendix D for a graphic of the areas where the news media are authorized unescorted access.
- News media are not authorized access to the Pentagon Athletic Center.

If news media require access to other areas or offices within the Pentagon for in-person interviews or other engagements, they must be escorted to and from those spaces by authorized DoW personnel.

Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon 24 hours a day and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

A PFAC also affords escort privileges for media members who are U.S. citizens for up to three visiting family members for special events, such as the Bring Your Child to Work Day, subject to the approval of the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). Family members 18 years and older must be entered into the PFPA Visitor Management System (VMS) by the sponsoring public affairs office no later than 24 hours in advance for U.S. citizens and no later than 48 hours in advance for non-U.S. citizens.

PFAC holders escorting other media members or family members must stay with their visitor(s) at all times. Failure to do so may result in loss of the PFAC issued to you.

PFAC holders who are not U.S. citizens do not have escort privileges.

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period and who have not posed a security or safety risk to DoW personnel or property will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period and who have not posed a security or safety risk to DoW personnel or property during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACs.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times, renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, or is not meeting the frequency requirements. An initial determination of a security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination. A determination that an individual poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. See Appendix A for information on the applicable standard and the process for denying, revoking, or non-renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email, phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 — Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.

- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.

- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.

- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil. You can download a DD Form 2798 here: https://www.esd.whs.mil/Directives/forms/dd2500_2999/DD2798/

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACs.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

NAME: ________________________________ DATE: ____________________

Acknowledgements

Please read and initial each of the below:

____ I understand that PFACs are extended as a courtesy to media members who work full-time in the Pentagon or who meet the minimum monthly visit frequency. PFACs may be revoked or not renewed for individuals who do not meet the frequency requirement.

____ I understand that securing my PFAC is my responsibility. I understand that I must immediately report a lost PFAC.

____ I understand that I must wear my PFAC and APIB above my waist at all times.

____ I understand that I and my belongings are subject to inspection when on the Pentagon reservation.

____ I understand that I am responsible for the physical security of my work area, including ensuring that doors are locked and properly secured, where applicable.

____ I understand that as a non-government employee, while a PFAC is my authorized means of entering the Pentagon, a PFAC does not allow me unfettered access to all of the Pentagon. I have been briefed on the physical control measures for news media access and understand which areas require escort even though I have a PFAC. I acknowledge that I must obtain an escort for the required escort areas and must remain with my escort at all times in those areas.

____ I understand that a property pass is required to remove property from the building that is not readily identifiable as personal. Property passes may be obtained from Pentagon Press Operations, room 2D961, during normal working hours.

____ I understand that any type of visual or audio recording on the Pentagon Reservation, including the use of a cell phone camera, is prohibited, unless approved in advance, in accordance with 32 CFR § 234.15.

____ I acknowledge receipt and briefing of the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which includes the standard and procedures for denying, revoking, or not renewing a PFAC.

____ I acknowledge that a PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property. I understand that such an initial determination may result in an immediate suspension of my Pentagon access while the procedures preceding a final determination are pending. I acknowledge that such a determination may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI.

____ I acknowledge that during a declared pandemic or national health emergency, I must follow the same personal protective measures as prescribed for Pentagon personnel when entering the building. This may include not entering the building if I am not feeling well or am experiencing symptoms. I acknowledge that I may be randomly selected for screening for symptoms or the pandemic disease when entering the building or may be required to participate in screening testing program. I acknowledge that failure to comply with the measures in any Health Protection Condition announcement could result in temporary denial of access or revocation of my PFAC. I acknowledge that as a civilian who is not a DoW employee, I could temporarily be denied access to the Pentagon during a declared pandemic, national health emergency, or other emergency contingency.

____ I acknowledge that if I am issued a "P" parking permit, that I will be required to return it to the PPO upon completion of my media/press duties, or upon the expiration of the "P" parking permit.

____ I have been briefed on the safety and security requirements and agree to abide by the provisions outlined above.

______________________________ ______________________________
Signature -- Administering Official Signature -- Media Member

New Badge Expiration Date________________

Email address______________________________

Work phone___________________ Cell phone_____________________

**APPENDIX A**

DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS.

A. Reason for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to DoW personnel or property. Persons presumed to present such a risk include, but are not limited to, those who have been convicted of any offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).

(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).

(3) Unlawful manufacturing or distribution of drugs.

(4) Threatening or harassing communications.

(5) Theft, embezzlement, trespassing, or property destruction.

(6) Fraud or deceit.

(7) Prostitution or other prohibited sexual conduct.

(8) Engaging in operations and activities that are unsafe, fail to abate an identified hazard, endanger others, or create a condition immediately dangerous to life health.

(9) Unprofessional conduct that might serve to disrupt Pentagon operations.

Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as attempts to improperly obtain CNSI or CUI, or being found in physical possession of CNSI or CUI without reporting it.

B. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit. When an individual's PFAC has been denied, revoked, not renewed, or suspended, both unescorted and escorted access to any DoW facility is terminated.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.

(2) The applicant will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).

(3) If the applicant or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.

(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant may receive a DoW Building Pass at that time.

(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant and must be signed by the applicant or representative under oath or affirmation.

(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or representative may request, and shall normally be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial. The Director, PFPA, or designee, shall exercise final review authority in the matter.

(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.

(a) If a decision is made that no such inquiry is necessary, a final decision shall be issued.

(b) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry as deemed appropriate.

(8) Upon receipt of the applicant's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon completion of any additional inquiry, a final decision shall be expeditiously made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial.

(9) The decision of the Director, PFPA, or designee, under this section shall be conclusive. This section does not confer any rights on any individual or entity and is intended only as internal guidance for the administration of the Department of War.

# Appendix B

## Additional Press Identifier Badge

FRONT




BACK



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 2 3 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency, the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E, without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1st Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in-person"

OSD005511-25/CMD007129-25

## Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 2nd Floor



# Appendix D

Yellow areas indicate areas where press are allowed without escort.

## Pentagon 1st Floor




JA163




JA 164

## Appendix E

ASSISTANT TO THE SECRETARY OF WAR
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

September 24, 2025

Reporters Committee for Freedom of the Press
PO Box 34176
Washington, DC 20043

Attn: Bruce D. Brown, President

*Re: Implementation of New Media In-Brief*

Dear Mr. Brown:

We are in receipt of the Reporters Committee for Freedom of the Press' letter dated September 22, 2025, regarding the new in-brief form for journalists holding a Pentagon Facilities Alternate Credential (PFAC). We appreciate the Reporters Committee for Freedom of the Press engaging directly on this matter and value your role in advocating for journalists and news organizations. Your input helps ensure that our policies support both national security and a free press, and we are committed to addressing your concerns with clarity and transparency.

The in-brief form outlines Department of War (DoW) information security requirements, physical control measures, and expectations for compliance with safety and security protocols. It does not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories—rights unequivocally protected by the First Amendment. Instead, it informs PFAC holders of DoW's internal policies and the processes for managing building access, which is a privilege extended to facilitate responsible coverage, not a right to unfettered entry and access. To address your illustrative concerns, I will respond to each in turn, quoting directly from the in-brief form and related documents where relevant.

First, regarding the section entitled "Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information," this language describes policies governing DoW personnel and does not purport to create obligations for reporters holding a PFAC. As stated in the in-brief:

> DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556.

> Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.
>
> Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy.

This section outlines the responsibilities of DoW servicemembers and civilian employees under established DoW Instructions, such as DoD Instruction 5230.09 ("Clearance of DoD Information for Public Release") and DoD Instruction 5230.29 ("Security and Policy Review of DoD Information for Public Release"), which mandate pre-publication reviews through official channels to prevent unauthorized disclosures by government personnel. It does not require reporters to seek DoW approval for their stories or endorse any viewpoint on pre-authorization. Journalists remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, or unsolicited tips, and to publish as they deem newsworthy. The focus is on preventing active solicitation that encourages DoW personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment.

Second, the series of "Acknowledgments" on page nine of the in-brief, which PFAC holders must "agree to abide by," are intended as acknowledgments of DoW's policies and potential grounds for discretionary action, not as commitments by reporters to refrain from newsgathering or disclosure. Specifically, the acknowledgment at issue states:

> I acknowledge that such a determination [that a person poses a security or safety risk] may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI.

This is the latter interpretation you describe: an acknowledgment of DoW's policy, not a pledge by the PFAC holder to avoid such actions. It informs credential holders of the potential bases for a reasonable determination of risk, ensuring transparency about the process. Receipt of unsolicited information and subsequent publication—even of CNSI or CUI—is generally constitutionally protected and would not normally, on its own, trigger revocation. However, in rare, extreme cases where publication recklessly endangers American lives, it could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk. Moreover, if a reporter solicits the gathering and providing of such information for use in the reporter's work or is otherwise aware of and encourages the actions, such actions may also weigh in this consideration. This aligns with First Amendment precedent, including that which holds that the First Amendment does not immunize conduct facilitating legal violations, while preserving broad protections for publication.

Finally, the in-brief does not mandate ("shall") that a PFAC holder's disclosure of CNSI or CUI result in denial or revocation; rather, it "may" do so in the Department's discretion, based on a reasonable determination of security or safety risk as informed by the unique facts and circumstances of each application. As detailed in Appendix A to the in-brief:

> The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to DoW personnel or property.

This determination is informed by factors such as convictions for national defense offenses, threats, or unsafe activities (listed in Appendix A). All decisions incorporate due process: written notice of the basis (as security permits), a 30-day appeal period, an opportunity for personal appearance, and a final, reviewable determination. This process ensures actions are narrowly tailored, not arbitrary, and support the government's compelling interest in safeguarding sensitive information without unduly restricting speech.

I trust that these clarifications address your concerns and confirm that the in-brief does not infringe upon First Amendment protections. As requested, we welcome a meeting with your organization's leadership to discuss these and other issues. Please have Mr. Rottman contact my office to coordinate a convenient time.

Sincerely,

Sean Parnell

CC: Gabe Rottman, Vice President of Policy
Susan Gough, Pentagon Press Operations

REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS
PO Box 34176
Washington, DC 20043
(202) 795-9300 • www.rcfp.org

PRESIDENT
Bruce D. Brown

STEERING COMMITTEE CHAIR
STEPHEN J. ADLER
VICE CHAIR
MARGARET LOW
WBUR
SECRETARY-TREASURER
MASSIMO CALABRESI
The New York Times
EXECUTIVE COMMITTEE MEMBERS
DAVID BOARDMAN
Temple University
THEODORE J. BOUTROUS, JR.
Gibson, Dunn & Crutcher LLP
GAIL GOVE
NBCUniversal
LAURA HANDMAN
Davis Wright Tremaine
DIEGO IBARGÜEN
Hearst
THOMAS C. RUBIN
OpenAI
STEERING COMMITTEE MEMBERS
MARTY BARON
Ret., The Washington Post
WOLF BLITZER
CNN
SEWELL CHAN
USC Annenberg
LYNETTE CLEMETSON
University of Michigan
JASON CONTI
Dow Jones
NIKHIL DEOGUN
Brunswick Group
MANNY GARCIA
Freelance Journalist
EMILIO GARCIA-RUIZ
The San Francisco Chronicle
JOSH GERSTEIN
POLITICO
ALEX GIBNEY
Jigsaw Productions
JAMES GRIMALDI
National Catholic Reporter
KAREN KAISER
The Associated Press
KIMBRIELL KELLY
Chicago Public Media
ALEX MACCALLUM
CNN
MATT MURRAY
The Washington Post
NORMAN PEARLSTINE
New York, New York
CHARLIE SAVAGE
The New York Times
NABIHA SYED
Mozilla
ADAM SYMSON
The E.W. Scripps Company
MATT THOMPSON
The New York Times
VICKIE WALTON-JAMES
NPR
*Affiliations appear only for purposes of identification.*

By email September 22, 2025

Sean Parnell
Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

Re: Implementation of New Media In-Brief.

Dear Mr. Parnell:

The Reporters Committee for Freedom of the Press writes regarding your memorandum dated September 18 to senior Pentagon leadership, which implements a new in-brief form for journalists who hold a Pentagon Facility Alternate Credential (PFAC). We see many ambiguities in the language of the in-brief form that would make it difficult – if not impossible – for news organizations to decide whether to sign the form. We urge the Department to pause implementation of the in-brief process until all of its ambiguous terms are clarified and respectfully request a meeting with Pentagon leadership to discuss these issues.

The Reporters Committee is the nation's largest non-profit providing free legal services for journalists and news organizations across the country. Reporters Committee attorneys frequently represent coalitions of major news organizations in matters involving reporters' access to government facilities, such as the Pentagon.

While these are illustrative, not exhaustive, of the many concerns we have heard, we note three questions relating to the "Pentagon Reservation In-Brief for Media Members," as circulated on September 19 with your implementation memorandum to Pentagon leadership. These questions arise from discussions the Reporters Committee has had with leading news organizations with Pentagon credentials seeking clarity about the meaning of the in-brief and its implications for their journalists.

First, the section of the in-brief entitled "Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information" does not make clear whether those paragraphs describe the policies governing Pentagon personnel or purport to create obligations for reporters who hold a PFAC. The sentences that read "DoW information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" and that "[u]nauthorized disclosure of CNSI or CUI poses a security risk that could damage the security of the United States" would present grave First Amendment concerns if the in-brief were construed to

require that reporters holding a PFAC agree to such a pre-authorization requirement or endorse such a view.

Second, the in-brief includes a series of "Acknowledgments" on page nine that the PFAC holder must "agree to abide by," one of which reads: "I acknowledge that such a determination [that a person poses a security or safety risk] may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of classified national security information or controlled unclassified information. That sentence can also be read in two ways – that the PFAC holder is acknowledging that he or she will not take those actions, or that the PFAC holder is merely acknowledging that this is the Pentagon's policy. The former meaning would likewise pose serious First Amendment concerns and would make news reporting by PFAC holders unworkable in practice given the uncertainty over which disclosures could lead to a PFAC revocation. The latter meaning would not carry those risks to the same extent. As written, news organizations cannot know which obligations they would be agreeing to.

Finally, the in-brief does not make clear whether a PFAC holder's disclosure of classified national security information or controlled unclassified information "shall" or "may" – in the Department's discretion – result in the denial or revocation of a PFAC. If the latter, the in-brief does not explain what standards would guide the Department in deciding whether a particular disclosure might justify denial or revocation. As with the preceding examples, without that clarity, news organizations cannot understand what they are acknowledging or agreeing to by signing the in-brief.

We believe that an addendum to the in-brief – or another memo from your office – addressing these and the other ambiguities well in advance of any deadline to apply for renewal of a PFAC is warranted, as is the pause in implementation we suggest above. We also request a meeting with Pentagon leadership to seek clarity on these and other issues with the new media in-brief as soon as practicable.

The Reporters Committee's Vice President of Policy Gabe Rottman is at your disposal to help coordinate a meeting and answer any other questions. He can be reached at grottman@rcfp.org and 202-795-9300.

Sincerely,

Reporters Committee
for Freedom of the Press

cc: Susan Gough
Pentagon Press Operations

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 2 3 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency, the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E, without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1st Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in-person"

OSD005511-25/CMD007129-25

interviews (or other engagements), they are required to be formally escorted to-and-from those respective offices by authorized DoD personnel from those specific offices/Agencies/Military Departments.

5. Press/media are no longer authorized access to the Pentagon Athletic Center.

In coming weeks, Pentagon Press Corps members will be required to complete an updated in-briefing form explaining their responsibilities to protect CNSI and sensitive information and reissued a new style of PFAC with a clearer "PRESS" identifier on their badge. We also anticipate a forthcoming announcement of additional security measures and enhanced scrutiny on the issuance of PFACs.

OSD(PA) will coordinate the Pentagon Force Protection Agency to ensure compliance with these additional security controls, including new PFACs. Failure by any member of the resident or visiting press to comply with these control measures will result in further restrictions and possibly revocation of press credentials.

PBH
SD29

**To:** Parnell, R Sean (Sean) SES (USA)[redacted] Parlatore, Timothy C CDR USN OSD OSD (USA)[redacted] Wilson, Kingsley R SES (USA[redacted]]; Valdez, Joel M CIV OSD OSD (USA)[redacted]; Flynn, Shawn M SES (USA)[redacted] Ablin, Erik J CIV OSD OGC (USA)[redacted]; David Chalian (CNN)[redacted]; Bryan Boughton (FOX)[redacted]; Rick Klein (ABC)[redacted]; Mark Lima (CBS)[redacted] Radabaugh, Tami J SES OSD PA (USA)[redacted]
**Cc:** David Chalian (CNN)[redacted]; Bryan Boughton (FOX)[redacted]; Rick Klein (ABC)[redacted] Mark Lima (CBS)[redacted]
**From:** Arensberg, Chloe (NBCUniversal)
**Sent:** Fri 9/26/2025 5:47:26 PM
**Subject:** Thank you
**Received:** Fri 9/26/2025 5:47:26 PM

Sean,

Thank you and your team for hosting us today and hearing our concerns. We really appreciated the opportunity - and are hopeful that a resolution is within reach.

Have a good weekend,
Chloe

*Chloe Arensberg*
*SVP & Washington Bureau Chief*
*NBC News*
[redacted]*(c)*

**To:** OSD Pentagon PA Mailbox Duty Officer Press Operations[osd.pa.dutyofficer@mail.mil]
**From:** OSD Pentagon PA Mailbox Duty Officer Press Operations
**Sent:** Tue 9/30/2025 6:51:04 PM
**Subject:** Update on the Pentagon Reservation In-brief for Media Members
**Received:** Tue 9/30/2025 6:51:04 PM
smime.p7s

Media colleagues,

While some items in the memo titled "Pentagon Reservation In-brief for Media Members" are being clarified, the Office of Public Affairs will allow seven days of additional time for reporters and their respective outlets to review the clarifications after the memo's redistribution. This timeline also applies to the issuance of new PFACs.
We will inform you when the new in-brief version is available and the issuance of the new PFACs resumes.

Regards,
Pentagon Press Operations
Office of the Assistant to the Secretary of War for Public Affairs

[redacted]

**From:** Parlatore, Timothy CDR SD [redacted]
**Sent:** Tuesday, October 7, 2025 7:51 PM
**To:** Schulz, David [redacted]
**Cc:** Parnell, R Sean (Sean) SES (USA) [redacted]
**Subject:** Re: Pentagon Press Association

I understand your position, however this is the form that was approved and will need to be signed. I suggest that the GCs help to educate the journalists so they do understand the policy, to the extent that any of them don't.

Remember, not agreeing with the policy on solicitation is not the same as not understanding. Much of what we saw was a lack of agreement, not a lack of understanding.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

---

**From:** "Schulz, David" [redacted]
**Date:** Tuesday, October 7, 2025 at 4:09:23 PM
**To:** "Parlatore, Timothy CDR SD" [redacted]
**Cc:** "Parnell, R Sean (Sean) SES (USA)" [redacted]
**Subject:** RE: Pentagon Press Association

Dear Commander Parlatore,

Thank you again for taking the time to discuss the concerns of the Pentagon Press Association with the initial in-brief concerning the media that was distributed last month. I have received a copy of the revised In-brief statement of Pentagon policy, which continues to request reporters to acknowledge their "understanding" of the policy as a condition to the receipt of a press pass. As previously explained, this language is problematic for many reporters because the discussion of what constitutes "solicitation" and other aspects of the policy are far from clear. We had understood that this unnecessary language would be replaced by a simple "received and read" acknowledgment.

While we appreciate the addition of language confirming that signing the acknowledgement is neither an endorsement of the policy nor a waiver of rights, you should understand that so long as an affirmation of understanding is required, many Pentagon Press Association members will likely be unable or unwilling to sign.

David A. Schulz
Cell: [redacted]

[redacted]

**From:** Parlatore, Timothy CDR SD [redacted]
**Sent:** Monday, September 29, 2025 9:53 PM
**To:** Schulz, David [redacted]
**Subject:** Edited memo

For tomorrow's discussion. I know we need to make additional edits to Appendix A, as discussed.

CDR Timothy C. Parlatore, JAGC, USNR

Special Advisor to the Secretary of War

[redacted]

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME: ________________________________________ DATE: ______________________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to abide by these rules may result in suspension or revocation of your building pass and loss of access. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

General Security

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building is subject to random checks of personal belongings. A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACs must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or

on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACs should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.DutyOfficer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBs serve only as an additional visual identifier. APIBs are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), new physical security restrictions have been enacted for news media, including those with valid, current PFACs:

- News media are not authorized to be anywhere on the 5th Floor, 4th Floor, 3rd Floor, Basement, or Mezzanine levels, including all corridors and rings, at any time without an escort from an authorized DoW official.
- On the 2nd Floor, news media are authorized unescorted access in the Pentagon for the below areas. For all other areas of the 2nd Floor not included below, except as otherwise addressed in this in-brief, news media must have an escort from authorized DoW personnel:
  - Rings A through E between Corridors 1, 10 and 9 (from the Metro Entrance on the E Ring through the Concourse to the A Ring);
  - E Ring from the Metro Entrance to Corridor 9;
  - E Ring from the River Entrance directly to Corridor 9;
  - Corridor 9 from the E Ring to the A Ring; 951-999
  - At the Apex of Corridors 9/10, the exit to the Courtyard;
  - A Ring from the Apex of Corridors 9/10 to the Mall Corridor between Corridor 6 and 7 and the Mall Corridor to the Mall Entrance for the purpose getting to and from the Mall Entrance for stand-ups
- On the 1st Floor, news media are authorized unescorted access to the Center Courtyard and the Food Court between Corridors 1 and 10.
- See Appendix D for a graphic of the areas where the news media are authorized unescorted access.
- News media are not authorized access to the Pentagon Athletic Center.

If news media require access to other areas or offices within the Pentagon for in-person interviews or other engagements, they must be escorted to and from those spaces by authorized DoW personnel.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. You have been briefed on the physical control measures for news media access and understand which areas require escort even though you have a PFAC. You must obtain an escort for the required escort areas and must remain with your escort at all times in those areas.

Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contractor, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, these are the laws and regulations that apply to military members and DoW civilian employees and contractors. This does not require journalists to submit their writings for approval.

Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy. News media who find themselves in possession of information that appears to be CNSI or CUI should report it immediately to PPO.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon 24 hours a day and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

A PFAC also affords escort privileges for media members who are U.S. citizens for up to three visiting family members for special events, such as the Bring Your Child to Work Day, subject to the approval of the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). Family members 18 years and older must be entered into the PFPA Visitor Management System (VMS) by the sponsoring public affairs office no later than 24 hours in advance for U.S. citizens and no later than 48 hours in advance for non-U.S. citizens.

PFAC holders escorting other media members or family members must stay with their visitor(s) at all times. Failure to do so may result in loss of the PFAC issued to you.

PFAC holders who are not U.S. citizens do not have escort privileges.

<u>PFAC Issuance and Renewals</u>

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period and who have not posed a security or safety risk to DoW personnel or property will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period and who have not posed a security or safety risk to DoW personnel or property during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACs.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times, renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, or is not meeting the frequency requirements. An initial determination of a security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination. A determination that an individual poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. See Appendix A for information on the applicable standard and the process for denying, revoking, or non-renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at

least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email, phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 — Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

<u>Filming/Photography Pre-Approved Exceptions</u>
News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

<u>Filming/Photography Exception Requests</u>

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either

the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.

- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.

- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.

- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil. You can download a DD Form 2798 here: https://www.esd.whs.mil/Directives/forms/dd2500_2999/DD2798/

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACs.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Security Risks

A PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, in accordance with the standards and procedures outlined in Appendix A. Such an initial determination may result in an immediate suspension of your Pentagon access while the procedures preceding a final determination are pending.

This is a description of DoW policy and the potential bases for such a discretionary determination only and does not impose any obligations on you as a PFAC holder to refrain from constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Such a determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI, but any such determination is discretionary ("may," not "shall"), based on a reasonable assessment informed by the unique facts and circumstances of each case, and incorporating due process (e.g., written notice of the basis, a 30-day appeal period, an opportunity for personal appearance, and a final, reviewable determination).

For clarity, the receipt of unsolicited CNSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC. However, if you solicit the gathering and providing of such information for use in your work or are otherwise aware of and encourage actions that violate DoW disclosure rules, such conduct may weigh in the consideration of whether you pose a security or safety risk.

Solicitation may include direct communications with specific DoW personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share CNSI or CUI. For example an advertisement or post that states that a reporter or outlet "wants to hear from Defense Department and national security officials about changes within the Pentagon and throughout the U.S. military and intelligence community. You can contact our reporters by email or Signal encrypted message…" would constitute a solicitation that could lead to revocation.

Additionally, in rare, extreme cases where publication recklessly endangers American lives, it could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

All determinations are narrowly tailored to safeguard sensitive information without unduly restricting speech, and are informed by factors such as convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Moreover, determinations will take into account whether such conduct is willful or repeated, as opposed to isolated and unintentional.

Additional Clarifications

Nothing in this document requires you to waive or give up any constitutional rights. This in-brief constitutes a description of DoW policies rather than an agreement to them by you as a PFAC holder, and access to the Pentagon is a privilege, not a right, which may be revoked by the Department of War.

NAME: ______________________________ DATE: ____________________

Acknowledgements

~~Please read and initial each of the below:~~

~~____ I understand that PFACs are extended as a courtesy to media members who work full-time in the Pentagon or who meet the minimum monthly visit frequency. PFACs may be revoked or not renewed for individuals who do not meet the frequency requirement.~~

~~____ I understand that securing my PFAC is my responsibility. I understand that I must immediately report a lost PFAC.~~

~~____ I understand that I must wear my PFAC and APIB above my waist at all times.~~

~~____ I understand that I and my belongings are subject to inspection when on the Pentagon reservation.~~

~~____ I understand that I am responsible for the physical security of my work area, including ensuring that doors are locked and properly secured, where applicable.~~

~~____ I understand that as a non-government employee, while a PFAC is my authorized means of entering the Pentagon, a PFAC does not allow me unfettered access to all of the Pentagon. I have been briefed on the physical control measures for news media access and understand which areas require escort even though I have a PFAC. I acknowledge that I must obtain an escort for the required escort areas and must remain with my escort at all times in those areas.~~

~~____ I understand that a property pass is required to remove property from the building that is not readily identifiable as personal. Property passes may be obtained from Pentagon Press Operations, room 2D961, during normal working hours.~~

~~____ I understand that any type of visual or audio recording on the Pentagon Reservation, including the use of a cell phone camera, is prohibited, unless approved in advance, in accordance with 32 CFR § 234.15.~~

____ I have received, read, and ~~acknowledge~~ understand ~~receipt and briefing of~~ the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which includes the standard and procedures for denying, revoking, or not renewing a PFAC.

~~____ I acknowledge that a PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property. I understand that such an initial determination may result in an immediate suspension of my Pentagon access while the procedures preceding a final determination are pending. I~~

~~acknowledge that such a determination may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI.~~

~~____ I acknowledge that during a declared pandemic or national health emergency, I must follow the same personal protective measures as prescribed for Pentagon personnel when entering the building. This may include not entering the building if I am not feeling well or am experiencing symptoms. I acknowledge that I may be randomly selected for screening for symptoms or the pandemic disease when entering the building or may be required to participate in screening testing program. I acknowledge that failure to comply with the measures in any Health Protection Condition announcement could result in temporary denial of access or revocation of my PFAC. I acknowledge that as a civilian who is not a DoW employee, I could temporarily be denied access to the Pentagon during a declared pandemic, national health emergency, or other emergency contingency.~~

~~____ I acknowledge that if I am issued a "P" parking permit, that I will be required to return it to the PPO upon completion of my media/press duties, or upon the expiration of the "P" parking permit.~~

~~____ I have been briefed on the safety and security requirements and agree to abide by the provisions outlined above.~~

______________________________ ______________________________
Signature -- Administering Official Signature -- Media Member

New Badge Expiration Date_______________

Email address____________________________

Work phone__________________ Cell phone____________________

[redacted]

-----Original Message-----
From: Schulz, David [redacted]
Sent: Monday, September 29, 2025 10:05 PM
To: Parlatore, Timothy CDR SD [redacted]
Subject: RE: Edited memo

Received.

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Monday, September 29, 2025 9:53 PM
To: Schulz, David [redacted]
Subject: Edited memo

For tomorrow's discussion. I know we need to make additional edits to Appendix A, as discussed.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

[redacted]

-----Original Message-----
From: Schulz, David [redacted]
Sent: Monday, September 29, 2025 8:28 PM
To: Parlatore, Timothy CDR SD [redacted]
Subject: RE: Pentagon Press Association

Just tried. Available to talk when you are free.

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Monday, September 29, 2025 8:24 PM
To: Schulz, David [redacted]
Subject: Re: Pentagon Press Association

Please give me a call so we can discuss further.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Parlatore, Timothy CDR SD" [redacted]
Date: Monday, September 29, 2025 at 6:40:21 PM
To: "Schulz, David" [redacted]
Subject: Re: Pentagon Press Association

We just received an inquiry from Washington Post who was provided a copy of the redlined draft and intends to report on it. This isn't exactly what I was expecting from what I thought were good faith

discussions.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Schulz, David"[redacted]
Date: Monday, September 29, 2025 at 4:02:00 PM
To: "Parlatore, Timothy CDR SD" [redacted]
Subject: RE: Pentagon Press Association

Thank you again for sharing the alternative language and for trying to work through the issues that have been raised. There continue to be a few substantial concerns with the language, especially but not exclusively around the notion of improper solicitation. It would be helpful to have a further discussion to see if the gap can be bridged, but we really need some additional time to discuss on our side ways to resolve the differences that will be widely acceptable. Is there any possibility of putting off the meeting scheduled for tomorrow until early next week, or after any government shutdown is resolved?

I think that would be the best way to get the buy-in needed.

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Sunday, September 28, 2025 1:25 PM
To: Schulz, David [redacted]
Subject: Re: Pentagon Press Association

I think your first point on the Exhibit can be easily fixed to mirror the other document. As to the worldwide ban, I don't foresee that changing.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Schulz, David" [redacted]
Date: Sunday, September 28, 2025 at 1:03:00 PM
To: "Parlatore, Timothy CDR SD"[redacted]
Subject: RE: Pentagon Press Association

Thank you for sharing the draft of a possible revised set of acknowledgments. We appreciate the effort to address concerns raised about the original language.

