**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 26-5113**

United States Court of Appeals
For the District of Columbia Circuit

---

UNITED STATES DEPARTMENT OF DEFENSE, ET AL.,

*Defendants-Appellants*,

v.

THE NEW YORK TIMES COMPANY, ET AL.,

*Plaintiffs-Appellees*.

---

On Appeal From The United States District Court
For The District Of Columbia, No. 1:25-cv-4218-PLF,
The Honorable Paul L. Friedman

---

# BRIEF FOR THE NEW YORK TIMES COMPANY AND JULIAN E. BARNES

Susan M. Pelletier
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

Theodore J. Boutrous, Jr.
Katie Townsend
Zachary C. Freund
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
ZFreund@gibsondunn.com

*Counsel for Plaintiffs-Appellees The New York Times Company and Julian E. Barnes*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. **Parties and amici.** All parties, intervenors, and *amici* appearing in this court are listed in Appellants' Certificate as to Parties, Rulings, and Related Cases, Doc. No. 2173174 (May 13, 2026).

2. **Rulings under review.** References to the rulings at issue appear in Appellants' Certificate as to Parties, Rulings, and Related Cases, Doc. No. 2173174 (May 13, 2026).

3. **Related cases.** This case was not previously before this Court. There is one pending related case in this Court: *Dep't of Defense v. New York Times Co.*, No. 26-5253 (D.C. Cir.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee The New York Times Company ("The Times") discloses that it is a publicly traded company, it has no parent company, and no publicly held corporation owns ten percent or more of its stock. The Times is a global media organization focused on creating and distributing high-quality news and information.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENT ........................................................ i

GLOSSARY ....................................................................................................v

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE ..........................................................................5

A. Journalists Have Worked In the Pentagon for Eighty Years. ...............5

B. Department Officials Target The Times and Other News Organizations for Their Editorial Viewpoint. ......................................8

C. The Department Implements the October Policy. ................................9

D. Plaintiffs Successfully Challenge the October Policy. ........................11

E. The Department Issues the "Interim Policy." ....................................13

F. The District Court Enforces its Judgment. ........................................15

G. The Department Appeals and Obtains a Partial Stay. .........................17

H. Plaintiffs Challenge the Interim Policy in a Separate Lawsuit and the District Court Preliminarily Enjoins the Escort Requirement. ...........18

SUMMARY OF ARGUMENT ........................................................................19

STANDARD OF REVIEW .............................................................................23

ARGUMENT ..................................................................................................23

I. The Department Has Forfeited Any Challenge to the Summary Judgment Order. ..............................................................................................23

II. The District Court Did Not Abuse its Discretion. ........................................25

A. The "Inducement" Provision Violates the Summary Judgment Order. ..........................................................................................................28

B. The Interim Policy's Escort Requirement Violates the Summary Judgment Order. ..................................................................................37

C. The Enforcement Order Is Consistent with Agency Authority to Issue New Policies. ..........................................................................................41

III. Though Lawfulness Would Not Excuse Noncompliance, the Interim Policy is Unlawful. ..........................................................................................45

CONCLUSION ................................................................................................50

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Am. First Legal Found. v. USDA*,
126 F.4th 691 (D.C. Cir. 2025) ..... 24

*Am. Min. Cong. v. U.S. Army Corps of Eng'rs*,
120 F. Supp. 2d 23 (D.D.C. 2000) ..... 41

*Anglers Conservation Network v. Ross*,
387 F. Supp. 3d 87 (D.D.C. 2019) ..... 26

*Associated Press v. United States*,
326 U.S. 1 (1945) ..... 1

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ..... 22, 46, 48

*Bd. of Regents of Univ. of Wash. v. EPA*,
86 F.3d 1214 (D.C. Cir. 1996) ..... 24

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ..... 33

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ..... 32, 47

*Chiles v. Salazar*,
607 U.S. 627 (2026) ..... 27

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ..... 22

*City of Cleveland v. Fed. Power Comm'n*,
561 F.2d 344 (D.C. Cir. 1977) ..... 36

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ..... 48

*Counterman v. Colorado*,
600 U.S. 66 (2023) ..... 49

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..... 23, 45

*Doe 2 v. Shanahan*,
755 F. App'x 19 (D.C. Cir. 2019) ..... 42

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
778 F.3d 142 (D.C. Cir. 2015) ..... 23

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026)........................................................................47

*Fla. Star v. B.J.F.*,
491 U.S. 524 (1989)........................................................................49

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)........................................................................1

*Garcia Ramirez v. Immigr. & Customs Enf't*,
812 F. Supp. 3d 86 (D.D.C. 2025)........................................................................36

*GTE Sylvania, Inc. v. Consumers Union*,
445 U.S. 375 (1980)........................................................................44

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)........................................................................43

*Heartland Regional Medical Center v. Leavitt*,
415 F.3d 24 (D.C. Cir. 2005)........................................................................43

*Int'l Ladies' Garment Workers' Union v. Donovan*,
733 F.2d 920 (D.C. Cir. 1984)..............................................4, 20, 26, 37, 42, 45

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019)..............................................2, 13, 21

*Madsen v. Women's Health Ctr.*,
512 U.S. 753 (1994)........................................................................25, 26

*Maness v. Meyers*,
419 U.S. 449 (1975)........................................................................44

*Martin v. Dep't of Just.*,
488 F.3d 446 (D.C. Cir. 2007)........................................................................24

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949)........................................................................26

*McCreary Cnty. v. ACLU of Ky.*,
545 U.S. 844 (2005)........................................................................48

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)........................................................................23

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)........................................................................22

*NAACP v. Donovan*,
737 F.2d 67 (D.C. Cir. 1984)..............................................21, 41, 42, 43

*New York Times Co. v. Dep't of Def.*,
2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) .................................................18

*New York Times Co. v. Dep't of Def.*,
2026 WL 2168070 (D.C. Cir. July 16, 2026)...........................................19, 28

*New York Times Co. v. Dep't of Def.*,
-- F. Supp. 3d --, 2026 WL 1872765 (D.D.C. June 30, 2026).................6, 19, 40

*Nix v. Billington*,
448 F.3d 411 (D.C. Cir. 2006).......................................................................23

*Peacock v. Thomas*,
516 U.S. 349 (1996)...........................................................................4, 20, 25

*Perkins Coie LLP v. Dep't of Justice*,
780 F. Supp. 3d 227 (D.D.C. 2025)...............................................................41

*Ramirez v. Collier*,
595 U.S. 411 (2022).......................................................................................24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
793 F. Supp. 3d 19 (D.D.C. 2025).................................................................26

*Salazar v. Buono*,
559 U.S. 700 (2010).......................................................................................26

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012).......................................................................27

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977).....................................................2, 5, 38, 47, 48

*Sierra Club v. McCarthy*,
61 F. Supp. 3d 35 (D.D.C. 2014)...........................................................36, 45

*Snyder v. Phelps*,
562 U.S. 443 (2011).......................................................................................50

*United States ex rel. Totten v. Bombardier Corp.*,
380 F.3d 488 (D.C. Cir. 2004).......................................................................24

*Trump v. Cook*,
146 S. Ct. 2234 (2026)...................................................................................48

*United States v. Al-Timimi*,
164 F.4th 292 (4th Cir. 2026) ...............................................................33, 50

*United States v. Christie Indus., Inc.*,
465 F.2d 1002 (3d Cir. 1972) ...........................................................26, 31, 40

*United States v. Facebook, Inc.*,
136 F.4th 1129 (D.C. Cir. 2025)....................................................20, 23, 36, 45

*United States v. Hansen*,
599 U.S. 762 (2023)....................................................................................49

*United States v. McKinley*,
70 F.3d 1307 (D.C. Cir. 1995)....................................................................33

*United States v. Rundo*,
990 F.3d 709 (9th Cir. 2021) .......................................................................50

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948)....................................................................................23

*United States v. Williams*,
553 U.S. 285 (2008)....................................................................................49

*Washington v. Trump*,
2017 WL 1045950 (W.D. Wash. Mar. 16, 2017)............................................42

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981)..............................................................32, 47

**Other Authorities**

Alexander Bickel, *The Morality of Consent* (1977) ..................................................2

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Barnes | Julian E. Barnes, a reporter for The Times |
| Department | Department of Defense a/k/a Department of War |
| Interim Policy | Policy at J.A. 245–62 |
| J.A. | Joint Appendix |
| October Policy | Policy at J.A. 125–41 |
| PFAC | Pentagon Facilities Alternate Credential |
| The Times | The New York Times Company |

## INTRODUCTION

On March 20, 2026, the district court granted summary judgment in favor of The New York Times Company ("The Times") and its reporter Julian E. Barnes, concluding that the Department of Defense, a/k/a the Department of War ("Department") violated the First and Fifth Amendments when it enacted a new Pentagon press credentialing policy ("October Policy") that targeted news organizations "based on editorial viewpoint." J.A. 233. Chief among its constitutional defects, the October Policy was, as the district court squarely held, impermissibly designed to "weed[] out disfavored journalists"—those unwilling to publish "only stories that are favorable to or spoon-fed by Department leadership," who were not, in the Department's words, "on board and willing to serve our commander in chief"—and "replac[e] them with news entities that are." *Id.*

Viewpoint discrimination by the government—what this Court has called "poison," *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotations omitted)—is all the more toxic to our system of self-government where, as here, it is aimed at an independent press. *See Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("[A] free press is a condition of a free society."). By upending the historical tradition of press access to the Pentagon that had prevailed since the building opened its doors in 1942, the Department through the October Policy sought to break the longstanding, "healthy adversarial tension

between the government, which may seek to keep its secrets" and an independent press "which may endeavor to" report them, Alexander Bickel, *The Morality of Consent* at 79 (1977). If allowed, the Department's efforts would deprive the public of vital information about the United States military and its leadership during wartime.

