**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-5113**

# In the United States Court of Appeals for the District of Columbia Circuit

THE NEW YORK TIMES COMPANY, *et al.*,

*Plaintiffs-Appellees*

*v.*

UNITED STATES DEPARTMENT OF DEFENSE,
also known as DEPARTMENT OF WAR, *et al.*,

*Defendants-Appellants*

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-4218-PLF
Hon. Paul L. Friedman, District Judge

## BRIEF OF THE SOCIETY FOR THE RULE OF LAW AS AMICUS CURIAE IN SUPPORT OF APPELLEES

Anne M. Voigts
Mauni Jalali
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2400 Hanover Street
Palo Alto, California 94304-1113
T: 650.233.4500/F: 650.233.4545
E: anne.voigts@pillsburylaw.com
mauni.jalali@pillsburylaw.com

Todd Kim
Ya'ara Barnoon
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
T: 202.663.8000/F: 202.663.8007
E: todd.kim@pillsburylaw.com
yaara.barnoon@pillsburylaw.com

Alexandra Elenowitz-Hess
PILLSBURY WINTHROP
SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
T: 212.858.1000/F: 212.858.1500
E: alex.elenowitz-hess@pillsburylaw.com

*Attorneys for Amicus Curiae*
*Society for the Rule of Law*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, undersigned counsel certifies as follows:

### A. Parties and Amici

To the best of counsel's knowledge, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Briefs for Appellants in this case and *New York Times Co. v. U.S. Department of Defense*, No. 26-5253 (D.C. Cir.), a pending related appeal.

### B. Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, the Society for the Rule of Law and Democracy, Inc. certifies that it is a nonprofit organization founded by lawyers and former public officials, whose general nature and purpose, insofar as relevant to this litigation, is to defend constitutional government, the integrity of the Nation's legal institutions, and the impartial administration of justice. The Society for the Rule of Law has no parent company and issues no stock, and no publicly held company has a 10% or greater ownership interest in it.

### C. Rulings Under Review

References to the rulings at issue in these two cases appear in the Briefs for Appellants.

**D. Related Cases**

These cases have not previously been before this Court or any court other than the district court. Undersigned counsel are aware of no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C), except that the two cases in which this brief is being filed are related to each other.

*/s/ Anne M. Voigts*
Anne M. Voigts

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ....... 1

PRELIMINARY STATEMENT ....... 3

SUMMARY OF ARGUMENT ....... 6

ARGUMENT ....... 7

AN UNREVIEWABLE MECHANISM TO DISFAVOR OR RETALIATE AGAINST PARTICULAR VIEWPOINTS IN THE PRESS IS IRRECONCILABLE WITH THE FIRST AMENDMENT ....... 7

I. The History and Purpose of the First Amendment Demand That It Be Understood to Constrain the Government from Disfavoring or Retaliating Against Particular Viewpoints in the Press, Whatever Means the Government Adopts to Do So ....... 8

II. The Court Thus Should Reject the Government's Categorical Argument That Generally Applicable Rules Cannot Constitute Retaliation Actionable Under the First Amendment ....... 13

III. The Government's Categorical Rule Fails Despite Its Invocation Of National Security. ....... 18

CONCLUSION ....... 26

## TABLE OF AUTHORITIES

### Cases

*Am. Sec. Council Ed. Found. v. F.C.C.*,
607 F.2d 438 (D.C. Cir. 1979) ....................21

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964)....................24

*Associated Press v. United States*,
326 U.S. 1 (1945)....................11

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025)....................17

*Beckerman v. City of Tupelo, Miss.*,
664 F.2d 502 (5th Cir. 1981) ....................23

*Boumediene v. Bush*,
553 U.S. 723 (2008)....................18, 19

*Branzburg v. Hayes*,
408 U.S. 665 (1972)....................2, 12, 13

*Brown v. Glines*,
444 U.S. 348 (1980) ....................22

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....................17

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975)....................11

*Dennis v. United States*,
341 U.S. 494 (1951) ....................18

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ....................22

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)....................................................................................13

*Flynt v. Rumsfeld*,
355 F.3d 697 (D.C. Cir. 2004)...........................................................................4

*Frederick Douglass Found., Inc. v. D.C.*,
82 F.4th 1122 (D.C. Cir. 2023)..........................................................................6

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011)...............................................................................13

*Gravel v. United States*,
408 U.S. 606 (1972) .....................................................................................5, 19

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936)....................................................................................11, 19

*Halperin v. Kissinger*,
606 F.2d 1192 (D.C. Cir. 1979)..................................................................21, 22