I need to review the revisions with my clients and the folks at the Reporters Committee before providing substantive comments on them. I want to let you know, however, that the continued incorporation of Exhibit A is likely to require some revisions to that exhibit to ensure consistency with the changes in the acknowledgment form. In particular, I suspect the highlighted language in this paragraph in Exhibit A will remain a problem for many:

" Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as attempts to improperly obtain CNSI or CUI, or being found in physical possession of CNSI or CUI without reporting it."

I know that concerns were also raised about the worldwide ban on access to any DoW facility imposed in paragraph B of the Appendix. I thought it would be useful to give you a heads up about these concerns with Appendix A while we are reviewing the revised acknowledgments.

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Sunday, September 28, 2025 9:30 AM
To: Schulz, David [redacted]
Subject: Re: Pentagon Press Association Introduction

With the understanding that this has not yet been reviewed by DoW OGC and could be subject to further edits, here is the current redline version where I tried incorporate all of your concerns. Let me know if you have any feedback.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Schulz, David" [redacted]
Date: Friday, September 26, 2025 at 5:07:20 PM
To: "Parlatore, Timothy CDR SD" [redacted]
Subject: RE: Pentagon Press Association Introduction

15 Minutes?

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Friday, September 26, 2025 5:06 PM
To: Schulz, David [redacted]; Martinez, Luis E. [redacted]
Subject: Re: Pentagon Press Association Introduction

Are you free to jump on a call now to discuss?

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Parlatore, Timothy CDR SD" [redacted]
Date: Friday, September 26, 2025 at 4:32:00 PM
To: "Schulz, David" [redacted] "Martinez, Luis E." [redacted]
Subject: Re: Pentagon Press Association Introduction

That is not accurate. We are looking to get the new form agreed upon today so that people can fill out the applications next week.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Schulz, David" [redacted]
Date: Friday, September 26, 2025 at 4:08:19 PM
To: "Parlatore, Timothy CDR SD" [redacted]
"Martinez, Luis E." [redacted]
Subject: RE: Pentagon Press Association Introduction

Thanks for the quick response. I understand that some of the time pressure is off because today is not the filing deadline. I have been told the new deadline is October 15. We could benefit on our side from some time to collect our thoughts. Would it be possible to schedule a call to review language sometime next week or early in October?

Dave

David A. Schulz
Cell: [redacted]

-----Original Message-----
From: Parlatore, Timothy CDR SD [redacted]
Sent: Friday, September 26, 2025 2:41 PM
To: Martinez, Luis E. [redacted]
Cc: Schulz, David [redacted]
Subject: Re: Pentagon Press Association Introduction

Sounds good. I'd like to talk after 4 so we can hopefully get an agreeable draft today.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Martinez, Luis E." [redacted]
Date: Friday, September 26, 2025 at 2:24:50 PM
To: "Parlatore, Timothy CDR SD" [redacted]
Cc: "Schulz, David" [redacted]
Subject: Pentagon Press Association Introduction

Mr. Parlatore,

I am the President of the Pentagon Press Association and I have just met with Pentagon Press Secretary Kingsley Wilson who passed along your email so I could contact you.

Included on this email is Dave Schulz who is the counsel for the Pentagon Press Association.

Kingsley communicated to me that you would be available to discuss changes in the language to the new requirements for journalists receiving their building badges.

We greatly appreciate the opportunity to have a discussion on this matter.

We will be reaching out as soon as possible to the Reporters Committee for Freedom of the Press and will be in touch with you later.

Thank you again for your assistance.

Luis Martinez
President, Pentagon Press Association

[redacted]

**From:** Gabe Rottman [redacted]
**Sent:** Wednesday, October 8, 2025 3:28 PM
**To:** Parlatore, Timothy CDR SD [redacted]
**Cc:** Parnell, R Sean (Sean) SES (USA) [redacted]
**Subject:** Re: Revisions to in brief for media membners

Dear Mr. Parnell and Commander Parlatore (and removing Mr. Schulz),

The Reporters Committee thanks you for taking the time to engage with us on the new in-brief form and for your willingness to attempt to address our concerns.

We are in receipt of the revised in-brief form. We had expected based on our meeting of September 30 and the correspondence below that the acknowledgement would reflect the simple receipt and review of the policy, not the signatory's "understanding" of the policy, and that that word would not appear in the revised acknowledgement. It has been reintroduced twice, in the first sentence ("received, read, and understand") and in the second sentence ("[m]y signature represents my acknowledgement and understanding").

We also anticipate that a number of news organizations will continue to have concerns about the purported legal distinction between passive receipt of information and active "solicitation" that DoW regards as improper, particularly as it would sweep in unclassified information or even information that merely hasn't been specifically pre-authorized. The revised policy contains new language on that point -- including the Privacy Act language, the discussion of Article 92 of the Uniform Code, and the Department's view of the legal implications of journalists' interactions with servicemembers, DoW civilian employees, and contractors -- but, as you know, this is the same underlying distinction that we discussed as a concern in our meeting and prior correspondence.

These issues may continue to be an impediment to signing for many journalists, though of course those decisions will have to be made by the journalists themselves in consultation with their employers.

Thank you again.

Best,

Gabe Rottman

Vice President of Policy

**The Reporters Committee for Freedom of the Press**
1156 15th St. NW, Suite 1020, Washington DC 20005
[redacted]

On Tue, Sep 30, 2025 at 10:01 PM Parlatore, Timothy CDR SD [redacted] wrote:

Understood. I incorporated your suggestion on the acknowledgment page. As to the solicitation, I did more legal research and made that section much more clear, as well as expanded the "privilege not a right" section. I think the expansions will make things much more clear. Thank you.

CDR Timothy C. Parlatore, JAGC, USNR
Special Advisor to the Secretary of War
[redacted]

From: "Schulz, David" [redacted]
Date: Tuesday, September 30, 2025 at 3:39:06 PM
To: "Parlatore, Timothy CDR SD" [redacted]
"Parnell, R Sean (Sean) SES (USA)"
[redacted]
Cc: [redacted]
Subject: Revisions to in brief for media members

Thank you both for your time today and your agreement to temporarily suspend the PFAC rollout pending further revision and internal review at DOW. This is to confirm that journalists holding credentials will have seven business days from the time you provide the revised policies and acknowledgements to decide whether to sign.

We think the revisions discussed will bring us really close to something most journalists can agree to, but have continuing concerns that some journalists and newsrooms may still react adversely. We think a few of the changes we discussed could go a long way to calming the waters and hope you will reassess them. One would be to further revise the acknowledgment to state:

I have received and read the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which includes the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief contains a description of DoW policies and does not constitute my agreement with them. Signing this acknowledgment is not a waiver of any rights.

Also, we anticipate that the example of active solicitation you plan to revise by removing the quotation marks and making it more general may still be a sticking point for many journalists that could keep them from signing. Removing that example, which was not in the original in-brief, would be meaningful.

As I know you are drafting and socializing the revisions internally, we wanted to get these continuing issues before you quickly to find common ground where possible, in the spirit of our conversation today. Thanks for your further consideration.

Dave

David A. Schulz

Mobile: [redacted]
@MFIADave@bsky.social
[cid:image001.jpg@01DC321F.EBA3D570]

[redacted]

**From:** Gabe Rottman [redacted]
**Sent:** Tuesday, September 30, 2025 5:03 PM
**To:** Schulz, David [redacted]
**Cc:** Parlatore, Timothy CDR SD [redacted]; Parnell, R Sean (Sean) SES (USA) [redacted]
**Subject:** Re: Revisions to in brief for media membners

Dear Mr. Parnell and Commander Parlatore,

To piggyback on Dave's note below, is there any way the Office of Public Affairs or the relevant DoW element could send a written notice to the journalists affected by today's deadline letting them know of the extension and providing some clarity on what specifically they need to do?

I understand that some of them may be hearing orally, but it sounds like there is some confusion.

Thank you so much, and thank you again for the meeting today.

Best,

Gabe

On Tue, Sep 30, 2025 at 3:39 PM Schulz, David [redacted] wrote:

Thank you both for your time today and your agreement to temporarily suspend the PFAC rollout pending further revision and internal review at DOW. This is to confirm that journalists holding credentials will have seven business days from the time you provide the revised policies and acknowledgements to decide whether to sign.

We think the revisions discussed will bring us really close to something most journalists can agree to, but have continuing concerns that some journalists and newsrooms may still react adversely. We think a few of the changes we discussed could go a long way to calming the waters and hope you will reassess them. One would be to further revise the acknowledgment to state:

> I have received and read the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which includes the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief contains a description of DoW policies and does not constitute my agreement with them. Signing this acknowledgment is not a waiver of any rights.

Also, we anticipate that the example of active solicitation you plan to revise by removing the quotation marks and making it more general may still be a sticking point for many journalists that could keep them from signing. Removing that example, which was not in the original in-brief, would be meaningful.

As I know you are drafting and socializing the revisions internally, we wanted to get these continuing issues before you quickly to find common ground where possible, in the spirit of our conversation today. Thanks for your further consideration.

Dave

David A. Schulz
Mobile: [redacted]

@MFIADave@bsky.social

MFIA
MEDIA FREEDOM & INFORMATION ACCESS CLINIC

Dated: March 4, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

**admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

Brett A. Shumate
Assistant Attorney General

Joseph E. Borson
Assistant Branch Director

*/s/ Michael Bruns*

Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, v. DEPARTMENT OF DEFENSE, et al., Defendants. | Civil Action No. 25-04218 (PLF) |

ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion for Summary Judgment [Dkt. No. 10] is GRANTED; it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 22] is DENIED; it is

FURTHER ORDERED that Defendants' request for a seven-day administrative stay is DENIED; it is

DECLARED that portions (the "Challenged Provision") of the policy pertaining to Pentagon Facility Alternate Credentials ("PFACs") that was promulgated by the Department of Defense (the "Department") on October 6, 2025 in a Memorandum for Senior Pentagon Leadership with the subject line "Implementation of New Media In-brief," Administrative Record ("AR") at 1-21 (the "Policy") are unlawful because they violate the First and Fifth Amendments to the United States Constitution. The Challenged Provisions are the following:

- The following sentence in the first paragraph of the "Pentagon Reservation In-Brief for Media Members ("In-Brief"): "Failure to abide by these rules may result in suspension of your PFAC and loss of access." AR at 3.
- The first paragraph of the In-Brief section entitled "General Security" as well as the following sentence in the second paragraph: "This framework establishes that access is not open to the public or the press as a matter of right but is instead a controlled privilege." AR at 3.
- The final three paragraphs of the In-Brief section entitled "Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information." AR at 6.
- The following phrase found in both the second and third paragraphs of the In-Brief section entitled "PFAC Issuance and Renewals": ". . . and who have not posed a security or safety risk to DoW personnel or property. . . ." AR at 7.
- The final paragraph of the In-Brief section entitled "PFAC Issuance and Renewals," save its last sentence. AR at 8.
- The In-Brief section entitled "Security Risks" in its entirety. AR at 12-13.
- The "Acknowledgment," AR at 14, and the mandate that PFAC holders sign it, AR at 1.
- Paragraph A of Appendix A to the In-Brief entitled "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials" in its entirety. AR at 15.
- The following two phrases found in Paragraph B of Appendix A to the In-Brief entitled "Procedures for Denial, Revocation, or Non-Renewal": (1) ". . . or suspended for the reasons outlined above . . ."; and (2) ". . . unrelated to any security or safety risk . . . ." AR at 15.

- The following sentence found in subparagraph 6 of Paragraph B of Appendix A to the In-Brief entitled "Procedures for Denial, Revocation, or Non-Renewal": "The Director, PFPA, or designee, shall exercise final review authority in the matter." AR at 16. It is

FURTHER DECLARED that all actions by Defendants implementing the Challenged Provisions of the Policy are unlawful and that Defendants may not lawfully deny, revoke, suspend, or not renew a PFAC pursuant to the Challenged Provisions of the Policy; it is

FURTHER ORDERED that the Challenged Provisions of the Policy are VACATED and SET ASIDE and that such vacatur applies to all regulated parties; it is

FURTHER ORDERED that Defendants and all persons acting in concert with them are permanently ENJOINED from implementing or enforcing the Challenged Provisions of the Policy to deny, suspend, revoke, or not renew the PFAC of Plaintiff Julian E. Barnes or any other person who holds, will hold, or will apply for a PFAC, who is employed by, working on behalf of, or otherwise associated with The New York Times; it is

FURTHER ORDERED that Defendants shall immediately reinstate the PFACs of Mr. Barnes and the following journalists with The New York Times, all of whom held a PFAC as of October 6, 2025: Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, and W.J. Hennigan; it is

FURTHER ORDERED that Defendants shall file a status report on or before March 27, 2026, describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; and it is

FURTHER ORDERED that this Court shall retain jurisdiction to enforce this Order.

This is a final appealable order. See FED. R. APP. P. 4(a).

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3/20/26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, v. DEPARTMENT OF DEFENSE, et al., Defendants. | Civil Action No. 25-04218 (PLF) |

OPINION

A primary purpose of the First Amendment is to enable the press to publish what it will and the public to read what it chooses, free of any official proscription. Those who drafted the First Amendment believed that the nation's security requires a free press and an informed people and that such security is endangered by governmental suppression of political speech. That principle has preserved the nation's security for almost 250 years. It must not be abandoned now.

As the Supreme Court said fifty years ago in Nebraska Press Association:

> We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we . . . remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.

Neb. Press Ass'n v. Stuart, 427 U.S. 539, 560-61 (1976) (alteration in original) (quoting Mia. Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 259 (1974) (White, J., concurring)).

The New York Times ("The Times") and its reporter Julian E. Barnes have brought this lawsuit to preserve and defend these principles against overzealous actions by the Secretary of Defense and the Department he leads. To do so, they have filed a motion for summary judgment seeking an order vacating, declaring unconstitutional, and permanently enjoining the enforcement of certain provisions of a policy newly implemented by the United States Department of Defense (the "Department"). The plaintiffs argue that those provisions violate their rights under the First and Fifth Amendments and are contrary to the Administrative Procedure Act ("APA"). Defendants the Department, Pete Hegseth in his official capacity as Secretary of Defense, and Sean Parnell in his official capacity as Chief Pentagon Spokesman have filed a cross-motion for summary judgment. The motions have been fully briefed and argued and are now ripe for decision.[1]

---

[1] The documents reviewed by the Court in connection with the pending motions include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiffs' Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief [Dkt. No. 10]; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls. Mot.") [Dkt. No. 10-1]; Declaration of Julian E. Barnes ("Barnes Decl.") [Dkt. No. 10-3]; Declaration of Robert Burns ("Burns Decl.") [Dkt. No. 10-4]; Declaration of Pete Williams ("Williams Decl.") [Dkt. No. 10-6]; Declaration of Theodore Boutrous ("Boutrous Decl.") [Dkt. No. 10-8]; Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("SUMF") [Dkt. No. 10-36]; Brief for State of New York as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment [Dkt. No. 13]; Brief of Amicus Curiae Pentagon Press Association in Support of Plaintiffs' Motion for Summary Judgment ("Press Ass'n Br.") [Dkt. No. 19]; Brief of Proposed Amici Curiae the Reporters Committee for Freedom of the Press and 23 Media Organizations in Support of Plaintiffs' Motion for Summary Judgment ("Committee Br.") [Dkt. No. 20]; Brief of Amici Curiae American Civil Liberties Union and American Civil Liberties Union of the District of Columbia in Support of Plaintiffs [Dkt. No. 21]; Defendants' Motion for Summary Judgment [Dkt. No. 22]; Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defs. Mot.") [Dkt. No. 22-1]; Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("Defs. Resp. to SUMF") [Dkt. No. 22-2]; Combined Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment ("Pls. Reply") [Dkt. No. 24]; Supplemental Declaration of Theodore Boutrous ("Supp. Boutrous Decl.") [Dkt. No. 24-1]; Defendants' Reply in Support of Their Motion for Summary Judgment ("Defs. Reply") [Dkt. No. 27]; Administrative Record,

For the reasons explained in this Opinion, the Court will grant the plaintiffs' motion and deny the defendants' motion.

## I. FACTUAL AND PROCEDURAL HISTORY

### *A. Factual Background*[2]

#### 1. The Parties

This case centers on Pentagon Facilities Alternate Credentials ("PFACs"), press credentials that members of the media are issued to access the Pentagon. SUMF at 1 (¶ 1). For decades, journalists from news organizations across the country have covered the Department from the Pentagon's grounds, which they have accessed using their PFACs. Id. at 1-2 (¶¶ 2, 5). The New York Times is one such news organization. Id. at 4 (¶ 22). For more than forty years, multiple Times reporters with PFACs have worked regularly at the Pentagon. Id. Having a consistent presence at the Pentagon has enabled and enhanced the ability of the plaintiffs and other journalists to report on the Department and its leadership during some of the most consequential moments in American history. Id. at 1-2 (¶ 3). For The Times, having journalists with access to the Pentagon has enhanced the depth, detail, quality, and accuracy of its coverage of the Department, the U.S. military, and national security issues. Id. at 5 (¶ 29).

Julian Barnes is a national security reporter with The Times who focuses on the Pentagon, U.S. intelligence agencies, and international security, among other subjects. SUMF

---

NYTIMES-DOW-25cv04218-0000001-78 ("AR") [Dkt. No. 29]; Defendants' Notice of Clarification Regarding Statements at Oral Argument ("Notice of Clarification") [Dkt. No. 32]; Plaintiffs' Response to Defendants' "Notice of Clarification" [Dkt. No. 33]; and the Transcript of Oral Argument ("OA Tr.").

[2] The parties agree that these facts are undisputed. See SUMF; Defs. Resp. to SUMF.

at 5 (¶ 24). He has held a PFAC almost continuously since 2004. Id. (¶ 25). Since then, he has attended hundreds of Pentagon press briefings and had countless discussions with Department officials in connection with his reporting. Id. (¶ 26). Mr. Barnes's access to and regular presence at the Pentagon allowed him to join press briefings scheduled on short notice, ask follow-up questions of Department spokespeople during and after press conferences, and ask questions of the public affairs representatives of every branch of the U.S. military. Id. (¶ 27). He and six other reporters with The Times held PFACs for most of 2025. Id. (¶ 23).

By law, the Pentagon is under the "jurisdiction, custody, and control" of the "Secretary of Defense," who is required to "protect [its] buildings, grounds, and property" and is empowered to prescribe rules and regulations "to ensure [its] safe, efficient, and secure operation." 10 U.S.C. § 2674(a)-(c). Pete Hegseth has served as Secretary of Defense since his confirmation by the Senate on January 24, 2025. SUMF at 6 (¶ 33). Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience. Id. (¶ 34). Throughout Secretary Hegseth's tenure, the Secretary and other Department officials have complained openly about reporting that they perceive as unfavorable to them and the Department. Id. (¶ 35).

### 2. The History of News Organizations at the Pentagon

There has long been a process by which the Department issues PFACs to journalists to access the Pentagon. SUMF at 2 (¶ 5). For decades, that process required PFAC applicants to submit a letter confirming their employment and assignment with a news organization and undergo a standard background check. Id. Beginning in the early 2000s,

reporters who received PFACs were also asked to sign a one-page form setting forth certain "basic, noncontroversial" requirements related to PFACs. Id. (¶ 8). Those requirements included that the credential should be "visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should immediately be reported to the Public Affairs Operations." Id. Reporters with PFACs were also restricted from accessing certain secure areas within the Pentagon, and reporters respected those boundaries. Id. at 3 (¶ 10). In addition, the Department has long provided dedicated physical workspace for news organizations within the Pentagon. Id. at 2 (¶ 7).

The regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel. SUMF at 3 (¶ 11). From the Pentagon, reporters historically have been able to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings. Id. (¶ 12). Reporters at the Pentagon also have engaged in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff. Id. (¶ 13). These in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations. Id. In addition, these interactions enable reporters at the Pentagon to establish professional relationships and foster trust with Department officials. Id. (¶ 15).

Over the past several decades, there have been times when PFAC holders have published news stories critical of the Department or reported information that Department officials believed had come out too soon or would have preferred had not been made public at all. SUMF at 4 (¶ 19). The publication of such stories has led to scrutiny of the Department and

its officials by lawmakers and the public, and it has sometimes spurred beneficial reform. Id. Historically, though, even when Department leaders disliked a journalist's reporting, they did not consider suspending, revoking, or not renewing the journalist's press credentials in response to that reporting. Id. (¶ 20). Julian Barnes, Pete Williams, and Robert Burns—reporters who have spent decades covering the Pentagon—as well as former Pentagon officials, are not aware of the Department ever suspending, revoking, or not renewing a journalist's credentials due to concern over the safety or security of Department personnel or property or based on the content of their reporting. Id. (¶ 21); see Barnes Decl. ¶ 7; Williams Decl. ¶ 10; Burns Decl. ¶¶ 16-17.[3]

3. The Department Announces a New PFAC Policy

In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," which imposed new restrictions on journalists' physical access to specific areas within the Pentagon. SUMF at 6-7 (¶ 38); see

[3] For example, during the heated controversy over the publication of the Pentagon Papers, the government fought The Times and The Washington Post in court rather than retaliating by attempting to exclude journalists from those organizations from the Pentagon. Notwithstanding the Department's strong desire to prevent the Pentagon Papers' release, the Department did not threaten to revoke the reporters' credentials, and press briefings continued as normal. See Press Ass'n Br. at 6. Likewise, the Department did not attempt to exclude journalists from the Pentagon following the publication of stories describing the toxicity of Agent Orange used during the Vietnam War, or the reporting on the "Fat Leonard" corruption scandal involving serious threats to national security, or a host of other revelations from the media. See Committee Br. at 13-15. And as counsel for the Pentagon Press Association as amicus curiae recounted at oral argument:

> When General Westmoreland was upset that CBS was reporting misinformation about the Vietnam War, he sued. But no reporter lost their credentials. When 60 Minutes published photos of Abu Ghraib, they did a public service. The Pentagon was upset, it was a disclosure of unauthorized information. But no one reached out to yank credentials.

OA Tr. at 31.

AR at 46-47. Specifically, the May memorandum prohibited journalists from being in the areas around the Secretary's office and stated that access to other sections of the building would require an official escort. SUMF at 7 (¶ 40). According to the memorandum, these "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." Id. (¶ 39).

Four months later, in September 2025, Mr. Parnell issued a memorandum entitled "Implementation of New Media In-brief," which purported to implement the Department's "Updated Physical Control Measures" from May. SUMF at 7 (¶ 42); see AR at 22-23. The September memorandum stated that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." SUMF at 7 (¶ 43). The Department did not identify any breach of physical security or other incident necessitating new restrictions or requirements, and journalists, including Mr. Barnes, are not aware of any such incident. Id. at 7-8 (¶ 44).

Attached to the September memorandum was a "Reservation In-Brief" (the "September In-Brief"), which announced new rules relating to PFACs. SUMF at 8 (¶ 45). The September In-Brief stated that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." Id. (¶ 46). The September In-Brief further provided that such a determination may be "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information and on grounds that "includ[ed], but [were] not limited to," "attempts to improperly obtain" Department information or "being found in physical possession of" such information "without reporting it." Id. Appendix A to the September In-Brief provided

additional grounds upon which the Department could "deny, revoke, or refuse to renew a PFAC," which "include[d], but [we]re not limited to," convictions for specific offenses. AR at 34-35. Finally, the September In-Brief included a series of "Acknowledgements" that journalists would be required to sign to obtain or maintain a PFAC. SUMF at 8 (¶ 47). Those Acknowledgements included statements affirming that the journalist had received the In-Brief and "underst[ood]" its requirements. AR at 32-33.

4. The Department and Members of the Press Engage on the New PFAC Policy

On September 22, 2025, the Reporters Committee for Freedom of the Press (the "Committee") sent a letter to Mr. Parnell "seeking clarity about the meaning of the [September In-Brief] and its implications for" journalists. AR at 44-45. The Committee's letter posed three broad questions and concerns. See id. First, the Committee asked whether the September In-Brief purported to require credentialed reporters to seek permission to disclose Department information. Id. at 44. Second, the Committee asked whether, by signing the Acknowledgements, "the PFAC holder is acknowledging that he or she will not take those actions, or that the PFAC holder is merely acknowledging that this is the Pentagon's policy." Id. at 45. Third, the Committee noted that, in its view, the September In-Brief "does not make clear whether a PFAC holder's disclosure of classified national security information or controlled unclassified information 'shall' or 'may' – in the Department's discretion – result in the denial or revocation of a PFAC." Id.

In a response letter dated September 24, 2025, Mr. Parnell wrote to "clarify" the application of the September In-Brief. SUMF at 9 (¶ 49); see AR at 41-43. Regarding the Committee's first concern, Mr. Parnell stated that the September In-Brief's requirement that "information must be approved for public release" was directed at Pentagon officials and did

"not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." SUMF at 9 (¶ 49). The "focus" of the new policy, Mr. Parnell explained, was "on preventing active solicitation that encourages [Department] personnel to violate [the Department's] disclosure rules, as such conduct is not always protected by the First Amendment." Id. (¶ 50). As for the Committee's second concern, Mr. Parnell stated that the "Acknowledgements" are intended as "acknowledgments of [Department] policies and potential grounds for discretionary action, not as commitments by reporters to refrain from newsgathering or disclosure." AR at 42. He further stated that "[r]eceipt of unsolicited information and subsequent publication" "would not normally, on its own, trigger revocation" of a PFAC but that in "rare, extreme cases," such receipt "could factor into an assessment" of whether the reporter "poses a security risk." Id. Regarding the Committee's third concern, Mr. Parnell stated that the September In-Brief "does not mandate ('shall') that a PFAC holder's disclosure of" Department information "result in denial or revocation; rather it 'may' do so in the Department's discretion." Id.

Following additional discussions between Department officials and various media outlets, see AR at 48-74, The Times and other media organizations informed the Pentagon that provisions of the new PFAC policy were incompatible with the First Amendment and the responsibilities of members of the press. SUMF at 9 (¶ 53). The reporters therefore advised the Pentagon that they could not sign the Acknowledgement. Id.

5. The Department Issues a Final PFAC Policy

On October 6, 2025, the Department issued a new PFAC policy that included final versions of the In-Brief and Acknowledgment (the "Policy"). SUMF at 10 (¶ 54); see AR at 1-21. The Policy provides that a PFAC "may be denied, revoked, or not renewed if a person is

reasonably determined to pose a security or safety risk to [Department] personnel or property" and that "[s]uch an initial determination may result in an immediate suspension of [a journalist's] Pentagon access while the procedures preceding a final determination are pending." SUMF at 10 (¶ 55). The Policy states that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified national security information ("CNSI") or controlled unclassified information ("CUI") "based on a reasonable assessment informed by the unique facts and circumstances of each case" and that "[a]ll determinations under th[e] Policy are undertaken on a case-by-case basis reviewing the totality of the circumstances." Id. (¶¶ 56-57). The Policy further provides that a journalist's receipt, publication, or "solicitation" of CUI, which "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information," may result in the immediate suspension or revocation of a PFAC. Id. (¶ 58). The examples of "solicitation" provided in the Policy

> include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips encouraging [Department] employees to share non-public [Department] information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation. Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

Id. at 11 (¶ 60).

Appendix A, Part A of the Policy provides that "[p]ersons presumed to present" a "security or safety risk to [Department] personnel or property" will "include, but are not limited to, those who have been convicted of any offense involving," among other things, national defense, theft, trespassing, fraud, deceit, and "[u]nprofessional conduct that might serve to

disrupt Pentagon operations." SUMF at 11 (¶ 61). The Appendix also states that "actions other than convictions may be deemed to pose a security or safety risk, such as discussed in the [In-Brief]." Id. (¶ 62). In addition, Appendix A, Part B sets forth "[p]rocedures for [d]enial, [r]evocation, or [n]on-[r]enewal" of a PFAC. Id. (¶ 63). Those procedures allow for an appeal following the "immediate suspension" of a reporter's PFAC and authorize the Department to "conduct [an] inquiry as deemed appropriate" after receiving a reporter's "written or oral response to the proposed denial, revocation, or non-renewal." Id. at 12 (¶¶ 64-65). Finally, the Policy includes the following "Acknowledgement":

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which addresses the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

Id. (¶ 67).

After the Policy was issued, PFAC holders were informed that their PFACs would be revoked if they did not sign the Acknowledgement by October 15, 2025. SUMF at 12 (¶ 68). Seven journalists with The Times, including Mr. Barnes, as well as most other journalists who held PFACs at the time, refused to sign the Acknowledgement. Id. (¶ 69). Mr. Barnes and his colleagues at The Times turned in their PFACs on or around October 15, 2025. Id. (¶ 70). Mr. Barnes has not been back to the Pentagon since that date. Id. at 13 (¶ 71).

6. The New "Pentagon Press Corps"

On October 22, 2025, in a post on his official X account, Mr. Parnell "announce[d] the next generation of the Pentagon press corps." SUMF at 13 (¶ 73). In that post,

Mr. Parnell wrote that the "[n]ew media outlets" that "signed the . . . media access policy" "circumvent the lies of the mainstream media and get real news to the American people." Id. (¶ 74). Mr. Parnell also wrote that "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon," and he referred to those former PFAC holders as "activists who masquerade as journalists." Id. The new PFAC holders that the Department selected "were individuals and outlets who had expressed ideological agreement with and support for the Trump administration in the past." Id. (¶ 75). Those new holders include reporters from the National Pulse, an "industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; Matt Gaetz, President Trump's one-time choice for Attorney General; James O'Keefe, the founder of the conservative group Project Veritas, who had pleaded guilty to federal charges for entering federal property under false pretenses and was under federal investigation for an unrelated offense; Mike Lindell, the CEO of MyPillow; Libby Emmons, the editor-in-chief of Human Events and the Post Millennial; and Tim Pool, a conservative political commentator and podcaster. Id. at 13-15 (¶¶ 76-82, 90).

Following the approval of his PFAC application, Mike Lindell promised to make the Trump administration "proud" of his coverage of the Pentagon. SUMF at 14 (¶ 80). Libby Emmons, who received an "unsolicited invitation to apply for credentials," stated that there should be a place for reporting on what they are doing [at the Pentagon] without always trying to expose the dark underbelly." Id. (¶ 81). Tim Pool stated that his outlet, which was granted a PFAC, was "not an investigative news organization" and did "not intend to maintain a significant presence in the Pentagon." Id. (¶ 82).