The Department disputes none of this. It has abandoned any effort to defend the constitutionality of the October Policy in this Court, conceding it was viewpoint discriminatory in both purpose and effect, and that its vague, overbroad provisions impermissibly vested Department officials with unbridled authority to suspend, deny, or revoke journalists' press credentials—credentials that journalists have constitutionally protected liberty interests in, *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019) (citing *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977))—to punish and chill First Amendment-protected newsgathering and reporting that Department officials dislike. On appeal, the Department challenges *only* a *subsequent* order by the district court prohibiting a blatant attempt by the Department to evade the district court's now-uncontested summary judgment ruling and thereby perpetuate its viewpoint discrimination. The Department provides no valid basis to disturb that order.

In entering summary judgment, the district court both vacated the October Policy's unconstitutional provisions and entered a permanent injunction (1) prohibiting the Department from enforcing the vacated provisions against Plaintiffs, and

(2) requiring it to "immediately reinstate" Plaintiffs' credentials to, as the district court's opinion made clear, restore the Pentagon access that had accompanied those credentials for decades. J.A. 202. Rather than comply with that order—or immediately appeal and seek a stay—the very "next business day," the Department issued an "interim" policy obviously intended to nullify it. J.A. 245–62 ("Interim Policy").

The Interim Policy was slapped together over a weekend in direct response to the Department's express "disagree[ment]" with the district court's summary judgment ruling—which the Interim Policy itself calls a "mischaracterization[]," J.A. 245—and it defied the district court's order in multiple ways. J.A. 245. First, it sought to resurrect vacated provisions of the October Policy by using, in the candid description of the Interim Policy's author, "more words to say the same thing." J.A. 257, 354. Specifically, the district court had struck down the October Policy's provisions deeming the "solicitation" of any "non-public information" not "authorized" for release, regardless of classification, as a ground for suspension, revocation or denial of a press credential, J.A. 136–37—a provision that prohibited "plainly lawful journalistic practices," J.A. 224–25. In the Interim Policy, the Department swapped out the word "solicitation" for "inducement." J.A. 257, 354.

Second, while the Department gave Times reporters new credentials, it simultaneously stripped those credentials of the very access the district court had ordered be restored—rendering them "essentially worthless." J.A. 311. The Interim

Policy closed Correspondents' Corridor, where reporters had worked for decades, "effective immediately," relegated reporters to a hypothetical annex that did not yet exist (and an off-site library in the meantime), forbade credentialed journalists from entering the Pentagon without an invitation or a pre-arranged interview or meeting and, even then, required that journalists be shadowed by an official escort. J.A. 246, 250. Put simply, the Interim Policy ensured that The Times's "restored" Pentagon credentials would not even get its reporters into the building.

The Department contends that the district court was powerless to stop this transparent attempt to circumvent its judgment. According to the Department, because it enacted what it now calls a "new" policy, The Times's only recourse was to start over: file a new lawsuit, obtain summary judgment as to the Interim Policy, and when the Department inevitably comes up with another "new" policy, do it all over again.

That is not the law. Injunctive relief is available in Administrative Procedure Act cases for situations, like this one, where vacatur alone may be insufficient to provide meaningful relief. And courts have "inherent power to enforce [their] judgments," *Peacock v. Thomas*, 516 U.S. 349, 356 (1996), including against agencies that "neglect the terms of [an order][,]" and reinstate an invalidated policy under new cover, *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). Were it otherwise, an injunction against the government would be worth

little more than the paper it is printed on (much like The Times's "restored" Pentagon credentials). The government could continue to enforce unlawful policies for unlawful purposes with impunity. Courts have never approved such a regime, and the district court did not abuse its discretion in enforcing its earlier judgment. Its order should be affirmed.

## STATEMENT OF THE CASE

### A. Journalists Have Worked In the Pentagon for Eighty Years.

Since the Pentagon opened in 1942, journalists from The Times and other news organizations "have covered the Department from the Pentagon's grounds." J.A. 80, 206. Their presence has enabled timely, accurate reporting during times of war and crisis, including during the September 11 terrorist attack on the Pentagon itself. J.A. 60, 81. As the Department conceded and the district court found, the presence of press in the Pentagon has "enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military" while "posing no security or safety risk to Department property or personnel." J.A. 80–82, 99, 358.

For decades, credentialed journalists could enter and exit the Pentagon without an appointment and move freely within unrestricted areas, including Correspondents' Corridor and the Pentagon Press Briefing Room, J.A. 21, 357, as is the case for other government institutions, including Congress, the White House, the Supreme Court, and the Departments of Justice and State. *See Sherrill v. Knight*,

569 F.2d 124, 126–27 & n.3 (D.C. Cir. 1977). This access allowed reporters to engage with Department officials in the unscheduled, iterative manner needed for timely, comprehensive reporting. J.A. 330. It enabled credentialed reporters to cover official press briefings "called on short notice" or "without notice," ask questions of Department officials before and after those briefings, and have "semi-formal and informal conversations" with Department officials and personnel. J.A. 82.

To obtain a Pentagon Facilities Alternate Credential, or "PFAC," a journalist needed only to confirm employment with a news organization, pass a standard background check, and agree to follow basic rules, such as visibly wearing the credential and not entering secure, restricted areas. J.A. 207. Journalists observed those boundaries. J.A. 62, 82. Since the 1970s, the Pentagon also provided reporters with "dedicated office space" in the building, known as Correspondents' Corridor, where reporters set up desks and TV network booths. J.A. 21–22. Members of the Pentagon press corps, including from The Times, routinely worked there. J.A. 60, 81.

The longstanding ability of credentialed journalists to move unescorted through parts of the Pentagon is also consistent with the layout and other unique features of the building. "The Pentagon is the world's second largest office building, with about six-and-a-half million square feet of floor space." *New York Times Co. v. Dep't of Def.*, -- F. Supp. 3d --, 2026 WL 1872765, at *3 (D.D.C. June 30, 2026). "It 'includes areas that resemble a mall and are often crowded with visitors and non-

military employees,'" "'a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop[,]'" and it "has long been staffed by a thousand or more non-Department employees, including cleaning and maintenance professionals, contractors, consultants, representatives of other government agencies, and retail and cafeteria workers, who move around areas of the building unescorted every day." *Id*.

As the district court found based on undisputed evidence, credentialed journalists' regular, unescorted presence in the Pentagon has never impeded information security. As a former Assistant to the Secretary of Defense for Public Affairs testified, he never "encounter[ed] any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon," and found that "journalists were very sensitive to security considerations and cared deeply about the safety of men and women in the United States military." J.A. 74–75. In his experience, the Pentagon never "suspend[ed], revok[ed], or [didn't] renew any journalist's press credential because of a safety or security concern." J.A. 75. In addition, "Department leadership understood" that "cutting off access to the Pentagon for journalists could never stop reporting that was critical of the Department," J.A. 73–74, and that "it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon[,]" including because "during times of war or national crises, it benefits

everyone to ensure that timely, accurate, information is being conveyed to the American public." J.A. 74.

### B. Department Officials Target The Times and Other News Organizations for Their Editorial Viewpoint.

Since his nomination to serve as Secretary of Defense, Pete Hegseth and other Department officials have routinely attacked news organizations for reporting they consider unflattering or unfavorable. J.A. 14, 22, 32. For example, before and after the October Policy was issued, Pentagon officials publicly lambasted journalists and news organizations, including The Times, as "propagandists" who "stopped telling the truth," "Fake News reporters" who did not "actually ha[ve] a brain," "activists who masquerade as journalists," and "dishonest and performative." J.A. 30–33. Department officials asserted that "a lot of the mainstream media continues to lie," and publicly called for reporters to suffer "severe punishment" for their reporting. J.A. 93–94, 108.

In addition to its steady stream of criticism and threats directed at the press, the Department has also taken escalating steps to interfere with independent newsgathering and reporting. Among other things, early in Secretary Hegseth's tenure, the Department revoked the dedicated workspaces of The Times and several other news outlets whose coverage of his confirmation process Hegseth had criticized. J.A. 85.