*Hassan v. City of New York*,
804 F.3d 277 (3d Cir. 2015) ............................................................................23

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) .........................................................................................9, 11

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)..........................................................................................13

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .........................................................................18

*McGehee v. Casey*,
718 F.2d 1137 (D.C. Cir. 1983).........................................................................21

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025).........................................................................14

*Mills v. State of Ala.*,
384 U.S. 214 (1966).......................................................................................3, 12

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*,
460 U.S. 575 (1983)....................15

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ....................26

*Nat'l Ass'n for Advancement of Colored People v. Button*,
371 U.S. 415 (1963)....................21

*Nation Mag. v. U.S. Dep't of Def.*,
762 F. Supp. 1558 (S.D.N.Y. 1991) ....................16

*Near v. State of Minnesota ex rel. Olson*,
283 U.S. 697 (1931)....................9, 10

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................9, 12

*New York Times Co. v. U.S. Dep't of Def.*,
No. 26-5253, 2026 WL 2168070 (D.C. Cir. July 16, 2026)....................15

*New York Times v. United States*,
403 U.S. 713 (1971) ....................9, 25

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*,
310 F.3d 43 (2d Cir. 2002) ....................7

*Pell v. Procunier*,
417 U.S. 817 (1974)....................6, 11

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)....................18

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ....................3, 12, 17

*United States v. Robel*,
389 U.S. 258 (1967)....................21, 23, 24

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)....................16

*Shelton v. Tucker*,
364 U.S. 479 (1960)....................24

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)....................16, 21

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................15

*United States v. Sterling*,
724 F.3d 482 (4th Cir. 2013) ....................4

*United States v. Sterling*,
732 F.3d 292 (4th Cir. 2013) ....................26

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994)....................14

*Tobey v. Jones*,
706 F.3d 379 (4th Cir. 2013) ....................23

*Toolasprashad v. Bureau of Prisons*,
286 F.3d 576 (D.C. Cir. 2002)....................15

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*,
407 U.S. 297 (1972)....................7, 21

*In re Washington Post Co.*,
807 F.2d 383 (4th Cir. 1986) ....................23

*Worrell Newspapers of Indiana, Inc. v. Westhafer*,
739 F.2d 1219 (7th Cir. 1984) ....................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................20

**Constitution**

United States Constitution
First Amendment ....................6, 20

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..........10

Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840* (2021) ..........20

Charles L. Black, Jr., *Structure and Relationship in Constitutional Law* (1969)....10

## GLOSSARY

| | |
|---|---|
| AOR | Area of Responsibility |
| CENTCOM | United States Central Command |
| DOD | United States Department of Defense |
| GAB | Brief for Defendants-Appellants, No. 26-5253 (filed Aug. 10, 2026) |
| *NYT* | *New York Times v. United States*, 403 U.S. 713 (1971) |
| PAG | Public Affairs Guidance |

## INTEREST OF AMICUS CURIAE[1]

The Society for the Rule of Law is a nonprofit organization of conservative, libertarian, and right-of-center lawyers, former public officials, and scholars dedicated to defending the Constitution and the rule of law regardless of politics or party affiliation.[2] The Society was originally founded under the name "Checks and Balances" in 2018 by lawyers who had served in previous Republican administrations. Created to advocate for constitutional government, defend the integrity of our legal institutions, and argue for the impartial administration of justice, the Society relaunched in 2023 to defend and advance these principles.[3]

The Society believes the press must be allowed to play its constitutionally protected role in our democracy's system of checks and balances, and that restricting critically important press access does not reconcile liberty and security as the Framers intended. Consistent with those concerns, the Society submits this *amicus*

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than amicus, its members, and its counsel contributed money intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

[2] Amicus filed a substantially identical brief in *New York Times Co. v. U.S. Department of Defense*, No. 26-5253 (D.C. Cir.), a pending related appeal.

[3] Information about the Society's leadership may be found at https://societyfortheruleoflaw.org/leadership/. The views of the Society do not necessarily reflect all of its individual members.

brief because the Department of Defense (DOD) asks this Court to adopt an improper interpretation of the First Amendment that runs contrary to the constitutional interests and democratic system of checks and balances for which the Society advocates. The government cannot design a rule with the purpose and effect of disfavoring or retaliating against particular viewpoints in the press (or the press full stop) and categorically escape First Amendment scrutiny so long as the rule purports to be neutral on its face. The government's argument that if all members of the media are equally denied access, there must be no First Amendment problem, is simply wrong, not to mention dangerous.