In her post on X announcing that her platform LOOMERED "is now a credentialed outlet at the Pentagon," Laura Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC." SUMF at 15 (¶ 87). In response to a question regarding whether Ms. Loomer's "request for tips violates" the Policy, the Department issued a statement on November 4, 2025, attributed to Pentagon Press Secretary Kingsley Wilson, asserting that Loomer's call for tips is "a general tip line, which is constitutionally permissible." Id. (¶ 88). By contrast, the Department stated that a tip line frequently published alongside Pentagon-related stories by The Washington Post violated the Policy because it "targets military personnel and [Department] employees." Id.

In December 2025, at the first in-person press event on Pentagon grounds since the Policy took effect, Press Secretary Wilson described the new PFAC recipients as people who "actually reach Americans, ask real questions, and don't pursue a biased agenda." SUMF at 14 (¶ 83). Ms. Wilson called journalists and news organizations who had previously held PFACs "propagandists" who "stopped telling the truth" and who "continue[] to lie." Id. at 14-15 (¶ 84). And in response to a question from James O'Keefe regarding his surreptitiously recording a Pentagon official's criticism of President Trump, Ms. Wilson stated: "That's why the work you all do is so important . . . . [W]e want to make sure that we have the absolute best people working in it to protect Americans . . . [and] that they're on board and willing to serve our commander in chief." Id. at 16 (¶ 91).

7. The Harm to the Plaintiffs

As of November 2025, The Times had more than twelve million subscribers across its print and digital products, including news. SUMF at 16 (¶ 92). The Times' website is

the most visited news website in the United States. Id. (¶ 93). The Times has multiple reporters dedicated to covering national security, the Department of Defense, and the U.S. military. Id. (¶ 94). Yet no reporter from The Times has held a PFAC since October 15, 2025. Id. (¶ 95).

The loss of PFACs has created an unprecedented and significant impediment to The Times' ability to cover the Department and its leadership, national security, and the U.S. military. SUMF at 16 (¶ 96). For example, the Pentagon has held press events, including a press conference in the Pentagon Press Briefing Room in which Pentagon staff discussed military strikes on Venezuelan boats and Venezuela itself, that Times reporters could not attend because they no longer have PFACs. Id. (¶ 97); Barnes Decl. ¶¶ 19-20. While The Times and Mr. Barnes have continued to cover the Pentagon since October 15, 2025, doing so has been more difficult and burdensome. SUMF at 17 (¶ 103).

### *B. Procedural History*

The plaintiffs filed this lawsuit on December 4, 2025. See Compl. The plaintiffs advance seven counts: two counts under the Fifth Amendment, three counts under the First Amendment, one count under both the First and Fifth Amendments, and one count under the APA. See id. ¶¶ 60-134. They seek an order that (i) declares that certain provisions of the Policy are unlawful and unconstitutional; (ii) vacates and preliminarily and permanently enjoins the defendants from implementing or seeking to enforce those provisions; and (iii) directs the defendants to reinstate the PFACs formerly held by Mr. Barnes and The Times' other reporters. See id. at 39.

On January 5, 2026, the plaintiffs moved for summary judgment on all counts. See Pls. Mot. The defendants filed an opposition to the plaintiffs' motion and a cross-motion for summary judgment on January 30. See Defs. Mot. The plaintiffs filed an opposition and reply

on February 18, see Pls. Reply, and the defendants filed a reply on February 27, see Defs. Reply. The Court heard oral arguments on the parties' cross-motions for summary judgment on March 6, 2026.

## II. LEGAL STANDARDS

A party is entitled to summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the [nonmoving] party, with the court determining, 'for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" Howard Town Ctr. Dev., LLC v. Howard Univ., 267 F. Supp. 3d 229, 236 (D.D.C. 2017) (quoting Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016)). The defendants dispute only four of the statements in the plaintiffs' statement of undisputed material facts, and the facts that the defendants do contest are not material. The Court therefore can resolve the case at this stage as a matter of law.

The plaintiffs acknowledge that they are challenging provisions of the Policy as unconstitutional "on their face." Pls. Reply at 1. "To succeed in a typical facial attack," a plaintiff "must establish 'that no set of circumstances exists under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep.'" Edwards v. District of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014) (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)). That requirement is relaxed in the First Amendment context, and a plaintiff must show

that "a substantial number of [the statute's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." Id. (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008)).

## III. DISCUSSION

The plaintiffs argue that the Policy is unconstitutional under both the First and Fifth Amendments and that it is contrary to the APA. See Pls. Mot. The Court agrees with the plaintiffs on their constitutional arguments and thus does not address the plaintiffs' argument under the APA.[4]

### *A. The Policy Violates the Fifth Amendment*

To press their due process claims under the Fifth Amendment, the plaintiffs must establish that they have "been deprived of a protected interest in 'liberty' or 'property.'" NB ex rel. Peacock v. District of Columbia, 794 F.3d 31, 41 (D.C. Cir. 2015) (quoting Gen. Elec. Co. v. Jackson, 610 F.3d 110, 117 (D.C. Cir. 2010)). Relying on Sherrill v. Knight ("Sherrill"), 569 F.2d 124 (D.C. Cir. 1977), the plaintiffs contend that "'the interest of a bona fide . . . correspondent' in obtaining or retaining a press credential is not only 'protected by the first amendment,' but also 'undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment.'" Pls. Mot. at 23 (second and third alterations in original) (quoting Sherrill, 569 F.2d at 130-31). Although the media credential at issue in Sherrill was a White House press pass rather than a Defense Department PFAC, the Court discerns no reason why that factual difference would be material, and the defendants

---

[4] The Court notes, however, that the plaintiffs' argument that the Policy is arbitrary and capricious under the APA largely is coextensive with their constitutional arguments.

identify none. See Defs. Mot. at 13-24. The plaintiffs have established that they have a protected liberty interest in their PFACs, which forms the basis for their due process challenge.

The plaintiffs' primary due process contention is that the Policy is so vague as to render it constitutionally deficient. See Pls. Mot. at 24-28. A law or regulation "is unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Woodhull Freedom Found. v. United States, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)). Put differently, "[r]egulated parties should know what is required of them so they may act accordingly[,] [and] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). These concerns are particularly acute in the First Amendment context because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (citation modified). So when a law implicates First Amendment rights, "a more stringent vagueness test" is applied. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982); see Karem v. Trump ("Karem"), 960 F.3d 656, 665 (D.C. Cir. 2020).

The plaintiffs maintain that the Policy violates due process vagueness principles because it "fails to give fair notice of the conduct it prohibits—a 'fundamental principle in our legal system.'" Pls. Mot. at 25 (quoting FCC v. Fox Television Stations, Inc., 567 U.S. at 253). They argue that the Policy "is unconstitutionally vague . . . because it does not tell journalists and news organizations what routine reporting and newsgathering . . . will (or will not) cause them to lose their PFACs." Pls. Reply at 3. In making this argument, the plaintiffs rely heavily on the

D.C. Circuit's decisions in Sherrill v. Knight, 569 F.2d 124 (D.C. Cir. 1977), and Karem v. Trump, 960 F.3d 656 (D.C. Cir. 2020).

In Sherrill, the plaintiff, Robert Sherrill, was a Washington correspondent for The Nation. Sherrill, 569 F.2d at 126. He applied for and was denied a White House press pass for "reasons of security." Id. at 126-27. In weighing the plaintiff's challenge to that denial, the D.C. Circuit explained that the government's decision to establish press facilities for correspondents who need to report from the White House implicates the First Amendment rights of both journalists and the general public and that access to those spaces cannot "be denied arbitrarily or for less than compelling reasons." Id. at 129. Given the interests at stake, the court elaborated that the government must meaningfully "inform the public [and] other potential applicants of the basis for exclusion of journalists from" those spaces. Id. at 130. But the mere invocation of "reasons of security," the court explained, does not suffice to inform the interested parties because that phrase "is unnecessarily vague and subject to ambiguous interpretation." Id. With all this in mind, the court held that the White House's "failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons" violated the Due Process Clause. Id. at 131.

In Karem, the White House suspended a journalist's press pass for one month based on his conduct at a Rose Garden event. Karem, 960 F.3d at 662-63. Considering the journalist's constitutional challenge to that suspension, the court of appeals held that a "duly issued [press] pass may not be suspended without due process." Id. at 665. The court elaborated that because the suspension of a press pass "implicates important first amendment rights," it must be evaluated "under a particularly stringent vagueness and fair-notice test." Id. (citation modified). Concluding that the White House had not fairly informed the journalist of the

behavior that would subject him to punishment and the severity of the penalty that might be imposed, the D.C. Circuit held that the suspension of the journalist's press pass likely contravened due process protections. Id.

These two decisions heavily inform this Court's analysis. Indeed, the parallels between this case and those precedents are hard to miss. In this case, the Policy states that "[a] PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." AR at 12. As the plaintiffs point out, this standard "echo[es] the approach struck down in Sherrill." Pls. Mot. at 25. In Sherrill, the D.C. Circuit explicitly held that the government may not point to unspecified "reasons of security" to deny an application for a press pass because such an explanation is "unnecessarily vague and subject to ambiguous interpretation." Sherrill, 569 F.2d at 130; see also N.Y. Times Co. v. United States, 403 U.S. 713, 719 (1971) (Black, J., concurring) (explaining that "the word 'security' is a broad, vague generality"). Yet that is precisely what the Department has done in the Policy.

The defendants argue that the D.C. Circuit's reasoning in Sherrill actually supports their position because the court there "rejected the contention that the White House was required to articulate 'detailed criteria upon which the granting or denial of White House press passes is to be based.'" Defs. Mot. at 18 (quoting Sherrill, 569 F.2d at 128). To be sure, the court in Sherrill agreed with the White House that its reason for regulating press access—the "protection of the President"—"does not lend itself to detailed articulation of narrow and specific standards." Sherrill, 569 F.2d at 130. But the court did so while noting that a standard for the issuance of White House press credentials based on "whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his

exclusion" would be "sufficiently circumspect" to provide journalists with constitutionally adequate notice. Id. That is, unlike the "reasons of security" standard, the "physical danger to the President" standard would be "explicit and meaningful." Id. at 130-31. The Court agrees with the plaintiffs that the standard outlined in the Policy allowing Department officials to revoke or deny the PFAC of any journalist deemed a "security or safety risk" for virtually any reason is a "far cry from the 'circumspect' hypothetical standard discussed in Sherrill." Pls. Reply at 4. While the Department need not "predict every conceivable form that a potential security risk might take," Defs. Mot. at 18, the reasoning in Sherrill dictates that the Department is required to articulate a standard that is more specific and meaningful than mere considerations of "security." See Sherrill, 569 F.2d at 130.

Nonetheless, the defendants assert that the Policy is not impermissibly vague because it "extensively details the criteria that will be considered" in determining whether a journalist is a "security or safety risk." Defs. Reply at 3. According to the defendants, those criteria include "soliciting the disclosure of CNSI or CUI or encouraging Department personnel to violate" disclosure laws. Defs. Mot. at 15. In addition, the defendants note that the Policy provides "examples of what . . . solicitation might look like: general appeals, direct communications, and advertisements that directly target Department personnel to disclose information without authorization." Id. In the defendants' view, that "is more than enough" to put a person "of ordinary intelligence" on notice. Id.

The problem for the defendants—as the plaintiffs point out—is that these criteria are themselves open to ambiguous interpretation. See Pls. Mot. at 26; Pls. Reply at 6. The considerations that may or may not lead to a reporter being deemed "a security or safety risk" include obtaining or attempting to obtain any information that the Department has not approved

for release, regardless of whether that information is classified. See AR at 12-13. But to state the obvious, obtaining and attempting to obtain information is what journalists do. A primary way in which journalists obtain information is by asking questions. Indeed, "[t]he freedom to ask questions of public officials is fundamental to the work of journalism." Committee Br. at 7. Under the Policy's terms, then, essential journalistic practices that the plaintiffs and others engage in every day—such as asking questions of Department employees—could trigger a determination by the Department that a journalist poses a security or safety risk.

Perhaps contending with that reality, the defendants argue in their reply brief that the Policy's limitations on journalists accessing or attempting to access non-public information are sufficiently clear because they do not in fact "create any new restriction on journalists' conduct." Defs. Reply at 4. Instead, the defendants assert that the Policy does no more than incorporate "existing federal criminal law" prohibiting the disclosure of certain Department information. Id. (emphasis omitted). The Policy's constraints on "solicitation," in the defendants' telling, simply proscribe criminal solicitation—that is, "the solicitation of conduct that is independently unlawful for Department personnel." Id. at 5 (emphasis omitted). And that—the defendants say—"is precisely the category of speech that the Supreme Court held is unprotected" in United States v. Hansen ("Hansen"), 599 U.S. 762, 783 (2023). Defs. Reply at 5.

This argument, simply put, is just plain wrong. "Criminal solicitation is the intentional encouragement of an unlawful act." Hansen, 599 U.S. at 771. But to "solicit" in the everyday sense means "to approach (someone) with a request or plea." Solicit, Merriam-Webster, https://perma.cc/73MD-6DF8. For example, one can solicit donations or solicit volunteers. A lawyer can solicit clients. The role of a journalist is to solicit information. All of

these acts fall within the everyday meaning of the word "solicitation." A charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime!

Even assuming that in some narrow circumstances a journalist's conduct could amount to criminal solicitation as defined in Hansen, the Policy does not clearly distinguish between any such impermissible solicitation and plainly lawful journalistic practices. For example, the Policy's illustrations of impermissible "solicitation" include obtaining not just classified information, but any "non-public information" released "without proper authorization." AR at 12-13. But a journalist would have no way of knowing what information has been authorized for release and what has not. Under the Policy, if the journalist happens to ask a question that results in the disclosure of unauthorized information by a Department employee, that question could lead to the journalist being deemed a "security or safety risk." Similarly, the Policy encompasses something called "controlled unclassified information," or CUI, which—by the Policy's definition—"may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." AR at 6. The plaintiffs point out that the Department recognizes 113 categories of CUI. See Pls. Reply at 6 & n.1. A journalist cannot possibly know every piece of information that falls into one of those 113 categories. But again, if a journalist asks a question that leads to the disclosure of CUI by a Department employee, the journalist's PFAC could be revoked under the terms of the Policy.

As a last resort, counsel for the defendants made the following "representation" at oral argument: "The Department will only consider solicitation where the disclosure by Department of [Defense] personnel would be a criminal act, and only where the criminal act

violates one of the statutes explicitly listed in the policy." OA Tr. at 47-48. Immediately after making that representation, though, counsel noted that it is not the defendants' position that if a journalist asks a question that seeks information, the providing of which would violate a criminal statute listed in the Policy, the journalist necessarily has engaged in criminal solicitation. See id. at 48. This ostensible limiting interpretation by the government does not clarify or limit the Policy's criteria because that interpretation itself encompasses within its prohibitions more than criminal solicitation. And in any event, counsel's representation is flatly inconsistent with the explicit language of the Policy. See AR at 12-13. If anything, the fact that the defendants felt compelled to make such a representation underscores just how impenetrable the Policy is. If the defendants themselves equivocate on the Policy's meaning, how can journalists possibly know what they can and cannot do under its terms?

In short, the Policy fails to provide fair notice of what routine, lawful journalistic practices will result in the denial, suspension, or revocation of a PFAC. In the plaintiffs' words, "[i]n practice, virtually any newsgathering could be characterized as prohibited 'solicitation,'" if the Department so chooses. Pls. Reply at 6. Given this uncertainty, one could easily predict that journalists would opt not to ask any questions rather than risk losing their PFACs. Indeed, Mr. Barnes averred that "[i]t is not clear to [him], based on the language of the new PFAC policy, what steps [he] would need to take to ensure that [his] PFAC was not subject to revocation, suspension, or non-renewal—other than to stop reporting on the Pentagon and the United States military." Barnes Decl. ¶ 15. The vagueness doctrine is intended to protect against precisely that chilling effect. See Grayned v. City of Rockford, 408 U.S. at 109.

The plaintiffs also argue that "the Policy is unconstitutionally vague for the additional reason that it 'is so standardless that it authorizes or encourages seriously

discriminatory enforcement.'" Pls. Mot. at 27 (quoting United States v. Williams, 553 U.S. at 304). The plaintiffs assert specifically that the Policy does not provide Department officials with clear standards to guide the determination of whether a journalist's PFAC should or should not be suspended, revoked, or not renewed, "thereby empowering Department officials to do whatever they want, depending on their own personal predilections." Id. at 27-28. As the D.C. Circuit has recognized, this argument is closely related to the argument that the Policy is unreasonable because it grants Department officials unbridled enforcement discretion. See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., WMATA ("AFDI"), 901 F.3d 356, 372 (D.C. Cir. 2018) ("[T]he overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based upon objective and clear standards."); Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia, 846 F.3d 391, 412 (D.C. Cir. 2017) (addressing "the analogous context of a facial First Amendment challenge to a licensing scheme" as part of a vagueness challenge). The Court agrees with the plaintiffs that the Policy does not provide Department officials with the requisite "objective and clear standards" for determining whether to deny, revoke, or suspend a journalist's PFAC, thereby permitting—and even encouraging—arbitrary and discriminatory enforcement. See AFDI, 901 F.3d at 372. The Policy therefore contravenes due process.[5]

[5] The plaintiffs also argue that the Policy violates due process "by failing to provide sufficient process before the immediate suspension of a reporter's PFAC." Pls. Mot. at 28. While the Court is skeptical that the plaintiffs have established their entitlement to pre-deprivation process, it has no occasion to decide that issue because the provisions of the Policy allowing for the "immediate suspension of a reporter's PFAC," id., as just discussed, are themselves constitutionally deficient.

In sum, the Policy on its face makes any newsgathering and reporting not blessed by the Department a potential basis for the denial, suspension, or revocation of a journalist's PFAC. It provides no way for journalists to know how they may do their jobs without losing their credentials. The Policy therefore is vague in violation of the Fifth Amendment.

*B. The Policy Violates the First Amendment*

The plaintiffs assert that the Policy contravenes the First Amendment in two ways. First, they argue that the Policy imposes unreasonable and viewpoint-discriminatory restrictions in a nonpublic forum. See Pls. Mot. at 38-40. Second, the plaintiffs contend that the Policy impermissibly regulates the content of newsgathering, reporting, and publication off Pentagon grounds. See id. at 34-38. The Court agrees with the plaintiffs' first argument and therefore need not reach their alternative argument.

The First Amendment limits the restrictions that the government may impose on speech, including speech on government property. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc. ("Cornelius"), 473 U.S. 788, 799-800 (1985). The level of scrutiny applicable to those restrictions depends on the type of forum for speech that the government has created. See Ateba v. Leavitt, 133 F.4th 114, 121 (D.C. Cir. 2025) ("As a general principle, the extent to which the government can control access to a forum it owns or controls depends on the nature of the relevant forum." (citation modified)). The Supreme Court has recognized "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." Minn. Voters All. v. Mansky ("Mansky"), 585 U.S. 1, 11 (2018).

The parties agree that the Pentagon's press spaces are nonpublic forums. See Pls. Mot. at 39; Defs. Mot. at 37. "A nonpublic forum is government property 'that is not by tradition or designation a forum for public communication,' such as a government office

building." Ateba v. Leavitt, 133 F.4th at 121-22 (quoting Mansky, 585 U.S. at 11). While the government need not "open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" Id. at 122 (quoting Bryant v. Gates, 532 F.3d 888, 895 (D.C. Cir. 2008)). "As a nonpublic forum, access to the [Pentagon] 'can be restricted as long as the restrictions are' viewpoint neutral and reasonable." Id. at 123 (quoting Cornelius, 473 U.S. at 800); see Mansky, 585 U.S. at 12.[6] The Court will consider each requirement in turn.

1. The Policy Is Viewpoint Discriminatory

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). Viewpoint discrimination is an "egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 829. Restrictions "based on viewpoint are prohibited." Mansky, 585 U.S. at 11. A speech

[6] For this reason, the defendants' insistence that "access to the Pentagon is a privilege, not a right" and that the Department "could have decided not to allow any press access to the Pentagon," Defs. Mot. at 1, is irrelevant. Because the Department has long chosen to allow press access to the Pentagon, it cannot deny that access unreasonably or on the basis of viewpoint. See Ateba v. Leavitt, 133 F.4th at 123; see also Sherrill, 569 F.2d at 129 ("[W]here the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom . . . the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for less than compelling reasons.").

regulation that is neutral on its face may nonetheless be viewpoint discriminatory if it was adopted "because of disagreement with the message [the speech] conveys." Sorrell v. IMS Health, Inc., 564 U.S. 552, 566 (2011) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Stated differently, the government may not impose speech restrictions that reflect "an effort to suppress expression merely because public officials oppose the speaker's view." Mansky, 585 U.S. at 12 (quoting Perry Educ. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 46 (1983)).

The plaintiffs argue that the Policy is viewpoint discriminatory because "both [its] purpose and [its] effect . . . is to chill" speech that the Department perceives as unfavorable or biased. Pls. Mot. at 35. In support, the plaintiffs point to a host of unchallenged public statements about the media made by Secretary Hegseth, Mr. Parnell, and other members of the Department's leadership. See id. at 36; Pls. Reply at 13-14; SUMF at 14-15 (¶¶ 83-89).

The plaintiffs are correct: "The record is replete with undisputed evidence that the Policy is viewpoint discriminatory." Pls. Reply at 13. That evidence tells the story of a Department whose leadership has been and continues to be openly hostile to the "mainstream media" whose reporting it views as unfavorable, but receptive to outlets that have expressed "support for the Trump administration in the past." SUMF at 6, 13 (¶¶ 35, 74-75). The story begins prior to the adoption of the Policy, when—following extensive reporting on Secretary Hegseth's background and qualifications during his confirmation process—Secretary Hegseth and Department officials "openly complained about reporting they perceive[d] as unfavorable to them and the Department." Id. at 6 (¶ 35). Then, in the weeks and months leading up to the issuance of the Policy, Department officials repeatedly condemned certain news organizations—including The Times—for their coverage of the Department. For example, in response to

reporting by The Times on Secretary Hegseth's alleged misuse of the messaging platform Signal, Mr. Parnell posted on X to call out The Times "and all other Fake News that repeat their garbage." Supp. Boutrous Decl. at Ex. 7. Mr. Parnell decried these news organizations as "Trump-hating media" who "continue[] to be obsessed with destroying anyone committed to President Trump's agenda." Id. In other social media posts leading up to the issuance of the Policy, Department officials referred to journalists from The Washington Post as "scum" and called for their "severe punishment" in response to reporting on Secretary Hegseth's security detail. See id. at Exs. 2-4.

The story continues following the issuance of the Policy. When The Times announced on X that its journalists were declining to sign the Policy's Acknowledgement and instead would be handing in their PFACs, Secretary Hegseth responded with a waving-hand emoji. See Supp. Boutrous Decl. at Ex. 1. In a press conference shortly after the Policy was issued, Ms. Wilson referred to journalists and news organizations who had previously held PFACs as "propagandists" who "stopped telling the truth" and who "continue[] to lie." SUMF at 14-15 (¶ 84). Other comments from Department officials referred to previous PFAC holders as "biased," "adversarial," "unprofessional," and lacking "a brain." Id. at 14-15 (¶¶ 83, 85-86, 89). By contrast, in a post on X announcing the "next generation of the Pentagon press corps," Mr. Parnell praised those willing to sign onto the Policy as "circumvent[ing] the lies of the mainstream media and get[ting] real news to the American people." Id. at 13 (¶¶ 73-74). Ms. Wilson praised those new PFAC holders as "the absolute best people" and commended them for being "on board and willing to serve our commander in chief." Id. at 16 (¶ 91); see also id. at 14 (¶¶ 80-82) (statements by new PFAC holders).

The defendants make little effort to respond to this voluminous record evidence, dismissing the aforementioned statements as mere "characterizations of different media outlets" or "praising one set of journalists and criticizing another." Defs. Mot. at 32. Instead, the defendants argue that the record does not support an "aim" to drive disfavored speakers and their disfavored journalism out of the Pentagon because "the PFAC Policy itself does not contain this aim." Id. at 31. That argument, of course, ignores the reality that a policy can be viewpoint discriminatory even if it is facially viewpoint neutral. See Cornelius, 473 U.S. at 812 (observing that facially neutral "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"); see also Sorrell v. IMS Health, Inc., 564 U.S. at 566; Ward v. Rock Against Racism, 491 U.S. at 791.

The defendants also contend that the Policy cannot be viewpoint discriminatory because "the Department conferred with the major news outlets and journalist professional organizations on revisions" to the Policy and "made particular changes . . . in response to such concerns." Defs. Mot. at 31. True, the record reflects that the Department made edits to the Policy in response to pushback from news organizations. See generally AR at 48-74. But those revisions appear to be largely superficial—for example, moving language from one section to another while retaining the substance of the provisions. See id. at 52-63. The record does not support any suggestion that those changes altered the substance of the Policy or addressed the thrust of the expressed concerns—that the Policy's prohibition on "solicitation" was unclear and the Acknowledgment required journalists to confirm their "understanding" of the Policy's unclear provisions. See e.g., id. at 50. To the extent that any conclusion can be drawn from the back-and-forth between the Department and news organizations, it is just as reasonable to

conclude that the Department knew the majority of existing PFAC holders would not agree to the Policy, yet it implemented it anyway.

In their reply brief, the defendants say that the Policy is not viewpoint discriminatory because journalists from across the political spectrum declined to sign onto it, including not just The Times but also CNN, Fox News, Newsmax, the Washington Examiner, and the Daily Caller. See Defs. Reply at 11. True, but beside the point. The record evidence supports the conclusion that the Policy discriminates not based on political viewpoint but rather based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership. See, e.g., SUMF at 16 (¶ 91) (Ms. Wilson praising the new PFAC holders for being "on board and willing to serve our commander in chief"). As counsel for the plaintiffs put it at oral argument, the difference between the prior and current PFAC holders is their viewpoint on "the nature of the role of the journalists covering the Pentagon." OA Tr. at 16-17.

In sum, the undisputed evidence reflects the Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, "on board and willing to serve," SUMF at 16 (¶ 91)—and replace them with news entities that are. That is viewpoint discrimination, full stop. And this viewpoint-discriminatory Policy represents a sea change in the Department's relationship with the media. In the past, respected journalists viewed themselves as neutral, independent reporters of news. See Wilson Decl. ¶¶ 14, 16-17; Barnes Decl. ¶ 21; Burns Decl. ¶¶ 18-21. And even when they were critical of the Defense Department or other government officials, their credentials were not revoked. See Wilson Decl. ¶ 16. As Mr. Burns said, no matter how critical he was, "I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that

my reporting would trigger retaliation." Burns Decl. ¶ 17. The Policy thus violates the First Amendment.

2. The Policy Is Unreasonable

To withstand First Amendment scrutiny, a policy regulating a nonpublic forum must be "reasonable in light of the purpose served by the forum." Mansky, 585 U.S. at 13 (quoting Cornelius, 473 U.S. at 806). The obvious purpose of the press areas of the Pentagon is to facilitate newsgathering and reporting on the Department for the benefit of the American people—or, as the defendants put it, to promote "transparency." Defs. Mot. at 1. The plaintiffs contend that the Policy is unreasonable in light of that purpose because it vests Department officials with "unbridled discretion" to enforce the Policy and fails to provide objective, workable standards for that enforcement. See Pls. Mot. at 40.

The D.C. Circuit has held "that a restriction is not reasonable under the First Amendment if it provides the decisionmaker with unbridled discretion to suppress expression—that is, when the rule is so broad as to provide no meaningful constraint upon the government's exercise of the power to squelch speech." Ateba v. Leavitt, 133 F.4th at 124-25 (citation modified); see City of Lakewood v. Plain Dealer Publ'g Co. ("City of Lakewood"), 486 U.S. 750, 764 (1988) (holding that the government may not "condition . . . speech on obtaining a license or permit from a government official in that official's boundless discretion" (emphasis omitted)). The "unbridled discretion" doctrine recognizes that "the mere existence . . . of unfettered discretion . . . intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." City of Lakewood, 486 U.S. at 757; see also AFDI, 901 F.3d at 372 ("[T]he 'danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.'"

(quoting Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975))). "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood, 486 U.S. at 755-56.

A credentialing scheme that has a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship and that vests officials with "boundless discretion" thus violates the First Amendment. City of Lakewood, 486 U.S. at 759, 764; see also Forsyth County v. Nationalist Movement, 505 U.S. 123, 130-33 (1992). The plaintiffs assert that the Policy meets the sufficiently "close . . . nexus to expression" test because "the entire purpose of a PFAC is to facilitate certain First Amendment-protected activity by journalists on Pentagon grounds." Pls. Mot. at 31. The defendants counter that a PFAC merely facilitates entry to portions of the Pentagon, which they contend "is a noncommunicative, preparatory step in the production of speech." Defs. Mot. at 25 (citing Price v. Garland, 45 F.4th 1059, 1068 (D.C. Cir. 2022)). The defendants' argument is a non-starter because the D.C. Circuit already has recognized the application of the unbridled discretion doctrine to a press pass policy. See Ateba v. Leavitt, 133 F.4th at 125.

Turning to the thrust of the arguments, the defendants acknowledge that the Policy vests Department officials with significant discretion, but they contend that the Department is entitled to "considerable leeway" in fashioning a press pass credentialing scheme. Defs. Mot. at 27 (quoting Sherrill, 569 F.2d at 130). The defendants are correct that "[i]t is not fatal to regulations that they endow officials with some measure of discretion." Ateba v. Leavitt, 133 F.4th at 125 (citation modified). But as the defendants themselves acknowledge,

"the unbridled discretion doctrine is concerned with making explicit the limits on an official's discretion." Defs. Mot. at 27. To that end, any regulations the government issues "must be reasonably specific and objective, and not leave the decision to the whim of the administrator." Ateba v. Leavitt, 133 F.4th at 125 (citation modified). The Department's Policy does not satisfy those requirements.

For one, as explained above, the Policy's operative standard—whether a journalist poses a "security or safety risk"—provides no meaningful limitations on Department officials. The defendants once again try to avoid this conclusion by invoking Sherrill to argue that "[t]he Department can hardly predict every conceivable form that a security risk in the Pentagon might take, and it is entitled to rely on standards at a sufficient level of generality to allow responsive action to be taken in cases presenting novel security risks." Defs. Mot. at 26; see Sherrill, 569 F.2d at 130. The Court has already explained why the D.C. Circuit's reasoning in Sherrill lends little support to the defendants' position, see supra Section III.A, and need not reiterate that explanation here.