**C. The Department Implements the October Policy.**

In October 2025, the Department announced a new Pentagon press credentialing policy. The October Policy vested Department officials with unbounded discretion to "den[y], revoke[], or not renew[]" the credential of any journalist it "reasonably determined to pose a security or safety risk," J.A. 24, 132, and made clear that routine newsgathering and reporting could lead to such a determination. Under the October Policy, a credential could be suspended or revoked "based on factors including," but not limited to, a reporter's "unauthorized access, attempted unauthorized access, or unauthorized disclosure of" nonpublic information, regardless of classification. J.A. 28, 136. It expressly stated that a journalist who "solicit[ed] the disclosure" of nonpublic information could be deemed a "security or safety risk," and defined "solicitation" to include any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips." J.A. 136. The Department identified no breach of security or other incident necessitating these new prohibitions. J.A. 86–87.

Before the final October Policy was issued, news organizations, including The Times, informed Pentagon leadership that it was incompatible with their First Amendment rights and that they could not sign the required "acknowledgement" affirming their "understand[ing]" of it. J.A. 138; *see also* J.A. 87–91. The Department nonetheless finalized it without meaningful change. J.A. 232–33. When The

Times announced its reporters would not affirm the October Policy, Secretary Hegseth responded on his official X account with an emoji of a hand waving good-bye. J.A. 231. After the October Policy went into effect, nearly all of the Pentagon press corps declined to sign the "acknowledgement" and lost their credentials as a result. J.A. 29.

Within days, Sean Parnell, Assistant to the Secretary of Defense for Public Affairs, took to his official X account to "announce the next generation of the Pentagon press corps"—a hand-selected group of "new" media the Department believed would deliver its preferred messaging. J.A. 30. It included the National Pulse, described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General. *Id*. Many had expressed ideological agreement with and support for the Trump administration or indicated that they did not intend to report critically on the Department. J.A. 30–31. According to Parnell, the "[n]ew media outlets" willing to accept the October Policy "circumvent the lies of the mainstream media and get real news to the American people" and "are far more effective and balanced than the self-righteous media" that had previously held PFACs. J.A. 79. Pentagon Press Secretary Kingsley Wilson called the journalists who had previously held credentials "propagandists who stopped telling the truth" and "continue[] to lie," while describing the Department's chosen

replacements as "the absolute best people" and "on board and willing to serve our commander in chief." J.A. 216, 233.

**D. Plaintiffs Successfully Challenge the October Policy.**

The Times and Barnes filed suit, asserting that the October Policy and their exclusion from the Pentagon was unconstitutional and violated the Administrative Procedure Act. J.A. 1. On March 20, 2026, following full briefing and a hearing, the district court granted summary judgment in Plaintiffs' favor, concluding that the October Policy violated the First and Fifth Amendments.

The district court found that the October Policy's provisions permitting Department officials to deem a reporter a "security or safety risk" and suspend, revoke, or not renew a reporter's press credential violated the Due Process Clause because they were impermissibly vague and did not "provide fair notice of what routine, lawful journalistic practices" would result in the deprivation of a protected liberty interest. J.A. 222–26. The resulting uncertainty, the district court ruled, would lead "journalists [to] opt not to ask any questions rather than risk losing their PFACs[.]" J.A. 226. The district court rejected the Department's claim that "the [October] Policy's limitations on journalists accessing or attempting to access information" only "proscribe[d] criminal solicitation," noting that it failed to "clearly distinguish between" what was considered "impermissible solicitation and plainly lawful journalistic practices." J.A. 224–25.

The district court also found, based on "voluminous record evidence," that the October Policy was an "unreasonable and viewpoint discriminatory" restriction on access to and use of a nonpublic forum in violation of the First Amendment. Specifically, the district court found the "true purpose and practical effect" of the October Policy "[was] to weed out disfavored journalists" unwilling to publish "only stories that are favorable to or spoon-fed by Department leadership." J.A. 228, 232–33. As the district court explained, "[t]he record evidence supports the conclusion that [the October Policy] discriminates . . . based on editorial viewpoint," with the "true purpose and practical effect" of "replac[ing]" independent news organizations like The Times "with news entities" that are, "in the Department's view, 'on board and willing to serve.'" J.A. 233.

The district court further found the October Policy unreasonable because "it vests Department officials with 'unbridled discretion' to enforce [its provisions] and fails to provide objective, workable standards for that enforcement." J.A. 234. The district court found the October Policy provided "no meaningful limitations" on Department officials' authority to deem a journalist a security or safety risk. J.A. 236. And it gave them unbounded discretion to deny or revoke a PFAC "for any reason or for no reason at all," beyond those enumerated in the October Policy. *Id.*

The district court rejected the Department's request for remand without vacatur, holding that the October Policy's "deficiencies are extremely serious" and that

the Department could not "'readily . . . cure' the defects identified in the Court's opinion." J.A. 241 (explaining that the Department's "suggestion that [it] could 'provide additional explanation' on remand . . . would not suffice to cure the constitutional deficiencies."). The district court also held that injunctive relief was appropriate. It determined that Plaintiffs suffered irreparable harm "[w]ithout their PFACs" because they were being deprived of "'the access to pursue'" "journalistically productive conversations." J.A. 240 (citing *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)). Noting that "defendants do not meaningfully dispute that the remedies available at law are inadequate," it further concluded that "[t]he only way to remedy the injury [from the loss of a press credential] is to return the hard pass and the access that comes with it." *Id*. (quoting *Karem*, 404 F. Supp. 3d at 217).

The district court vacated the October Policy's challenged provisions, enjoined their enforcement against Plaintiffs, and ordered the Department to "immediately reinstate" the Pentagon access of Barnes and six other Times reporters. J.A. 202, 239–42.

### E. The Department Issues the "Interim Policy."

The next business day after that ruling the Department announced that it "disagree[d] with the Court's decision" and was imposing a stopgap policy that would apply "[i]n the interim" while it "pursue[d] an appeal." J.A. 245.

That Interim Policy closed Correspondents' Corridor "[e]ffective immediately," J.A. 246—with the Department going so far as to tear down the "Correspondents' Corridor" sign that had hung in the building, J.A. 311. The Interim Policy prohibits credentialed journalists from entering the Pentagon except "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and, only then, if "escort[ed] by authorized [Department] personnel at all times." *Id.* The Interim Policy limits each media outlet's "escort privileges" to "three visiting media members." J.A. 252. The Department's stated justification for these restrictions was that the district court had purportedly vacated "the [October] Policy's security screening provisions" and, consistent with that rationale, the Interim Policy stated that these restrictions would remain in effect only "until [new screening] standards have been fully implemented." J.A. 246.

In addition, in response to the vacatur of the October Policy's "solicitation" provision, the Interim Policy "replace[d] the term 'solicitation' with 'intentional inducement of unauthorized disclosure,'" which the Department defined as

> intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclosing [sic] under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a.

J.A. 245, 257.

At the time, Commander Timothy Parlatore—a part-time Special Advisor to Secretary Hegseth and author of the Interim Policy—publicly described the Interim Policy as an effort to "us[e] more words to say the same thing" as the October Policy. J.A. 305, 354. Parlatore assembled the Interim Policy over a weekend. J.A. 305. And the record makes clear the Department was unprepared to implement it. J.A. 310, 359. New credentials were not available at the provided time. J.A. 348. The library annex reporters were told they could access could be reached only through areas from which they were barred. J.A. 310. And when Barnes secured a pre-approved interview—which was ultimately postponed—security refused him entry at the Visitor Center where the Department had directed him to meet his escort, saying journalists were not, in fact, permitted to enter there. J.A. 329, 360–61.

### F. The District Court Enforces its Judgment.

Contending that the Interim Policy was a clear attempt to evade the district court's summary judgment order, Plaintiffs moved to compel the Department's compliance. J.A. 340. Plaintiffs submitted a redline comparing the Interim Policy to the October Policy, demonstrating that significant portions remained unchanged, J.A. 263–91, and the parties filed multiple rounds of briefs and declarations in connection with Plaintiffs' motion. *See* No. 25-cv-4218, Dkts. 37–51 (D.D.C.). Following a hearing on March 30, 2026, the Department submitted a twelve-page supplemental declaration from Deputy Press Secretary Joel Valdez that, *inter alia*, addressed the

timing of the Department's issuance of new PFACs and Plaintiffs' inability to access previously accessible areas of the Pentagon. *Id.*, Dkt. 46. The parties filed additional briefs thereafter. Dkt. 47, 48. At no point did the Department argue it implemented the Interim Policy to prevent credentialed reporters from observing the "activity patterns" of Department personnel. Instead, the Department asserted the Interim Policy was needed because the district court had vacated "the [October] Policy's security screening provisions." Dkt. 41 at 16.