Insulating such rules against constitutional review would allow administrations of any political stripe to exclude or restrain journalists who are focused on probing military officials and defense policies and practices without a preconceived bias in favor of the government's story line. And it would encourage them to restrict the speech of the many in order to silence the few. Appellees ably explain how the government's categorical argument fails under current precedent. The Society provides additional context about how and why that argument is inconsistent with the longer arc of our constitutional experience, including of course the principle at stake here: preservation of the ability to gather news because "without some protection for seeking out the news, freedom of the press could be eviscerated," *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

## PRELIMINARY STATEMENT

Under our constitutional structure, journalists serve as the "constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. State of Ala.*, 384 U.S. 214, 219 (1966). As "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion), journalists are a necessary and "powerful antidote to any abuses of power by governmental officials." *Mills*, 384 U.S. at 219. Accordingly, the Free Press Clause protects them out of constitutional self-interest, so that they in turn can protect constitutional democracy and the rule of law. As Benjamin Franklin recognized nearly three centuries ago, "to suppress inquiries into the administration is good policy in an arbitrary government; but a free constitution and freedom of speech have such reciprocal dependance on each other, that they cannot subsist without consisting together." Benjamin Franklin, On Freedom of Speech and The Press (1737), *reprinted in* Memoirs of Benjamin Franklin; Written by Himself 71–82 (Harper & Brothers eds., 1860).

For decades, highly specialized journalists have covered the Department of Defense from inside the Pentagon, a beat considered "the toughest in Washington." Robert Sims, The Pentagon Reporters 146 (1983) (Assistant Secretary of Defense for Public Affairs for President Ronald Reagan). "The fact that the Pentagon reporters are dealing with military subjects suggests that they would be among the

first journalists to be subjected to government hostility, government restraint, government persecution, perhaps even government prosecution." *Id.* Those reporters are at the front line in the battle between what the public should know and what the government wants to surface, and few categories of speech are more valuable to the First Amendment than criticism of the government on matters of national security. "Criticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966); *see also United States v. Sterling*, 724 F.3d 482, 521 (4th Cir. 2013) (Gregory, J., dissenting in part) ("public debate on American military and intelligence methods is a critical element of public oversight of our government").

For decades, DOD policy generally favored open, independent reporting and disfavored excessive or unnecessary restrictions on access. *Flynt v. Rumsfeld*, 355 F.3d 697, 705 (D.C. Cir. 2004) ("[o]pen and independent reporting shall be the principal means of coverage of U.S. military operations"); *see also* Public Affairs Guidance (PAG) On Embedding Media During Possible Future Operations/Deployments In The U.S. Central Commands (Centcom) Area Of Responsibility (AOR) (Feb. 2003) (DOD's policy providing that "media will have long-term, minimally restrictive access to U.S. air, ground, and naval forces" even in "the absence of a [military] escort"). Now, however, in the name of national

security, it does not. Instead, it seeks to severely limit press access to the nation's largest government agency.

To be clear, the government has a profound, legitimate interest in national security. There will always be tension between the need to protect military activities and maintaining an open relationship between the military and the media. History illustrates, though, how easily national security concerns can be invoked to justify a wide variety of repressive government actions. As with the Pentagon Papers, "the Government usually suppresses damaging news but highlights favorable news." *Gravel v. United States*, 408 U.S. 606, 641-42 (1972) (Douglas, J., dissenting). In this filtering process, "the secrecy stamp is the officials' tool of suppression … used to withhold information which in '99 1/2%' of the cases would present no danger to national security." *Id.* at 642.

Here, the district court concluded that the government's rules restricting access were adopted with the purpose and effect of disfavoring or retaliating against particular viewpoints. Yet the government argues that its adoption of these rules is effectively unreviewable, at least for purposes of a retaliation analysis under the First Amendment, because they are purportedly facially neutral and applied even-handedly. Neither the Constitution's text nor the Supreme Court's jurisprudence nor invocations of national security concerns support effectively insulating such a decision from constitutional scrutiny.

## SUMMARY OF ARGUMENT

The First Amendment establishes that "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. Its prohibitions "appl[y] equally to executive actions." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1140 (D.C. Cir. 2023); *see also Pell v. Procunier*, 417 U.S. 817, 834 (1974) ("The First and Fourteenth Amendments bar government from interfering in any way with a free press."). The Framers adopted those protections because they recognized that an informed citizenry is a prerequisite for an open, well-functioning democratic society. Accordingly, as the history of the Free Press Clause amply demonstrates, the Clause constrains the political branches and protects the press so that the people can govern themselves. Placing particular government rules categorically beyond the reach of the Clause would violate that history and constitutional intent, especially if they were issued with the purpose and effect of disfavoring or retaliating against particular viewpoints in the press.