What is more, even when the Policy purports to clarify the bases upon which a PFAC may be denied or revoked, it expressly retains authority for a Department official to make a different choice—for any reason or for no reason at all. As the plaintiffs summarize: "Information in specified categories 'may' (or may not) be 'controlled unclassified information'; prohibited '[s]olicitation may' (or may not) 'include direct communications with [Department] personnel or general appeals'; a reporter who receives or discloses 'unauthorized' information 'may' (or may not) be deemed a 'security or safety risk'; and a reporter who is deemed a 'security or safety' risk 'may' (or may not) lose his or her PFAC." Pls. Mot. at 32-33 (alterations in original) (citations omitted); see AR at 6, 12-13. On top of these layers upon layers of

discretion, the Policy contains the express caveat that a "security or safety risk" determination will be made "on a case-by-case basis reviewing the totality of the circumstances" and will turn on "the unique facts and circumstances of each case." AR at 12-13. The Policy thus supplies no concrete limitations, only "illusory 'constraints'" that can be invoked or ignored at the Department's pleasure. City of Lakewood, 486 U.S. at 769.

Indeed, the Department has already shown its discretion to be unconstrained by the Policy. For example, James O'Keefe applied for and was granted a PFAC notwithstanding that he pleaded guilty to crimes involving "trespassing" and "deceit"—offenses that the Policy explicitly provides as bases for "presumptive[ly]" deeming an applicant a "security or safety risk." AR at 15; see SUMF at 14 (¶ 79). The defendants offer no explanation for the Department's decision to give Mr. O'Keefe a PFAC despite his presumptive ineligibility, other than that "the Policy's presumptive disqualifiers . . . are not automatic." Defs. Reply at 16. "The Department's decision to grant O'Keefe a PFAC," the defendants say, "is consistent with the Policy's terms." Id. But that is precisely the problem. Nothing in the Policy prevents the Department from granting Mr. O'Keefe a PFAC, just like nothing in the Policy would prevent the Department from, say, denying the PFAC application of a journalist from The Times who pleaded guilty to the exact same crimes. Both scenarios would be consistent with the Policy because nothing in the Policy proscribes its arbitrary enforcement. See Forsyth County v. Nationalist Movement, 505 U.S. at 133.

As another example, the Department has stated that it understands the Policy's prohibition on solicitation "to forbid the Washington Post from stating publicly that it 'wants to hear from Defense Department civilians and service members about changes within the Pentagon and throughout the U.S. Military.'" Pls. Reply at 6; see Defs. Mot. at 27-28; SUMF at 15 (¶ 88).

Meanwhile, the Department deemed permissible a social media post by Laura Loomer that likewise called for tips in the context of a post in which Ms. Loomer stated, "LOOMERED is now a credentialed outlet at the Pentagon," and "I look forward to covering the Pentagon and breaking more stories that impact our country and our national security." Boutrous Decl. at Ex. 20; see SUMF at 15 (¶¶ 87-88). The defendants attempt to distinguish those two calls for tips on the grounds that The Washington Post's tip line "appears at the end of military defense related stories," whereas Ms. Loomer's post is supposedly more "general" and invites tips "on any matter." Defs. Mot. at 27-28. The Court is unpersuaded that there is any distinction between The Washington Post's tip line and Ms. Loomer's, other than that The Washington Post's motto is "Democracy Dies in Darkness," while Ms. Loomer's apparently is willingness to "serve [the] commander in chief." See SUMF at 14, 16 (¶¶ 83-84, 91). But the problem is that nothing in the Policy explicitly prevents the Department from treating these two nearly identical tip lines differently. As an example, even if the Department determined that Ms. Loomer's request for tips constituted "solicitation" under the Policy, it could still decide in its discretion not to revoke her PFAC for any reason or for no reason at all.[7]

The Policy also is unreasonable and therefore violates the First Amendment for the related reason that it is not "guided by objective, workable standards." Mansky, 585 U.S. at 21; see AFDI, 901 F.3d at 372 (observing that "whether the discretion vested in a government official to permit or prohibit speech is 'guided by objective, workable standards'" is a "related inquiry" to questions of vagueness and unbridled discretion (quoting Mansky, 585 U.S. at 21)).

---

[7] In a similar vein, the Court is aware of recent reporting that the Pentagon has barred press photographers from briefings on the ongoing U.S.-Israeli war with Iran after they published photos of Secretary Hegseth that his staff deemed "unflattering." See Scott Nover, Pentagon Bars Press Photographers Over 'Unflattering' Hegseth Photos, WASH. POST (Mar. 11, 2026), https://perma.cc/CP92-234S.

As described throughout this Opinion, the Policy contains expansive and expressly noncommittal language that provides no objective basis upon which to judge the Department's decision to grant or deny a PFAC application. For that reason, among the others described herein, it cannot stand.[8]

### *C. The Remedies*

#### 1. The Plaintiffs Are Entitled to Injunctive Relief

To obtain a permanent injunction, the plaintiffs must demonstrate:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010). The Court determines that the injunction factors weigh in the plaintiffs' favor.

First, the plaintiffs stand to suffer immediate irreparable harm absent equitable relief. As the D.C. Circuit has recognized in the context of the First Amendment's free speech guarantee, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation modified) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)); see also Karem, 960 F.3d at 667 ("As our court has explained, a prospective violation of a constitutional right constitutes irreparable injury for

---

[8] When asked by the Court during oral argument whether "the standards here [are] objective," counsel for the defendants responded that the Policy's standards are "more subjective." OA Tr. at 41. The defendants subsequently submitted a notice to the Court purporting to walk back that response. See Notice of Clarification. The Court will give counsel the benefit of the doubt and assume that he simply misspoke during the argument. In any event, neither counsel's statement at argument nor the subsequent "clarification" makes much of a difference to the Court's analysis because neither changes what the Policy actually says.

purposes of seeking equitable relief." (citation modified)). In Sherrill, the D.C. Circuit held that a journalist "arbitrarily excluded from sources of information" suffers irreparable First Amendment harm. Sherrill, 569 F.2d at 129-30. This harm is "not merely . . . abstract" or "theoretical" because journalists' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'" Karem v. Trump, 404 F. Supp. 3d 203, 217 (D.D.C. 2019). Without their PFACs, the plaintiffs lack "the access to pursue those conversations," and because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively." Id.

Second, the defendants do not meaningfully dispute that the remedies available at law are inadequate. See Karem v. Trump, 404 F. Supp. 3d at 217 ("[T]he only way to remedy the injury [from the loss of a press credential] is to return the hard pass and the access that comes with it.").

Third and fourth, the balance of equities and public interest factors, which "merge when the Government is the opposing party," Nken v. Holder, 556 U.S. 418, 435 (2009), weigh in the plaintiffs' favor. On the plaintiffs' side, the constitutional interests at stake are hard to overstate. As Mr. Burns put it, "[t]he new policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves." Burns Decl. ¶ 23. On the defendants' side, the Department surely has a legitimate interest in managing security risks at the Pentagon. "The Constitution, however, does not permit [it] to prioritize any policy goal over the Due Process Clause" or the First Amendment, and "enforcement of an unconstitutional law is always contrary to the public interest." Karem, 960 F.3d at 668 (alteration in original) (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013)); see also Legend Night Club v.

Miller, 637 F.3d 291, 302-03 (4th Cir. 2011) ("[The government] is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions.").

The Court therefore will grant the plaintiffs' request for injunctive relief.

2. The Court Will Vacate the Policy

While remand without vacatur is sometimes appropriate, it is "[t]he ordinary practice" and "normal course" to "vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019). Courts will opt to remand without vacating only in "rare cases" where the "deficiencies of the [agency] action" are not "serious[]" or the "disruptive consequences of vacatur" are significant. Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d 649, 674 (D.C. Cir. 2019) (quoting United Steel v. Mine Safety & Health Admin., 925 F.3d at 1287). In this case, neither of those factors governing the exercise of the Court's discretion weighs against vacatur. See Anderson v. U.S. Dep't of Hous. & Urb. Dev., 731 F. Supp. 3d 19, 45 (D.D.C. 2024) ("[T]his case is not so exceptional that it warrants remand without vacatur." (citation modified)).

First, the Policy's deficiencies are extremely serious—indeed, the Policy contravenes both the First and Fifth Amendments. See Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d at 674. The defendants do not explain how the Department would "be able readily to cure" the defects identified in the Court's opinion. Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009). The defendants' suggestion that the Department could "provide additional explanation" on remand, Defs. Mot. at 44, would not suffice to cure the constitutional deficiencies.

Second, in this case the "disruptive consequences of vacatur" are minimal. Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d at 674. Contrary to the defendants'

suggestion, the plaintiffs ask the Court to vacate not the entire Policy but only certain challenged provisions, leaving in place requirements that are no less stringent than in the previous regime. See Cath. Soc. Serv. v. Shalala, 12 F.3d 1123, 1128 (D.C. Cir. 1994) ("[C]ourts may 'set aside' only the part of a rule found to be invalid."). Given that the plaintiffs do not seek vacatur of the Policy's issuance and renewal guidelines, the Court discerns no reason why the Department could not continue "processing" PFACs. Moreover, the defendants do not dispute that the Department's previous PFAC requirements served its proffered interests in safety and security for decades and that nothing in particular triggered the need for increased measures. See SUMF at 4, 7-8 (¶¶ 21, 44). The defendants' assertion that vacatur would "compromise the safety of the Pentagon" therefore is unfounded. Defs. Mot. at 45.

In short, the defendants have not shown that the Department is entitled to a remand without vacatur. Accordingly, the Court will vacate the challenged provisions of the Policy.

## IV. CONCLUSION

The Court recognizes that national security must be protected, the security of our troops must be protected, and war plans must be protected. But especially in light of the country's recent incursion into Venezuela and its ongoing war with Iran, it is more important than ever that the public have access to information from a variety of perspectives about what its government is doing—so that the public can support government policies, if it wants to support them; protest, if it wants to protest; and decide based on full, complete, and open information who they are going to vote for in the next election. As Justice Brandeis correctly observed, "sunlight is the most powerful of all disinfectants." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 305 (1964) (Goldberg, J., concurring) (footnote omitted).

And as this Court said during oral argument:

> We all know that what seems to be important to people are certain issues which fluctuate from time to time. Issues like the economy. Issues like the country's security. And, you know, we've been through, in my lifetime, you know, the Vietnam War, where the public, I think it's fair to say, was lied to about a lot of things. We've been through 9/11. We've been through the Kuwait situation, Iraq, Guantanamo Bay.
>
> A lot of things need to be held tightly and secure [by the government], but openness and transparency allows members of the public to know what their government is doing in times of peace and more important, in times of war and upheaval . . . .
>
> [T]hat's what the First Amendment is all about . . . I think the public has a right to know a lot of things as [elections] approach and think about what their elected leaders in the legislative branch and the executive branch are doing.

OA Tr. at 58-59.

For the foregoing reasons, the Court will GRANT the plaintiffs' motion for summary judgment and DENY the defendants' cross-motion for summary judgment. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

Paul L. Friedman

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|26

# EXHIBIT 1

**ASSISTANT TO THE SECRETARY OF WAR**
1400 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1400

PUBLIC AFFAIRS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of Revised Media In-Brief

On March 20, 2026, the United States District Court for the District of Columbia vacated certain provisions of the October 6, 2025 PFAC Policy. *See New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026). The Department disagrees with the Court's decision and is pursuing an appeal. In the interim, and without conceding the validity of the Court's analysis, the Department has revised the Policy to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 10 U.S.C. § 2674.

The attached documents implement the revised "Pentagon Reservation In-Brief for Media Members," effective March 23, 2026. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated October 6, 2025.

**Revised Policy.** All members of the press issued a PFAC will receive a copy of the revised in-brief at the time their PFAC is issued or renewed. Receipt of the PFAC and the accompanying in-brief constitutes notice of the Policy's terms. The revised in-brief addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation.

**Clarifications in Response to the Court's Decision.** The Court characterized the original Policy's provisions in ways the Department believes were inaccurate. The revised Policy includes targeted clarifications to correct these mischaracterizations. In particular:

- The Court stated that the Policy's use of the term "solicitation" was ambiguous because "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the revised Policy replaces the term "solicitation" with "intentional inducement of unauthorized disclosure" and provides a specific definition tied to identified federal criminal statutes, with a knowledge requirement and six explicit safe harbors for routine newsgathering activities that were never covered by this provision.

- The Court stated that the Policy's "security or safety risk" standard was too vague. While the Department maintains that the original standard, read in context with its enumerated factors, provided adequate notice, the revised Policy replaces this standard with an exhaustive list of specific, enumerated grounds for denial, revocation, or non-renewal of a PFAC, with evidentiary standards consistent with those applied in security clearance

adjudications under Executive Order 12,968. No PFAC may be denied, revoked, or not renewed on grounds not enumerated in the revised Appendix A.

- The Court expressed concern about the absence of processing timelines. The revised Policy includes specific deadlines: 30 days for a final decision where no further inquiry is needed, and 60 days where further inquiry is required.

**Closure of Correspondents' Corridor and Relocation of Press Workspace.** As previously announced in the October 6, 2025 Policy, the Department committed to "upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps." The Department is now fulfilling that commitment. Effective immediately, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational.

In the interim, PFAC holders will continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices. Access to the Pentagon for these events will require escort by authorized DoW personnel at all times. In breaking news situations, PFAC holders will be escorted into the Pentagon by authorized DoW personnel. The Pentagon Briefing Room remains in the Pentagon and will continue to be used for press events.

In assessing the Department's security posture following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks. The revised Policy establishes new security screening standards in the revised Appendix A. Until those standards have been fully implemented and the new workspace is operational, all journalist access to the Pentagon will require escort.

**Notice of Policy.** The original Policy required PFAC holders to sign an Acknowledgement attesting to their receipt, reading, and understanding of the Policy. The Court vacated this requirement. The Department maintains that requiring journalists to acknowledge a constitutional policy is a reasonable administrative measure, and the Court's vacatur was based on its finding that the underlying provisions were constitutionally deficient — a finding the Department disputes and is appealing. Regardless, the revised Policy eliminates the signature requirement. Instead, each PFAC holder will receive a copy of the revised in-brief at the time their PFAC is issued or renewed, and will sign a receipt confirming that they have received their PFAC and a copy of the Policy. Receipt of the PFAC and the accompanying in-brief constitutes sufficient notice of the Policy's terms. No PFAC holder is required to agree with, endorse, or acknowledge understanding of the Policy as a condition of receiving or maintaining a PFAC.

I request your assistance in ensuring that all personnel in your Component are aware of the revised physical access measures, including the requirement to provide escorts for media entering the Pentagon for approved events. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

My POC for this action is Sue Gough, Pentagon Press Operations, susan.l.gough.civ@mail.mil or 703-697-1254.

Sean Parnell

Attachments:
As stated

# PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS

NAME:____________________________ DATE:______________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to comply with the physical access restrictions and conduct requirements set forth in this in-brief may result in loss of access to the Pentagon. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

## General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege extended by the government. Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. Having chosen to extend this privilege, the Department will not deny, revoke, or suspend a PFAC arbitrarily or on the basis of the content or viewpoint of a journalist's reporting.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

PFACS must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost PFACS should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.Duty Officer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that APIBS serve only as an additional visual identifier. APIBS are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), physical security restrictions have been enacted for news media, including those with valid, current PFACS.

Effective March 23, 2026, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational. This closure fulfills the Department's previously announced commitment to upgrade the space used by PFAC holders to a different area that provides WiFi access, cell phone service, and increased space for the expanded press corps.

Until the new workspace is operational, PFAC holders will continue to have access to the Pentagon for the following purposes, with escort by authorized DoW personnel at all times:

- Scheduled press briefings and press conferences in the Pentagon Briefing Room;
- Interviews and meetings arranged through OATSW(PA) or the sponsoring public affairs office;
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps;
- Honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard;
- Other events specifically approved by OATSW(PA).

In breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel.

News media are not authorized to be anywhere in the Pentagon at any time without an escort from an authorized DoW official. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. When in the Pentagon, you must remain with your escort at all times.

Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing non-public information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. § 1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. § 552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, the foregoing laws and regulations apply to military members, DoW civilian employees, and contractors. Members of the news media are not required to submit their writings to DoW for approval. Members of the news media remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, questions posed to authorized Department spokespersons and officials, or unsolicited tips, and to publish as they deem newsworthy. The receipt of unsolicited information, including CNSI or CUI, and its subsequent publication, is protected by the First Amendment. Nothing in this in-brief prohibits a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon with escort by authorized DoW personnel for the purposes described in the "News Media Physical

Security Restrictions" section above, and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month PFACS.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times, renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the

bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A, or is not meeting the frequency requirements. See Appendix A for the applicable standards and the process for denying, revoking, or not renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email,

phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at 703-678-6162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 - Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.

(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.
- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.
- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.
- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil.

<u>Filming/Photography from the Press Parking Area</u>

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

<u>Pandemics, National Health Emergencies, and Other Contingencies</u>

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel

and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of PFACS.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

Standards for PFAC Determinations

**Grounds for Denial, Revocation, or Non-Renewal.** A PFAC shall be denied, revoked, or not renewed only on the grounds set forth in Appendix A. No PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism.

**Intentional Inducement of Unauthorized Disclosure.** The Court in *New York Times Co. v. Department of Defense*, No. 25-04218 (D.D.C. Mar. 20, 2026), characterized the original Policy's use of the term "solicitation" as ambiguous, stating that "to 'solicit' in the everyday sense means 'to approach (someone) with a request or plea'" and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.*, slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the Department has replaced the term "solicitation" with "intentional inducement of unauthorized disclosure."

For purposes of this Policy, "intentional inducement of unauthorized disclosure" means intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclosing under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a. This is an administrative standard for PFAC determinations; it does not constitute a criminal charge or referral.

A journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought. This presumption may be

rebutted through the procedures set forth in Appendix A by evidence that the journalist did not know that the employee was unauthorized to disclose the information notwithstanding the offer of anonymity.

The following do not constitute "intentional inducement of unauthorized disclosure" under this Policy, notwithstanding the general definition of that term above:

(a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;
(b) Receiving unsolicited information, including classified national security information or controlled unclassified information;
(c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;
(d) Developing source relationships outside the Pentagon through independent reporting;
(e) Communicating with Department personnel through official channels for public disclosure of information, including press briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests.
(f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

**Due Process Protections.** Without conceding the validity of the Court's analysis, the revised Policy provides the following protections regarding suspension of a PFAC: Before any PFAC is denied, revoked, or not renewed on the grounds set forth in Appendix A, the applicant or holder shall receive the process set forth in Appendix A, Part B. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that the holder has engaged in conduct described in Appendix A, Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Appendix A, Part B. In such cases, the holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, and the full procedures described in Appendix A, Part B shall commence immediately.

**No Waiver of Rights.** Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

**APPENDIX A:** DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS

A. Grounds for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person who meets one or more of the following criteria. These are the sole grounds for denial, revocation, or non-renewal of a PFAC based on security considerations. No PFAC shall be denied, revoked, or not renewed on grounds not enumerated in this section.

Conviction-Based Grounds. Conviction of an offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).
(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).
(3) Unlawful manufacturing or distribution of drugs.
(4) Threatening or harassing communications directed at Department personnel or facilities.
(5) Theft, embezzlement, trespassing, or property destruction on the Pentagon Reservation or other Department facility.
(6) Fraud or deceit in connection with obtaining or maintaining access to a government facility or government information systems.
(7) Engaging in operations and activities that are unsafe, failing to abate an identified hazard, endanger others, or creating a condition immediately dangerous to life or health

A conviction described in subsections (1) through (7) creates a rebuttable presumption that the applicant or holder poses a security risk. The applicant or holder may rebut this presumption by demonstrating, through the procedures set forth in Part C below, that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Factors relevant to rebuttal include the nature and seriousness of the offense, the time elapsed since the conviction, evidence of rehabilitation, and the applicant's or holder's conduct since the conviction. Any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Conduct-Based Grounds. Engaging in conduct that would constitute an offense described in subsections (1) through (7) above, or inducement of unauthorized disclosure as defined in the "Standards for PFAC Determinations" section of this in-brief. For a final determination based on conduct, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. A conduct-based determination does not require a criminal charge, indictment, or conviction. The written determination shall identify:

(g) The specific subsection of this Part A that the conduct would constitute;
(h) The specific facts supporting the determination, including the date, time, location, and nature of the conduct;

(i) The identity of any witnesses or the source of any documentary evidence supporting the determination, to the extent that disclosure would not compromise an ongoing investigation or the safety of any individual; and
(j) The basis for the Director's determination that substantial evidence supports the conclusion that the conduct occurred.

The PFAC holder shall receive the full procedures set forth in Part C below, including the opportunity to contest the factual basis for the determination. A conduct-based determination is subject to the same rebuttable presumption framework as a conviction-based determination: the holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Any doubt as to whether the holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Standard of Review. For conduct-based determinations under this section, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. For immediate suspension under Part B, the Director, PFPA, or designee, must find probable cause to believe the conduct occurred. For rebuttal of a conviction-based or conduct-based presumption, the applicant or holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation; any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation. The final decision of the Director, PFPA, or designee, shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A). These standards are consistent with those applied in security clearance adjudications under Executive Order 12,968.

B. Immediate Suspension. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that there is probable cause to believe that the holder has engaged in conduct described in Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Part C. Probable cause exists when the facts and circumstances known to the Director, PFPA, or designee, are sufficient to warrant a person of reasonable caution to believe that the conduct described in Part A has occurred.

In such cases:

(8) The holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, the specific facts establishing probable cause, and the basis for the determination that immediate action is required.
(9) The full procedures described in Part C shall commence immediately upon issuance of the written notice.
(10) The immediate suspension shall remain in effect until a final decision is issued under Part C, unless the Director, PFPA, or designee, determines that the basis for the immediate suspension no longer exists.
(11) At the final determination stage under Part C, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct occurred.

If the substantial evidence standard is not met, the immediate suspension shall be lifted and the PFAC reinstated.

C. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or holder or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit, citing the specific subsection of Part A that applies. When an individual's PFAC has been denied, revoked, or not renewed pursuant to a final decision under this Part, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to the criteria in Part A, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant or holder of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.
(2) The applicant or holder will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).
(3) If the applicant or holder or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.
(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant or holder may receive a DoW Building Pass at that time.
(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant or holder will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant or holder and must be signed by the applicant or holder or representative under oath or affirmation.
(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or holder or representative may request, and shall be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial.
(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.
    (k) If a decision is made that no such inquiry is necessary, a final decision shall be issued within 30 days.
    (l) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry and issue a final decision within 60 days of the personal appearance.
(8) Upon receipt of the applicant's or holder's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon

completion of any additional inquiry, a final decision shall be made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant or holder shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial, citing the specific subsection of Part A that applies.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A).

[Appendices B through E remain unchanged, except that Appendices D and E shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center.]

# EXHIBIT 2

(Mod)

**ASSISTANT TO THE SECRETARY OF WAR**

1400 DEFENSE PENTAGON
WASHINGTON~~.~~, D.C. 20301-1400

~~erT 0 5 ns~~

**PUBLIC AFFAIRS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP

SUBJECT: Implementation of ~~New~~Revised Media ~~In-brief~~In-Brief

On March 20, 2026, the United States District Court for the District of Columbia vacated certain provisions of the October 6, 2025 PFAC Policy. *See New York Times Co. v. Department of Defense,* No. 25-04218 (D.D.C. Mar. 20, 2026). The Department disagrees with the Court's decision and is pursuing an appeal. In the interim, and without conceding the validity of the Court's analysis, the Department has revised the Policy to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 10 U.S.C. § 2674.

The attached documents implement the ~~Secretary of War memorandum, "Updated Physical Control Measures for Press/Media Access Within the Pentagon," dated May 23, 2025. All members of the press requesting to be issued a Pentagon Facility Alternate Credential (PFAC), will be required to read and sign the updated in-brief form outlining information security requirements, the new physical control measures, and Department of War expectations of their compliance with safety and security requirements~~revised "Pentagon Reservation In-Brief for Media Members," effective March 23, 2026. This memorandum and attachments supersede the "Implementation of New Media In-Brief," dated ~~September 18~~October 6, 2025.

~~The package that will be provided to the member of the press as part of the in-brief includes the following:~~

- ~~Pentagon Reservation In-brief for Media Members~~
- ~~Appendix A, "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials"~~
- ~~Appendix B, "Additional Press Identifier Badge"~~
- ~~Appendix C, SW memo, "Updated Physical Control Measures for Press/Media Access Within the Pentagon"~~
- ~~Appendix D, graphic showing the areas on the first and second floor of the Pentagon where press do not require a new escort~~
- ~~Appendix E, graphic showing the route that press can take to access the River Entrance on weekends and holidays~~

~~In addition to the Additional Press Identifier Badge depicted in Appendix B, the Pentagon Force Protection Agency (PFPA) will begin issuing new PFACs to the press in coming weeks. Priority of issuance of the new PFACs will be to members of the news media, including equipment crew members, with existing PFACs expiring by October 31, 2025, and will run through October 31, 2025. Beginning November 1, 2025, PFPA will then commence issuing new PFACS for members of the news media~~

~~with existing PFACS expiring after October 31, 2025, starting with resident members (i.e., those with current authorized workspace in the Pentagon), followed by non-resident members. The new PFACs will have "PRESS" clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon.~~

Revised Policy. All members of the press issued a PFAC will receive a copy of the revised in-brief at the time their PFAC is issued or renewed. Receipt of the PFAC and the accompanying in-brief constitutes notice of the Policy's terms. The revised in-brief addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation.

Clarifications in Response to the Court's Decision. The Court characterized the original Policy's provisions in ways the Department believes were inaccurate. The revised Policy includes targeted clarifications to correct these mischaracterizations. In particular:

- The Court stated that the Policy's use of the term "solicitation" was ambiguous because "to `solicit' in the everyday sense means 'to approach (someone) with a request or plea' and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.,* slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's mischaracterization, the revised Policy replaces the term "solicitation" with "intentional inducement of unauthorized disclosure" and provides a specific definition tied to identified federal criminal statutes, with a knowledge requirement and six explicit safe harbors for routine newsgathering activities that were never covered by this provision.

- The Court stated that the Policy's "security or safety risk" standard was too vague. While the Department maintains that the original standard, read in context with its enumerated factors, provided adequate notice, the revised Policy replaces this standard with an exhaustive list of specific, enumerated grounds for denial, revocation, or non-renewal of a PFAC, with evidentiary standards consistent with those applied in security clearance

adjudications under Executive Order 12,968. No PFAC may be denied, revoked, or not renewed on grounds not enumerated in the revised Appendix A.

- The Court expressed concern about the absence of processing timelines. The revised Policy includes specific deadlines: 30 days for a final decision where no further inquiry is needed, and 60 days where further inquiry is required.

Closure of Correspondents' Corridor and Relocation of Press Workspace. As previously announced in the October 6, 2025 Policy, the Department committed to "upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps." The Department is now fulfilling that commitment. Effective immediately, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational.

In the interim, PFAC holders will continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices. Access to the Pentagon for these events will require escort by authorized DoW personnel at all times. In breaking news situations, PFAC holders will be escorted into the Pentagon by authorized DoW personnel. The Pentagon Briefing Room remains in the Pentagon and will continue to be used for press events.

In assessing the Department's security posture following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks. The revised Policy establishes new security screening standards in the revised Appendix A. Until those standards have been fully implemented and the new workspace is operational, all journalist access to the Pentagon will require escort.

Notice of Policy. The original Policy required PFAC holders to sign an Acknowledgement attesting to their receipt, reading, and understanding of the Policy. The Court vacated this requirement. The Department maintains that requiring journalists to acknowledge a constitutional policy is a reasonable administrative measure, and the Court's vacatur was based on its finding that the underlying provisions were constitutionally deficient — a finding the Department disputes and is appealing. Regardless, the revised Policy eliminates the signature requirement. Instead, each PFAC holder will receive a copy of the revised in-brief at the time their PFAC is issued or renewed, and will sign a receipt confirming that they have received their PFAC and a copy of the Policy. Receipt of the PFAC and the accompanying in-brief constitutes sufficient notice of the Policy's terms. No PFAC holder is required to agree with, endorse, or acknowledge understanding of the Policy as a condition of receiving or maintaining a PFAC.

I request your assistance in ensuring that all personnel in your Component are aware of the revised physical ~~control~~access measures, including the requirement to provide escorts for media ~~coming into your spaces~~entering the Pentagon for approved ~~interviews. Additionally, if~~events. If personnel see any news media ~~outside of the areas depicted in Appendix D that do not have~~inside the Pentagon without an escort, they should direct them ~~back to the designated no-escort required~~



~~NYTIMES-DOW-25cv04218-~~

~~areas and alert~~to the Pentagon Press Operations office ~~at 703697-5131~~and alert PPO at 703-697-5131.

My POC for this action is Sue Gough, Pentagon Press Operations, susan.l.gough.civ@mail.mil or 703-697-1254.

(Mod)



~~Sea~~
Sean Parnell

Attachments: As stated



~~NYTIMES-DOW-25cv04218-~~

My POC for this action is Mr. Christopher Garver, Pentagon Press Operations, christopher.c.garver.civ@mail.mil or 703-695-3886.

Attachments: As stated

**PENTAGON RESERVATION IN-BRIEF FOR MEDIA MEMBERS**

NAME: ______________________ DATE: ______________

NAME: ______________________ DATE: ______________

The purpose of this briefing is to inform you, as a member of the news media who has been granted access to the Pentagon Reservation and issued a Pentagon Facilities Alternative Credential (PFAC), also known as a Department of War Building Pass or a Pentagon badge, of the rules regarding conduct on the Pentagon Reservation. Failure to abide by these rulescomply with the physical access restrictions and conduct requirements set forth in this in-brief may result in suspension or revocation of your PFAC and loss of access to the Pentagon. Additionally, this briefing informs you of the procedures associated with denying, revoking, or not renewing the issuance of a PFAC, including contesting such a decision (see Appendix A).

General Security

Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege, subject to the discretion of government authorities and is regulated by federal law and Department of War policy. Legally, the press has no greater right of access than the public. While members of the news media may be granted access under certain conditions, this is a privilege extended by the government and not a . constitutionally protected right.