The district court entered an order enforcing its summary judgment ruling. J.A. 340–42 ("Enforcement Order"). It found that the Department's rushed effort to "cut off all PFAC holders' meaningful access" to the Pentagon was a "transparent" attempt to circumvent its order requiring "the Department to restore [Plaintiffs'] access to the Pentagon." J.A. 351, 359. It determined that the Interim Policy's change of "solicitation" to "inducement of unauthorized disclosure" was an unsuccessful attempt to "'cure' the impermissible restrictions" on protected newsgathering: nothing more than a "wording change" purporting to add a scienter requirement that was only "a mirage." J.A. 353–56.

The district court also held that the Department violated its order to restore to Barnes and other Times reporters their credentials and corresponding Pentagon access. J.A. 357. In particular, the court concluded that the Department's explanation for closing Correspondents' Corridor and imposing an escort requirement—that the

district court's "[o]rder [had] removed all security screening authority"—was "nonsense" because the order had left longstanding security screening protocols untouched. J.A. 356–58. The district court found it "ha[d] no choice but to conclude that the Department's abrupt closure of the Correspondents' Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon [wer]e not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of th[e c]ourt's [o]rder." J.A. 359.

In sum, the district court concluded the Interim Policy "flout[ed] [its] explicit directives and disregard[ed] the constitutional principles at the heart of [its merits opinion]," by resurrecting vacated provisions of the October Policy and imposing the escort requirement and other physical access restrictions that made it "exceedingly difficult to cover the Department and the U.S. military from the Pentagon grounds." J.A. 360–61. The district court enjoined the Department from enforcing the challenged parts of the Interim Policy against Plaintiffs. J.A. 371.

### G. The Department Appeals and Obtains a Partial Stay.

The Department appealed both the summary judgment ruling and the Enforcement Order. J.A. 363. It then sought a narrow stay for the sole purpose of allowing it to implement the Interim Policy's escort requirement pending appeal. *Id.* In support of its stay motion, the Department submitted a declaration from Wilson asserting, for the first time, that the escort requirement was adopted because she had

noticed a decrease in calls from journalists relating to "sensitive," controlled, or classified information after the October Policy, when most journalists were no longer working in the building—a phenomenon she attributed to reporters' decreased ability to "observe activity patterns" of Pentagon personnel and "time inquiries" strategically. J.A. 367; *see* Defs.' Reply in Support of Emergency Motion for Stay Pending Appeal, Doc. No. 2169693, at 11–12 (Apr. 21, 2026).

Noting that the escort requirement's constitutionality was not before it, a divided panel of this Court entered a stay on the ground that the Department was likely to succeed on its argument that the escort requirement was outside the scope of the district court's earlier order. *New York Times Co. v. Dep't of Def.*, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026). Judge Childs dissented, explaining that "an injunction is not an invitation to circumvention," and that "once a court has spoken, the party bound by its order may not evade it through creative policymaking." *Id.* at *6. Judge Childs would have denied the stay because, by eliminating "meaningful access" to the Pentagon for credentialed journalists, the escort requirement ran "headlong into what the injunction 'was really designed to accomplish.'" *Id.*

### H. Plaintiffs Challenge the Interim Policy in a Separate Lawsuit and the District Court Preliminarily Enjoins the Escort Requirement.

Plaintiffs filed a new action to challenge the Interim Policy on its merits and sought a preliminary injunction to bar enforcement of the escort requirement—the only challenged portion of the Interim Policy currently in effect as to The Times—

while that lawsuit was pending. *New York Times v. Dep't of Def.*, No. 26-cv-1690 (D.D.C.). The district court granted Plaintiffs' motion, concluding Plaintiffs were likely to succeed on the merits of their claim that the escort requirement was unconstitutional retaliation for their First Amendment-protected newsgathering, reporting, and litigation activity. *See New York Times Co.*, -- F. Supp. 3d --, 2026 WL 1872765, at *15. The Department appealed and sought a stay of the district court's preliminary injunction. A divided panel of this Court granted that motion, finding the Department likely to succeed on its argument that the escort requirement could not constitute retaliation because it applied to other journalists and news organizations—not solely Plaintiffs. *New York Times Co. v. Dep't of Def.*, 2026 WL 2168070, at *1 (D.C. Cir. July 16, 2026). Judge Garcia dissented. *Id.* That appeal is pending before this Court. *See Dep't of Def. v. New York Times Co.*, No. 26-5253 (D.C. Cir.).

**SUMMARY OF ARGUMENT**

The district court did not abuse its discretion when it enjoined enforcement of provisions of the Department's Interim Policy that defied its earlier summary judgment ruling. The Enforcement Order should be affirmed for the following reasons:

I. The Department has forfeited any challenge to the district court's summary judgment ruling. Its opening brief asks only that the Enforcement Order be vacated. Accordingly, the summary judgment ruling is final and binding on the Department, including the district court's unchallenged findings that the purpose and effect of the

October Policy—to "weed out" disfavored journalists based on editorial viewpoint, J.A. 233—was viewpoint discriminatory; that asking questions is lawful journalistic activity protected by the First Amendment, not a crime; and that decades of unescorted access to the Pentagon by credentialed journalists has posed no safety or security threat.

II. The district court did not abuse its discretion in enforcing its judgment. Courts have inherent power to enforce and interpret their judgments, *Peacock v. Thomas*, 516 U.S. 349, 356 (1996), and the exercise of that authority is particularly appropriate when an agency "plainly neglects the terms" of an order and the case returns to the same court on a motion to enforce it, *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). The district court correctly determined that the Department's hastily thrown-together Interim Policy violated its summary judgment order in multiple respects.

A. The Interim Policy's "inducement" provision, J.A. 257, violates the district court's order prohibiting enforcement of the October Policy's vacated provisions. Read, as it must be, together with the opinion that explains it, *United States v. Facebook, Inc.*, 136 F.4th 1129, 1133–34 (D.C. Cir. 2025), the district court's summary judgment order clearly vacated the October Policy's "solicitation" ban, J.A. 136, because it unconstitutionally sought to prohibit reporters from engaging in lawful, protected newsgathering activity, including asking questions of Department

personnel. The Interim Policy's "inducement" ban, J.A. 257, in its author's own words, simply "use[s] more words to say the same thing," J.A. 305. It continues to treat journalists asking questions as a basis for suspending or revoking their press credentials, and the Department's minor linguistic changes fail to disguise its defiance of the district court's order and the new restrictions' viewpoint-discriminatory objectives.

B. The Interim Policy's escort requirement and physical access restrictions violate the district court's mandate that the Department restore to each affected Times reporter his or her Pentagon press credential and the "access that comes with it." J.A. 240 (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)). The Interim Policy rendered those credentials worthless in an obvious attempt to flout that order. That the injunction did not expressly contemplate that the Department would attempt to strip press credentials of their value through these particular measures in no way excuses the Department's noncompliance.

C. Contrary to the Department's claims, the Enforcement Order is not inconsistent with the ability of an agency to respond to a court decision invalidating an action by taking a new action in compliance with that decision. *See NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984). That unremarkable rule does not insulate a measure designed to evade a court order; an agency cannot ignore an injunction or

flout it through the issuance of a "new" policy that aims to achieve the same unconstitutional objectives as the old one. Br. 2.

III. The Department's lengthy explication of the Interim Policy's supposed lawfulness is irrelevant. A motion to enforce asks whether the defendant complied with the judgment, not whether its noncompliant conduct would be independently lawful. And, in any event, the Interim Policy is not lawful. It is unconstitutional for the same reasons that the predecessor October Policy it attempts to resurrect was unconstitutional—reasons that the Department, by not challenging the district court's summary judgment ruling, cannot contest. The Interim Policy violates the First Amendment because, just like its predecessor, it discriminates based on editorial viewpoint and is an unreasonable restriction on First Amendment–protected activity in a nonpublic forum, *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018), including because it vests Department officials with unbridled discretion, *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025). It also violates the Due Process Clause because no reporter can know what a given Department employee is "authorize[d]" to disclose and because it invites arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Further, as explained in The Times's brief in the Department's related appeal from an order preliminarily enjoining the Interim Policy's escort requirement, the Interim Policy also violates the First Amendment because it retaliates against The Times for its journalism and for

successfully challenging the October Policy, *see Media Matters for Am. v. Paxton*, 138 F.4th 563, 580–84 (D.C. Cir. 2025), and was imposed to discriminate against Plaintiffs' editorial viewpoint. It is also arbitrary and capricious in violation of the Administrative Procedure Act because the Department engaged in nothing resembling reasoned decisionmaking when it issued the Interim Policy, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16, 21, 24 (2020).