Over the last century, the Supreme Court's jurisprudence has reaffirmed the critical role played by the press in American society and protected the press's ability to perform its role effectively. Where the rubber really hits the constitutional road, though, is where the government defends its proposed restrictions on national security grounds. But here too, federal courts at every level have routinely rejected the notion that the government can foreclose the exercise of First Amendment rights

through the broad invocation of "national security." As those courts have recognized, the concept of "national security" is "so vague," *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972), that unconditional deference to its invocation would endanger the democratic experiment. *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 53–54 (2d Cir. 2002).

For more than 30 years, the Department of Defense has adopted a media policy that allowed media access to the military with relatively few limitations. It now abandons that policy and argues that its decision to reverse course is effectively unreviewable, at least for purposes of a retaliation claim, because the new policy purportedly implements a facially neutral rule evenhandedly. But under the First Amendment, that cannot (and does not) foreclose constitutional scrutiny.

## ARGUMENT

### AN UNREVIEWABLE MECHANISM TO DISFAVOR OR RETALIATE AGAINST PARTICULAR VIEWPOINTS IN THE PRESS IS IRRECONCILABLE WITH THE FIRST AMENDMENT

Under settled law, the First Amendment and in particular the Free Press Clause constrains the government from disfavoring or retaliating against particular viewpoints in the press even if it finds a workaround that (at least on its face) appears neutral. The government, however, takes the remarkable position that generally applicable rules restricting press access cannot constitute retaliation or viewpoint

discrimination actionable under the First Amendment. That is wrong, and fundamentally at odds with the principles underpinning the Constitution's protections. To adopt the government's position would give it carte blanche to punish those who engage in unwelcome reporting—so long as it can craft an ostensibly neutral sounding rule, it can restrict press access and avoid any inquiry into the actual retaliatory motives behind a particular rule. That is an invitation to unconstitutional mischief. Nor do the alleged national security concerns warrant taking the government up on its analysis—as courts have repeatedly recognized, if the government can cut short the constitutional inquiry by invoking national security, it can effectively cut off press access when and where it is needed most.

## I. The History and Purpose of the First Amendment Demand That It Be Understood to Constrain the Government from Disfavoring or Retaliating Against Particular Viewpoints in the Press, Whatever Means the Government Adopts to Do So

The First Amendment, and in particular the Free Press Clause, ensure that the press can give the American people the information they need to choose for themselves, rather than have the government choose for them. As Thomas Jefferson explained, the nation's "liberty depends on the freedom of the press, and that cannot be limited without being lost." 9 Thomas Jefferson, The Papers of Thomas Jefferson 239–40 (Julian P. Boyd ed., 1954). Or, as James Madison, the First Amendment's principal architect, put it later: "A popular Government, without popular

information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James Madison 103 (Gaillard Hunt ed., 1910).

The press thus appears in the Constitution by name as "an acknowledgment of the critical role played by the press in American society." *Houchins v. KQED, Inc.*, 438 U.S. 1, 17 (1978) (Stewart, J., concurring). Indeed, the Continental Congress dubbed "freedom of the press" as one of the "five great rights." *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 716–19 (1931). And ultimately, the First Amendment's Press Clause was ratified to give the press the protection required "to fulfill its essential role in our democracy" as "'one of the great bulwarks of liberty.'" *New York Times Co. v. United States* ("*NYT*"), 403 U.S. 713, 716 (1971) (per curiam) (Black, J., concurring) (quoting Madison's version of the speech and press clauses, introduced in the House of Representatives on June 8, 1789).

The Founders conceived of the "liberty" of the press as "a freedom in canvassing the merits and measures of public men of every description," *Near*, 283 U.S. at 718, and "of free communication among the people thereon," *New York Times Co. v. Sullivan*, 376 U.S. 254, 274 (1964) (quoting the Virginia Resolutions of 1798). They upended the British system, abolishing the government's power to censor the press so that the press would remain free to censure the government. *See Sullivan*, 376 U.S. at 275 ("the censorial power is in the people over the Government,

and not in the Government over the people") (quoting 4 Annals of Cong. 934 (1794)).