Pursuant to 10 U.S.C. § 2674, the Secretary of War has jurisdiction, custody, and control over, and responsibility for, the operation, maintenance, and management of the Pentagon Reservation. Under this statute, the Secretary is authorized to prescribe appropriate regulations to ensure the safe, efficient, and secure operation of the Pentagon Reservation. 32 C.F.R. Part 234 addresses conduct on the Pentagon Reservation, and section 234.4 of this part makes clear that entering or remaining on Pentagon property without express invitation or consent from those with lawful control is prohibited. The regulation applies "to all persons entering in or on the property" (see 32 C.F.R. § 234.2), including members of the news media, and provides that individuals who violate a Department rule or regulation may be ordered to leave or barred from reentry. This framework establishes that access is not open to the public or the press as a matter of right but is instead a controlled privilege.Having chosen to extend this privilege, the Department will not deny, revoke, or suspend a PFAC arbitrarily or on the basis of the content or viewpoint of a journalist's reporting.

Be alert for suspicious activity and immediately report any unusual activity and/or circumstances to the Pentagon Force Protection Agency (PFPA) at (703) 697-1001.

Ensure office doors are locked, and property is secure when exiting your office or cubicle.

Every individual entering the building is subject to random metal detector and X-ray inspection of personal belongings. Many events, including those involving the Secretary of War, Deputy Secretary of War, or visiting high-level U.S. government officials or

foreign dignitaries, require additional security screenings to which PFAC holders would be subject.

Every individual exiting the building, regardless of status (e.g., military Service member, civilian employee, member of the news media), is subject to random checks of personal belongings.

A property pass is required to remove property from the building that is not readily identifiable as personal. When you or other members of your organization (e.g., technicians, photographers) remove equipment owned by your organization, obtain a property pass in advance to avoid problems when exiting the building. Property passes may be obtained in the Pentagon Press Operations (PPO) office, room 2D961, during normal working hours.

PFAC Security

Maintaining the security of your PFAC is an individual responsibility.

~~PFACs~~PFACS must be visible and always worn above the waist while in the Pentagon, except as noted below during press or other recorded events. Remove or hide your PFAC from view when not in the Pentagon.

Exceptions for press and other events: Do not have your PFAC visible in the following circumstances: when present during an on-camera press briefing; when doing a live-shot in the Pentagon Briefing Room or stand-ups at the Mall Entrance, River Parade Field, or on the Connector Parking Lot hill; when covering honor cordon arrival ceremonies; if on-camera during an open press event on the Pentagon Reservation; or at any other events that will be recorded via photograph or video. For those with a recording studio in the Pentagon, do not have your PFAC visible when recording in your studio.

Lost ~~PFACs~~PFACS should be immediately reported to PPO at (703) 697-5131, or, after normal working hours, to (703) 678-6162 or to OSD.PA.~~DutyOfficer~~Duty Officer@mail.mil. Normal working hours for PPO on non-holiday weekdays are 7:30 a.m. to 6 p.m. Eastern Time.

Additional Press Identifier Badge

The Additional Press Identifier Badge (APIB) (see Appendix B) must also be visible and always worn above the waist while in the Pentagon. Note that ~~APIBs~~APIBS serve only as an additional visual identifier. ~~APIBs~~APIBS are not credentials and do not confer credentialing or attendance approval for any event.

News Media Physical Security Restrictions on the Pentagon Reservation

Effective May 23, 2025, in accordance with Secretary of War Memorandum, "Updated Physical Control Measures for Press/Media Access within the Pentagon," May 23, 2025 (Appendix C), ~~new~~ physical security restrictions have been enacted for news media, including those with valid, current ~~PFACs:~~PFACS.

Effective March 23, 2026, the Correspondents' Corridor is closed. A new press workspace will be established in an annex facility outside the Pentagon and will be available when ready. The Department will notify PFAC holders when the new workspace is operational. This closure fulfills the Department's previously announced commitment to upgrade the space used by PFAC holders to a different area that provides WiFi access, cell phone service, and increased space for the expanded press corps.

Until the new workspace is operational, PFAC holders will continue to have access to the Pentagon for the following purposes, with escort by authorized DoW personnel at all times:

- Scheduled press briefings and press conferences in the Pentagon Briefing Room;
- Interviews and meetings arranged through OATSW(PA) or the sponsoring public affairs office;
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps;
- Honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard;
- Other events specifically approved by OATSW(PA).

In breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel.

News media are not authorized to be anywhere ~~on~~in the ~~5th Floor, 4th Floor, 3rd Floor, Basement, or Mezzanine levels, including all corridors and rings,~~Pentagon at any time without an escort from an authorized DoW official. If personnel see any news media inside the Pentagon without an escort, they should direct them to the Pentagon Press Operations office and alert PPO at 703-697-5131.

- ~~On the 2nd Floor, news media are authorized unescorted access in the Pentagon for the below areas. For all other areas of the 2nd Floor not included below, except as otherwise addressed in this in-brief, news media must have an escort from authorized DoW personnel:~~
  - ~~Rings A through E between Corridors 1, 10 and 9 (from the Metro Entrance on the E Ring through the Concourse to the A Ring);~~
  - ~~E Ring from the Metro Entrance to Corridor 9;~~
  - ~~E Ring from the River Entrance directly to Corridor 9;~~
  - ~~Corridor 9 from the E Ring to the A Ring; 951-999~~
  - ~~At the Apex of Corridors 9/10, the exit to the Courtyard;~~
  - ~~A Ring from the Apex of Corridors 9/10 to the Mall Corridor between Corridor 6 and 7 and the Mall Corridor to the Mall Entrance for the purpose getting to and from the Mall Entrance for stand-ups~~

- ~~On the 1St Floor, news media are authorized unescorted access to the Center Courtyard and the Food Court between Corridors 1 and 10.~~
- ~~See Appendix D for a graphic of the areas where the news media are authorized unescorted access.~~
- ~~News media are not authorized access to the Pentagon Athletic Center.~~

~~If news media require access to other areas or offices within the Pentagon for in-person interviews or other engagements, they must be escorted to and from those spaces by authorized DoW personnel.~~

As a non-government employee, while a PFAC is your authorized means of entering the Pentagon, a PFAC does not allow you unfettered access to all of the Pentagon. ~~You have been briefed on the physical control measures for news media access and understand which areas require escort even though you have a PFAC. When in an area requiring an escort~~When in the Pentagon, you must remain with your escort at all times.

~~The list of authorized areas is expected to be modified within the next three months, as DoW intends to upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps.~~

Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information

DoW remains committed to transparency to promote accountability and public trust. However, DoW information must be approved for public release by an appropriate authorizing official before it is released by any military member, DoW civilian employee or contract employee, even if it is unclassified. The Department of War must safeguard

~~3~~

classified national security information (CNSI), in accordance with Executive Order 13526 and the Atomic Energy Act, and information designated as controlled unclassified information (CUI), in accordance with Executive Order 13556. CUI may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information. Beyond CNSI and CUI, additional authorities may restrict the disclosure of certain information. Given the complexities of the various laws and policies concerning disclosure of information, DoW employees are required to have all information cleared for release by an appropriate authorizing official.

Military members, in particular, face potentially severe consequences for disclosing nonpublic information without proper authorization. Article 92 of the Uniform Code of Military Justice imposes criminal liability on military members who violate a lawful order or regulation.

Both military members and DoW civilian employees also face potential criminal liability under 18 U.S.C. § 1905 for disclosure of confidential information or under the Privacy Act, 5 U.S.C. § 552a, for knowing and willful unauthorized disclosures.

Only authorized persons who have received favorable determinations of eligibility for access, signed approved non-disclosure agreements, and have a need-to-know may be granted access to CNSI. DoW may only provide CUI to individuals when there is a lawful governmental purpose for doing so.

To be clear, ~~these are~~ the foregoing laws and regulations ~~that~~ apply to military members ~~and~~, DoW civilian employees, and contractors. Members of the news media are not required to submit their writings to DoW for approval. ~~However, they should understand that DoW personnel may face adverse consequences for unauthorized disclosures (see, e.g., Uniform Code of Military Justice Article 92 (10 U.S.C. 892); 18 U.S.C. 1905; 5 U.S.C. 552a(i)). Any solicitation of DoW personnel to commit criminal acts would not be considered protected activity under the 1' Amendment.~~ Members of the news media remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, questions posed to authorized Department spokespersons and officials, or unsolicited tips, and to publish as they deem newsworthy. The receipt of unsolicited information, including CNSI or CUI, and its subsequent publication, is protected by the First Amendment. Nothing in this in-brief prohibits a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.

~~Unauthorized disclosure of CNSI or CU1 poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy. To ensure the safety of U.S. personnel, news media who find themselves in possession of information that appears to be CNSI or CUI should discuss those materials with the PPO prior to publication.~~

Escort Privileges and Procedures

A PFAC authorizes media members who are U.S. citizens to access the Pentagon ~~24 hours a day~~ with escort by authorized DoW personnel for the purposes described in the "News Media Physical Security Restrictions" section above, and affords escort privileges for up to three visiting media members from the same media outlet who possess appropriate media credentials.

Visiting media members must be entered into the PFPA Visitor Management System (VMS) by the sponsoring U.S. public affairs office no later than one business day in



advance for U.S. citizens and no later than three business days in advance for non-U.S. citizens.

~~A PFAC also affords escort privileges for media members who are U.S. citizens for up to three visiting family members for special events, such as the Bring Your Child to Work Day, subject to the approval of the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). Family members 18 years and older must be entered into the PFPA Visitor Management System (VMS) by the sponsoring public affairs office no later than 24 hours in advance for U.S. citizens and no later than 48 hours in advance for non-U.S. citizens.~~

~~PFAC holders escorting other media members or family members must stay with their visitor(s) at all times. Failure to do so may result in loss of the PFAC issued to you.~~

~~PFAC holders who are not U.S. citizens do not have escort privileges.~~

PFAC Issuance and Renewals

PFACs may be issued to those media members who require regular access to the Pentagon, who are accessing the building at a minimum monthly visit frequency. See PPO for the current minimum monthly visit frequency. You must continue to meet the minimum access frequency requirement to be reissued a PFAC. There are two probationary periods for an initial PFAC issuance.

An initial PFAC expires in three months, on the last day of the third month. You may submit a request for renewal at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the initial three-month probationary period ~~and who have not posed a security or safety risk to DoW personnel or property~~ will generally be approved for a six-month badge.

The second probationary period is for six months. Requests for renewals of a six-month PFAC may be submitted at the beginning of the month of expiration. Media members who have met the minimum monthly visit frequency requirements during the six-month probationary period ~~and who have not posed a security or safety risk to DoW personnel or property~~ during both the initial three-month and subsequent six-month probationary periods, will generally be approved for a one-year PFAC.

If the two probationary periods have been completed successfully and all requirements have been met, PFACs will be renewed annually. During annual renewal reviews, if frequency requirements have not been met, PFAC renewals may be denied or revert to 3- or 6-month ~~PFACs~~PFACS.

For all renewals, PFACs expire on the last day of the month of expiration. Renewal requests should be submitted at the beginning of the month of expiration, but not before the start of the month of expiration. Requests received prior to the start of the month will not be processed until the first business day of the month. Due to processing times,

~~5~~

renewal requests should be submitted to PPO no later than the middle of the month of expiration to ensure a new badge is available before the old one expires.

Frequency requirements may be waived by OATSW(PA) for a news organization's equipment technicians and some camera crews, if specifically identified and requested by the bureau chief. For first-time applications, equipment technicians and camera crews must still go through the two probationary periods.

PFACs may be denied, revoked, or not renewed if a person ~~is reasonably determined to pose a security or safety risk to DoW personnel or property~~meets any of the criteria set forth in Appendix A, or is not meeting the frequency requirements. ~~An initial determination of a security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination. A determination that an individual poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI.~~ See Appendix A for ~~information on~~ the applicable ~~standard~~standards and the process for denying, revoking, or ~~non-renewing~~not renewing a PFAC.

Press Parking

Parking on the Pentagon Reservation is restricted to vehicles with permanent parking permits, or which have been cleared for temporary parking for specific days. Vehicles may only be parked in the areas for which they have been cleared.

There is a designated parking area for the news media at the Pentagon. The parking spaces in two lanes of the Connector Lot, located at intersection of Connector Road and Boundary Channel Drive, have been reserved for the press (see Appendix E). These parking spaces are clearly marked with "PRESS" stenciled on the ground.

To access the building, for those with a PFAC, walk north towards Boundary Drive and go up either the stairs or the ramp to the pedestrian bridge. At the security checkpoint, swipe your badge and then show it to the PFPA officer on duty. See the route depicted at Appendix E. The checkpoint opens at 6:00 a.m. and closes at 8:00 p.m. on weekdays. The checkpoint is closed on weekends and federal holidays. All visiting press must go through the Visitor Center at the Pentagon Metro Entrance.

There are a limited number of permanent "P" parking permits for news media members. Those who have such permits may park in designated PRESS spaces with their approved "P" parking permit at any time. News media members with "P" permit are not authorized to park elsewhere on the Pentagon Reservation, except when provided specific guidance to do so for special circumstances (e.g., when the Connector Lot is being re-surfaced, or closed for a special event). For such instances, PPO will provide information on where you may park.

News media members desiring to be issued a "P" parking pass should contact PPO; there is usually a waiting list for available permit.

~~6~~

News media without a "P" parking permit may also park in the PRESS area provided they obtain an approved temporary parking clearance prior to their arrival at the Pentagon. News media should contact the PPO Admin Support Team at 703-697-5131 at least 30 minutes prior to their arrival to request temporary parking clearance, and must provide the PPO with the following information: date requesting to park if not the day of the call, driver's name, email, phone number, media outlet, vehicle make, vehicle model, vehicle color, license plate number, state of registration, vehicle classification (car/truck/motorcycle/etc.), fuel type (gas/diesel/hybrid/electric), and whether it is a personal vehicle or a business vehicle. For repeat visits using the same vehicle, press need only provide date, name, and vehicle license plate. For parking on weekends, call the PPO Duty Officer at 703-678-6162.

News media may request temporary parking clearance for up to 5 days per month. Press can request an exception from the PPO for more days only on a case-by-case basis.

Overnight parking at the Pentagon is not permitted for members of the news media. Overnight parking is considered parking for more than 24 hours at a time.

If you are issued a "P" parking permit, you will be required to return it to the PPO upon completion of your media/press duties, or upon the expiration of the "P" parking permit.

Access on Weekends

If news media need to access the Pentagon on weekends, holidays, or when the pedestrian bridge between the Connector Lot and River Entrance is closed, news media may park in the press parking area and walk along Connector Road to River Road, go through a pedestrian turnstile, and continue walking up the River Road to Mug Handle to get to the River Entrance, which is open 24/7. See Appendix E for a depiction of the route. Note that those without a "P" parking permit must still provide their vehicle information to the PPO Duty Officer at ~~703-678-6162~~703-6786162.

Mall Entrance Temporary Parking

News media crews that are doing a stand-up at the Mall Entrance location may request Mall parking. Mall Entrance parking is by reservation only. News media should contact the PPO Support Team at 703-697-5131 at least two hours prior to their arrival to request Mall Entrance parking clearance and must provide the same information as for regular press parking (see above) with the addition of time and arrival. Note that due to demand, there may be times when parking in the Mall Entrance lot is restricted to four hours per day. Visiting press who need to be at the Pentagon all day should park either in regular press parking or at the Mall Entrance. Parking at the Mall Entrance is by numbered spaces; PPO will provide the numbered parking space for each vehicle when Mall Entrance Parking is requested.

Filming/Photography

Filming, photography, and audio recording on the Pentagon Reservation is prohibited, unless approved in advance. In accordance with 32 CFR § 234.15 — - Use of visual recording devices:

(a) The use of cameras or other visual recording devices on the Pentagon Reservation is prohibited, unless the use of such items are approved by the Pentagon Force Protection Agency, the Installation Commander, or the Office of the Assistant to the Secretary of War for Public Affairs.
(b) It shall be unlawful to make any photograph, sketch, picture, drawing, map or graphical representation of the Pentagon Reservation without first obtaining permission of the Pentagon Force Protection Agency or the Office of the Assistant to the Secretary of War for Public Affairs.

Note that this prohibition applies to the use of apps on mobile devices that utilize the front-facing camera lens, such as "FaceTime" or the taking of "selfies."

News media visiting the National Pentagon 9/11 Memorial in their personal capacity, not as a member of the press, may take photos using their personal devices. Filming or photography in the Memorial for a news media interview or to obtain b-roll requires an exception, as described below under Filming/Photography Exception Requests.

Filming/Photography Pre-Approved Exceptions

News media do not need to obtain permission in advance for filming, photography, or

audio recording in the following circumstances:

- Press events in the Pentagon Briefing Room.
- Press events announced by OATSW(PA), the public affairs office for the Office of the Chairman of the Joint Chiefs of Staff, or the public affairs offices of the Military Departments or Headquarters, U.S. Marine Corps, that are not located in the Pentagon Briefing Room. Examples would include honor cordons and events at the Pentagon River Terrace Parade Field, the Pentagon Auditorium, and the Pentagon Center Courtyard.
- Unilateral news media stand-ups in the Pentagon Briefing Room, if approved, at the designated stand-up location outside the Mall Entrance, or live or recorded shots inside the network studio rooms in the Correspondent's Corridor.
- Recording audio of off-camera interviews approved and monitored by authorized DoW public affairs personnel.

Filming/Photography Exception Requests

The filming/photography exception requests discussed below require public affairs escort from either OATSW(PA) or the sponsoring public affairs office, regardless of whether the news media involved have a current PFAC or are visiting press.

- News media desiring to obtain b-roll or stock footage or photos of the Pentagon interior or exterior must submit a request to PPO a minimum of one week in advance



to obtain permission. If this request is in conjunction with a press event sponsored by a public affairs office other than OATSW(PA), submit the request through the sponsoring public affairs office. Requests should include date and times and either the exact location or sufficient information for the public affairs office to determine the best available locations for the footage or photos.

- News media desiring to film DoW officials standing or walking in a corridor in conjunction with an interview must submit a request through the sponsoring public affairs office to PPO a minimum of one week in advance to obtain permission. Request must include date, time, and exact location.
- News media desiring to photograph DoW officials in their offices or conference rooms in conjunction with an interview must submit their request through the sponsoring public affairs office to the security manager for that space.
- News media desiring to obtain b-roll or interview or film anyone inside the National Pentagon 9/11 Memorial must submit a DD Form 2798, "Application/Permit for Use of Space on the Pentagon Reservation," at least one week in advance to the Pentagon Facility Operations Division Special Events Office at whs.pentagon.fsd.mbx.pbmo-special-events@mail.mil. ~~You can download a DD Form 2798 here: https://www.esd.whs.mil/Directives/forms/dd2500 2999/DD2798/~~

Filming/Photography from the Press Parking Area

News media desiring to do a stand-up or film from the grassy hill next to the press parking area (see Appendix E) should submit a request to PPO no later than three hours in advance. Requests should include the date, time, and the number of personnel in the crew. Once approved, filming from the grassy hill does not require public affairs escort.

Pandemics, National Health Emergencies, and Other Contingencies

During a declared pandemic or national health emergency, the DoW will protect the workforce while continuing to perform its national security mission. Protecting the workforce may entail the adoption of personal protective measures, restrictions on access to the Pentagon for essential functions only, symptom screenings, or other measures.

In the event of a declared pandemic or national health emergency, news media entering the Pentagon are expected to follow the same personal protective measures as DoW personnel and as required by Health Protection Condition (HPCON) announcements. Failure or refusal to comply may result in a loss of access, ranging from temporary suspension to revocation of ~~PFACs~~PFACS.

Additionally, news media are not considered essential personnel. During a declared pandemic or national health emergency, news media may temporarily be denied physical access to the Pentagon.

~~9~~

During other general emergency contingencies (e.g., fires, active shooters, natural disasters, utility outages), news media physical access to the Pentagon may be temporarily curtailed or denied.

~~Security Risks~~

~~A PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, in accordance with the standards and procedures outlined in Appendix A. Such an initial determination may result in an immediate suspension of your Pentagon access while the procedures preceding a final determination are pending.~~

~~This in-brief and its Appendices address DoW policy and the potential bases for such a determination and do not prohibit you as a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories.~~

Such determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI, convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Such a determination is based on a reasonable assessment informed by the unique facts and circumstances of each case--such as whether the conduct is willful or repeated, versus isolated and unintentional -- and incorporates due process (e.g., written notice of the basis, a 30-day appeal period, an opportunity for personal appearance, and a final, reviewable determination).

For clarity, the receipt of unsolicited CNSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC. However, if you solicit the disclosure of such information or otherwise encourage DoW personnel to violate laws and policies concerning the disclosure of such information, such conduct may weigh in the consideration of whether you pose a security or safety risk.

There is a critical distinction between lawfully requesting information from the government and actively soliciting or encouraging government employees to break the law. The First Amendment does not permit journalists to solicit government employees to violate the law by providing confidential government information. The press's rights are not absolute and do not override the government's compelling interest in maintaining the confidentiality of sensitive information. Soliciting or encouraging government employees to break the law falls outside the scope of protected newsgathering activities.

Solicitation may include direct communications with specific DoW personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share non-public DoW information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets DoW personnel to disclose



non-public information without proper authorization would constitute a solicitation that could lead to revocation.

Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

All determinations under this policy are undertaken on a case-by-case basis reviewing the totality of the circumstances to ensure the policy is narrowly tailored to safeguard sensitive information without unduly restricting speech and are informed by factors such as convictions for national defense offenses, threats, or unsafe activities (as listed in Appendix A). Moreover, determinations will take into account whether such conduct is willful or repeated, as opposed to isolated and unintentional.

No Waiver of Rights

Standards for PFAC Determinations

Grounds for Denial, Revocation, or Non-Renewal. A PFAC shall be denied, revoked, or not renewed only on the grounds set forth in Appendix A. No PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism.

Intentional Inducement of Unauthorized Disclosure. The Court in *New York Times Co. v. Department of Defense,* No. 25-04218 (D.D.C. Mar. 20, 2026), characterized the original Policy's use of the term "solicitation" as ambiguous, stating that "to `solicit' in the everyday sense means `to approach (someone) with a request or plea' and that "a charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime." *Id.,* slip op. at 21. The Department agrees that asking questions is not a crime. The original Policy never prohibited asking questions. To correct the Court's

mischaracterization, the Department has replaced the term "solicitation" with "intentional inducement of unauthorized disclosure."

For purposes of this Policy, "intentional inducement of unauthorized disclosure" means intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclosing under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a. This is an administrative standard for PFAC determinations; it does not constitute a criminal charge or referral.

A journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought. This presumption may be rebutted through the procedures set forth in Appendix A by evidence that the journalist did not know that the employee was unauthorized to disclose the information notwithstanding the offer of anonymity.

The following do not constitute "intentional inducement of unauthorized disclosure" under this Policy, notwithstanding the general definition of that term above:

(a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;
(b) Receiving unsolicited information, including classified national security information or controlled unclassified information;
(c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;
(d) Developing source relationships outside the Pentagon through independent reporting; (e) Communicating with Department personnel through official channels for public disclosure of information, including press briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests.
(f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

Due Process Protections. Without conceding the validity of the Court's analysis, the revised Policy provides the following protections regarding suspension of a PFAC: Before any PFAC is denied, revoked, or not renewed on the grounds set forth in Appendix A, the applicant or holder shall receive the process set forth in Appendix A, Part B. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that the holder has engaged in conduct described in Appendix A, Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Appendix A, Part B. In such cases, the holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, and the full procedures described in Appendix A, Part B shall commence immediately.

No Waiver of Rights. Nothing in this document requires you to waive any constitutional rights. This in-brief constitutes a description of DoW policies.

PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 113, Secretary of Defense; 42 U.S.C. Chapter 23, Development and Control of Atomic Energy; Executive Order 13526, Classified National Security Information; Executive Order 13556, Controlled Unclassified Information; 32 C.F.R. Part 234, Conduct on the Pentagon Reservation; DoD Directive 5122.05, Assistant to the Secretary of Defense for Public Affairs (ATSD(PA)).
PRINCIPAL PURPOSE: To inform members of the news media being granted access to the Pentagon Reservation and issued a Pentagon Alternative Facilities Alternative Credential (PFAC) of the rules regarding conduct on the Pentagon Reservation and the rules and procedures concerning termination of such access.
ROUTINE USE(S): In certain circumstances, it may be necessary to disclose this record outside of the Department of Defense. For example, this record may be disclosed to a component of the Department of Justice for the purpose of representing the Department of Defense, or its components, officers, employees, or members in pending or potential litigation to which the record is pertinent; or to an appropriate law enforcement authority when the record, either alone or in conjunction with other information, indicates a violation or potential violation of law, whether criminal, civil, or regulatory in nature. For a complete list of routine uses, refer to the applicable system of records notice: DPAD 12.0, DoD Media Pool and Pentagon Correspondent Files, at httvs://www.federalregister.gov/documents/2021/05/03/2021-0921 I /privacy-act-of- 1974-system-of-records
DISCLOSURE: Voluntary; however, failure to complete this acknowledgement may result in limiting DoD's ability to grant access to the Pentagon Reservation.

NAME: ______________________ DATE: ______________

Acknowledgement

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which addresses the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief describes DoW policies and procedures. My signature represents my acknowledgement and understanding of such DoW policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

Signature -- Administering Official Signature -- Media Member

New Badge Expiration Date________________

Email address_____________________________

Work phone____________________Cell phone____________________



APPENDIX A: DENIAL, REVOCATION, OR NON-RENEWAL OF PENTAGON FACILITY ALTERNATIVE CREDENTIALS.

A. ReasonGrounds for Denial, Revocation, or Non-Renewal. The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person



NYTIMES-DOW-25cv04218-

reasonably determined to pose a security or safety risk to DoW personnel or property. Persons presumed to present such a risk include, but are not limited to, those who have been convicted who meets one or more of the following criteria. These are the sole grounds for denial, revocation, or non-renewal of a PFAC based on security considerations. No PFAC shall be denied, revoked, or not renewed on grounds not enumerated in this section.

of anyConviction-Based Grounds. Conviction of an offense involving:

(1) National defense (such as treason, sabotage, terrorism, or espionage).
(2) The use, attempted use, or threatened use of physical force against another person (such as murder, manslaughter, assault, rape, robbery, or kidnapping) or conduct that presents a serious potential risk of physical injury to another (such as arson, burglary, or the unlawful possession of explosives or firearms).
(3) Unlawful manufacturing or distribution of drugs.

(4) Threatening or harassing communications. directed at Department personnel or facilities. (5) Theft, embezzlement, trespassing, or property destruction on the Pentagon Reservation or other Department facility.
(6) Fraud or deceit in connection with obtaining or maintaining access to a government facility or government information systems.

(7) Prostitution or other prohibited sexual conduct.
(87) Engaging in operations and activities that are unsafe, failfailing to abate an identified hazard, endanger others, or createcreating a condition immediately dangerous to life or health.

A conviction described in subsections (1) through (7) creates a rebuttable presumption that the applicant or holder poses a security risk. The applicant or holder may rebut this presumption by demonstrating, through the procedures set forth in Part C below, that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Factors relevant to rebuttal include the nature and seriousness of the offense, the time elapsed since the conviction, evidence of rehabilitation, and the applicant's or holder's conduct since the conviction. Any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Conduct-Based Grounds. Engaging in conduct that would constitute an offense described in subsections (1) through (7) above, or inducement of unauthorized disclosure as defined in the "Standards for PFAC Determinations" section of this in-brief. For a final determination based on conduct, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. A conduct-based determination does not require a criminal charge, indictment, or conviction. The written determination shall identify:

(9g) UnprofessionalThe specific subsection of this Part A that the conduct that might serve to disrupt Pentagon operations.would constitute;

Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the Pentagon Reservation In-Brief for Media Members

(h) The specific facts supporting the determination, including the date, time, location, and nature of the conduct;

(i) The identity of any witnesses or the source of any documentary evidence supporting the determination, to the extent that disclosure would not compromise an ongoing investigation or the safety of any individual; and

(j) The basis for the Director's determination that substantial evidence supports the conclusion that the conduct occurred.

The PFAC holder shall receive the full procedures set forth in Part C below, including the opportunity to contest the factual basis for the determination. A conduct-based determination is subject to the same rebuttable presumption framework as a conviction-based determination: the holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation. Any doubt as to whether the holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation.

Standard of Review. For conduct-based determinations under this section, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct described in the applicable subsection occurred. For immediate suspension under Part B, the Director, PFPA, or designee, must find probable cause to believe the conduct occurred. For rebuttal of a conviction-based or conduct-based presumption, the applicant or holder must demonstrate that granting or maintaining the PFAC is clearly consistent with the security of the Pentagon Reservation; any doubt as to whether the applicant or holder poses a security risk shall be resolved in favor of the security of the Pentagon Reservation. The final decision of the Director, PFPA, or designee, shall constitute a final agency decision subject to judicial review under 5 U.S.C. § 706(2)(A). These standards are consistent with those applied in security clearance adjudications under Executive Order 12,968.

B. Immediate Suspension. A PFAC may be immediately suspended if the Director, PFPA, or designee, determines that there is probable cause to believe that the holder has engaged in conduct described in Part A and that the nature of the conduct requires immediate action to protect the security of Pentagon personnel, property, or information pending the completion of the procedures set forth in Part C. Probable cause exists when the facts and circumstances known to the Director, PFPA, or designee, are sufficient to warrant a person of reasonable caution to believe that the conduct described in Part A has occurred.

In such cases:

(8) The holder shall receive written notice within 24 hours stating the specific subsection of Part A that applies, the specific facts establishing probable cause, and the basis for the determination that immediate action is required.

(9) The full procedures described in Part C shall commence immediately upon issuance of the written notice.

(10) The immediate suspension shall remain in effect until a final decision is issued under Part C, unless the Director, PFPA, or designee, determines that the basis for the immediate suspension no longer exists.

(11) At the final determination stage under Part C, the Director, PFPA, or designee, must find that substantial evidence supports the determination that the conduct occurred.

If the substantial evidence standard is not met, the immediate suspension shall be lifted and the PFAC reinstated.