## STANDARD OF REVIEW

A "district court's interpretation and enforcement of its own orders is typically subject to review only for abuse of discretion." *Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006); Br. 21. The district court's construction of its own judgment is entitled to deference, *Facebook*, 136 F.4th at 1134 n.3, and its factual findings are reviewed only for "clear error," *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 148 (D.C. Cir. 2015). A finding is clearly erroneous only if, on the entire record, the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## ARGUMENT

### I. The Department Has Forfeited Any Challenge to the Summary Judgment Order.

Although the Department initially appealed from the district court's summary judgment ruling, *see* Doc. No. 2173168, it has since abandoned any challenge to it.

The Department's statement of issues makes no mention of the summary judgment order's soundness, Br. 5; the Department asks only that this Court "vacate[]" the "district court's decision granting plaintiffs' motion to compel compliance," Br. 60. Accordingly, the district court's summary judgment ruling, including all of its factual findings, is final and uncontested. *Martin v. Dep't of Just.*, 488 F.3d 446, 454–55 (D.C. Cir. 2007).

When a party fails to raise a non-jurisdictional argument, that issue is forfeited. *See Ramirez v. Collier*, 595 U.S. 411, 422 n.1 (2022). Because the Department "fail[ed] to raise" any substantive challenge to the summary judgment ruling in its "opening brief," any such challenge is forfeited. *Am. First Legal Found. v. USDA*, 126 F.4th 691, 696 n.2 (D.C. Cir. 2025); *see also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004). The Department's one-sentence aside that the district court's viewpoint discrimination finding "was error even as to the October Policy," Br. 58–59, is insufficient. Such "obscure" "stat[ements] in conclusory fashion and without visible support" are not preserved. *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996). The Court should thus treat the summary judgment order as affirmed or dismiss that portion of the appeal as abandoned, and it should treat the district court's holdings and underlying factual findings as established for purposes of this case and any future

case between the parties. *See* Plaintiffs-Appellees' Br., *Dep't of Def. v. New York Times Co.*, No. 26-5253, Doc. No. 2191696, at 45–46 (D.C. Cir. Sept. 4, 2026).

The district court's summary judgment ruling established that the challenged provisions of the October Policy violated both the First and Fifth Amendments, including because the October Policy's "true purpose and practical effect" was viewpoint discriminatory: "to weed out" journalists disfavored based on the content of their coverage. J.A. 230–34. The ruling further established that everyday newsgathering techniques, including asking questions, are not "criminal solicitation," and proscribing them is unreasonable in light of the purpose of the forum, J.A. 223–25; that credentialed journalists' unescorted presence in the Pentagon for decades had posed no security or safety threat, J.A. 208, and that the loss of Plaintiffs' credentials inflicted irreparable harm remediable only by restoring each Times reporter's PFAC "and the access that comes with it," J.A. 240. Against this backdrop, unchallenged and therefore conceded by the Department, the Department cannot establish that the district court abused its discretion when it concluded that the Interim Policy—far from being a "legitimate" and "lawful" attempt to comply with the district court's ruling, J.A. 251—was a "transparent" and impermissible attempt to defy it, J.A. 359.

## II. The District Court Did Not Abuse its Discretion.

Courts have "inherent power to enforce [their] judgments," *Peacock*, 516 U.S. at 356, and in doing so, to interpret those judgments, *Madsen v. Women's Health*

*Ctr., Inc.*, 512 U.S. 753, 795 (1994) (Scalia, J., concurring in the judgment in part and dissenting in part); *Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting); *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019). That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Garment Workers' Union*, 733 F.2d at 922.

These principles apply to federal agencies like any other litigants. After an agency's policy has been vacated, the agency may not resume the same policy based on an already discredited rationale, *Garment Workers' Union*, 733 F.2d at 923, nor "avoid[] . . . [an] injunction" either "through a mere change of terminology," *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972), or by "experimentation with disobedience of the law," *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). And courts are empowered to award injunctive relief in APA cases to prevent that result. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 109–10 (D.D.C. 2025) (injunctive relief appropriate when vacatur likely to be insufficient). Indeed, as this Court has explained, such enforcement "is particularly appropriate" where, as here, an "agency plainly neglects the terms of [an order], and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original [order]." *Garment Workers' Union*, 733 F.2d at 922.

The district court faithfully applied this precedent. Its summary judgment order did two things. First, it enjoined the Department from enforcing the vacated provisions of the October Policy against Plaintiffs. Second, for Barnes and six of his Times colleagues, it ordered the Department to "immediately reinstate" their Pentagon press credentials "and the access that comes with [them]," J.A. 202, 240. The Interim Policy's "inducement" provision violates the first command, and its escort requirement and other access restrictions violate the second.

The Department attempts to justify its evasion of the district court's order as permissible because it did not use the exact same words that had been vacated by the district court and it issued new (yet worthless) physical credentials to Times reporters. Br. 18. Those arguments are meritless. "The First Amendment is no word game," and "the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'" *Chiles v. Salazar*, 607 U.S. 627, 645 (2026). The district court did not abuse its discretion in refusing to allow the Department's "blatant attempt to circumvent a lawful order of the Court to succeed." J.A. 352.[1]

---

[1] The Department relies extensively on the divided stay panel's April 27 order, Br. 2, 16, 19–20, 27–30. But that order was entered in an emergency posture, addressed only the escort requirement and no other aspect of the Interim Policy, and does not bind this Court. *See Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012). Indeed, Judge Garcia, who was part of the majority that granted that stay motion, later dissented from another divided panel's decision to stay the district court's order preliminarily enjoining the escort requirement—concluding that Plaintiffs are likely

### A. The "Inducement" Provision Violates the Summary Judgment Order.

The Interim Policy's "inducement" ban did "precisely what [the district court] expressly forbade [the Department] from doing": It "us[ed] revised language to proscribe the same 'lawful journalistic practices' that the vacated provisions encompassed." J.A. 353–54. The district court correctly concluded as much; it did not abuse its discretion to interpret and enforce its own orders.

In granting summary judgment in Plaintiffs' favor, the district court squarely held that the October Policy's "solicitation" provisions—its "limitations on journalists accessing or attempting to access non-public information"—were unconstitutional because they permitted Department officials to suspend or revoke journalists' credentials for any reason, including, specifically, for asking questions or seeking out information not approved for release by the Department. J.A. 223–25. As the district court explained, its ruling "recognized that 'obtaining and attempting to obtain information is what journalists do[,]'" and by empowering Department officials to "[p]unish[] journalists for requesting and receiving non-public information," the October Policy "would chill and penalize 'essential journalistic practices that the plaintiffs and others engage in every day.'" J.A. 352 (quoting J.A. 223–24).

---

to prevail on their argument that the escort requirement is unconstitutional. *See New York Times Co.*, 2026 WL 2168070, at *2–3.

The summary judgment ruling also established that the October Policy's "restrictions on journalists seeking information" violated the First Amendment because they were "unreasonable" and "amounted to viewpoint discrimination 'based on editorial viewpoint.'" J.A. 353 (quoting J.A. 233–39); *supra* pp. 12–13, 25. In light of its determination that the Department's "solicitation" ban was incompatible with the First and Fifth Amendments, the court concluded the Department could not "cure" its "constitutional deficiencies" merely by "'provid[ing] additional explanation' on remand." J.A. 241.

The Interim Policy does exactly what the district court told the Department it could not do: "endeavor[] to 'cure'" the October Policy's "impermissible restrictions on a journalist seeking information not authorized for release by providing 'targeted clarifications.'" J.A. 353 (quoting J.A. 245). Under the October Policy, "solicitation" of unauthorized information could trigger an adverse PFAC decision. J.A. 136. And, as the Department's opening brief acknowledges, under the Interim Policy "intentionally inducing disclosure of sensitive information from a Department employee that the reporter knows the employee is not authorized to disclose" can trigger "an adverse PFAC decision." Br. 40–41.[2] Simply put, the Department "replace[d]

[2] This includes mere "sensitive" information, which is not defined, as well as "controlled unclassified information" ("CUI"), which includes 113 categories of information, J.A. 225, 251, notwithstanding the district court's holding that barring the solicitation of such information raises Fifth Amendment vagueness concerns

the prohibition on 'soliciting' non-public or unauthorized classified or unclassified information with a prohibition on 'encouraging, inducing, or requesting' the disclosure" of such information. J.A. 353 (quoting J.A. 257). As the district court correctly concluded, "[t]hat is simply using revised language to proscribe the same 'lawful journalistic practices' that the vacated provisions encompassed." J.A. 354.