As the Supreme Court has recognized, "the right of free public discussion of the stewardship of public officials … was a fundamental principle of the American form of government." *Id*. The health of the United States as a democracy depends on a vigorous, independent press: just as "the right of electing the members of the government constitutes more particularly the essence of a free and responsible government," "[t]he value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively.'" *Id.* at 275 n.15 (quoting 4 Elliot's Debates on the Federal Constitution, 575 (1876)).[4]

True, for its first 150 years, the Court did not have occasion to opine on the Free Press Clause given "almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers." *Near*, 283 U.S. at 718. Over the last century, however, the Supreme Court has reaffirmed

---

[4] The structural character of the guarantee is a settled theme of the scholarship. *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) (the First Amendment as a populist guarantee running to the people's capacity to monitor their agents); Charles L. Black, Jr., *Structure and Relationship in Constitutional Law* (1969) (constitutional meaning derives from the structures the document creates, not from clauses read in isolation).

again and again "the critical role played by the press in American society" and the "sensitivity" to the "special needs of the press in performing [its role] effectively" that the Constitution requires. *Houchins*, 438 U.S. at 17 (Stewart, J., concurring).

Precedent reflects the founding principle that "a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Thus, in *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936), the Supreme Court struck down a state license tax on popular newspaper publications because the "predominant purpose" of the First Amendment's Free Press Clause is "to preserve an untrammeled press as a vital source of public information":

> The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. … A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

*Id.* at 250. Similarly, in *Pell v. Procunier*, 417 U.S. 817 (1974), the Court reiterated that the constitutional guarantee of a free press "assures the maintenance of our political system and an open society, and secures the paramount public interest in a free flow of information to the people concerning public officials." *Id.* at 832 (citations omitted). And in *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975), the Court recognized that the press in particular is indispensable to an "open society":

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.

*Id.* at 491–92.

Ultimately, the press plays a critical role as surrogates for the public, *Richmond Newspapers*, 448 U.S. at 573, and an indispensable means to a core, constitutional end: "keeping officials elected by the people responsible to all the people whom they were selected to serve," *Mills*, 384 U.S. at 219.

To facilitate the First Amendment's "profound national commitment" to protecting the free discussion of governmental affairs, *Sullivan*, 376 U.S. at 270, the First Amendment protects certain important "special needs" of the press, including the press's rights to: (i) gather news, because "without some protection for seeking out the news, freedom of the press could be eviscerated," *Branzburg*, 408 U.S. at 681; *see also Richmond Newspapers*, 448 U.S. at 576–77 (same); (ii) "seek news from any source by means within the law," including "the use of confidential sources," *Branzburg*, 408 U.S. at 681–82; *see also Pell*, 417 U.S. at 834 ("a journalist is free to seek out sources of information not available to members of the general

public"); (iii) "receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972); (iv) be protected from the government "disrupt[ing] a reporter's relationship with his news sources … [with] no justification," *Branzburg*, 408 U.S. at 707–08; and (v) be protected from the government "limiting the stock of information from which members of the public [or press] may draw," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978); *see also Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (applying the "interest in protecting the stock of public information" to the press); and (vi) receive protection from prior judicial restraints, *NYT*, 403 U.S. 713.

The journalists at the courthouse door (or the Pentagon corridor) stand there for the rest of us. Accordingly, the First Amendment prevents the government from choosing particular ones to favor and disfavor, whether through actions expressly directed at the press, particular viewpoints, and/or a disposition to report with or without a particular bias or actions merely designed to achieve that end.

## II. The Court Thus Should Reject the Government's Categorical Argument That Generally Applicable Rules Cannot Constitute Retaliation Actionable Under the First Amendment

In this case, the government suggests that the First Amendment provides no basis to object if the rule in question was (i) adopted in order to retaliate against the press or discriminate against a particular viewpoint so long as (ii) it is facially neutral and evenly applied. As demonstrated, though, the history and purpose of the Free

Press Clause does not tolerate giving the government a ready-made and unreviewable mechanism for engaging in such retaliation. The Society concedes that it may be a considerable burden for a challenger to show that a particular policy was in fact unconstitutionally retaliatory or viewpoint-discriminatory if written in general terms. But the government's categorical argument must be rejected.