BC. Procedures for Denial, Revocation, or Non-Renewal. If the Director, PFPA, or designee, anticipates that a PFAC might be denied, revoked, or not renewed, the applicant or holder or his or her authorizing official shall be notified in writing by the Director, PFPA, or designee, of the basis for the proposed denial, in as much detail as security considerations permit, citing the specific subsection of Part A that applies. When an individual's PFAC has been denied, revoked, or not renewed, or suspended for the reasons outlined above pursuant to a final decision under this Part, both unescorted and escorted access to any DoW facility is terminated. This section does not apply to journalists who decide not to renew for reasons unrelated to any security or safety riskthe criteria in Part A, such as a change in employment or assignment.

(1) The notification of proposed denial, revocation, or non-renewal shall inform the applicant or holder of the right to respond to and rebut any factual basis supporting the proposed denial, revocation, or non-renewal.

(2) The applicant or holder will be allowed 30 days from the mailing date of the proposed denial, revocation, or non-renewal notification to make an appeal appointment with the Director, Pentagon Access Control Branch (PACB).

(3) If the applicant or holder or representative is unable to schedule an appointment within 30 days, an extension for one additional 30-day period will be granted on receipt of a telephone request to PACB for such an extension.

(4) If mitigating information is presented at the appointment to substantiate a reversal of denial, revocation, or non-renewal, the applicant or holder may receive a DoW Building Pass at that time.

(5) If no mitigating information is presented or if information is presented but is insufficient to substantiate the issuance of a DoW Building Pass, the applicant or holder will be allowed 30 days from the appeal appointment to respond in writing to the Director, PFPA, or designee. The response will consist of any explanation or rebuttal considered appropriate by the applicant or holder and must be signed by the applicant or holder or representative under oath or affirmation.

(6) At the time of the filing of the written response to the notification of the proposed denial, revocation, or non-renewal, the applicant or holder or representative may request, and shall normally be granted, the opportunity to make a personal appearance before the Director, PFPA, or designee, to personally support his or her eligibility for a pass and to rebut or explain the factual basis for the proposed denial. The Director, PFPA, or designee, shall exercise final review authority in the matter.

(7) On the basis of the written or oral response to the proposed denial, revocation, or non-renewal, the Director, PFPA, or designee, shall determine whether further inquiry or investigation on the issues raised is necessary.


NYTIMES-DOW-25cv04218-

(ak) If a decision is made that no such inquiry is necessary, a final decision shall be issued within 30 days.

(b1) If a decision is made that further inquiry is necessary, the Director, PFPA, or designee, shall conduct such inquiry ~~as deemed appropriate~~and issue a final decision within 60 days of the personal appearance.

(8) Upon receipt of the applicant's or holder's written or oral response explaining or rebutting the factual basis for the proposed denial, revocation, or non-renewal, and upon

completion of any additional inquiry, a final decision shall be ~~expeditiously~~ made by the Director, PFPA, or designee. If a final adverse decision is reached, the applicant or holder shall be notified of the final decision in writing. The notification shall state, as precisely as security considerations permit, the factual basis for the denial, citing the specific subsection of Part A that applies.

(9) The decision of the Director, PFPA, or designee, under this section shall constitute a final agency decision~~. This section does not confer any rights on any individual or entity and is intended only as internal guidance for the administration of the Department of War.~~ subject to judicial review under 5 U.S.C. § 706(2)(A).

[Appendices B through E remain unchanged, except that Appendices D and E shall be

updated to reflect the relocation of the press workspace to the Pentagon Library and Conference

# ~~Appendix B~~

## ~~Additional Press Identifier Badge~~

~~FRONT~~

(Deleted)




~~BACK~~



NYTIMES-DOW-25cv04218-00000017

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC
20301-1000

MAY 2 3 2025

MEMORANDUM FOR RESIDENT AND VISITING PRESS ASSIGNED TO THE PENTAGON

SUBJECT: Updated Physical Control Measures for Press/Media Access Within the Pentagon

References: (a) DoDM 5200.01, "Volume 3, DoD Information Security Program: Protection of Classified Information," February 24, 2012
(b) Office of Secretary of Defense, Chief of Staff Memorandum: "Efforts to Combat Unauthorized Disclosures," March 21, 2025

The Department of Defense's (DoD) highest priority is the defense of our Nation and our national security. Per reference (a), the protection of classified national intelligence information (CNSI) and sensitive, unclassified information, including information deemed critical to operations security (OPSEC), remains an unwavering imperative for the Department. Per reference (b), the Chief of Staff to the Secretary of Defense recently directed an investigation into unauthorized disclosures.

While the Department remains committed to transparency. the Department is equally obligated to protect CNSI and sensitive information — the unauthorized disclosure of which could put the lives of U.S. Service members in danger. To attain professional balance between press access and OPSEC, the following updated security measures for resident and visiting press are needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures.

swam aim usimm. 6 MID

Effective immediately, the Secretary of Defense directs the following control measures for all resident and visiting press who have been issued a Pentagon Facilities Alternate Credential (PFAC) for the Pentagon:

1. Press/media are not authorized entry/access to the Secretary of Defense physical office spaces located on the 3rd floor, ring E, between corridors 9 and 8 without an official approval and escort from the Office of the Assistant to the Secretary of Defense for Public Affairs (OATSD(PA)).

2. Press/media are not authorized entry/access to the Joint Staff physical office spaces located on the 2nd floor between corridors 9 and 7, rings A through E. without official approval from the Office of the Secretary of Defense for Public Affairs (OSD(PA)) and escort by personnel from the Joint Staff Public Affairs Office.

3. Press/media are only authorized unescorted access in the Pentagon on rings A through E on the 2nd floor of the Pentagon between the "Metro Entrance" at corridors 1 and 10 and the "River Entrance" at corridors 8 and 9 via and to the Pentagon Courtyard and Food Court (located between corridor 1 and 10 on the 1'` Floor). The exception is noted in paragraph 2 (above).

4. If press require access to other areas/offices within the Pentagon for "in person"

OSD005511.25/Ctv D007129-2:3

~~NYTIMES-DOW-25cv04218-00000018~~

~~Pentagon~~

(Deleted graphics)

~~Appendix D~~

~~Yellow areas indicate areas where press are allowed without escort.~~




NYTIMES-DOW-25cv04218-

NYTIMES-DOW-25cv04218-

(Deleted graphics)

~~Appendix D~~

~~Yellow areas indicate areas where press are allowed without escort.~~

(Delet




~~METRO – BUS~~

~~River Entrance~~Center.]

~~**Appendix E**~~

~~NYTI~~

# EXHIBIT 4

The New York Times Company

David E. McCraw
Senior Vice President
& Deputy General Counsel

T [redacted]

[redacted]
nytimes.com

March 21, 2026

**VIA EMAIL**

Michael Bruns, Esq.
Trial Attorney
U.S. Dept. of Justice
Civil Division – Federal Programs
1100 L Street N.W.
Washington, DC 20005

Re: Reinstatement of Pentagon Credentials

Dear Mr. Bruns:

I write on behalf of The New York Times Company and its seven journalists who are the subjects of yesterday's Order (Dkt. No. 35) in *The New York Times Company v. Department of Defense*, 25-cv-04218 (D.D.C. Mar. 20, 2026). Please advise me how they will obtain their Pentagon Facility Alternate Credentials ("PFACs") on Monday, as required by the Court.

As you know, the Court's Order states that your clients "shall immediately reinstate the PFACs of [Julian] Barnes and the following journalists with The New York Times, all of whom held a PFAC as of October 6, 2025: Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, and W.J. Hennigan."

I can be reached at [redacted] if you need to confer about implementation of the Court's order.

Thank you for your assistance with this matter.

Sincerely,



David E. McCraw

cc: Commander Timothy Parlatore
Ted Boutrous, Esq.
Katie Townsend, Esq.

# EXHIBIT 5

**From:** "Parlatore, Timothy C CDR USN OSW SECWAR (USA)" [redacted]
**Date:** Monday, March 23, 2026 at 1:15 PM
**To:** David McCraw [redacted]
**Cc:** Theodore Boutrous [redacted], "michael.bruns [redacted] Katie Townsend^ [redacted]
**Subject:** Re: [Non-DoD Source] Re: New PFACs for Times Journalists

**This Message Is From an External Sender**
This message came from outside your organization.

Everything is set. Please see attached revised policy, in accordance with the Court's decision. To schedule pickup, the journalists may contact:

MAJ Andrea L. Kelly
PPO Operations Officer
Office: [redacted]
Cell: [redacted]

Get Outlook for iOS

**From:** Parlatore, Timothy C CDR USN OSW SECWAR (USA) [redacted]
**Sent:** Monday, March 23, 2026 3:55:53 PM
**To:** David McCraw [redacted]
**Cc:** Boutrous Jr., Theodore J. [redacted]; michael.bruns [redacted]
Townsend, Katie [redacted]
**Subject:** Re: [Non-DoD Source] Re: New PFACs for Times Journalists

We're still working on it. The PFAC applications are processed. PFPA is finalizing their way ahead for issuance. We are awaiting confirmation on what time they'll be able to put things into place to properly receive the journalists.

Get Outlook for iOS

**From:** David McCraw [redacted]
**Sent:** Monday, March 23, 2026 2:05:30 PM
**To:** Parlatore, Timothy C CDR USN OSW SECWAR (USA) [redacted]
**Cc:** Boutrous Jr., Theodore J. [redacted]; michael.bruns [redacted]
Townsend, Katie [redacted]
**Subject:** [Non-DoD Source] Re: New PFACs for Times Journalists

You don't often get email from [redacted]. Learn why this is important
Commander:

Could you update us on what The Times reporters should do this afternoon to obtain their PFACs?

Regards,

David

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: [redacted]

On Sun, Mar 22, 2026 at 8:25 PM David McCraw [redacted] wrote:

> Commander,
>
> Thank you for the update.
>
> David
>
> David E. McCraw
> Senior Vice President & Deputy General Counsel
> The New York Times Company
> 620 Eighth Avenue
> New York, New York 10018
> Phone: [redacted]
>
> On Sun, Mar 22, 2026 at 7:05 PM Parlatore, Timothy C CDR USN OSW SECWAR (USA) [redacted] wrote:
>
>> We will be able to get you more information mid morning tomorrow. The issuance involves a few different offices, some of which were closed over the weekend. The team will be coordinating everything in the morning and we will let you know once it is set. Plan is to get them issued sometime in the afternoon.
>>
>> CDR Parlatore
>>
>> Get Outlook for iOS

**From:** Boutrous Jr., Theodore J. [redacted]
**Sent:** Sunday, March 22, 2026 1:26:26 PM
**To:** Parlatore, Timothy C CDR USN OSW SECWAR (USA) [redacted]; michael.bruns[redacted]
**Cc:** Townsend, Katie [redacted]; David McCraw [redacted]
**Subject:** [Non-DoD Source] RE: New PFACs for Times Journalists

You don't often get email from [redacted] Learn why this is important

Following up on Mr. McCraw's letter, please note that Judge Friedman's March 20 order and injunction require that Defendants reinstate the PFACs of Mr. Barnes and the other six Times journalists "immediately." Accordingly, please confirm immediately that their PFACs have already been reinstated and that they can now access the Pentagon campus and briefing room and also can retrieve their physical passes.

**Theodore J. Boutrous Jr.**
Partner

T: [redacted] | M: [redacted]

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** David McCraw [redacted]
**Sent:** Saturday, March 21, 2026 10:56 AM
**To:** Timothy Parlatore, Esq. [redacted]
**Cc:** michael.bruns[redacted] Boutrous Jr., Theodore J. [redacted] Townsend, Katie [redacted]; Parlatore, Timothy C CDR USN OSW SECWAR (USA) [redacted]
**Subject:** Re: New PFACs for Times Journalists

Thanks. I will do so.

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: [redacted]

On Sat, Mar 21, 2026 at 12:34 PM Timothy Parlatore, Esq. [redacted] wrote:

Thank you. For purposes of this case, please use my DoW email, which I have added as a CC.




**CONFIDENTIAL NOTICE:** This email (including any attachments) may contain confidential and/or legally privileged information protected under applicable laws, including the Electronic Communications Privacy Act (18 U.S.C. §§ 2510–2521). It is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any review, retention, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply email and then delete it from your system. Thank you for your cooperation.

**From:** David McCraw [redacted]
**Sent:** Saturday, March 21, 2026 12:04:26 PM
**To:** michael.bruns[redacted]
**Cc:** Ted Boutrous [redacted]; Townsend, Katie [redacted]; Timothy Parlatore, Esq. [redacted]
**Subject:** New PFACs for Times Journalists

Dear Mr. Bruns:

Please see the attached letter from The New York Times. I have also copied Commander Parlatore (although, with apologies, I have sent it to his firm address because I don't have his DOD contact information).

Yours,

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: [redacted]

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

# EXHIBIT 6

The New York Times
https://www.nytimes.com/2026/03/23/business/media/pentagon-closes-journalists-work-area.html

# *Pentagon Adopts New Limits for Journalists After Court Loss*

The Defense Department said it would close the Pentagon's work area for journalists, among other changes, after a judge found the existing media policy unconstitutional.

Listen · 4:59 min



**By Erik Wemple**
Reporting from Washington

March 23, 2026

The Defense Department said on Monday that it was taking a new approach to limiting access to media organizations, after a federal judge ruled on Friday that major parts of its current policy were unconstitutional, in a case brought by The New York Times.

The Pentagon is closing the workspace used for years by journalists with credentials to cover the military, Sean Parnell, the Pentagon's chief spokesman, wrote in a memo to senior Pentagon leadership. A new area for the press will be set up in an annex outside the main Pentagon building, he said, and all journalists now seeking physical access to the Pentagon will require an escort.

In addition, the department is changing the wording of some of the rules for journalists requesting a credential, Mr. Parnell wrote. He said the changes, like making more explicit definitions of prohibited activities, addressed concerns raised by the judge last week.

The Defense Department said it planned to appeal the judge's ruling. But the Pentagon said its new policies would comply with the ruling while still preserving the department's security and "without conceding the validity of the court's analysis." The Pentagon has argued in numerous legal filings that access to the Pentagon is a privilege and not a right.

A spokesman for The Times, Charlie Stadtlander, said on Monday: "The new policy does not comply with the judge's order. It continues to impose unconstitutional restrictions on the press. We will be going back to court."

The new rules are the latest effort by Pentagon officials to limit journalists' access to the Defense Department. Pete Hegseth, the defense secretary, has had an adversarial stance toward the news media since he took over last year. He previously proposed denying access to the Pentagon to a reporter from NBC News, then removed several news organizations from their on-site workstations. Months later, he curtailed the unescorted roaming privileges of journalists within the complex.

In October, the Pentagon adopted a policy that empowered the department to declare journalists "security risks" and revoke their press passes if they engaged in any conduct that the Pentagon believed threatened national security. Instead of signing the new policy, dozens of journalists from traditional news outlets turned in their press passes, opting to cover the military from outside the complex. The Pentagon later welcomed a reconstituted press corps consisting of pro-Trump commentators and influencers.




Pentagon reporters carrying their belongings out of the Pentagon after turning in their press badges in October. Win McNamee/Getty Images

The Times sued, arguing that the rules violated the First Amendment. Routine news-gathering activities, like asking questions and seeking information from sources, were punishable under the rules, the company contended. It also said the Pentagon had given itself unbridled discretion to enforce the rules.

Judge Paul Friedman of the U.S. District Court for the District of Columbia sided with the company. He wrote in his ruling on Friday that the Pentagon's policy rewarded reporters who were "willing to publish only stories that are favorable to or spoon-fed by department leadership."

Judge Friedman ordered the Pentagon to immediately restore the press passes of seven journalists for The Times. The Pentagon Press Association, a group representing journalists on the national security beat, also pressed the department for reinstatement for other journalists who had handed in their passes.

The Pentagon had not returned the passes to Times journalists as of Monday afternoon.

In its lawsuit, The Times took aim at restrictions in the October policy relating to "solicitation" of information by reporters. That policy said First Amendment protections did not apply when journalists "solicit government employees to violate the law by providing confidential government information." In his ruling, Judge Friedman wrote that this provision was susceptible to "ambiguous interpretation."

The new version replaces "solicitation" with "intentional inducement of unauthorized disclosure."

"We used more words to say the same thing and to foreclose creative misinterpretations," Cmdr. Tim Parlatore, a special adviser to Mr. Hegseth, said in an interview.

The department revamped the policy over the weekend, Commander Parlatore said, because the ruling "excised all of the security provisions and enforcement mechanisms and ordered that we immediately issue passes under the revised, toothless policy."

He said housing journalists in the annex ensured that they could attend news conferences and interviews with Pentagon officials while the policy regulated their ability to "talk in the hallways and be able to induce unauthorized disclosures, which was really our whole concern from the beginning."

Commander Parlatore said members of the Pentagon press corps were "more than welcome" to apply for credentials under this new policy. He said credentials would be issued promptly to Times journalists, as the judge ordered.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, et al.,<br><br>*Defendants.* | Civil Action No. 1:25-cv-04218-DLF |

**DECLARATION OF JOEL MANUEL VALDEZ**

I, JOEL MANUEL VALDEZ, hereby declare as follows:

1. I am DEPUTY PRESS SECRETARY within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I make this declaration based upon my personal knowledge and upon my review of information available to me in my official capacity.
2. I have served as DEPUTY PRESS SECRETARY since 2025. My official duties include advising the Chief Pentagon Spokesman Sean Parnell and Press Secretary Kingsley Wilson on strategic communication and prepare them for press engagements, including press briefings, television interviews, speeches, and multimedia content for social media. I also serve as the principal liaison between Pentagon Press Operations desk officers and the Press Secretary, drafting responses to political and sensitive press requests, statements, and releases.
3. The Department of War published its Revised Media Policy ("Interim Policy") on Monday, March 23, 2026.

4. Following the court's order on March 20, 2026, the Department of War received requests from numerous journalists for PFACs. These journalists included those affiliated with The Associated Press, CNN, The Washington Post, The Wall Street Journal, USA Today, and CBS News. These outlets provided the required documentation (e.g., letters from their publications' editors) necessary to be issued a PFAC under the Interim Policy. None of these requests have been withdrawn by the outlets since the issuance of the Interim Policy on Monday, March 23, 2026. These journalists will be able to pick up their credentials beginning today.

***

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of March 2026.

Joel Valdez

JOEL MANUEL VALDEZ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br>*Defendants*. | Civil Case No. 25-cv-04218 (PLF) |

**SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion to Compel Compliance with the Court's Order granting Plaintiffs' Motion for Summary Judgment.

3. I am a national security reporter with The New York Times ("The Times"). I have worked for The Times since June 2018 and am assigned to The Times's Washington Bureau. My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects.

4. As detailed in my prior declaration filed in this matter, I am one of seven Times reporters who held Pentagon Facility Alternate Credentials ("PFACs") issued by the Department of Defense (the "Department") before the Department adopted a new policy relating to PFACs in October 2025.

5. On March 20, 2026, I learned that the Court had granted Plaintiffs' Motion for Summary Judgment and ordered the Department to vacate the unconstitutional provisions of its PFAC policy and to reinstate the PFACs previously held by me and my colleagues at The Times. I was enthusiastic about the prospect of regaining access to the Pentagon, which is extremely valuable to my work as a reporter. I immediately sent an email to the Pentagon Press Office inquiring about how to pick up my reinstated PFAC so that I could access the Pentagon on the next business day, Monday, March 23. Lawyers for The Times also sent inquiries asking how reporters from The Times could obtain their reinstated PFACs.

6. On Monday, March 23, I received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office. When I arrived at 8:00 am, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass. Instead, there was a set time between noon and 3:00 pm that the badge office would issue New York Times reporters new PFACs. The public affairs officer told me this information was supposed to have been included in another email but had inadvertently been omitted. I left and returned to the Pentagon visitor center at 1:00 pm. I was escorted to the badge office where four other New York Times reporters were waiting to retrieve their reinstated PFACs. That same afternoon, I was notified that the Department had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

7. After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff. The new PFACs were different from the ones we had previously held. The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon: While our previous PFACs, once

scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us on March 23, 2026 did not.

8. The Pentagon Press Office staff also told me and my colleagues from The Times that we, along with all other reporters, would no longer be allowed into the Pentagon without an escort from the Department, and that an escort would be provided only for pre-arranged interviews, press conferences, or other specified types of events. We were also told that we would need to submit a request to attend such events at least one day in advance in order to obtain an escort, and that the request would need to be approved by the Department's Office of Public Affairs.

9. The Pentagon Press Office staff also explained to me and my colleagues from The Times that our PFACs would enable us to access a new press area located in the Pentagon library, which is on the Pentagon grounds but in a separate building. My colleagues and I asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through. The Pentagon Press Office staff indicated that they were unsure how we could access the library. They suggested we could use a Pentagon shuttle bus but, as we pointed out, PFAC holders did not have permission to ride on the shuttle bus. Ultimately, the Pentagon Press Office staff told us we needed to come back the next day for further instructions on how to access the library. We were later told that PFAC holders would be given permission to ride on the shuttle bus.

10. It was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy. It was clear to me that these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling that required reinstatement of our PFACs.

11. For more than 20 years, I have regularly accessed the Pentagon in the course of my work as a reporter. To my knowledge, this is the first time that the Department has ever barred reporters with PFACs from entering the Pentagon without an escort, a reservation, or an invitation to a specific press conference or event.

12. The Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters used to work—is closed effective immediately. Within the last few days, I have seen what I understand to be a photograph of the entrance to the Correspondents' Corridor which shows that the old signage, which said "Correspondents' Corridor," has been torn down.

13. In my view, the new rules and restrictions imposed by the Interim Policy make the reinstated PFACs that were issued to me and my colleagues this week essentially worthless. All reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview. The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon. Under the Interim Policy, that is no longer the case.

14. No longer being able to access the Public Affairs Offices in the main Pentagon building is particularly frustrating for me. Before the Department implemented new PFAC rules and restrictions last fall, I would frequently spend my days going from one Public Affairs Office to another to talk with Public Affairs staff. There are numerous Public Affairs Offices within the Pentagon: Among others, the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps each have their own Public Affairs Office within the Pentagon, each of which is staffed by separate Public Affairs officials whose job is to liaise with the media. In addition,

military intelligence agencies and combatant commands sometimes have public affairs officers within their Pentagon liaison offices.

15. Before the Department implemented new PFAC rules and restrictions, the staff of these various Public Affairs Offices were frequent sources of information for my reporting. Those are individuals who are expressly authorized to talk to the press. In fact, it is in their job description.

16. The Interim Policy says that the Department may deny, revoke, or not renew reporters' PFACs based on the "intentional inducement of unauthorized disclosures." This would suggest that "authorized" and "unauthorized" disclosures can be easily distinguished from one another. But in my experience, that distinction is much blurrier—particularly when it comes to conversations with Public Affairs staff who are authorized to talk to the press, but who may have a specific set of talking points that they may decide to deviate from, clarify, or expand upon. Would I be "intentional[ly] induc[ing]" an "unauthorized disclosure" simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points? I do not know—but I do know that asking those kinds of questions, and seeking information that clarifies, contextualizes, or digs deeper than pre-approved talking points is in integral part of my job as a journalist.

17. The Interim Policy also creates a "presumption" that when a reporter agrees to keep a source's identity anonymous or confidential, that reporter is intentionally inducing an unauthorized disclosure of information. But in my experience, many *authorized* sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld—even if they are authorized to speak with me about the information in question. There are various reasons why a source may wish not to have their

name published in connection with the information they provided, and honoring those preferences is often integral to my ability to gather and report the news.

18. The Interim Policy, like the policy the Department put in place last fall, states that reporters' PFACs may be revoked, denied, or not renewed if the reporter solicits classified national security information or "controlled unclassified information." But I would not know the classification status of information unless it was told to me. And even after more than two decades as a national security and intelligence reporter, I do not know all the various kinds of information that qualify as "controlled unclassified information." That is not a designation that means anything to me, and I would not know how to avoid soliciting that information—other than by avoiding all information-gathering activities altogether.

19. The Interim Policy continues to proscribe and threaten to punish routine newsgathering and, for the first time, it also deprives reporters of any meaningful Pentagon access at all. As with the PFAC policy the Department put in place last fall, I do not know how I would comply with the Interim Policy while continuing to do my job.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of March 2026 in Washington, D.C.

[signature]

Julian E. Barnes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | Civil Case No. 25-cv-04218 (PLF) |

**SECOND SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion to Compel Compliance with the Court's Order granting Plaintiffs' Motion for Summary Judgment, and to provide a clarification regarding Paragraphs 6 and 7 of my Supplemental Declaration filed on March 30, 2026. The clarifying language is bolded and underlined in the following paragraphs.

3. On Monday, March 23, I received an email from the Pentagon saying I could pick up my PFAC **on Tuesday, March 24**, between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office. When I arrived at 8:00 am **on Tuesday, March 24**, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass. Instead, there was a set time between noon and 3:00 pm that the badge office would issue New York Times reporters new PFACs. The public affairs officer told me this information was supposed to have

been included in another email but had inadvertently been omitted. I left and returned to the Pentagon visitor center at 1:00 pm. I was escorted to the badge office where four other New York Times reporters were waiting to retrieve their reinstated PFACs. That same afternoon, I was notified by a **public affairs officer** that the Department of Defense ("Department") had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

4. After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff. The new PFACs were different from the ones we had previously held. The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon: While our previous PFACs, once scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us **on March 24, 2026** did not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of March 2026 in Washington, D.C.

Julian E. Barnes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted a declaration in this matter on March 27, 2026 (ECF No. 41-3). I submit this Supplemental Declaration in response to the Supplemental Declaration of Julian E. Barnes (ECF No. 44-1, "Barnes Supp. Decl.") filed on March 29, 2026, and the Second Supplemental Declaration of Julian E. Barnes (ECF No. 45, "Second Supp. Barnes Decl.") filed on March 31, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. My official duties include advising the Chief Pentagon Spokesman and Press Secretary on strategic communication, serving as the principal liaison between Pentagon Press Operations (PPO) desk officers and the Press Secretary, and overseeing the implementation of the Department's press access policies.

3. Throughout his supplemental declaration, Mr. Barnes attributes various claims to unnamed "Pentagon Press Office staff" and "a Pentagon public affairs officer" without identifying these individuals by name. Barnes Supp. Decl. ¶¶ 6, 7, 8, 9. These sources are unnamed not because they requested anonymity, but because Mr. Barnes did not identify them.

## A. TIMELINE

4. Mr. Barnes's Supplemental Declaration indicated he picked up his PFAC and received a copy of the Interim Policy at around 1pm on "Monday, March 23." Barnes Supp. Decl. ¶ 6. That was incorrect, for two reasons.

5. First, Mr. Barnes could not have received a copy of the Interim Policy at 1:00 PM on Monday, because the policy had not been finalized or adopted at that time. The Interim Policy was not signed until approximately 4:15 PM Eastern on Monday, March 23. The Interim Policy was transmitted to Plaintiffs' counsel promptly upon signing. *See* ECF No. 37-6 (email to Plaintiff's counsel attaching revised policy, received by Plaintiff's counsel at 1:15 PM Pacific time—4:15 PM Eastern time—on Monday, March 23).

6. Second, Mr. Barnes—together with four other New York Times journalists—picked up his PFAC on Tuesday, March 24, not on Monday, March 23. Mr. Barnes corrected the date in his Second Supplemental Declaration.

7. On Monday, March 23, Commander Parlatore sent representatives from The New York Times a point of contact at the Pentagon Press Office — Major Andrea L. Kelly, PPO Operations Officer — to schedule PFAC pickup for Tuesday, March 24. Mr. Barnes's colleagues, New York Times journalists Helene Cooper and John Ismay, contacted Major

Kelly to schedule a pickup time and received instructions to pick up their PFACs between 12:00 PM and 3:00 PM.

8. Mr. Barnes did not schedule a pickup time through Major Kelly. Instead, he arrived at the Pentagon at 8:00 AM without having communicated with Major Kelly or other Pentagon staff.

9. Mr. Barnes declares that he "received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time." Barnes Supp. Decl. ¶ 6. The email Mr. Barnes is referring to is an automated notification from the Pentagon Visitor Management System (VMS). PPO submitted Mr. Barnes into the VMS for arrival between 6:00 AM to 6:00 PM in order to ensure scheduling flexibility in the event Mr. Barnes had limited availability and could not pick up his PFAC between 12:00 PM to 3:00 PM.

### B. GRAPHIC DESIGN AND ACCESS

10. Mr. Barnes declares that the PFACs issued to him and his colleagues were "different from the ones we had previously held." Barnes Supp. Decl. ¶ 7. The PFACs issued on Tuesday, March 24 are the current PFAC version. The appearance of PFACs was updated in October 2025 to include a red banner with "PRESS" reflected in white text. The previous version that Mr. Barnes held did not have this red banner.

11. This graphic design change was announced in the October 6, 2025 Policy, which stated: "The new PFACs will have 'PRESS' clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon." AR at 2.

12. The access granted by the PFACs issued on March 24 aligns with the Interim Policy. Specifically, the PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. Access to the main Pentagon building requires escort by authorized Department personnel, consistent with the Interim Policy. The PFACs are configured to reflect the access arrangements described in the Interim Policy.

13. PFAC holders can enter the Pentagon and access PLC2 with their PFACs via a pedestrian bridge. *See* ¶¶ 15-21 below.

14. By Monday, March 23, I personally witnessed confirmation from the Pentagon's library leadership that a temporary workspace for PFAC holders, in PLC2, was ready for use. I was shown the spaces during a walkthrough.

### C. PFAC HOLDERS HAVE UNESCORTED ACCESS TO PLC2

15. Mr. Barnes declares that he and his colleagues "asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through" and that "the Pentagon Press Office staff indicated that they were unsure how we could access the library." Barnes Supp. Decl. ¶ 9. Both of these statements are inaccurate, and the information necessary to correct them was available to Mr. Barnes in the policy document he received and from the personnel he had access to.

16. First, the PLC2 is not accessible only through the Pentagon. The PLC2 is accessible via the Corridor 8 Pedestrian Bridge, which connects the Pentagon's North Parking Lot to the PLC2. A PFAC holder does not need to enter the Pentagon to reach the PLC2. The PFAC holder can walk, drive, carpool, rideshare, or take the Pentagon shuttle bus to the North

Parking Lot and then cross the Corridor 8 Pedestrian Bridge to the PLC2. Journalists may park in the designated press parking area at the Connector Lot and proceed from there to the North Parking Lot by foot or by shuttle bus. In approaching the PLC2, a PFAC badge holder will be required to present the PFAC badge to access the PLC2 as is required of any and all badge holders with access to the PLC2.