The Department has admitted as much. Parlatore stated publicly at the time that the Interim Policy's ban on inducement was intended to "use[] more words to say the same thing" as the October Policy's ban on solicitation. J.A. 305. Following the issuance of the Interim Policy, Parnell even described the inducement ban as a "prohibition on PFAC holders *soliciting* unlawful disclosures of sensitive information"—an exact description of the October Policy's vacated and enjoined solicitation provision. Decl. of Sean Parnell, *New York Times Co. v. Dep't of Def.*, No. 26-cv-1690-PLF (D.D.C.), Dkt. 11-3 at 4–5 (emphasis added). Moreover, the Interim Policy itself expressly states that it "includes targeted clarifications to correct" the district court's supposed "mischaracterizations" of the October Policy. J.A. 245. But the district court did not mischaracterize or misunderstand the October Policy's

---

because "[a] journalist cannot possibly know every piece of information that falls into one of those 113 categories," J.A. 225. In practice, "CUI" can encompass any information that the Department wants the label to cover and has no limiting principle. This is why the Department has repeatedly referred to the vague and undefined term "sensitive" information to describe the information it is purporting to protect. *E.g.*, J.A. 136–37, 161, 366–67.

ban on solicitation; it concluded it was unconstitutional, vacated it, and enjoined the Department from enforcing it—in a decision that the Department has abandoned any attempt to challenge on the merits. In the wake of that ruling, the Department was not permitted to just reinstitute its solicitation ban using different words to "say the same thing." J.A. 305. A party may not "avoid[] . . . [an] injunction through a mere change of terminology." *Christie Indus.*, 465 F.2d at 1007.

The Department points to two supposed clarifications in the Interim Policy that purportedly cure the unconstitutional defects in the October Policy's solicitation ban, but neither has the effect the Department asserts.

First, the Department highlights the so-called "scienter requirement"—which, it claims, "limit[s] the[] scope" of the inducement ban to "classified or controlled [unclassified] information" that a journalist "*knows* the specific Department employee at issue is *legally forbidden* to disclose." Br. 42. But the Interim Policy undercuts that ostensible limitation by creating a "rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought" *any time* that journalist "offer[s] . . . anonymity or privacy protection" to his or her source. J.A. 257. Rebutting that presumption requires the journalist to present "evidence that the journalist did not know that the employee was unauthorized to disclose the information" sought. J.A. 258. The Interim Policy gives no clue as to what evidence will suffice, imposes no guardrails to ensure consistent enforcement,

establishes no processes for fair adjudication, and expressly provides that any doubts will be resolved in the Department's favor—*i.e.*, in favor of revocation, denial, or non-renewal of a credential. As the district court found, the "supposed [scienter] requirement is illusory . . . because it presumes scienter and provides no clear path to rebut that presumption." J.A. 354.

The Department's presumption is also wholly incompatible with the First Amendment's protections for newsgathering and the practical realities of reporting. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) (explaining that "without some protection for seeking out the news, freedom of the press could be eviscerated"). As this Court has explained, "journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). Moreover, "[t]here are various reasons why a source may wish not to have their name published in connection with the information they provided, and honoring those preferences is often integral to [reporters'] ability to gather and report the news." J.A. 312–13 (Barnes Declaration); *see also id*. (testifying that "many *authorized* sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld"). The Interim Policy's scienter requirement ignores this reality. Because every bona fide Pentagon reporter will speak to sources on background, not for attribution, or on a confidential basis—

activity the First Amendment protects—every one of them would routinely be presumptively in violation of the Interim Policy's "inducement" provision. J.A. 258. That leaves the Department exactly where it started: free to decide when its "presumption" applies and when it has been rebutted, and ultimately free to suspend, revoke, or deny the press credential of any reporter who publishes information without identifying a source. J.A. 257–58. This is precisely the standardless, unbridled discretion that the First and Fifth Amendments—and the district court's unchallenged summary judgment decision—forbid.

Even setting aside that presumption, the Interim Policy's ban on "inducement" misleadingly and improperly recasts routine journalistic practices as unlawful in defiance of the district court's holding that "[t]he role of a journalist is to solicit information" and its admonition that "a journalist asking questions is not a crime!" J.A. 224–25. The October Policy threatened to punish conduct that does not approach criminal solicitation, as the district court determined. *Id*. The Interim Policy swaps in inducement but, like solicitation, inducement requires speech that "must do more than simply urge unlawful conduct." *United States v. Al-Timimi*, 164 F.4th 292, 309 (4th Cir. 2026). It is not satisfied merely by posing a question, *see, e.g.*, *United States v. McKinley*, 70 F.3d 1307, 1312 (D.C. Cir. 1995); *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969)—much less by a journalist doing so in the context of First Amendment-protected newsgathering. Thus, notwithstanding the Interim Policy's

supposed "scienter" requirement, Br. 42, its inducement ban penalizes and chills the everyday, fundamental journalistic practice of asking questions—in direct contravention of the district court's summary judgment order.

Second, the Department touts what it calls "safe harbors," Br. 43—six purported carve-outs for newsgathering activities that, according to the Department, "do not constitute 'intentional inducement of unauthorized disclosure' under this Policy," J.A. 258. But those narrow carve-outs—which exempt things like attending press conferences and receiving unsolicited information (without clarifying how the Department would know such information was unsolicited), *id.*—only confirm the Department's goal is to make press credentials contingent on reporters obtaining and publishing only information the Department has authorized for public release.

As the district court explained, despite its clear (and unchallenged) holding that "asking questions is fundamental to the role of a journalist, and a journalist's ability to ask questions is protected," the Interim Policy's "safe harbors" fail to ensure that "engagement in lawful journalistic practices will not trigger the revocation of a PFAC." J.A. 356. The safe harbors may provide some ostensible reassurance to journalists who wish to report only information conveyed at Department press conferences—a member, for instance, of the Department's "New 'Pentagon Press Corps'" who admits his outlet is "not an investigative news organization," J.A. 30–31—but they are cold comfort for reporters who wish to ask follow-up questions,

cultivate informal relationships across the Department, and pursue stories from different angles. The safe harbors "explicitly leave open the possibility that '[a]sking questions' on certain topics and to certain officials could trigger the revocation or denial of a PFAC." J.A. 356. Thus, even with the so-called "safe harbors," the Interim Policy's "inducement" ban continues to threaten the revocation of a journalist's credential if they solicit non-public information the Department has not authorized for release—precisely what the district court's summary judgment order prohibited.[3]

Finally, the Department argues that it was only bound to comply with "one injunction," which it asserts "permanently ENJOINED [it] from implementing or enforcing the Challenged Provisions of the [October] Policy to deny, suspend, revoke, or not renew the PFAC[s]" of Barnes and other Times reporters. Br. 35. And it argues that the district court erred by looking to the "*reasoning* contained in its summary judgment *opinion* to conclude" that the Department had violated its order. *Id*. 38. The Department argues, in essence, that the district court's decision was unenforceable—and required no compliance—beyond the narrowest construction of the order standing alone. The Department is wrong as a matter of law.

---

[3] The Interim Policy also still reaches calls for tips from Department personnel—a basic reporting technique that the Department makes no attempt to argue is unprotected by the First Amendment. Br. 54; *see* J.A. 258.

In determining whether the Department violated its ruling, the district court had "the power to construe and interpret the language of [its] judgment." *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014). As this Court has held, "[a] court order is not an isolated, self-contained writing but an order with the gloss of an accompanying opinion," and "injunctions should be read with all the connotations that are infused into their terms by the opinions of the issuing court." *Facebook,* 136 F.4th at 1133–34 (citations omitted). When the district court entered the Enforcement Order, it was properly "guided not only by the text of [its summary judgment] order but also by its related opinion[]." *Garcia Ramirez v. Immigr. & Customs Enf't*, 812 F. Supp. 3d 86, 97 (D.D.C. 2025) (citing *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977)).

The Department cites *no law* to support its assertion that "reasoning from [the] court's opinion" was irrelevant to determining the scope of its order. *See* Br. 38. With good reason. The Department cannot flout the district court's express holdings simply by mischaracterizing them as "isolated reasoning" or by wrongly suggesting that the inducement ban merely "r[an] afoul of the *spirit* of" the district court's decision. *Id*. (emphasis added). It did much more than that, as the district court made clear: The summary judgment decision "require[d] the Department to scrap its prior approach and start afresh" consistent with constitutional guarantees. J.A. 356–57. The Department's feeble attempt to construe the district court's decision as narrowly

as possible, and to erroneously treat its opinion as irrelevant and precatory, is an implicit acknowledgment that the inducement ban *did* violate the district court's decision, inclusive of its opinion and the reasoning therein.

As the district court put it, "there is little daylight between the [October] Policy's unconstitutional 'solicitation' prohibition and the Interim Policy's 'inducement' prohibition, and the latter is impermissible for the same reasons as the former." J.A. 356. The Interim Policy's "inducement" provision is not a "new" policy and the district court was well within its discretion to "see[] that [the] unambiguous mandate" set forth in its summary judgment ruling "[was] not blatantly disregarded." *Garment Workers' Union*, 733 F.2d at 922.

**B. The Interim Policy's Escort Requirement Violates the Summary Judgment Order.**

The Interim Policy's escort requirement and physical access restrictions, like its inducement ban, are "transparent attempts to negate the impact of [the district court's] [o]rder." J.A. 359. The district court was unassailably correct—and certainly did not abuse its discretion—in concluding that "[t]he Department did not comply" with its unambiguous directive to reinstate Plaintiffs' credentials *and the access* those credentials previously afforded. J.A. 357.