Take the retaliation analysis: To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that it engaged in protected activity, that the government took "retaliatory action sufficient to deter a person of ordinary firmness in [plaintiff's] position from speaking," and that there is a "causal link" between the protected activity and the adverse action. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (citation omitted). The government, however, takes the extraordinary position that a prospective and generally applicable rule can never constitute adverse action against the target of retaliation, no matter how clear the motive or how serious the burdens. GAB 26. But as Judge Garcia noted in dissenting from the decision staying the district court decision, the adverse-action inquiry poses a relatively low bar. *Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) ("the First Amendment protects ... from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee'" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990))). All it is intended to do is to screen out claims based on government actions so minor they would not "inhibit an ordinary person from

speaking." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002). As Judge Garcia noted, though, "if threatening to impose a requirement like the escort requirement on one journalist would (as the district court found) sufficiently chill his speech, it makes little sense to suggest that effect evaporates if the government threatens to impose the same requirement on *all* reporters. Indeed, the chilling effect on a speaker with any regard for his peers may be amplified." *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5253, 2026 WL 2168070, at *3 (D.C. Cir. July 16, 2026) (Garcia, J., dissenting). Simply put, a retaliatory government policy should not be immunized because it is broadly and evenly applied—that only encourages the government to restrict the speech of many in order to restrict the speech of some or one. That in turn makes the First Amendment problem more pressing, not less.

So too for questions of viewpoint discrimination. The constitutional free pass the government requests would enable viewpoint discrimination by an administration whether it believes that the mainstream media is the enemy or, conversely, wants to shut down grassroots voices to control the narrative. "When the State singles out the press," it "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585 (1983); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011) (laws that target "a narrow class

of disfavored speakers" frequently run afoul of the First Amendment). The broad denial of access can become a tool in the hands of whatever administration holds power to disfavor probing inquiry by journalists, thus suppressing journalists who might challenge Pentagon officials and thus provide the public with more information.

Once the government "has opened a limited forum," it "must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). For example, in 1966 the Secret Service denied a White House press pass to Robert Sherrill, the Washington correspondent of The Nation, on grounds of national security (grounds it declined to explain). *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). When the issue reached this Circuit, this Court held that where the White House had "voluntarily decided to establish press facilities for correspondents who need to report therefrom," access could "not be denied arbitrarily or for less than compelling reasons" without violating the First Amendment. *Id.* In so holding, the Court explained that "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id.* at 129–30; *see also Nation Mag. v. U.S. Dep't of Def.*, 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991) (where "the government

chose to grant some access to the press for purposes of covering military activities in the Persian Gulf," the government "created a place for expressive activity" and "in essence, determined that the war theatre was a limited public forum" such that "the government is under an obligation to insure that access not be denied arbitrarily or for less than compelling reasons"). *Cf. Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025) ("the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable").

Even justifications that are facially reasonable and viewpoint-neutral "will not save a regulation that is in reality a facade for viewpoint-based discrimination," because such justifications "cannot save an exclusion that is, in fact, based on the desire to suppress a particular point of view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811–12 (1985); *see also Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring) (under the First Amendment, "a tradition of accessibility implies the favorable judgment of experience"). To hold that a rule is beyond constitutional question because it is facially neutral would do just that.

Moreover, such an arbitrary rule would not expire with this policy or this administration. It would lie ready at hand for every administration to come, of every political persuasion, in controversies no one can now foresee. The Supreme Court has warned against precisely that danger: "Innocent motives do not eliminate the danger of censorship," because "future government officials may one day wield such

statutes to suppress disfavored speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 167 (2015). "The vice of content-based legislation … is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting)).

## III. The Government's Categorical Rule Fails Despite Its Invocation Of National Security.

Ours is a Constitution "intended to endure for ages to come." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). Present-day exigencies cannot circumvent fundamental constitutional guarantees because "[t]he laws and the Constitution are designed to survive, and remain in force, in extraordinary times." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008); *see also Dennis v. United States*, 341 U.S. 494, 520 (1951) (Frankfurter, J., concurring) ("But even the all-embracing power and duty of self-preservation are not absolute. … [I]t is subject to applicable constitutional limitations. … The First Amendment is such a restriction. It exacts obedience even during periods of war; it is applicable when war clouds are not figments of the imagination no less than when they are.").

At times, the First Amendment's "imperative of a free and unfettered press" comes into collision with the effective exercise of certain "powers of the Executive." *NYT*, 403 U.S. at 748. In this case, the government presents the "collision," *id.*, as

one between "jeopardizing national security" and "First Amendment injury." GAB 11, 20. But both the case law and the Constitution are clear: the First Amendment interest in informed popular debate does not vanish at the invocation of national security. *See Boumediene*, 553 U.S. at 798 ("Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law."). In fact, liberty and security have long been reconciled under the Pentagon's existing policy of comparatively liberal access.