17. Second, PPO staff did not indicate that they were "unsure how [Mr. Barnes and his colleagues] could access the library." PPO staff explained the access options to Mr. Barnes and his colleagues and stated that the decision on how to arrive at the Pedestrian Bridge — whether by walking, driving, or shuttle bus — was up to the journalists.

18. Third, the Interim Policy that Mr. Barnes received itself described PLC2 as the designated workspace and breaking news gathering point. The Interim Policy states that "[i]n breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel." ECF No. 37-2 at 7. The Interim Policy further states that "[a] new press workspace will be established in an annex facility outside the Pentagon." ECF No. 37-2 at 7. And the Interim Policy references Appendix D, which "shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center." ECF No. 37-2 at 15.

19. Fourth, on the morning of Wednesday, March 25—two days before Mr. Barnes signed his Supplemental Declaration—PPO staff provided Mr. Barnes with photos and Google Maps screenshots to show him where to access PLC2.

20. Fifth, regardless, Mr. Barnes had multiple avenues to obtain accurate information about PLC2 access. His designated point of contact, Major Kelly, could have answered any questions. Indeed, his colleagues Cooper and Ismay used the designated POC and received proper instructions. Or he could have asked his counsel to confer with counsel for the defendants in this matter to raise concerns or seek clarification. Verifying information should be routine for a veteran Pentagon reporter.

21. Mr. Barnes also declares that "PFAC holders did not have permission to ride on the shuttle bus." Barnes Supp. Decl. ¶ 9. This is incorrect. Before the New York Times reporters received their PFACs, OATSW(PA) had already arranged for the Pentagon shuttle bus to transport PFAC holders to the PLC2. The shuttle bus route includes a stop near the Pentagon Library and Conference Center, as shown on the Pentagon Circulator flyer attached hereto as Exhibit A. Mr. Barnes was told that PFAC holders could use the shuttle bus and that the signage — which currently states "Common Access Card (CAC) required to ride DoD Shuttles" — would be updated to include PFAC holders. Despite being told he could ride the shuttle bus, Mr. Barnes presented the outdated signage to the Court as if it prohibited him from riding. The accommodation was already in place, and Mr. Barnes was informed of it well before he signed his supplemental declaration on March 27.

**D. <u>PFACs PROVIDE SIGNIFICANT ADVANTAGES OVER DAY PASSES</u>**

22. Mr. Barnes declares that the reinstated PFACs are "essentially worthless" because "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview."

Barnes Supp. Decl. ¶ 13. This is incorrect. There are significant differences between holding a PFAC and obtaining a day pass.

23. A day pass requires at least 24 hours advance notice and a background check conducted by the Pentagon Force Protection Agency (PFPA). A journalist without a PFAC who wishes to attend a press event must submit a request at least 24 hours in advance, undergo a background check, and wait for PFPA approval before being granted access.

24. A PFAC holder, by contrast, is already pre-cleared in the system. A PFAC holder does not need to undergo a background check each time he or she wishes to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff (which Mr. Barnes "would frequently spend [his] days" doing as a PFAC holder, Barnes Supp. Decl. at ¶ 14), all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

25. Mr. Barnes declares that reporters "would need to submit a request to attend such events at least one day in advance in order to obtain an escort." Barnes Supp. Decl. ¶ 8. The Interim Policy contains no such requirement for PFAC holders. The 24-hour advance notice requirement applies to day passes — not to PFACs. *See* ECF No. 37-2 at 8-9 (Interim Policy specifying that a PFAC "affords escort privileges for up to three visiting media members from the [PFAC holder's] same media outlet," although such "[v]isiting media members must be entered into the PFPA Visitor Management System (VMS) …

no later than one business day in advance for U.S. citizens."). Mr. Barnes apparently did not seek clarification from his designated point of contact or by having his attorneys confer with counsel for the defendants in this matter.

26. To be clear, the Interim Policy does not require PFAC holders to submit requests to attend events or obtain escorts "at least one day in advance."

27. Just this morning, for example, the Department held a press briefing that was announced at approximately 3 PM Eastern yesterday. New York Times journalist and PFAC holder Greg Jaffe attended the press conference. Attending journalists, including Mr. Jaffe, were escorted to and from the press briefing seamlessly.

### E. THE INTERIM POLICY'S PROVISIONS ARE CLEAR

28. Mr. Barnes declares that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is unclear, and asks whether he would be in violation "simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points." Barnes Supp. Decl. ¶ 16. The answer is no. Safe harbor (a) of the Interim Policy expressly protects "[a]sking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question." ECF No. 37-2 at 15 (emphasis added). Follow-up questions, probing questions, and questions that push beyond talking points are all "questions" within the meaning of safe harbor (a). The safe harbor contains no limitation on the type, tone, or persistence of questions directed at authorized personnel. The copy of the Interim Policy that Mr. Barnes received makes this clear.

29. Mr. Barnes also declares that "many authorized sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld — even if they are authorized to speak with me about the information in question." Barnes Supp. Decl. ¶ 17. That situation raises no concerns under the policy, for two reasons. First, even if the presumption applied, safe harbor (a) protects "[a]sking questions of Department personnel who are authorized to speak with the press," "regardless of the subject matter of the question." ECF No. 37-2 at 15. That safe harbor applies whether or not the Public Affairs Office staff member is speaking on background, anonymously, off the record, or on the record with full attribution. Second, the presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects "[r]eceiving unsolicited information, including classified national security information or controlled unclassified information." ECF No. 37-2 at 15. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity.

30. To be clear about how the "intentional inducement" provision operates in practice: the Department does not actively monitor published stories to identify anonymous sources, and the publication of a story with an anonymous source does not necessarily suggest a violation of the policy. For example, the anonymous source may have been a Press Office staffer (as Mr. Barnes says is "often" the case, *see* Barnes Supp. Decl. ¶ 17), the

anonymous source may have offered the information to the journalist (*see* ¶ 29 above), or the anonymous source may have been a "source relationship[]" developed "outside the Pentagon through independent reporting (Interim Policy safe harbor (d), ECF No. 37-2 at 15).

31. Department employees receive training on reporting attempted security breaches, including information security breaches. If a Department employee believes that anyone has attempted to induce the employee to disclose information the employee is not authorized to disclose, the proper means to report that attempt is through the Department's security reporting channels.

32. If an employee reports such an attempt, and the report identifies a specific journalist who offered anonymity or privacy protection to induce the employee to disclose information not authorized for release, the presumption may apply. The presumption is rebuttable—the journalist may provide evidence that he or she did not know the employee was not authorized to disclose the information, notwithstanding the offer of anonymity.

33. Critically, because the Interim Policy defines "intentional inducement of unauthorized disclosure" as inducing "a specific Department employee," the Department cannot act on this provision without identifying that specific employee. The publication of a story relying on anonymous sources does not, standing alone, provide the Department with sufficient information to satisfy the "specific Department employee" element. The only way the Department can identify the specific employee is through the employee's own report — not by reading a published story. Without a specific employee report identifying a specific journalist's specific conduct, the Department has no basis for action under this

provision. There is no "inquisition panel" that reviews published stories. The enforcement mechanism is employee-initiated, not Department-initiated.

34. Mr. Barnes declares that he does not "know all the various kinds of information that qualify as 'controlled unclassified information'" and that he "would not know how to avoid soliciting that information — other than by avoiding all information-gathering activities altogether." Barnes Supp. Decl. ¶ 18. Safe harbor (f) of the Interim Policy directly addresses this concern. It provides that "asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought" does not constitute "intentional inducement of unauthorized disclosure." ECF No. 37-2 at 15. If Mr. Barnes does not know whether information qualifies as CUI, and does not know whether the employee he is speaking with is authorized to disclose it, safe harbor (f) protects him. The intentional inducement provision applies only where the journalist *knows* the employee is prohibited from disclosing the information by "Article 92 of the [UCMJ] (10 U.S.C. §892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." ECF No. 37-2 at 14. Mr. Barnes's professed lack of knowledge about CUI categories is precisely the situation the safe harbor was designed to address.

## F. <u>THE DEPARTMENT'S WEEKEND COORDINATION</u>

35. Mr. Barnes declares that "[i]t was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy" and that "these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling." Barnes Supp. Decl. ¶ 10. The Department issued PFACs, prepared a workspace, and adopted the Interim Policy within two business days of the Court's order. That the

Department moved quickly to comply with a judicial order does not mean it was unprepared — it means the Department took the Court's order seriously and devoted significant resources to compliance on an expedited timeline.

**EXHIBIT**

36. Attached hereto as **Exhibit A** is a true and correct copy of the Pentagon Circulator Service flyer, showing the shuttle bus route including the stop near the Pentagon Library and Conference Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026 at Washington, D.C.

Joel Valdez

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,

*Defendants*.

Civil Case No. 25-cv-04218 (PLF)

**THIRD SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Post-Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order granting Plaintiffs' Motion for Summary Judgment.

3. As explained in my prior declaration dated March 29, 2026, I spoke with a member of the Pentagon Press Office staff on March 24, 2026 about accessing the library, among other topics. *See* ECF No. 44-1 (Supplemental Declaration of Julian E. Barnes) ¶ 9; ECF No. 45 (Second Supp. Decl. of Julian E. Barnes) ¶¶ 6–7. Mr. Valdez was not present when that conversation took place, and I stand by the accuracy of my statements.

4. Since my last declaration, I have experienced firsthand the restrictions that the Interim Policy places on PFAC holders' ability to access the Pentagon. Those restrictions are

making it exceedingly challenging to speak with press officials and other personnel, and to otherwise cover the Department and the U.S. military from Pentagon grounds.

5. On Monday, March 30, 2026, following the hearing on my and The New York Times's motion to compel compliance with the Court's order, and in response to a request that I had made three days earlier, on Friday, March 27, 2026, I received an invitation to interview a Department official at the Pentagon the following day, Tuesday, March 31, 2026. The press office later requested that interview be on background—meaning he would be an anonymous source. The interview was set for 12:45 p.m., but the press officer recommended I arrive at 12:15 p.m. to navigate security issues. The press officer entered the information for the visit into the Pentagon system, and I received an automatic confirmation.

6. On Tuesday, March 31, 2026, I arrived at the Pentagon at 12:10 p.m. and entered the Visitor Center security area. I showed the attendant behind the glass my driver's license and the PFAC. I entered my social security number upon his request. I was advised that individuals holding PFACs must enter through corridor 8. I replied that I had an appointment and the escort was going to meet me in the Visitor's Center. The supervisor repeated that anyone with a PFAC could enter only through corridor 8. This was despite the fact that I was told to meet my escort in the Visitor's Center and the fact that before I could have simply entered through the main gate using my PFAC. After I arrived at the Pentagon, the interview was postponed, and I was immediately escorted out of the building.

7. As that experience made clear to me, my PFAC does not provide me access to the Pentagon building and provides access only to the separate library building. By contrast, and like visitors who do not hold a PFAC, I may access the Pentagon building only upon invitation or approval by Department officials, and only with an escort. Neither I nor, to my knowledge, any

of my colleagues have been told about the criteria used in determining whether to approve such a request, though the Interim Policy does state that no more than three PFAC holders from the same news organization will be provided an escort per day.

8. Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting. As I stated in a prior declaration, reporting from the Pentagon has historically necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events. While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort. That means I will be spending hours of my day just waiting and walking back and forth—assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all. That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

9. Mr. Valdez's declaration suggests that these requirements are meant to ensure that my colleagues and I do not ask for or receive classified or otherwise protected information in the Pentagon corridors between public affairs offices. If so, these limitations are wholly unnecessary. In my experience, Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways.

10. Mr. Valdez's description of how the Department's "presumption" related to a reporter's agreement to speak to a source anonymously or on background will be applied in practice is also inconsistent with my decades of experience as a journalist. Mr. Valdez contemplates a sharp distinction between situations in which an individual comes to the journalist with specific information and demands anonymity to disclose it, and ones in which the journalist comes to the source requesting a specific piece of information and offers anonymity. In the real world, journalists have conversations with sources that may span multiple topics. Conversations sometimes go on and off the record, with it unclear exactly who initiated what or how a mutual agreement about proceeding without attribution affected the individual's willingness to share information.

11. Finally, Mr. Valdez's description of the press conference that occurred at the Pentagon on Tuesday, March 31, 2026, as "seamless[]," ECF No. 46 (Supp. Decl. of Joel Manuel Valdez) ¶ 27, is not consistent with my understanding. Another Times reporter, Greg Jaffe, attended the press conference. I understand that all reporters, including PFAC holders, were required to arrive by 7 a.m. for the press conference scheduled for 8 a.m., and that they were required to wear wristbands, in addition to the two identification cards we are required to wear within the Pentagon, which were repeatedly checked throughout the scheduled event. This process is the same as the process that was in place for reporters that did not hold a PFAC before this Court issued its March 20, 2026 order. I also understand that reporters were told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of April 2026 in ______________________________.

______________________________
Julian E. Barnes

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SECOND SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted declarations in this matter on March 27, 2026 (ECF No. 41-3) and March 31, 2026 (ECF No. 46). I submit this Second Supplemental Declaration in response to the Third Supplemental Declaration of Julian E. Barnes (ECF No. 48-2) filed on April 2, 2026, and the Post-Hearing Brief (ECF No. 48-1) filed the same day.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

**MR. BARNES'S ACCOUNT OF THE PLC2 CONVERSATION**

3. Mr. Barnes declares that "Mr. Valdez was not present when that conversation took place, and I stand by the accuracy of my statements." Third Barnes Decl. ¶ 3. I was not present during Mr. Barnes's conversation with PPO staff on March 24, 2026. However, before

submitting my first Supplemental Declaration, I spoke with both PPO staffers who interacted with Mr. Barnes on that day. Both confirmed the account I provided to the Court. My declaration was based on the facts—not on speculation.

**THE MARCH 31 INTERVIEW WITH A SENIOR DEPARTMENT OFFICIAL**

4. Mr. Barnes declares that on Monday, March 30, 2026, he scheduled an interview with “a Department official” for Tuesday, March 31, 2026. Third Barnes Decl. ¶ 5. This is correct. In response to an interview request made by Mr. Barnes, a senior Department official granted an interview. OATSW(PA) facilitated the logistics of the interview as a liaison but was not involved in setting the terms of the interview.

5. Mr. Barnes declares that “the press office later requested that interview be on background — meaning he would be an anonymous source.” Third Barnes Decl. ¶ 5. To clarify: the senior official’s office requested that the interview be conducted on background. This was the official’s preference, not a request from OATSW(PA) or the Pentagon Press Office. The decision to conduct an interview on background is a routine matter between the official and the journalist. It is not uncommon for senior Department officials to speak with reporters on background, and the decision to do so is made by the official — not by the press office.

6. This fact is relevant to the anonymity presumption in the Interim Policy. The presumption is triggered when a journalist *offers* anonymity or privacy protection to a Department employee “in exchange for information.” ECF No. 37-2 at 14. Here, the official’s office requested background treatment — the journalist did not offer it as an inducement. This is precisely the distinction the Interim Policy draws: when the source initiates the request for anonymity, the journalist is not “offering” anything. The presumption does not apply.

7. If that were not enough, the interview is also covered, in its entirety, by safe harbor (e), which applies to "interviews arranged through public affairs offices." ECF 37-2 at 15.

**MR. BARNES'S ESCORT ON MARCH 31**

8. Mr. Barnes declares that on March 31, 2026, he arrived at the Pentagon Visitor Center for his scheduled interview, was told that PFAC holders must enter through Corridor 8, and was unable to meet his escort in the Visitor's Center as planned. Third Barnes Decl. ¶ 6.

9. This was a one-off event, not a result dictated by the Interim Policy. Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy. Going forward, OATSW(PA) and PFPA will permit reporters visiting the Pentagon to be escorted through either the Visitor's Center or Corridor 8, reducing the risk for any confusion in the future.

10. Mr. Barnes also declares that "the interview was postponed, and I was immediately escorted out of the building." Third Barnes Decl. ¶ 6. The interview was postponed because the senior official was in a meeting that overlapped with Mr. Barnes's scheduled interview time and could not leave in time to conduct the interview. This was a routine scheduling conflict, not a consequence of the Interim Policy or any restriction on Mr. Barnes's access. The interview has been rescheduled.

**THE MARCH 31 PRESS CONFERENCE**

11. Mr. Barnes declares that his colleague's experience of the March 31 press conference was not "seamless" and describes various security requirements, including early arrival, wristbands, and restrictions on restroom access. Third Barnes Decl. ¶ 11.

12. The aspects of the press conference about which Mr. Barnes's colleague complains—the arrival time and wristbands—are standard security protocols for events involving the Secretary. They are not new, and they are not imposed by the Interim Policy.

13. As is the case with all bilateral meetings when the Secretary of War is present, reporters who have received confirmation to attend must arrive no later than 7:00 AM Eastern in order to be properly screened. The wristbands indicate to security personnel that the wearer has been screened and does not require additional security checks. These requirements apply to all media — credentialed and non-credentialed alike — and are standard security protocols for events involving the Secretary. In every media advisory announcing a morning press briefing, the email clearly indicates that press must arrive no later than 7:00 AM, briefings begin at 8:00 AM, and reporters must be in their seats no later than 7:30 AM.

14. Mr. Barnes also states that his colleague was "told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk." Third Barnes Decl. ¶ 11. The restrooms nearest to the Pentagon Briefing Room are located down the hall in proximity to the Joint Chiefs of Staff corridor — a restricted area. Journalists require an escort to access that area. PPO staff informed reporters of this logistical reality and recommended that they use the restrooms before 7:30 AM — when escorts were readily available — to avoid delays once the briefing commenced. This was a practical accommodation, not a punitive restriction. The fact that every reporter whose RSVP was confirmed was screened, escorted into the building, and prepared for the press briefing by 8:00 AM confirms that the process functioned as intended.

**THE ANONYMITY DISTINCTION IN PRACTICE**

15. Mr. Barnes declares that the distinction between a journalist offering anonymity and a source requesting it is "blurry" in practice, and that "conversations sometimes go on and off the record, with it unclear exactly who initiated what." Third Barnes Decl. ¶ 10. The Interim Policy's anonymity presumption addresses a specific, identifiable situation: where a journalist proactively offers anonymity or privacy protection to a Department employee as an inducement to disclose information the employee is not authorized to disclose. It does not address the fluid, conversational dynamics Mr. Barnes describes — where parties negotiate terms of engagement as a conversation unfolds, or where a source independently requests that his or her name not be used.

16. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects the receipt of unsolicited information. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity. The presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not.

17. As I explained in my prior Supplemental Declaration, the Department does not actively monitor published stories to identify anonymous sources. The enforcement mechanism is employee-initiated: if a Department employee believes a journalist has attempted to induce the employee to disclose unauthorized information, the employee reports the attempt through the Department's existing security reporting channels. Because the

Interim Policy requires identification of "a specific Department employee," the Department cannot act without a specific employee report identifying a specific journalist's specific conduct. The publication of a story with anonymous sources does not, standing alone, provide the Department with sufficient information to act.

**<u>MR. BARNES'S CHARACTERIZATION OF THE SCHEDULING PROCESS</u>**

18. Mr. Barnes declares that "going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official… does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." Third Barnes Decl. ¶ 8. As I explained in my prior Supplemental Declaration, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed.

19. To the extent Mr. Barnes experiences delays in scheduling interviews with Department officials, those delays are attributable to the officials' own schedules — not to the Interim Policy. Before the Interim Policy, if Mr. Barnes wished to interview a specific Department official, he still had to schedule through that official's office and wait for the official to be available. The Interim Policy does not change the officials' scheduling process. The only additional step is the escort from PLC2 to the official's office, which can be arranged immediately once the official is available. Mr. Barnes's own experience last week demonstrates this: he scheduled an interview with a senior Department official on Monday and the interview was arranged for Tuesday — with less than 24 hours' notice.

20. Mr. Barnes also declares that "Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways." Third Barnes Decl. ¶ 9. Pentagon officials and personnel are not permitted to discuss classified or national-security sensitive information with reporters in any setting. However, the security concern addressed by the escort requirement is not limited to the verbal disclosure of classified information in hallways. Unescorted access to hallways near sensitive spaces can provide information about activity patterns within the Pentagon — such as which officials are meeting, when, and in what configuration — that may be used to identify and target sources for unauthorized disclosures of non-public information. The escort requirement addresses this broader information-security concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2026 at Washington, D.C.

Joel Valdez

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, et al.,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE, et al.

Defendants.

Civil Action No. 25-04218 (PLF)

ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion to Compel Compliance with the Court's Order [Dkt. No. 37] is GRANTED; it is

DECLARED that by adopting and enforcing portions of the policy pertaining to Pentagon Facility Alternate Credentials ("PFACs") that was promulgated by the Department of Defense (the "Department") on March 23, 2026 in a Memorandum for Senior Pentagon Leadership with the subject line "Implementation of Revised Media In-Brief" (the "Interim Policy") [Dkt. No. 37-2], Defendants are in violation of the Order this Court issued on March 20, 2026 [Dkt. No. 34]. The violation encompasses adoption and enforcement of the following provisions:

- The entire four-paragraph section at pages 10-11 of the In-Brief, in full and including the list of so-called "safe harbors," that begins with the words "Intentional Inducement of Unauthorized Disclosure."

- The language in the last paragraph of page 12 of the In-Brief (under "Appendix A") that includes "inducement of unauthorized disclosure as defined in the 'Standards for PFAC Determinations' section of this in-brief'" as a "[c]onduct-[b]ased [g]round" for PFAC revocation, denial, or non-renewal.
- The escort requirements and access limitations set forth at pages 2-3 of the In-Brief, under the heading "New Media Physical Security Restrictions on the Pentagon Reservation," including all language beginning with, "Until the new workspace is operational . . ." and ending with, "When in the Pentagon, you must remain with your escort at all times."
- The entire section at pages 4-5 of the In-Brief under the heading "Escort Privileges and Procedures."

Imposing these standards and restrictions on access to the Pentagon for PFAC holders constitutes continued implementation and enforcement of those provisions of the Department's prior PFAC Policy that this Court vacated and that it enjoined the Defendants from enforcing against Julian E. Barnes and persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf of, or otherwise associated with The New York Times. It is

FURTHER DECLARED that, by continuing to impose restrictions on the ability of PFAC holders to engage in the routine, lawful journalistic activity of asking questions, Defendants are in violation of the Court's Order; it is

FURTHER DECLARED that, by imposing restrictions on PFAC holders that forbid them from entering the main Pentagon building without prior approval and an escort, Defendants have failed to reinstate the PFACs of Julian E. Barnes and the following journalists with The New York Times: Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol

Rosenberg, and W.J. Hennigan, as ordered by this Court; it is

FURTHER ORDERED that, pursuant to the Court's Order and Opinion of March 20, 2026, Defendants and all persons acting in concert with them are permanently ENJOINED from enforcing the provisions listed above against Julian E. Barnes or any persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf of, or otherwise associated with The New York Times; it is

FURTHER ORDERED that, pursuant to the Court's Order and Opinion of March 20, 2026, Defendants shall permit Julian E. Barnes and any other person who holds, will hold, or will apply for and otherwise qualifies for a PFAC, who is employed by, working on behalf of, or otherwise associated with The New York Times, to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following this Court's Order vacating certain provisions of the prior PFAC Policy; it is

FURTHER ORDERED that Defendants shall file a status report on or before April 16, 2026, accompanied by an affidavit or declaration by a Department official with personal knowledge, describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; and it is

FURTHER ORDERED that this Court shall retain jurisdiction to enforce this Order.

SO ORDERED.

Paul L. Friedman

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/9/26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, | ) | |
| v. | ) | Civil Action No. 25-04218 (PLF) |
| DEPARTMENT OF DEFENSE, et al. Defendants. | ) | |

OPINION

Proposed by Congress in 1789, and ratified in 1791, the First Amendment to the Constitution of the United States provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

The First Amendment empowers the press to publish what it will and the public to read what it chooses, free of official proscription. In the words of Justice Black:

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people . . . .

N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring). As the Supreme Court recently affirmed, "[t]he First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'" Chiles v. Salazar, 607 U.S. ____, 2026 WL 872307, at *9 (Mar. 31, 2026) (quoting NAACP v. Button, 371 U.S. 415, 429 (1963)).

On the evening of Friday, March 20, 2026, this Court entered an Order declaring specific provisions of a policy newly issued by the Department of Defense (the "Department) regarding Pentagon Facilities Alternate Credentials ("PFACs") (the "Policy") to be unlawful and in violation of the First and Fifth Amendments to the United States Constitution. See Order of March 20, 2026 ("Order") [Dkt. No. 34].[1] The Court vacated and set aside those provisions (the "Challenged Provisions") as to The New York Times Company ("The Times") and Julian E. Barnes, a long-time national security reporter with The Times, as well as all regulated parties. Id. at 1-3. The Court also permanently enjoined the defendants from implementing or enforcing

[1] The documents reviewed by the Court in connection with the pending motion include: Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Mot.") [Dkt. No. 37]; Second Supplemental Declaration of Theodore J. Boutrous ("Second Supp. Boutrous Decl.") [Dkt. No. 37-1] and Exhibits [Dkt. Nos. 37-2 to -9]; [Corrected] Brief of Pentagon Press Association as Amicus Curiae in Supp. of Pls.' Mot. to Compel Compliance [Dkt. No. 39]; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Defs. Opp.") [Dkt. No. 41]; Declaration of Michael Bruns ("Bruns Decl.") [Dkt. No. 41-1]; Declaration of Joel Manuel Valdez [Dkt. No. 41-3]; Plaintiffs' Reply to Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Reply") [Dkt. No. 44]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 44-1]; Second Supplemental Declaration of Julian E. Barnes [Dkt. No. 45]; Supplemental Declaration of Joel Manuel Valdez ("Supp. Valdez Decl.") [Dkt. No. 46]; Plaintiffs' Post-Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Supp. Br.") [Dkt. No. 48-1]; Third Supplemental Declaration of Julian E. Barnes ("Third Supp. Barnes Decl."); Defendants' Response to Plaintiffs' Supplemental Brief ("Defs. Supp. Br.") [Dkt. No. 51]; Second Supplemental Declaration of Joel Manuel Valdez ("Second Supp. Valdez Decl.") [Dkt. No. 51-1]; and Transcript of Oral Argument on Plaintiffs' Motion to Compel Compliance with the Court's Order ("OA Tr.").

those provisions "to deny, suspend, revoke, or not renew the PFAC of" any journalist from The Times, and it ordered the immediate reinstatement of the PFACs previously held by The Times' reporters. Id. at 3.

Four days later, the plaintiffs returned to Court to file the instant motion to compel compliance with the Court's Order. See Pls. Mot. The plaintiffs assert that the Department has attempted an "end-run around this Court's ruling" by hastily issuing a new "interim" policy that defies the Court's Order in both "letter and spirit." Id. at 1-2. In response, the defendants argue that the Department has refrained from implementing or enforcing the Challenged Provisions, as the Court's Order required. See Defs. Opp. at 1-2. But the defendants maintain that the Order does not preclude the Department from issuing a new policy, which they contend is what the Department has done. See id. After considering the parties' written submissions, their oral arguments, and the relevant caselaw, the Court concludes that the defendants have failed to comply with its Order.

## I. BACKGROUND

The Court discussed the background of this case at length in its Opinion issued on March 20, 2026. See Opinion of March 20, 2026 ("Op.") [Dkt. No. 35]. For purposes of the instant motion, it is sufficient to note the following. On March 21, 2026, the day after this Court issued its Order and Opinion, the plaintiffs sent a letter to the Department asking how the seven Times reporters identified by name in the Order could obtain their reinstated PFACs. See Second Supp. Boutrous Decl. at Ex. 4. Counsel for amici the Pentagon Press Association also wrote to the Department to ask "when and how the Department will return the revoked PFACs and restore the access it revoked on October 15, 2025." Id. at Ex. 3. Following a few additional inquiries, counsel for the Department emailed counsel for the plaintiffs late in the afternoon of

Monday, March 23, providing contact information for The Times' journalists to "schedule pickup" of their physical credentials. Id. at Ex. 5. In that same email communication, the Department provided the plaintiffs with a "revised policy, in accordance with the Court's decision." Id.

The "revised policy" consists of a "Memorandum for Senior Pentagon Leadership" from Chief Pentagon Spokesman Sean Parnell (the "Memorandum" or "Mem."), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix (together with the In-Brief, the "Interim Policy"). See Second Supp. Boutrous Decl. at Ex. 1 [Dkt. No. 37-2]. The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal." Mem. at 1.[2] But "[i]n the interim," the Memorandum explains, the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." Id. The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation." Id. In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations." Id.

The In-Brief provides in pertinent part that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A." Interim Policy at 6. Appendix A outlines certain conviction-based grounds for a PFAC denial, revocation, or

[2] As of the date of this Opinion, no appeal from the Court's March 20, 2026 Order has been filed.

non-renewal, as well as "[c]onduct-[b]ased [g]rounds." Id. at 12-13. The conviction-based grounds are not at issue. Relevant here, the conduct-based grounds include the "inducement of unauthorized disclosure as defined in" the In-Brief. Id. at 12. The In-Brief, in turn, states that "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Id. at 10. "[I]ntentional inducement of unauthorized disclosure" is defined as "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclos[e] under" one of three specified statutes. Id. The In-Brief then states that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." Id.

The same section of the In-Brief outlines six "safe harbors" that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy. Interim Policy at 11; see Defs. Opp. at 6. Those safe harbors are:

> (a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;
>
> (b) Receiving unsolicited information, including classified national security information or controlled unclassified information;
>
> (c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;
>
> (d) Developing source relationships outside the Pentagon through independent reporting;
>
> (e) Communicating with Department personnel through official channels for public disclosure of information, including press

> briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests;
>
> (f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

Interim Policy at 11.

Finally, the Interim Policy provides that the Correspondents' Corridor—the designated space in the Pentagon for reporters to work, Supp. Barnes Decl. ¶ 12—is closed effective immediately. Interim Policy at 3. According to the Interim Policy, "[a] new press workspace will be established" at some point in the future "in an annex facility outside the Pentagon," and PFAC holders will be notified once that space is "operational." Id. That space is not yet available for journalists to use, and the Interim Policy does not say when it will be. See id. In the meantime, PFAC holders are permitted to work from a building separate from the Pentagon that contains a library and conference center. See Supp. Valdez Decl. ¶ 12; Supp. Barnes Decl. ¶ 9. The Memorandum further states that PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times." Mem. at 2. The Memorandum provides as the reason for this change that "following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Id.