The district court's summary judgment order expressly required the Department to "immediately reinstate the PFACs" of seven Times reporters. J.A. 202. In doing so, the district court recognized and vindicated Plaintiffs' constitutional rights

to engage in protected newsgathering and reporting in a nonpublic forum free from vague, unreasonable, and viewpoint-discriminatory restraints—not a right to possess a piece of plastic. *See Sherrill*, 569 F.2d at 129. As the district court explained, PFACs are "press credentials that members of the media are issued *to access the Pentagon*." J.A. 206 (emphasis added); J.A. 229 n.6 ("[T]he protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this *access* not be denied arbitrarily or for less than compelling reasons.") (emphasis added) (quoting *Sherrill*, 569 F.2d at 129).

The district court's ruling vacated the October Policy's provisions that restricted reporters' access, restored the status quo ante, *and* granted further injunctive relief on the basis of its finding that Plaintiffs were suffering irreparable harm due to the denial of the *access* they previously had: Plaintiffs' "arbitrar[y] exclu[sion] from sources of information" caused them "irreparable First Amendment harm," J.A. 240 (quoting *Sherrill*, 569 F.2d at 129–30), because "[w]ithout their PFACs, the plaintiffs lack 'the access to pursue [journalistically productive] conversations.'" *Id.* Indeed, in issuing injunctive relief, the district court made explicit that restoring Times reporters' physical access to the Pentagon was required, stating that "the remedies available at law [were] inadequate" and that "[t]he only way to remedy the injury from the loss of a press credential is to return the hard pass *and the access that comes with it*." *Id.* (internal citations omitted) (emphasis added).

"Rather than comply with that [o]rder," the Department responded by "cut[ting] off *all* PFAC holders' meaningful access to the Pentagon." J.A. 351. The Interim Policy's escort requirement and physical access restrictions eliminated the very access that the district court ordered the Department to restore. While the Department issued PFAC *cards* to Barnes and his colleagues, it simultaneously stripped them of their value. As Barnes testified, the credentials issued *before* the district court's order "once scanned," enabled journalists "to enter through the turnstiles at the Pentagon entrance." J.A. 315. The new credentials issued with the Interim Policy did not. J.A. 309–10. In Barnes's words, the Interim Policy's escort requirement and access restrictions "m[ade] the reinstated PFACs that were issued to me and my colleagues . . . essentially worthless." J.A. 311.

The Interim Policy's escort requirement, which allows PFAC holders to enter the Pentagon only for pre-approved events or appointments, and only if shadowed by a Department minder, is a far cry from what Plaintiffs' credentials previously afforded. Indeed, as Barnes explains, "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or pre-arranged interview." J.A. 311. Thus, the new PFACs

issued to Barnes and his colleagues not only failed to restore the status quo ante, but also provide nothing beyond what is already available to journalists *without* PFACs.[4]

The Department argues that the district court never expressly adjudicated the lawfulness of the escort requirement or physical access restrictions, and it contends that those requirements do not suffer from the identical constitutional infirmities that doomed the vacated provisions of the October Policy. Br. 22–23, 26. But the district court squarely held that those provisions "flout[ed] [its] explicit directives" to restore Plaintiffs' credentials and their attendant access to the Pentagon and "disregard[ed] the constitutional principles at the heart of its [summary judgment ruling]." J.A. 361. Injunctions are construed in light of "the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *Christie*, 465 F.2d at 1007. That the escort requirement is not expressly referenced in the district court's summary judgment order is a function of the fact that it was invented overnight to flout that order and evade the district court's injunction. It was not incumbent on the district court to anticipate and specifically enjoin every possible gambit the Department might use to avoid reinstating

---

[4] Other non-Department employees who work at the Pentagon—in its coffee shops, restaurants, dry cleaners, pharmacy, and so forth—hold PFACs and have greater access than PFAC-holding journalists; they are able to gain entry and traverse the non-secure portions of the building unescorted. *New York Times Co.*, 2026 WL 1872765, at *3.

Plaintiffs' access. Rather, it was incumbent on the Department to reinstate that access in good faith in compliance with the district court's order, and not "undercut[] the effectiveness of [the] permanent injunction order and [Plaintiffs'] litigation generally" by necessitating "future litigation over enforcement of such an injunction order." *Perkins Coie LLP v. Dep't of Justice*, 780 F. Supp. 3d 227, 231 (D.D.C. 2025). Creative attempts to thwart the relief the district court ordered, trample the constitutional rights the injunction intended to vindicate and protect, and double down on the mischief the district court sought to prevent by its injunction cannot be deemed compliant merely because they are creative.

### C. The Enforcement Order Is Consistent with Agency Authority to Issue New Policies.

Nothing about the Enforcement Order calls into question whether an agency whose policy has been held unlawful may "respond" in good faith "by adopting a revised policy," Br. 36, and ordinarily "need not seek modification of [an] injunction before it initiates" that effort. *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984) (addressing new agency rule adopted following notice and comment rulemaking). An agency is free to respond to an injunction with new action consistent with the requirements of the Administrative Procedure Act provided it does not perpetuate what had previously been found unlawful. *See*, *e.g.*, *Am. Min. Cong. v. U.S. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 29 (D.D.C. 2000) (when the court "invalidated the Tulloch Rule because it regulated incidental fallback, the Court's order enjoining

the agencies from applying or enforcing the Tulloch Rule must be understood to bar the agencies from regulating incidental fallback"); *Washington v. Trump*, 2017 WL 1045950, at *3–4 (W.D. Wash. Mar. 16, 2017) (declining to enforce an injunction against agency implementation of an executive order to a new executive order when there were "substantial distinctions" between them); *see also Doe 2 v. Shanahan*, 755 F. App'x 19, 23 (D.C. Cir. 2019) (dissolving injunction when the "government took substantial steps to cure the procedural deficiencies the court identified" as a basis for the injunction). But an agency subject to an injunction is not free to reinstate the same policy found unlawful using different words or to enact an interim measure intended "to avoid compliance with th[e] court order" while the agency decides whether to seek further review. *NAACP*, 737 F.2d at 72 (describing *Garment Workers' Union*, 733 F.2d 920). That is precisely what the Department did here. J.A. 350, 354, 359–61. The Department did not engage in reasoned decisionmaking and adopt a new policy designed to cure the constitutional flaws the district court had identified in the October Policy. It threw together, effectively overnight, an "interim" set of rules that sought to evade compliance with a district court ruling it "disagree[d]" with, J.A. 245, and reinstated (using different words) vacated and enjoined provisions of the October Policy that the district court had just determined violated the First and Fifth Amendments, J.A. 305.

The Department insists that the district court could not "prevent [it] from making future changes to the rights and privileges that PFAC holders enjoy," Br. 18. But the district court never purported to forever prevent the Department from issuing any new policies in the future. The district court correctly determined that the Interim Policy violated its injunction. Noncompliance with an order is noncompliance, whether or not it is accomplished through an agency "policy" or otherwise. *Contra* Br. 35–36, 45. If the Department had returned the Times's PFACs and then, without comment, deactivated them so they no longer worked at the Pentagon turnstiles, no one would doubt that it had violated the order to reinstate them. The result is not different simply because the deactivation was written into an official memorandum.[5]

If the Department believed the summary judgment order erroneous, the appropriate course was to appeal or seek modification—not to ignore it under the guise of issuing what it now calls a "new" rather than "interim" policy.[6] "Persons subject

---

[5] None of the authorities the Department cites suggest the district court abused its discretion. Br. 36–37, 45–49. In *NAACP*, the injunction enforced the agency's own regulation; the district court erred by treating the agency's decision to modify that regulation through a notice and comment rulemaking process as a violation. 737 F.2d at 71–72. Here, by contrast, the district court was faced with open defiance of an injunction enforcing constitutional guarantees. In *Heartland Regional Medical Center v. Leavitt*, the judgment merely directed the agency to consider alternatives—and the court cautioned that its "usual rule" "would not apply" where the defect is "irredeemable." 415 F.3d 24, 29–30 (D.C. Cir. 2005). *Harmon v. Thornburgh* involved no enforcement proceeding at all. 878 F.2d 484, 495 (D.C. Cir. 1989).

[6] The Department stated in the Interim Policy that it "disagree[d] with" the district court's summary judgment "decision and [was] pursuing an appeal." J.A. 245.

to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386 (1980); *see Maness v. Meyers*, 419 U.S. 449, 458 (1975). Contrary to the Department's assertion, the district court did not "indefinitely free[ze] in place" the Department's press credentialing policies. Br. 5. Its order leaves the Department free to adopt genuinely new lawful measures through lawful means, and to seek modification under Rule 60(b)(5) on a showing of changed circumstances.