The Framers of the First Amendment, fully aware of both the need to defend a new nation and the abuses of the English and colonial governments, "sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged." *NYT*, 403 U.S. at 719 (Black, J., concurring); *see also Grosjean*, 297 U.S. at 245–51 (discussing the history of the British government's "persistent effort" to "prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government"). Jefferson in a letter to Madison, dated December 20, 1787, posed the question of "'whether peace is best preserved by giving energy to the government, or information to the people,' and then answered, 'This last is the most certain, and the most legitimate engine of government.'" *Gravel*, 408 U.S. at 641 (Douglas, J., dissenting) (quoting 6 Writings of Thomas Jefferson 392 (Memorial ed. 1903)). Embodying that choice to provide

"information to the people," *id.*, the First Amendment categorically demands that "Congress shall make no law … abridging the freedom of speech, or of the press."

The men who wrote the Free Press Clause were not innocents in matters of national security. They had won independence from the world's preeminent military power and had no assurance of keeping it; they governed a republic that European empires bordered on three sides; they knew espionage, sedition, and the fragility of a new state as facts of daily governance rather than abstractions. *See* Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840*, at 111–32, 140–44 (2021); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring) ("the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation"). Writing in that world, they might have qualified the press's freedom and reserved to the government some power over publication in times of danger, as every government they had ever known had claimed. They wrote instead a guarantee without proviso. The proposition the government advances—that the press's freedom bends to the government's assessment of present danger—has thus been considered before by the generation with the strongest claim to make it and the most to lose by making it wrongly, and squarely rejected.

Both the Supreme Court and this Court thus have rejected the notion that the government can "foreclose the exercise of constitutional rights by mere labels." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963). As this Court has previously identified, "[t]he term 'national security' is inherently vague." *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) (collecting cases); *see also Halperin v. Kissinger,* 606 F.2d 1192, 1200 (D.C. Cir. 1979) (same). "[D]ifferent people rely on it and use it in different ways" and "to attack protected speech [under the First Amendment] with such vagueness is as unthinkable as attempting to enforce a preamble as positive law." *Am. Sec. Council Ed. Found. v. F.C.C.*, 607 F.2d 438, 456 (D.C. Cir. 1979) (Wright, J., concurring). Similarly, in *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297 (1972), the Supreme Court held that "the danger" to the First Amendment is "acute" where the government "attempts to act under so vague a concept as the power to protect 'domestic security' … given the difficulty of defining the domestic security interest." *Id.* at 314; *see also, e.g.*, *United States v. Robel*, 389 U.S. 258, 263–64 (1967) (explaining that "the phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit" because "even the war power does not remove constitutional limitations safeguarding essential liberties"); *Sherrill*, 569 F.2d at 130 ("the phrase 'reasons of security' is unnecessarily vague and subject to ambiguous

interpretation"). The government's need for secrecy cannot eliminate constitutional scrutiny.

Indeed, courts have recognized that invocations of national security concerns warrant skepticism, lest such matters become a First Amendment-free zone:

> There seems to be no limit to the Government's argument. The Government could use its "[security] intelligence" argument as a justification to close any public hearing completely and categorically. … The Government could operate in virtual secrecy in all matters dealing, even remotely, with "national security," resulting in a wholesale suspension of First Amendment rights. By the simple assertion of "national security," the Government seeks a process where it may, without review, designate certain classes of cases as "special interest cases" and, behind closed doors, adjudicate the merits of these cases. … This, we simply may not countenance. A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution.

*Detroit Free Press v. Ashcroft*, 303 F.3d 681, 709–10 (6th Cir. 2002).[5] Accordingly, "[n]o matter how tempting it might be to do otherwise, we must apply the same rigorous standards even where national security is at stake. We have learned from experience that it is often where the asserted interest appears most compelling that

---

[5] *See also Brown v. Glines*, 444 U.S. 348, 369 (1980) (Brennan, J., dissenting) ("Because they invariably have the visage of overriding importance, there is always a temptation to invoke security 'necessities' to justify an encroachment upon civil liberties. For that reason, the military-security argument must be approached with a healthy skepticism: its very gravity counsels that courts be cautious when military necessity is invoked by the Government to justify a trespass on First Amendment rights."); *Halperin,* 606 F.2d at 1200–01 ("The Court has not denied the reality of dangers from foreign or internal conflicts. Rather, it has recognized the need to respect constitutional requirements even in troubled times.").

we must be most vigilant in protecting constitutional rights." *Hassan v. City of New York*, 804 F.3d 277, 306–07 (3d Cir. 2015); *Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013) ("And while it is tempting to hold that First Amendment rights should acquiesce to national security … , our Forefather Benjamin Franklin warned against such a temptation by opining that those 'who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety.'"); *In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986) ("History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions."); *Beckerman v. City of Tupelo, Miss*., 664 F.2d 502, 514 (5th Cir. 1981) ("The concept of 'security risks' takes on special significance in First Amendment context."). The government cannot "bend[] constitutional principles" merely because an interest in national security is invoked. *Hassan*, 804 F.3d at 307 (citation omitted). To the contrary, even "the country's interest in national security must [at times] bend to the dictates of the First Amendment." *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir. 1984).