On Tuesday, March 24, 2026, the plaintiffs filed a motion to compel compliance with the Court's Order. See Pls. Mot. The defendants filed an opposition on March 27, see Defs. Opp., and the plaintiffs filed a reply on March 29, see Reply. The Court heard oral argument on the motion to compel on March 30. With the Court's permission, the plaintiffs filed

a post-hearing brief on April 3, see Pls. Supp. Br., and the defendants filed a response on April 6, see Defs. Supp. Br.

## II. LEGAL STANDARD

This Court has the "jurisdiction" and "inherent power to enforce its judgments." Peacock v. Thomas, 516 U.S. 349, 356 (1996); see Order at 4 (retaining "jurisdiction to enforce this Order"). That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." Int'l Ladies' Garment Workers' Union v. Donovan ("Donovan"), 733 F.2d 920, 922 (D.C. Cir. 1984). Fundamental to that authority is the power of the Court "to construe and interpret the language of the judgment." Anglers Conservation Network v. Ross, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting Heartland Hosp. v. Thompson, 328 F. Supp. 2d 8, 11-12 (D.D.C. 2004)). In determining whether an agency has complied with the terms of an order, "the Court is guided not only by the text of that order but also by its relevant opinions." Id.; see also, e.g., Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Rubio, No. 18-CV-1388 (TSC), 2026 WL 322996, at *4 (D.D.C. Feb. 6, 2026). "Success on a motion to enforce a judgment gets a plaintiff only the relief to which the plaintiff is entitled under its original action and the judgment entered therein." Anglers Conservation Network v. Ross, 387 F. Supp. 3d at 93 (citation modified).

## III. DISCUSSION

The plaintiffs challenge two aspects of the Interim Policy: the prohibition on the "inducement of unauthorized disclosure" and the closure of the Correspondents' Corridor coupled with the escort requirement. See Pls. Mot. at 5-15. The defendants contend as a threshold matter that neither challenge is appropriately raised in a motion to compel. See Defs.

Opp. at 3-4.[3] In the defendants' view, the Department was prohibited from retaining and enforcing the language of the Challenged Provisions but was otherwise free to act as it saw fit. See id. at 4-5. The defendants maintain that if the plaintiffs wish to challenge the substance of the Interim Policy, they must do so by amending their complaint and filing a new substantive motion rather than by moving to compel compliance with the Court's Order. See id. at 2. The Court disagrees.

To be sure, the defendants are correct that once a court has invalidated an agency's policy, the agency is empowered to "deal[] with the problem afresh by taking new agency action that [i]s consistent with the legal principles as articulated in the [c]ourt's opinion." Neguse v. U.S. Immigr. & Customs Enf't, Civil Action No. 25-2463 (JMC), 2026 WL 137017, at *1 (D.D.C. Jan. 19, 2026) (citation modified); see also NAACP v. Donovan, 737 F.2d 67, 72 (D.C. Cir. 1984). The problem for the defendants, however, is that the Department has not in fact taken "new" action, at least with respect to the proscription on the "inducement of unauthorized disclosure." To the contrary, as explained in detail below, that proscription contained in the Interim Policy amounts to—in the Department's words—a "clarification[]" of the prohibitions contained in the original Policy that this Court held to be unconstitutional. Mem. at 1. The Department cannot simply reinstate an unlawful policy under the guise of taking "new" action and expect the Court to look the other way. See Donovan, 733 F.2d at 922

[3] The defendants also assert that the plaintiffs did not confer in good faith prior to filing their motion to compel, in violation of Local Civil Rule 7(m). See Defs. Opp. at 3; see also LCvR 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement."). The record reflects, however, that the plaintiffs sought the defendants' position on their anticipated motion to compel and provided the substantive basis for their requested relief. See Bruns Decl. at Ex. A. The plaintiffs thus have satisfied their obligations under Rule 7(m).

(holding that enforcing a prior judgment against the application of a new agency policy "is particularly appropriate . . . where an administrative agency plainly neglects the terms of [an order], and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original [order]"); United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972) (explaining that a litigant cannot "avoid[] . . . [an] injunction through a mere change of terminology").

Nor can the Department take steps to circumvent the Court's injunction and expect the Court to turn a blind eye. But that is exactly what the defendants have done by closing the Correspondents' Corridor and imposing an escort requirement. The Court's Order requires the Department to restore the plaintiffs' access to the Pentagon. Rather than comply with that Order, the Department has cut off all PFAC holders' meaningful access to the Pentagon. When assessing a litigant's compliance in the posture of an enforcement motion, a court need not accept a "dubious literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals." Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d 943, 990-91 (N.D. Cal.), aff'd in relevant part, 161 F.4th 1162 (9th Cir. 2025). Where an enjoined party engages in such evasive conduct, a motion to compel is the proper means of bringing that party into compliance. See id. at 990-92 (granting a motion to enforce an injunction where the court "prohibited certain of [the enjoined party's] policies that prevented meaningful competition" and the enjoined party "rewrote those policies by choosing a different anticompetitive path"); AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, 768 F. Supp. 3d 1, 3 (D.D.C. 2025) (granting a motion to enforce a temporary restraining order where the government "ha[d] continued . . . the very action that the [order] enjoined").

At bottom, the defendants ask this Court to hold that so long as the Department does not reinstate the exact words of the Challenged Provisions, and so long as it restores The Times' reporters' physical credentials, it has done enough.[4] If the Department immediately uses new words to do the same thing? Too bad. The plaintiffs need to start over while the Court stands idly by. If the Department immediately takes steps to undermine the purpose of the reporters' credentials, namely, entry to the Pentagon? Again, too bad. The Court need not embrace such a narrow interpretation of its authority and permit such a blatant attempt to circumvent a lawful order of the Court to succeed. See Donovan, 733 F.2d at 923; Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d at 991 (observing that such an "approach would require courts to effectively engage in a 'whack-a-mole' game to require compliance").

*A. Inducement of Unauthorized Disclosure*

The Court carefully considered the Policy's constraint on "solicitation" and the arguments for and against its permissibility. In the context of the plaintiffs' Fifth Amendment void for vagueness argument, the Court determined that the constraint was unacceptable because it encompassed "obtaining or attempting to obtain any information that the Department has not approved for release, regardless of whether that information is classified." Op. at 20-21. The Court recognized that "obtaining and attempting to obtain information is what journalists do" and that "[a] primary way in which journalists obtain information is by asking questions." Id. at 21. Punishing journalists for requesting and receiving non-public information thus would chill and penalize "essential journalistic practices that the plaintiffs and others engage in every day."

---

[4] Ironically, the defendants' own brief makes clear that the Department continues to use many of the words of the Challenged Provisions that this Court vacated. See Defs. Opp. at 8-12.

Id. In no uncertain terms, the Court rejected the Department's assertion that the Policy was permissible because it proscribed only criminal solicitation, concluding that the Policy punished "plainly lawful journalistic practices." Id. at 22; see also id. at 21 (explaining that the defendants' argument that the Policy's prohibition on solicitation was acceptable because it "simply proscribe[s] criminal solicitation . . . is just plain wrong"). The Court also held in the context of the plaintiffs' First Amendment forum argument that the Policy's restrictions on journalists seeking information were unreasonable in light of the purpose of the Pentagon's press spaces and that the Policy amounted to viewpoint discrimination "based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership." Id. at 30-36. In rejecting the defendants' argument that the Court should simply remand to the Department for clarification rather than vacate the Challenged Provisions in their entirety, the Court concluded that in light of the Policy's "extremely serious" constitutional defects, "'additional explanations' on remand would not suffice." Id. at 38 (citation omitted).

Because the Court vacated the Challenged Provisions, it was appropriate for the Department to issue a new policy, so long as the new policy "was consistent with the legal principles as articulated in the Court's opinion." Neguse v. U.S. Immigr. & Customs Enf't, 2026 WL 137017, at *1. But the Department has done precisely what this Court expressly forbade it from doing: it has endeavored to "cure" the impermissible restrictions on a journalist seeking information not authorized for release by providing "targeted clarifications." Mem. at 1; see Op. at 38. Specifically, the Interim Policy replaces the prohibition on "soliciting" non-public or unauthorized classified or unclassified information with a prohibition on "encouraging, inducing, or requesting" the disclosure of that non-public or unauthorized information. Interim Policy

at 10. That is simply using revised language to proscribe the same "lawful journalistic practices" that the vacated provisions encompassed. Op. at 23. Remarkably, even the Department acknowledges as much. For example, the Interim Policy explains that the wording change was simply an effort "[t]o correct the Court's mischaracterization" of the Policy. Mem. at 1; Interim Policy at 10. Commander Timothy Parlatore, Special Advisor to the Secretary of Defense, similarly explained that the Interim Policy responds to the Court's Order by "us[ing] more words to say the same thing and to foreclose creative misinterpretations." Second Supp. Boutrous Decl. at Ex 6.

The defendants suggest that the Department has solved the constitutional problems identified in the Court's Opinion by inserting a "scienter requirement": an adverse PFAC determination will be triggered only if the journalist attempts to obtain information that the journalist "knows" the Department employee is forbidden to disclose by law. Defs. Opp. at 15-16; see Interim Policy at 10. This addition, however, does not render the Interim Policy permissible. For one, the supposed requirement is illusory—in the plaintiffs' words, "a mirage," Reply at 6—because it presumes scienter and provides no clear path to rebut that presumption. The Interim Policy provides that a journalist's knowledge is presumed if the journalist offers a Department employee "anonymity or privacy protection." Interim Policy at 10. The Department thus need not establish that a journalist actually knows anything to find the journalist presumptively in violation of the Interim Policy. See id. Considering that journalists "frequently" grant anonymity to sources, see Zerilli v. Smith, 656 F.2d 705, 711 (D.C. Cir. 1981), including sources authorized to speak to the press on the Department's behalf, see Supp. Barnes Decl. ¶ 18, every Pentagon reporter routinely will be presumptively in violation of the

Interim Policy.[5] While that presumption ostensibly is rebuttable, it is unclear just how a journalist would go about rebutting it. The Interim Policy certainly does not indicate what evidence would suffice for journalists to prove what they did not know. And as the plaintiffs point out, the Interim Policy "expressly provides that any doubts will be resolved in the Department's favor." Reply at 7; see Interim Policy at 13-14.

The defendants attempt to justify the presumption by asserting that "the most obvious reason to offer anonymity to a Department employee is because the journalist knows the employee is not authorized by law to disclose the information sought." Defs. Opp. at 19. That contention is unsupported and simply wrong. There are myriad reasons why a source may wish to remain anonymous—most apparently, a source may fear retaliation for disclosing information that is "unflattering," even if not unauthorized by law. Cf. Op. at 35 n.7 (observing "that the Pentagon has barred press photographers from briefings on the ongoing U.S.-Israeli war with Iran after they published photos of Secretary Hegseth that his staff deemed 'unflattering'"). As Mr. Barnes suggested, "[t]here are various reasons why a source may wish not to have their name published in connection with the information they provided, and honoring those preferences is often integral to [his] ability to gather and report the news." Supp. Barnes Decl. ¶ 17; see also Zerilli v. Smith, 656 F.2d at 710-11 (explaining that interference with a journalist's use of "confidential source raises obvious First Amendment problems" because "journalists

---

5 The Court gives little credence to the assurances of Deputy Press Secretary Joel Manuel Valdez that the Department will enforce the Interim Policy only upon a complaint by a Department employee. See Supp. Valdez Decl. ¶¶ 30-33. The plaintiffs correctly point out that Mr. Valdez's proffered interpretation of the Interim Policy is not grounded in its text. See Pls. Supp. Br. at 4. Like the plaintiffs, the Court has "no reason to trust that officials will not follow the Interim Policy's express language and revoke PFACs based on information in [the] [p]laintiffs' reporting whenever it is not tied to a specific, authorized source." Id. In any event, the Court struggles to see how the enforcement regime that Mr. Valdez promises changes the illusory nature of the scienter requirement.

frequently depend on" such sources "to gather news, and confidentiality is often essential to establishing a relationship with" a source).

The defendants also emphasize the addition of six "safe harbors" as evidence that the Interim Policy is distinct from the original Policy in a way that complies with this Court's Opinion and Order. See Defs. Opp. at 16. But like the scienter "requirement," the safe harbors do not make clear that engagement in lawful journalistic practices will not trigger the revocation of a PFAC. See Op. at 21-22. As this Court has explained, asking questions is fundamental to the role of a journalist, and a journalist's ability to ask questions is protected. See id. at 21; see also id. at 22 ("[A] journalist asking questions is not a crime!"). Yet the "safe harbors" explicitly leave open the possibility that "[a]sking questions" on certain topics and to certain officials could trigger the revocation or denial of a PFAC. Interim Policy at 11. They provide, for example, that asking questions about any subject to a Department official who is "authorized to speak with the press" is permissible. Id. But how is a journalist to know who is authorized to speak? That uncertainty and lack of clarity is precisely what this Court held to be unacceptable.

In sum, there is little daylight between the Policy's unconstitutional "solicitation" prohibition and the Interim Policy's "inducement" prohibition, and the latter is impermissible for the same reasons as the former. Simply put, the Department's attempt to "clarif[y]" the Policy did not cure its constitutional infirmities. That, of course, is exactly why this Court determined it was necessary to vacate the Policy and "re-establish the status quo" as it existed prior to "the unlawful agency action." Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec., 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (quoting Texas v. United States, 40 F.4th 205, 219-20 (5th Cir. 2022) (per curiam)). The Court explained that the Policy's deficiencies were so entrenched that there was no alternative but to require the Department to scrap its prior approach and start

afresh. See Op. at 38-39. By failing to do so, the Department has violated this Court's explicit mandate.

*B. Expulsion of PFAC Holders from the Pentagon*

In its March 20, 2026 Order, the Court directed the defendants to "immediately reinstate the PFACs of" Julian Barnes and six other Times journalists, "all of whom held a PFAC as of October 6, 2025." Order at 3. Before doing so, the Court carefully considered the defendants' argument that the plaintiffs had not established their entitlement to injunctive relief. The Court ultimately disagreed with the defendants, concluding in relevant part that the plaintiffs had shown irreparable injury because "[w]ithout their PFACs, the plaintiffs lack 'the access to pursue [journalistically productive] conversations.'" Op. at 36. (quoting Karem v. Trump, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)). The Court observed that "the only way to remedy the injury [from the loss of a press credential] is to return the [credential] and the access that comes with it." Id. at 36-37 (first alteration in original) (quoting Karem v. Trump, 404 F. Supp. 3d at 217).

The Department did not comply with the Court's Order. Rather, the very next business day, the Department announced that it was immediately closing the "Correspondents' Corridor"—the area in the Pentagon from which journalists had worked for years. See Mem. at 2; Interim Policy at 3; see also Supp. Barnes Decl. ¶ 12. Instead, PFAC holders would be relegated to work from a space outside the Pentagon building. See Supp. Valdez Decl. ¶ 12; Supp Barnes Decl. ¶ 9. The Department further announced that journalists would no longer be permitted to access the Pentagon building at all without a Department escort and that even escorted access would be limited to specific events. See Interim Policy at 3. The justification offered by the Department for this sudden change is that this Court's Order "remov[ed] . . . all

security screening authority" and that "unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks." Second Supp. Boutrous Decl. at Ex. 7; see also id. at Ex. 6 (Commander Parlatore stating that the Court's ruling "excised all of the security provisions and enforcement mechanisms and ordered that [the Department] immediately issue press passes under the revised, toothless policy"); Mem. at 2.

In short, this is nonsense. The Court did not "remove" or "excise" the Department's authority to screen PFAC holders. For one, The Times' journalists named in the Court's Order have already been screened by the Department—for example, prior to the issuance of the Policy, Mr. Barnes had held a PFAC without issue for more than twenty years. See Op. at 4; Supp. Barnes Decl. ¶ 11. Moreover, the Court was clear in its Opinion that it was leaving intact the security measures that previously existed for PFAC holders and that "served [the Department's] proffered interests in safety and security for decades." Op. at 39. Based on the undisputed facts, the Court found that "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." Id. at 5 (emphasis added). There is no evidence whatsoever that the facts have changed in the weeks since this Court issued its summary judgment decision. The rote invocation of "security" or "national security" has never been enough "to abrogate the fundamental law embodied in the First Amendment." N.Y. Times Co. v. United States, 403 U.S. at 719 (Black, J., concurring). As Judge Leon observed in a recent decision, "[b]ald assertions of 'national security' cannot excuse the Government's failure to follow the law." Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv., __ F. Supp. 3d ___, 2026 WL 877779, at *16 (D.D.C. Mar. 31, 2026).

In their opposition brief, the defendants state that the "relocation of the press workspace" is unconnected to the Court's ruling and instead simply "fulfills a commitment announced . . . before this lawsuit was filed." Defs. Opp. at 20; see also Mem. at 2. That assertion is undermined by the timing of the announced closure. The Court cannot ignore the fact that the decision to bar all journalists from the Pentagon came the next business day after the Court ordered the Department to restore the plaintiffs' access to the Pentagon. Further, the testimony of Mr. Barnes supports that Department officials were ill-prepared to facilitate this "relocation," suggesting that the Department had scrambled to close the Correspondents' Corridor in direct response to this Court's directives. See Supp. Barnes Decl. ¶ 9; Third Supp. Barnes Decl. ¶ 6.[6]

In light of all this, the Court has no choice but to conclude that the Department's abrupt closure of the Correspondents' Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon are not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of this Court's Order. The point of the Court's injunction was to restore The Times journalists' access to the Pentagon, not merely to ensure that they have possession of a physical credential. See Op. at 37. But the access now available to PFAC holders in the wake of this Court's Order is not even close to as meaningful as the broad access that PFAC holders had previously been afforded. The PFACs

---

[6] Deputy Press Secretary Joel Manuel Valdez submitted a declaration purporting to refute Mr. Barnes' account of his interactions with Pentagon Press Office staff on the day he went to pick up his PFAC. See Supp. Valdez Decl. But Mr. Valdez's declaration does not contradict Mr. Barnes' testimony about his conversations with Department staff, for which Mr. Valdez was not present. See id.; see also Third Supp. Barnes Decl. ¶ 3. The only thing Mr. Valdez's declaration establishes is that some of the information given to Mr. Barnes was inaccurate. See Supp. Valdez Decl. ¶¶ 15-21. If anything, that fact supports the notion that Department officials were unsure of the parameters of the Interim Policy and were unprepared to implement it. See id.

issued to Mr. Barnes and his colleagues permit them to access only a building separate from the Pentagon. See Supp. Valdez Decl. ¶ 12. PFAC holders may enter the Pentagon only for limited purposes approved by the Department, and only if the holder is accompanied by an escort at all times. See id. ¶¶ 22-25; see also Interim Policy at 3. These restrictions make it exceedingly difficult to cover the Department and the U.S. military from the Pentagon grounds, as the April 2, 2026 declaration from Mr. Barnes illustrates:

> Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting. As I stated in a prior declaration, reporting from the Pentagon has historically necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events. While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort. That means I will be spending hours of my day just waiting and walking back and forth—assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all. That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

Third Supp. Barnes Decl. ¶ 8.[7] For decades, the plaintiffs and other reporters were permitted to move throughout the building and engage with Pentagon press officials and other personnel to

---

[7] On Monday, March 30, in response to a request that he had made three days earlier, on Friday, March 27, Mr. Barnes received an invitation to interview a Department official at the Pentagon the following day, Tuesday, March 31, at 12:45 p.m. Third Supp. Barnes Decl. ¶ 5. Mr. Barnes explained:

> On Tuesday, March 31, 2026, I arrived at the Pentagon at 12:10 p.m. and entered the Visitor Center security area. I showed the attendant behind the glass my driver's license and the PFAC. I entered my social security number upon his request. I was advised that individuals holding PFACs must enter through corridor 8. I replied

provide timely reporting to the American people. See, e.g., Op. at 5-6. That undisputedly is no longer the case.

In short, the Department has responded to the Court's express instruction to return the PFACs previously held by The Times' journalists and restore the access to the Pentagon that came with those credentials by instead cutting off that access for all journalists. That response flouts the Court's explicit directives and disregards the constitutional principles at the heart of its Opinion.

***

The Court cannot conclude this Opinion without noting once again what this case is really about: the attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see. The Constitution demands better. The American public demands better, too. Over the past few weeks, the Court has received dozens of letters and postcards from people across the country explaining what the First Amendment means to them. To quote one such letter:

---

> that I had an appointment and the escort was going to meet me in the Visitor's Center. The supervisor repeated that anyone with a PFAC could enter only through corridor 8. This was despite the fact that I was told to meet my escort in the Visitor's Center and the fact that before I could have simply entered through the main gate using my PFAC. After I arrived at the Pentagon, the interview was postponed, and I was immediately escorted out of the building.

Id. ¶ 6. This scenario exemplifies precisely the Kafkaesque nature of the Department's implementation of the Interim Policy that the Court raised during oral argument. See OA Tr. at 37. The only response to Mr. Barnes's declaration: "Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy." Second Supp. Valdez Decl. ¶ 9. Really?

> A free press is essential to the success of our democratic republic. The people are the government, and they cannot make good well-informed choices without all the facts. . . . A free press is an excellent place to start.

The protection of the freedoms enshrined in the First Amendment "is a fundamental principle of the American government. The First Amendment means that [g]overnment has no power to thwart the process of free discussion, to abridge the freedoms necessary to make that process work." Kleindienst v. Mandel, 408 U.S. 753, 775-76 (1972) (Marshall, J., dissenting) (citation modified); see also Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (observing that the "free trade in ideas . . . [is] the best test of truth"). Less than three weeks ago, this Court rejected the defendants' efforts to abridge those freedoms. With the issuance of the Interim Policy, the Department has invoked slightly different language to achieve that same unconstitutional result. The curtailment of First Amendment rights is dangerous at any time, and even more so in a time of war. Suppression of political speech is the mark of an autocracy, not a democracy—as the Framers recognized when they drafted the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the plaintiffs' motion to compel. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

Paul L. Friedman

PAUL L. FRIEDMAN
United States District Judge

DATE: 4|9|26

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, et al.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.,

*Defendants*.

Civil Action No. 1:25-cv-04218-PLF

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of Appeals for the District of Columbia from this Court's March 20, 2026, Order on Plaintiffs' Motion for Summary Judgment (ECF No. 34) and this Court's April 9, 2026, Order on Plaintiffs' Motion to Compel Compliance (ECF 54).

DATED: April 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

SARAH WELCH
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Michael Bruns*
MICHAEL BRUNS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>Defendants-Appellants. | No. [__________] |

DECLARATION OF KINGSLEY WILSON IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

I, Kingsley Wilson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## BACKGROUND

1. I am the Pentagon Press Secretary. I have served in this position since May 2025. In this role, I am responsible for managing press interactions with the Department of Defense (the "Department"), overseeing the Pentagon Press Operations office ("PPO"), and serving as the Department's principal liaison with credentialed journalists. I report directly to the Assistant to the Secretary of War for Public Affairs.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. In particular, I have personal knowledge of the frequency and nature of press inquiries involving classified information because such inquiries are directed to my office or are reported to me by my staff.

3. I submit this declaration in support of the Department's emergency motion for a stay pending appeal of the district court's Orders of March 20, 2026 and April 9, 2026.

Specifically, the Department seeks a stay of the requirement that the Department provide unescorted access to the Pentagon for holders of Pentagon Facility Alternate Credentials ("PFACs").

**THE FREQUENCY OF SENSITIVE INFORMATION REACHING JOURNALISTS BEFORE THE POLICY**

4. Before the Department implemented the PFAC Policy in October 2025, my office was contacted by journalists on a regular basis — often monthly, and sometimes multiple times per month — regarding information they had obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions. These contacts came from journalists at multiple news outlets, including the New York Times. Many of these journalists, including New York Times journalists, were PFAC holders.

5. Controlled unclassified information and classified information was reaching journalists with a frequency that raised serious concerns about the security of information within the Pentagon.

6. To be clear, the Department encourages journalists who come into possession of controlled or classified information to contact the press office before publishing, and these contacts are not themselves improper. Nor does the Department know or opine on whether each instance involved information that was solicited by the journalist, because the Department does not know the source in each case. The concern is the frequency with which journalists were coming into possession of sensitive, controlled or classified information.

**THE CONNECTION BETWEEN PHYSICAL ACCESS AND THE PATTERN**

7. Based on my experience and the reports of my staff, I believe that unescorted access to the Pentagon was a significant contributing factor to the frequency with which controlled and classified information was reaching journalists. Unescorted access allowed journalists to maintain a persistent physical presence near sensitive spaces within the Pentagon. This presence enabled journalists to observe activity patterns — such as which officials were meeting, when, and in what configuration — that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly.

8. The Correspondents' Corridor was located next to the office space for the Joint Chiefs of Staff—the military advisors to the President, National Security Council, Homeland Security Council, and Secretary of Defense. *See* 10 U.S.C. § 151. Journalists, including journalists who regularly called my office regarding controlled or classified information they had obtained, frequently used their access to closely monitor activity in and out of the Joint Staff spaces.

9. The Department assessed that the combination of unescorted access and the absence of security screening criteria contributed to the frequency with which classified information was reaching journalists. The escort requirement adopted as part of the Interim Policy was specifically designed to address this assessment after the district court invalidated the PFAC Policy.

**THE CHANGE AFTER THE POLICY**

10. Following the implementation of the PFAC Policy in October 2025, the frequency with which my office was contacted by journalists regarding sensitive, controlled or classified

information dropped dramatically. While there have been a small number of isolated incidents, the regular pattern of contacts involving such information largely ceased.

11. I attribute this reduction primarily to the fact that many journalists were not present in the Pentagon because they surrendered their PFACs following the implementation of the PFAC Policy, meaning they were unable to maintain a persistent, unescorted presence near sensitive spaces within the Pentagon. The PFAC Policy was not intended to exclude journalists from the Pentagon. But when journalists surrendered their PFACs and accompanying Pentagon access, the Department was able to observe a dramatic decrease in journalists obtaining sensitive, controlled or classified information that should never have been released to them. Without the ability to observe activity patterns and time their inquiries accordingly, the systematic pattern was disrupted.

**THE IMPACT ON NATIONAL SECURITY**

12. The regular receipt and publication of classified information by journalists posed serious risks to national security. The unauthorized disclosure of operational plans, intelligence assessments, and force posture decisions has the potential to put American lives in danger and to compromise ongoing military and intelligence operations. When classified information about military operations is published, adversaries can adjust their tactics, techniques, and procedures in response — potentially endangering the servicemembers conducting those operations.

13. The current national security environment makes the protection of classified information particularly critical. United States military personnel are currently deployed and stand ready to support military operations in Iran should the ceasefire break. The unauthorized disclosure of classified information relating to this operation could have immediate and

irreversible consequences for the safety of American servicemembers and the success of military objectives.

**THE HARM FROM RESTORING UNESCORTED ACCESS**

14. Based on my experience as Pentagon Press Secretary, I believe that restoring unescorted access to the Pentagon for PFAC holders — especially without the security screening criteria and the prohibition on intentional inducement of unauthorized disclosures that the district court vacated — will almost certainly result in the resumption of the pattern I have described: a return to the regular, frequent receipt of controlled or classified information by journalists.

15. The escort requirement would disrupt this pattern by limiting journalists' ability to maintain a persistent, unescorted presence near sensitive spaces — the presence that enabled the observation of activity patterns and the targeting of specific personnel. Without the escort requirement or even a prohibition on intentionally inducing unauthorized disclosures, the Department has no effective means of managing this specific security risk while still providing journalists with access to the Pentagon for press briefings, press conferences, interviews, and other legitimate newsgathering activities.

16. If sensitive, controlled or classified information is compromised during the pendency of this appeal, the harm cannot be undone. Such information, once disclosed, cannot be recalled. The potential consequences — including the endangerment of American lives and the compromise of ongoing operations — are irreversible.

**THE DEPARTMENT'S GOOD-FAITH COMPLIANCE**

17. Following the district court's March 20, 2026 Order, the Department took prompt steps to comply. The Department reinstated the PFACs of all seven New York Times journalists identified in the Order. The Department issued a revised Interim Policy that addressed the concerns identified in the Court's Opinion — including a different defined term, a knowledge requirement, six safe harbors protecting routine newsgathering, exhaustive factors, evidentiary standards, mandatory timelines, judicial review, and an explicit content-neutrality provision. The Department provided workspace for PFAC holders at the Pentagon Library and Conference Center and arranged shuttle bus transportation. The Department also processed PFAC applications from the Associated Press, CNN, The Washington Post, The Wall Street Journal, USA Today, and CBS News — none of which withdrew their applications after the Interim Policy was issued.

18. The escort requirement was adopted in good faith to address the security gap created by the Court's vacatur of the Policy's security screening provisions. It was not adopted to circumvent the Court's Order or to retaliate against any journalist or news organization. The escort requirement applies equally to all PFAC holders, regardless of their news organization or the content of their reporting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2026 at Washington, D.C.

[ Kingsley Wilson ]
Kingsley Wilson
Pentagon Press Secretary
1400 Defense Pentagon
Washington, D.C. 20301-1400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., Plaintiffs, v. DEPARTMENT OF DEFENSE, et al. Defendants. | Civil Action No. 25-04218 (PLF) |

ORDER

This matter is before the Court on defendants' Motion to Stay Pending Appeal [Dkt. No. 58]. Defendants ask the Court to stay its Orders of March 20, 2026 [Dkt. No. 34] and April 9, 2026 [Dkt. No. 54] to the extent that those Orders vacate and enjoin the enforcement of the Department of Defense's physical access restrictions for the Pentagon—namely, the escort requirement and closure of the Correspondents' Corridor. In the alternative, defendants request a fourteen-day administrative stay of those Orders to the same extent to allow for orderly briefing on defendants' forthcoming stay motion in the U.S. Court of Appeals for the D.C. Circuit. Upon careful consideration, it is hereby

ORDERED that defendants' Motion to Stay Pending Appeal [Dkt. No. 58] is GRANTED in part and DENIED in part. Defendants' request for a fourteen-day administrative stay is GRANTED, and the motion is otherwise DENIED.

SO ORDERED.

Date: 2026.04.13 12:26:52 -04'00'

PAUL L. FRIEDMAN
United States District Judge

DATE: April 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, I electronically filed the foregoing record excerpts with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jack Starcher*
*Counsel for Defendants- Appellants*