The Department's repeated insistence that the district court could not have enjoined it from pursuing "legitimate objectives," Br. 27–28, 36–37, simply ignores the district court's original judgment. The district court found that the October Policy rested on an unlawful premise—that a journalist may be prohibited from (and punished for) asking questions of Department officials—and was motivated by an unlawful objective: to exclude journalists unwilling to report only information "spoon-fed by Department leadership." J.A. 224–25, 233. That is why the district

---

Parnell reiterated that position in a March 23, 2026 post on X.com. *See* Dkt. 37-8 at 2 ("The Department . . . disagrees with the decision and is pursuing an appeal."). But the Department did not file a notice of appeal until after the district court issued the Enforcement Order—and it has now abandoned all efforts to defend the October Policy's constitutionality. Instead, the Department now pretends as if it always intended for the Interim Policy to be its new, permanent policy, rather than a stopgap implemented "[i]n the interim." J.A. 245; Dkt. 37-8 at 2.

court held the defects "extremely serious" and concluded that "'additional explanations' on remand would not suffice" to cure them. J.A. 241. No "targeted clarifications" or "more words to say the same thing," J.A. 245, 354, would comply with constitutional requirements. Thus, the Department's reliance on *Regents* for the proposition that an agency whose action has been set aside may "deal with the problem afresh by taking new agency action," 591 U.S. at 21, is badly misplaced. Br. 27. The "problem" the Department set out to address—stopping independent newsgathering and reporting that Department leadership dislikes—is not one that can be solved consistent with the First Amendment.

### III. Though Lawfulness Would Not Excuse Noncompliance, the Interim Policy is Unlawful.

The Department's extended attempt to defend the Interim Policy on its merits, Br. 30–34, 49–60, is, as the Department ultimately concedes, irrelevant. *See* Br. 49. An enforcement motion requires the court to decide whether "a defendant has . . . complied with a judgment entered against it," not whether the defendant's conduct could survive an independent legal challenge. *McCarthy*, 61 F. Supp. 3d at 39; *see also Garment Workers' Union*, 733 F.2d at 922; *Facebook*, 136 F.4th at 1133–34. The district court understood this perfectly. It addressed the unconstitutionality of the Interim Policy within the framework of determining whether its provisions were substantively the same as the October Policy's that had already been adjudicated unconstitutional—in a decision that the Department does not even attempt to contest

on its merits. *See*, *e.g.*, J.A. 356 (finding the Interim Policy's impermissibly vague standard to be "precisely" what its prior order had enjoined enforcement of). Because the district court correctly found that the Interim Policy violated its summary judgment order that is the end of the matter.[7]

But even on its own terms the Department's argument fails because the Interim Policy is independently unlawful. First, as Plaintiffs explain in their brief in the Department's related appeal from an order preliminarily enjoining the Interim Policy's escort requirement, that requirement is retaliatory and viewpoint discriminatory, unreasonably restricts access to and use of a nonpublic forum in violation of the First Amendment, *see Ateba*, 133 F.4th at 122, and violates the Administrative Procedure Act. *See* Br. of Appellees, *New York Times Co. v. Dep't of Def.*, No. 26-5253 (D.C. Cir. Sept. 4, 2026).

Second, now that the Department has forfeited any argument that the October Policy's "solicitation" ban is constitutional, *see supra* Part I, it cannot credibly contend that its "inducement" ban—which Parlatore admitted "say[s] the same thing" and which Parnell likewise described under oath as identically prohibiting "solicitation," J.A. 304, 352—is lawful. *See supra* pp. 28–37. As the district court correctly

[7] After a divided panel of this Court partly stayed the Enforcement Order, Plaintiffs filed a separate action to preserve their right to promptly seek relief from the Interim Policy, including its unstayed escort requirement. *See New York Times Co. v. Dep't of Def.*, No. 26-cv-1690-PLF (D.D.C.)

held, the Interim Policy's addition of a purported scienter requirement did not "solve[] the constitutional problems identified in the Court's" summary judgment ruling: That requirement is "illusory . . . because it presumes scienter and provides no clear path to rebut that presumption" whenever a source is offered anonymity. J.A. 354 (alterations omitted). Nor did the Department cure the October Policy's constitutional defects by adding purported "safe harbors"—because even with those additions, the Department failed to "make clear that engagement in lawful journalistic practices will not trigger the revocation of a PFAC." J.A. 356. As the district court explained, the October Policy's constitutional "deficiencies were so entrenched that there was no alternative but to require the Department to scrap its prior approach and start afresh." J.A. 356–57. The Interim Policy instead reflects a "fail[ure] to do so." J.A. 357.

The First Amendment unquestionably protects journalists' rights to both gather and publish information. *See Branzburg*, 408 U.S. at 681; *Zerilli*, 656 F.2d at 711; *Sherrill*, 569 F.2d at 130–31; *see also First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) ("The First Amendment guarantees all Americans the rights to speak, worship, *publish*, assemble, and petition their government freely." (emphasis added)). By continuing to make journalists' protected newsgathering activities, like speaking with sources on background, the possible basis for a PFAC suspension or revocation, the inducement ban vests

Department officials with the same impermissible "unbridled discretion to suppress expression" that the Department has now conceded rendered the October Policy unconstitutional. *See* J.A. 234, 237–39; *see City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988); *Ateba*, 133 F.4th at 124–25. And, for like reason, the Interim Policy perpetuates the same "arbitrary and discriminatory enforcement" regime as its predecessor October Policy that was found to violate the Fifth Amendment. J.A. 227; *see also Sherrill*, 569 F.2d at 130–31; J.A. 219–20. The Interim Policy's supposed "safe harbors" are immaterial changes that perpetuate "precisely" the "uncertainty and lack of clarity" the district court previously "held [was] unacceptable." J.A. 356. And, what is more, given the now-uncontested finding that the October Policy's "solicitation" provision was motivated by an intent to discriminate on the basis of viewpoint—to exclude those journalists not "on board and willing to serve" the administration, J.A. 233—it follows inexorably that the "inducement" provision had the same impermissible motive. The Department, after all, has offered nothing to suggest that its unlawful motive vanished in the two days between the injunction and the Interim Policy—nor could it credibly do so. *See McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 874 (2005). The evidence that both policies were motivated by animus against The Times's journalism is overwhelming, and in finding so this Court need not "exhibit a naiveté from which ordinary citizens are free." *Trump v. Cook*, 146 S. Ct. 2234, 2249 (2026) (citation omitted).

Finally, the Department is simply wrong that the inducement provision reaches only speech the First Amendment does not protect. Br. 51–52. A journalist posing a question does not constitute criminal solicitation. *See supra* Part II.A; *Counterman v. Colorado*, 600 U.S. 66, 76 (2023). Indeed, it is extraordinary for the Department to suggest that newsgathering—core First Amendment-protected activity—qualifies as speech lacking "social value." Br. 51; *see United States v. Williams*, 553 U.S. 285, 298 (2008). The Department's own authority only confirms how far its arguments stray from the precedent governing criminal solicitation. In *United States v. Hansen*, the Court construed a statute prohibiting "encourag[ing] or induc[ing]" unlawful conduct to reach only the solicitation or facilitation of a specific unlawful act, undertaken with the intent that the act occur. 599 U.S. 762, 771, 783 (2023). The Interim Policy departs from that standard in multiple ways: it presumes culpable knowledge from First Amendment-protected activity—offering to speak to a source on background or confidentially—and it resolves all doubts against the speaker. J.A. 257–58, 260–61. Whether Department employees may lawfully answer a question, Br. 52, says nothing about a journalist's right to ask it. And punishing such a "paradigmatically routine newspaper reporting technique" cannot be reconciled with the First Amendment. *Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989) (citation and alteration omitted). In fact, even speech as "[un]palatabl[e]" as urging someone to "leave the United States," "join the mujahideen," and "fight . . .

the Americans" is protected speech, not criminal solicitation, because it does not induce a particular illegal act. *Al-Timimi*, 164 F.4th at 299, 310–11; *see also Snyder v. Phelps*, 562 U.S. 443, 460–61 (2011) (the First Amendment "protect[s] even hurtful speech" that "inflict[s] great pain"). So too, the government may not prosecute someone merely for "promot[ing]," "encourag[ing]," or even "urg[ing]" a riot because those actions are not tied closely enough to a specific unlawful action. *United States v. Rundo*, 990 F.3d 709, 720 (9th Cir. 2021). If such speech is protected, as precedent makes clear it is, a journalist's offer of anonymity to a source in the course of newsgathering most certainly is. That the Department cites no case treating a reporter's question as criminal solicitation should dispose of this argument.

## CONCLUSION

This Court should affirm the now-uncontested district court order granting summary judgment to Plaintiffs and the district court's order enforcing that judgment.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.
Katie Townsend
Zachary C. Freund
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
ZFreund@gibsondunn.com

Susan M. Pelletier
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs-Appellees The New York Times Company and Julian E. Barnes.*

**CERTIFICATE OF COMPLIANCE (RULE 32(G)(1))**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 11,967 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2026, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.