Two cases exemplify the courts' rejection of the subordination of First Amendment rights to the vagaries of "national security." *First*, in *United States v. Robel*, 389 U.S. 258 (1967), the Supreme Court invalidated a Cold War-era statute barring members of the Communist Party from working at a shipyard after the Secretary of Defense had designated it a "defense facility." The government claimed

that statute was "an expression of the growing concern shown by the executive and legislative branches of government over the risks of internal subversion" by Communists in facilities "on which the national defense depends." *Id* at 264. (citations omitted). Although the Supreme Court acknowledged that "[t]he Government's interest in such a prophylactic measure is not insubstantial," it held that the means chosen to implement that governmental purpose "cut deeply"—too deeply—into "the exercise of First Amendment rights." *Id.*

The Court explained that the "concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal." *Id*. ("Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart."). The Court went on, "[f]or almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." *Id.* Under *Robel*, even a "legitimate and substantial" governmental purpose cannot be pursued by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Aptheker v. Sec'y of State*, 378 U.S. 500, 508 (1964) (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

*Second*, in *New York Times Co. v. United States*, 403 U.S. 713 (1971), the United States famously sought to enjoin newspapers from publishing the contents of the Pentagon Papers, a classified historical study on Vietnam policy that revealed that the government had systematically lied to the public and Congress about the scope and prospects of the Vietnam War. The Supreme Court rejected the prior restraint, holding that the government did not meet its heavy burden of showing justification for its imposition. In his concurrence, Justice Black expressly rejected the government's national security rationale: "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic." *NYT*, 403 U.S. at 719 (Black, J., concurring); *see also id.* at 718 (rejecting "the bold and dangerously far-reaching contention that the courts should take it upon themselves to 'make' a law abridging freedom of the press in the name of equity, presidential power and national security, even when the representatives of the people in Congress have adhered to the command of the First Amendment and refused to make such a law"); *id.* at 724 ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health.") (Douglas, J., concurring).

The tension between national security and the freedom of the press "is not going to abate"; rather, "the question is how a responsible balance may be achieved." *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring); *see also United States v. Sterling*, 732 F.3d 292, 294 (4th Cir. 2013) ("[G]overnment at all levels, must meet its obligation to provide [the press] with the fullest possible information outside the narrowest limits of national security." (quoting President John F. Kennedy, The President and the Press, Address before the American Newspaper Publishers Association (April 27, 1961))). The government's proposed rule, however, is not the answer. As the Fourth Circuit recognized in *Morison*, "[p]ublic security can … be compromised in two ways: by attempts to choke off the information needed for democracy to function, and by leaks that imperil the environment of physical security which a functioning democracy requires." 844 F.2d at 1081 ("National security is public security, not government security from informed criticism."). This Court should reject the government's invitation to adopt an analytical approach that would categorically privilege claims of the latter over the very real risks of the former.

## CONCLUSION

This Court should affirm.

Dated: September 16, 2026
Palo Alto, California

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Anne M. Voigts*
Anne Voigts
Mauni Jalali
2400 Hanover Street
Palo Alto, California 94304
Tel.: (650) 233-4500
Fax: (650) 233-4545
anne.voigts@pillsburylaw.com
mauni.jalali@pillsburylaw.com

Todd Kim
Ya'ara Barnoon
1200 17th Street, NW
Washington, D.C. 20036
Tel.: (202) 663-8000
Fax: (202) 663-8007
todd.kim@pillsburylaw.com
yaara.barnoon@pillsburylaw.com

Alexandra Elenowitz-Hess
31 West 52nd Street, 29th Floor
New York, New York 10019
Tel.: (212) 858-1000
Fax: (212) 858-1500
alex.elenowitz-hess@pillsburylaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 6,479 words of the foregoing brief, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5).

*/s/ Anne M. Voigts*
Anne M. Voigts

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I electronically filed the foregoing brief in support of Plaintiffs-Appellees with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

*/s/ Anne M. Voigts*
Anne M. Voigts