**ORAL ARGUMENT SCHEDULED NOVEMBER 16, 2026**

No. 26-5113

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE NEW YORK TIMES COMPANY, *et al.*,
*Plaintiffs-Appellees*,

v.

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,
*Defendants-Appellants*.

On Appeal from the
United States District Court for the District of Columbia
No. 1:25-cv-04218 (Hon. Paul L. Friedman, J.)

# BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 34 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE

Bruce D. Brown
*Counsel of Record*
Lisa Zycherman
Gabriel Rottman
Marietta Catsambas
Annie Seminara (*of counsel*)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
bruce.brown@rcfp.org

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)**

A. Parties and amici curiae

Except for the following amici, all parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document 2173174: Association of Alternative Newsmedia, The Atlantic Monthly Group LLC, Axios, Boston Globe Media Partners, LLC, BuzzFeed, The Center for Investigative Reporting, Committee to Protect Journalists, The Daily Beast Company LLC, First Amendment Coalition, The Intercept Media, Inc., McClatchy Media Company, LLC, The Media Institute, Media Law Resource Center, MediaNews Group Inc., MS NOW, National Freedom of Information Coalition, National Newspaper Association, National Press Club Journalism Institute, The National Press Club, National Press Photographers Association, National Public Radio, Inc., The New Yorker, News/Media Alliance, Online News Association, PEN America, ProPublica, Inc., Pulitzer Center on Crisis Reporting, Radio Television Digital News Association, Reuters News & Media Inc., Slate, Society of Environmental Journalists, Society of Professional Journalists, The War Horse News, and The Washington Post.

B. Rulings under review

References to the rulings at issue appear in Appellants' Certificate as to Parties, Rulings, and Related Cases, Document 2173174.

C. Related cases

One related case is pending before this Court: *New York Times Co. v. U.S. Department of Defense*, No. 26-5253 (D.C. Cir.).

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock.

Boston Globe Media Partners, LLC, is a privately held company. No publicly held corporation owns 10% or more of its stock.

BuzzFeed, Inc. ("BuzzFeed"), is a publicly traded company (NASDAQ:BZFD). No publicly held company owns 10% or more of BuzzFeed's stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

The Committee to Protect Journalists is a nonprofit organization with no parent corporation and no stock.

The Daily Beast Company LLC is a wholly-owned indirect subsidiary of IAC/InterActiveCorp, a publicly traded company.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

MS NOW Cable, LLC ("MS NOW"), previously MSNBC, is a subsidiary of Versant Media Group, Inc., a publicly traded company.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

The National Press Club Journalism Institute is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

The New Yorker is a national magazine published by Condé Nast, which is a division of Advance Magazine Publishers Inc., the shares of which are not publicly traded. There is no publicly held corporation that owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

PEN American Center, Inc. has no parent or affiliate corporation.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Pulitzer Center on Crisis Reporting is a non-profit organization with no parent corporation and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

Slate is part of The Slate Group, a wholly owned subsidiary of Graham Holding Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The War Horse is a non-profit 501(c)(3) and has no parent corporations or subsidiaries.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos.

WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

## TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) ..... i

CORPORATE DISCLOSURE STATEMENTS ..... ii

TABLE OF AUTHORITIES ..... ix

STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF AUTHORITY TO FILE ..... xv

RULE 29(A)(4)(E) CERTIFICATION ..... xvi

CIRCUIT RULE 29(D) CERTIFICATION ..... xvi

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 4

I. Press access to Pentagon personnel has fostered essential news reporting in the public interest. ..... 4

II. The Interim Policy burdens core newsgathering conduct through its standardless "inducement" prohibition. ..... 15

CONCLUSION ..... 20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..... 21

CERTIFICATE OF SERVICE ..... 22

ADDENDUM: STATEMENTS OF INTEREST OF INDIVIDUAL AMICI CURIAE ..... 23

# TABLE OF AUTHORITIES

## Cases

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) .......... 19

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) .......... 18

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) .......... 18, 19

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 18

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... 18

*N.Y. Times Co. v. Dep't of Def.*,
830 F. Supp. 3d 1 (D.D.C. 2026) .......... 19

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) .......... 12

*Nicholson v. McClatchy Newspapers*,
177 Cal. App. 3d 509 (1986) .......... 16

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .......... 18

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) .......... 5, 16, 19

*Trump v. Trump*,
79 Misc. 3d. 866 (Sup. Ct. N.Y. Cnty. 2023) .......... 16

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .......... 16

## Statutes

5 U.S.C. § 552(a)(4)(A)(ii) .......... 17

Colo. Rev. Stat. § 13-90-119(1)(c) ....................17

Fla. Stat. § 90.5015(1)(b) ....................17

La. Stat. § 45:1451 ....................17

Minn. Stat. § 595.023 ....................17

Nev. Rev. Stat. § 49.275 ....................17

Tex. Civ. Prac. & Rem. Code § 22.021(2) ....................17

**Other Authorities**

Aaron Glantz, *Revealed: Pentagon Orders States' National Guards To Form 'Quick Reaction Forces' For 'Crowd Control'*, Guardian (Oct. 29, 2025), https://perma.cc/B4LB-XNK9 ....................10

Abraham Lustgarten, *How Military Outsourcing Turned Toxic*, ProPublica (Sep. 26, 2017), https://perma.cc/HRT9-D4H7 ....................12

Alex Horton & David Ovalle, *Pentagon Plan Would Create Military 'Reaction Force' For Civil Unrest*, Wash. Post (Aug. 12, 2025), https://bit.ly/4xiiD4Z ....................10

Alison Bath, *Navy Carrier in Mideast at Sea for More Than 200 Days, Testing Crew Resilience*, Stars and Stripes (Jul. 9, 2026), https://perma.cc/T6XF-N397 ....................14

Alison Bath, *USS Abraham Lincoln Families Press Navy leaders Over Sailors' Mental Health*, Stars and Stripes (Aug. 11, 2026), https://perma.cc/6ASE-V6D6 ....................14

Barak Ravid et al., *"It Was a Headfake": Inside Trump's Secret Orders to Strike Iran*, Axios (June 22, 2025), https://bit.ly/46jMn6q ....................10

Barak Ravid, *Inside Biden's Push For The Israel-Hamas Hostage Deal*, Axios (Nov. 23, 2023), https://bit.ly/4xkCikx ....................11

Barbara Starr, *Mr. Hegseth: Don't Ban the Free Press from the Pentagon*, Substack (Oct. 13, 2025), https://perma.cc/8922-B357 ........................................................................7, 8

Bill Barrow, *U.S. Strikes a Vessel in the Eastern Pacific, Killing 2 People in First Attack in Months*, L.A. Times (Aug. 24, 2026), https://perma.cc/M46R-L3AW ........................................................................1

Craig Whitlock, *The Man Who Seduced the 7th Fleet*, Wash. Post (May 27, 2016), https://perma.cc/CAD6-NZ6L ........................................................................11

Dan Lamothe, *Pentagon Deploys Navy Destroyer for Unusual U.S. Border Mission*, Wash. Post (Mar. 16, 2025), https://bit.ly/3V4xjHk ........................................................................11

Dave Davies, *How a Colorful Malaysian Businessman Bilked the U.S. Navy for Millions*, NPR (May 23, 2024), https://perma.cc/P9YL-PYQY ........................................................................11

Dave Philipps, *A Green Beret Went on a Shooting Rampage. Is the Army at Fault?,* N.Y. Times (Jan. 12, 2026), https://bit.ly/4r3QqgN ........................................................................13

Dave Philipps, *Other than Honorable: Disposable*, The Gazette (May 19, 2013), https://perma.cc/7DK8-C4A3 ........................................................................13

Editorial, *Patriotism and the Press*, N.Y. Times (June 28, 2006), https://bit.ly/4yOhuU3 ........................................................................14

Eric Schmitt, *Pentagon to Send 1,500 Additional Troops to U.S.-Mexico Border*, N.Y. Times (Jan. 22, 2025), https://bit.ly/4dbsmCP ........................................................................10

*Harmless or Hazardous? Troops Say Chemicals and Medical Waste Burned at Balad are Making Them Sick, but Officials Deny Risk*, Mil. Times (Nov. 3, 2008), https://bit.ly/4jHWDvb ........................................................................12

Helen Coster and Andrew Goudsward, *Pentagon Journalists Vacate Workspace as New Restrictions Take Effect*, Reuters (Oct. 16, 2025), https://bit.ly/4xLztdx ........................................................................3

Hillary Profita, *A Day In The Life Of A Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/8BBA-NHYT ....................................................................8

Jared Malsin, *The U.S. and Iran Are Stuck in a Cycle of Military Escalation*, Wall St. J. (July 24, 2026), https://bit.ly/46M27zd ....................................................................1

Jasmine Baehr & Jennifer Griffin, *Pentagon Halts Some Weapons Shipments to Ukraine Over Concerns About US Stockpiles*, Fox News (July 1, 2025), https://perma.cc/JSK6-EFHJ ....................................................................10

Jeffrey Gettleman et al., *U.S. Plans Military Expansion in Greenland*, N.Y. Times (Apr. 1, 2026), https://bit.ly/4AmqG3B ....................................................................1

Jim Garamone, *Senior CNN Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://perma.cc/4GHC-B33N ....................................................................9

Jim Garamone, *September 11 at the Pentagon*, Am. Forces Press Serv. (Oct. 11, 2001), https://perma.cc/4VE8-5TUN ....................................................................9

Joel Schectman & Aruna Viswanatha, *The Pentagon Disinformation That Fueled America's UFO Mythology*, Wall St. J. (June 6, 2025), https://bit.ly/4qkv5yh ....................................................................10

Meg Kinnard and Michelle L. Price, *How the US Captured Venezuelan Leader Nicolás Maduro*, AP (Jan. 3, 2026), https://bit.ly/4yNUpkn ....................................................................1

Megan K. Stack, *The Soldiers Came Home Sick. The Government Denied It Was Responsible.*, N.Y. Times (Jan. 16, 2022), https://bit.ly/46exwKw ....................................................................12

Nancy A. Youssef, *The Last Days of the Pentagon Press Corps*, The Atlantic (Oct. 15, 2025), https://perma.cc/D4HN-CAGU ....................................................................6

Natalie Oliverio, *Multiple USS Abraham Lincoln Sailors Have Tried to go Overboard Amid Extended Deployment, Families Say*, Navy Times (Aug. 11, 2026),
https://perma.cc/S6EV-SDEJ ....................................................................14

*New York Times Accuses Pentagon of Flouting Judge's Order Blocking its Press Access Policy*, CBS News (Mar. 30, 2026),
https://bit.ly/4xQHrC8 ..............................................................................5

Queen City News, *Former Reporter Recounts Being Among First Inside Pentagon on 9/11*, YouTube (Sept. 11, 2024),
https://bit.ly/3UEPEuA .............................................................................9

*RCFP Pushes Back Against Pentagon Policy Restricting Press Access*, Reps. Comm. for Freedom of the Press (last updated on Oct. 8, 2025),
https://perma.cc/Z2VF-C4KE ......................................................................2

Rebecca Falconer, *Press Groups Denounce Pentagon's New Media Rules*, Axios (Mar. 23, 2026),
https://bit.ly/3UGkLpz ..............................................................................6

Reporter's Privilege Compendium, Reporters Comm. for Freedom of the Press,
https://perma.cc/7PUL-NMB4 ....................................................................18

T. Christian Miller & Daniel Zwerdling, *Brain Injuries Remain Undiagnosed in Thousands of Soldiers*, ProPublica (June 7, 2010),
https://perma.cc/57EY-LU2S......................................................................13

Tara Copp & Lolita C. Baldor, *Pentagon Leaders Cite Military Tactics to Show Destruction from US Attacks on Iran*, AP (June 26, 2025),
https://perma.cc/VKA2-FC4S......................................................................10

Thomas Whiteside, *Defoliation*, The New Yorker (Feb. 7, 1970)
https://perma.cc/5Z6E-N3WR ....................................................................12

Tom Bowman, *Opinion: Why I'm Handing In My Pentagon Press Pass*, NPR (Oct. 14, 2025),
https://perma.cc/R6JY-YPC2................................................................. 6, 13

U.S. Dep't of War, *Department of War Releases the President's Fiscal Year 2027 Budget* (Apr. 21, 2026),
https://perma.cc/5VVR-REZ3 ......................................................................1

*US Troops Describe Safety Hazards in Barracks*, Wash. Examiner (Sept. 20, 2023), https://bit.ly/4yuadZe ..........13

**Treatises**

Alexander M. Bickel, The Morality of Consent 84 (1975) ..........5

## STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF AUTHORITY TO FILE

Amici are the Reporters Committee for Freedom of the Press, Association of Alternative Newsmedia, The Atlantic Monthly Group LLC, Axios, Boston Globe Media Partners, LLC, BuzzFeed, The Center for Investigative Reporting, Committee to Protect Journalists, The Daily Beast Company LLC, First Amendment Coalition, The Intercept Media, Inc., McClatchy Media Company, LLC, The Media Institute, Media Law Resource Center, MediaNews Group Inc., MS NOW, National Freedom of Information Coalition, National Newspaper Association, National Press Club Journalism Institute, The National Press Club, National Press Photographers Association, National Public Radio, Inc., The New Yorker, News/Media Alliance, Online News Association, PEN America, ProPublica, Inc., Pulitzer Center on Crisis Reporting, Radio Television Digital News Association, Reuters News & Media Inc., Slate, Society of Environmental Journalists, Society of Professional Journalists, The War Horse News, and The Washington Post.[1] Amici have a strong interest in ensuring that the press remain independent from undue government influence so that journalists can keep the public informed and perform their watchdog role. Accordingly, amici submit this

---

[1] A statement of interest for each amicus organization is set forth in the addendum below.

brief to address the importance of proper access to government places and personnel, particularly in the context of military and national security reporting.

Amici have obtained consent to file this brief from both parties and therefore may file it pursuant to Federal Rule of Appellate Procedure 29(a)(2) and D.C. Circuit Rule 29(b).

## RULE 29(A)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

## CIRCUIT RULE 29(D) CERTIFICATION

Pursuant to D.C. Circuit Rule 29(d), amici certify that this brief is necessary to provide the perspective of media organizations and journalists, including those who publish military and national security reporting and those who were part of the Pentagon press corps and were subject to the interim policy at issue.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal comes at a busy time at the Pentagon. Just this year, the United States apprehended the president of Venezuela, *see* Meg Kinnard & Michelle L. Price, *How the US Captured Venezuelan Leader Nicolás Maduro*, AP (Jan. 3, 2026), https://bit.ly/4yNUpkn; sought to strengthen its military foothold in Greenland, *see* Jeffrey Gettleman et al., *U.S. Plans Military Expansion in Greenland*, N.Y. Times (Apr. 1, 2026), https://bit.ly/4AmqG3B; continued to strike boats in the Caribbean and eastern Pacific as part of a campaign targeting alleged drug smuggling, *see* Bill Barrow, *U.S. Strikes a Vessel in the Eastern Pacific, Killing 2 People in First Attack in Months*, L.A. Times (Aug. 24, 2026), https://perma.cc/M46R-L3AW; and entered into a war with Iran, *see* Jared Malsin, *The U.S. and Iran Are Stuck in a Cycle of Military Escalation*, Wall St. J. (July 24, 2026), https://bit.ly/46M27zd. At the same time, the administration has sought a record budget of $1.5 trillion for defense spending in fiscal year 2027. U.S. Dep't of War, *Department of War Releases the President's Fiscal Year 2027 Budget* (Apr. 21, 2026), https://perma.cc/5VVR-REZ3.

Yet the Pentagon has repeatedly sought to hinder visibility into its affairs, first in October 2025 with a new policy requiring journalists to agree to updated protocols for members of the Pentagon's press corps ("Press Policy"), *see* J.A.

127–145,[2] and then in March of this year with a revised policy ("Interim Policy" and, together with the Press Policy, the "Policies"), *see* J.A. 248–62, after the District Court found the Press Policy unconstitutional. This brief addresses two provisions in the Interim Policy: (1) the requirements that media members be escorted while on the Pentagon premises, that their access is limited only to press briefings and other events specifically approved by the public affairs office, and that they provide advance notice of their visit; and (2) the prohibition against "intentional inducement of unauthorized disclosure" of information, including that a journalist's offer of "anonymity or privacy protection" to a government employee creates a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought.[3] J.A. 249–52, 257–58.

Since the Policies were implemented, the Pentagon has remained almost entirely empty of the traditional press corps that has walked its halls unescorted

[2] Lead amicus, the Reporters Committee, sent a letter to the Pentagon on September 22, 2025, expressing concern with certain provisions in a prior version of the policy issued on September 18, 2025, and requesting that the Department provide clarification. Assistant Secretary of War for Public Affairs Sean Parnell responded on September 24, 2025. That correspondence and other background can be found at *RCFP Pushes Back Against Pentagon Policy Restricting Press Access*, Reps. Comm. for Freedom of the Press (last updated on Oct. 8, 2025), https://perma.cc/Z2VF-C4KE.

[3] This is one of two related appeals currently pending before the Court. In the other case, No. 26-5253, the Reporters Committee filed a separate amicus brief in support of Plaintiffs-Appellees that focused solely on the escort policy.

since the building opened during World War II. Helen Coster & Andrew Goudsward, *Pentagon Journalists Vacate Workspace as New Restrictions Take Effect*, Reuters (Oct. 16, 2025), https://bit.ly/4xLztdx. While purportedly addressing the Press Policy's constitutional infirmities, the Interim Policy continues to burden journalists who seek to report on military affairs—people who previously had covered the policies and activities of the world's largest armed force for decades, across numerous administrations, reported as embeds with U.S. troops in conflict zones, and spent years stationed in Iraq, Afghanistan, and other regions with a U.S. military presence.

Amici bring unique perspectives to the deficiencies in the Interim Policy. First, amici offer illustrations of the influential and informative coverage of the Pentagon in this and prior administrations made possible by the everyday interactions between journalists and military officials, which are hindered by the Interim Policy's new inducement and escort provisions. While the press continues its work informing the public about military affairs—even in the face of the unprecedented physical restrictions now in force in the Pentagon—the escort policy nonetheless makes that reporting much more difficult and the stories, including those that postdate the escort requirement, harder to tell. The examples described below underscore what the American public, including the Armed Forces, stands to lose under the escort and inducement provisions. Second, amici

emphasize that the new directive regarding "intentional inducement" suffers from the same constitutional defects as the earlier provision in the Press Policy purporting to prohibit "solicitation." The provision could potentially punish routine newsgathering activity, including asking servicemembers, civilian Pentagon employees, and contractors basic questions about Pentagon affairs. Journalists cannot abide by the Interim Policy and still do their jobs effectively. The inducement provision thus violates the District Court's summary judgment order and initial injunction and is independently unconstitutional.

The loss of news gathered by long-standing members of the press corps from within the hallways in Arlington benefits no one—including the Pentagon itself, a cabinet department managing three million employees, the legitimacy and effectiveness of which depends on an informed public and an accountable bureaucracy. For the reasons set forth herein, amici urge the Court to affirm the District Court's grant of Plaintiffs' summary judgment motion and motion to compel compliance with the summary judgment order.

## ARGUMENT

### I. Press access to Pentagon personnel has fostered essential news reporting in the public interest.

The freedom to ask questions of public officials is fundamental to the work of journalism. As recognized since the nation's earliest days, and confirmed across generations of historical events, the knowledge most essential to informing the

public is "not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source." Alexander M. Bickel, The Morality of Consent 84 (1975). Moreover, anonymous sources are often crucial to obtaining important information that is unavailable through other channels. *See id.* ("Forcing reporters to divulge such confidences would dam the flow to the press, and through it to the people, of the most valuable sort of information . . . ."). The imperative of journalists to obtain the facts beyond the press release or official line is why "[a] free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979).

The Policies thus created an immediate and understandable backlash among press groups. Pentagon reporters could not perform their jobs because the Policies "further limit[ed] their ability to actually do journalism in the forum designated specifically for that purpose," *New York Times Accuses Pentagon of Flouting Judge's Order Blocking its Press Access Policy*, CBS News (Mar. 30, 2026), https://bit.ly/4xQHrC8 (quoting a Pentagon Press Association statement), and "sharply limited how journalists gather news, build sources and cover one of the most powerful institutions in government—reducing what the public is able to see and understand about decisions made in its name." Rebecca Falconer, *Press*

*Groups Denounce Pentagon's New Media Rules*, Axios (Mar. 23, 2026), https://bit.ly/3UGkLpz (quoting a National Press Club statement).

Despite accommodating reporters inside the Pentagon for over 80 years without major incident, the Pentagon now claims that journalists who engage with Department officials are a security threat. J.A. 136–137. The day-in, day-out work of reporting on high-stakes and complicated national security and military matters paints a different picture. In reality, longtime Pentagon reporters develop expertise and relationships that enable them to report with vigor, fairness, and discernment. *See, e.g.*, Tom Bowman, *Opinion: Why I'm Handing In My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://perma.cc/R6JY-YPC2 (describing 28 years of covering the Pentagon, including reporting when administrations of either political party would misrepresent events surrounding military actions because "[i]nstead of toeing the official line, that reporting helped people understand what U.S. troops were really facing"); Nancy A. Youssef, *The Last Days of the Pentagon Press Corps*, The Atlantic (Oct. 15, 2025), https://perma.cc/D4HN-CAGU (explaining that "something intangible" is lost when credentialed journalists leave the building, including "meeting people like Jimmy," a Pentagon police officer, "whose names may never appear in print but who are essential to how we understand the U.S. military").

Additionally, it bears repeating that journalists are not seeking unescorted access—or even escorted access—to the massive whole of the Pentagon. Correspondents' Corridor is a space that is designed and intended to facilitate, in a secure manner, physical access by the press to the building. Other areas that now require an escort resemble a mall, with a bank, a sit-down restaurant, a food court, and, indeed, a chocolate shop. *N.Y. Times Co. v. U.S. Dep't of Def.*, No. 26-5253 (D.C. Cir.), J.A. 7. Sizeable numbers of civilian employees, contractors, cleaning and maintenance professionals, and others are permitted unescorted access to these areas, *id.*, but not journalists. Despite there not being any security concerns with past press access to these spaces, journalists are now unable to perform the most ordinary of reporting in the building, like visiting the various public affairs offices (without making an appointment and waiting for an escort, all of which adds time and inefficiency).

But it is such commonplace reporting that leads to important and more accurate journalism, and often relationships of trust and respect. As former CNN Pentagon correspondent Barbara Starr put it: "Every Secretary of Defense until now has seen the value of talking to reporters even in the hallways of the Pentagon." Barbara Starr, *Mr. Hegseth: Don't Ban the Free Press from the Pentagon*, Substack (Oct. 13, 2025), https://perma.cc/8922-B357. Starr recounted how James Mattis would chat with reporters on his way back from the Pentagon

cleaners; that the "notoriously shy" Lloyd Austin "would always say hello and ask[] how things are going"; and that Leon Panetta and Chuck Hagel were likewise voluble with journalists in the building. *Id.* "I guarantee they had reporters they didn't like, stories out there they wish weren't," Starr noted. *Id.* "But each of them saw the value of a free press in America." *Id.*

Similarly, veteran CBS national security reporter David Martin observed that "95 percent of the good stories you get in the hallways. The more you're out in the hallways the more likely you are to stumble on a story or pick up on vibes." Hillary Profita, *A Day In The Life Of A Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/8BBA-NHYT. He would "spend[] a great deal of his time walking through the building, checking in with public affairs officers and sources" and "hoping to run into someone who might be useful" because he had learned that a reporter is more likely to get Pentagon officials to comment and provide information for a story by encountering them in the building. *Id.* Martin analogized the work of a Pentagon reporter to "almost like being a beat cop," explaining that he found that "[y]ou become very sensitive to what's out of order." *Id.*

While untrammeled access to government buildings and personnel is only part of what journalists need to cover federal agencies effectively, that access can be particularly consequential for major news stories. Barbara Starr recounted

being inside the Pentagon on September 11, 2001, for DOD News: "I was sitting with other reporters in the office of the public affairs chief for the chairman of the Joint Chiefs. We're all looking at the TV, and the second plane hits." Jim Garamone, *Senior CNN Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://perma.cc/4GHC-B33N. Starr then followed an aide down the hall when a general coming out of a command center said, "It's terrorism." *Id.*

Other reporters on the scene that day have similar accounts of how their proximity to Pentagon sources helped advance early reporting on the unfolding attacks. In fact, Pentagon officials deliberately brought the Pentagon press corps *back* into the building the day of the attack, notwithstanding the still smoldering damage, as a "show of strength" and to keep the public informed. Queen City News, *Former Reporter Recounts Being Among First Inside Pentagon on 9/11*, YouTube (Sept. 11, 2024), https://bit.ly/3UEPEuA, at 1:55–2:10; *see also* Jim Garamone, *September 11 at the Pentagon*, Am. Forces Press Serv. (Oct. 11, 2001), https://perma.cc/4VE8-5TUN ("At 6 p.m., with the building still on fire, Pentagon officials announced Rumsfeld would hold a press conference in the Pentagon. Buses arrived at the gas station to take reporters, photographers and videographers to the Pentagon.").

Recently, communications with government officials, beyond what was offered at the podium, have allowed journalists to know and understand important

news events, from plans for deployment of National Guard troops to U.S. cities, to information about military tactics and weapons use in active combat zones, to a host of other stories that involve the security of the American people and the exercise of military power. *See* Aaron Glantz, *Revealed: Pentagon Orders States' National Guards To Form 'Quick Reaction Forces' For 'Crowd Control'*, Guardian (Oct. 29, 2025), https://perma.cc/B4LB-XNK9; Alex Horton & David Ovalle, *Pentagon Plan Would Create Military 'Reaction Force' For Civil Unrest*, Wash. Post (Aug. 12, 2025), https://bit.ly/4xiiD4Z; Jasmine Baehr & Jennifer Griffin, *Pentagon Halts Some Weapons Shipments to Ukraine Over Concerns About US Stockpiles*, Fox News (July 1, 2025), https://perma.cc/JSK6-EFHJ; Tara Copp & Lolita C. Baldor, *Pentagon Leaders Cite Military Tactics to Show Destruction from US Attacks on Iran*, AP (June 26, 2025), https://perma.cc/VKA2-FC4S; Barak Ravid et al., *"It Was a Headfake": Inside Trump's Secret Orders to Strike Iran*, Axios (June 22, 2025), https://bit.ly/46jMn6q; Eric Schmitt, *Pentagon to Send 1,500 Additional Troops to U.S.-Mexico Border*, N.Y. Times (Jan. 22, 2025), https://bit.ly/4dbsmCP; Joel Schectman & Aruna Viswanatha, *The Pentagon Disinformation That Fueled America's UFO Mythology*, Wall St. J. (June 6, 2025), https://bit.ly/4qkv5yh; Dan Lamothe, *Pentagon Deploys Navy Destroyer for Unusual U.S. Border Mission*, Wash. Post (Mar. 16, 2025),

https://bit.ly/3V4xjHk; Barak Ravid, *Inside Biden's Push For The Israel-Hamas Hostage Deal*, Axios (Nov. 23, 2023), https://bit.ly/4xkCikx.

The same interests are at stake when reporting on military logistics, as well as when covering waste, fraud, and corruption in the military, which is naturally dependent on unofficial communications between Pentagon personnel and journalists. *The Washington Post*'s reporting on the "Fat Leonard" scandal—"perhaps the worst national-security breach of its kind to hit the Navy since the end of the Cold War"—relied both on public records and Pentagon sources to reveal that defense contractor Leonard Francis "doled out sex and money to a shocking number of people in uniform who fed him classified material about U.S. warship and submarine movements." Craig Whitlock, *The Man Who Seduced the 7th Fleet*, Wash. Post (May 27, 2016), https://perma.cc/CAD6-NZ6L. *The Post* discovered that the investigation encompassed nearly 1,000 people, including 90 admirals. *See* Dave Davies, *How a Colorful Malaysian Businessman Bilked the U.S. Navy for Millions*, NPR (May 23, 2024), https://perma.cc/P9YL-PYQY. And the Justice Department eventually charged 35 people in connection with the scandal. *Id.* A few years later, in a longform story comprising part of its *Bombs in Our Backyard* series, ProPublica reported on the military's reliance on contractors in overseeing "thousands of toxic sites on American soil," uncovering a long history of fraud, bribery, and incompetence. Abraham Lustgarten, *How Military Outsourcing*

*Turned Toxic*, ProPublica (Sept. 26, 2017), https://perma.cc/HRT9-D4H7. In these and other stories, reporters played a crucial role in outing corruption, a vital public good given our country's recognition that "[s]ecrecy in government" breeds "bureaucratic errors." *N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Stewart, J., concurring).

Or consider the health and safety of active-duty soldiers and veterans. In Iraq and Afghanistan, for instance, reporters gave voice to troops suffering chronic health issues after their exposure to cancer-causing toxins from the use of burn pits, even as military and Veterans Affairs officials publicly denied a link. *See Harmless or Hazardous? Troops Say Chemicals and Medical Waste Burned at Balad are Making Them Sick, but Officials Deny Risk*, Mil. Times (Nov. 3, 2008), https://bit.ly/4jHWDvb (discussing an internal Air Force memo acknowledging that burn pits are "an acute health hazard" and quoting active-duty and retired military servicemembers on the topic); *see also* Megan K. Stack, *The Soldiers Came Home Sick. The Government Denied It Was Responsible.*, N.Y. Times (Jan. 16, 2022), https://bit.ly/46exwKw.

Similar stories abound, from revelations of the toxicity of Agent Orange in Vietnam, *see* Thomas Whiteside, *Defoliation*, The New Yorker (Feb. 7, 1970) https://perma.cc/5Z6E-N3WR (reporting on impact of herbicides on human health, including drawing on unofficial information, and contrasting findings with public

U.S. statements and reports); to reports that the military dishonorably discharged soldiers for minor offenses as part of its downsizing in the early 2010s, denying them military benefits, *see* Dave Philipps, *Other than Honorable: Disposable*, The Gazette (May 19, 2013), https://perma.cc/7DK8-C4A3; to health and safety risks present in military quarters, *see US Troops Describe Safety Hazards in Barracks*, Wash. Examiner (Sept. 20, 2023), https://bit.ly/4yuadZe; to endemic brain injuries caused by blast trauma and the military's failure to adequately diagnose and treat those harms, *see* T. Christian Miller & Daniel Zwerdling, *Brain Injuries Remain Undiagnosed in Thousands of Soldiers*, ProPublica (June 7, 2010), https://perma.cc/57EY-LU2S; Dave Philipps, *A Green Beret Went on a Shooting Rampage. Is the Army at Fault?,* N.Y. Times (Jan. 12, 2026), https://bit.ly/4r3QqgN.[4]

More recently, *Stars and Stripes* and *Navy Times* reported on conditions aboard the aircraft carrier USS Abraham Lincoln, where sailors and Marines have been deployed for extended periods to support operations in the Middle East and against Iran, resulting in hardship for servicemembers and their families. Alison

[4] These are, of course, but a few examples. The press has played a role in revealing countless other stories involving the well-being of servicemembers, such as sexual assault in the military and challenges faced by military families. And when it comes to sending soldiers to fight, and whether U.S. leaders are properly recognizing and conveying the realities of war, it is often journalists who press for answers and accountability. *See* Bowman, *supra* (recounting reporting on Iraq, Afghanistan, and Syria that challenged administration claims of victory).

Bath, *Navy Carrier in Mideast at Sea for More Than 200 Days, Testing Crew Resilience*, Stars and Stripes (Jul. 9, 2026), https://perma.cc/T6XF-N397; Alison Bath, *USS Abraham Lincoln Families Press Navy leaders Over Sailors' Mental Health*, Stars and Stripes (Aug. 11, 2026), https://perma.cc/6ASE-V6D6; Natalie Oliverio, *Multiple USS Abraham Lincoln Sailors Have Tried to go Overboard Amid Extended Deployment, Families Say*, Navy Times (Aug. 11, 2026), https://perma.cc/S6EV-SDEJ. All of this reporting relied on everyday gumshoe journalism, including the ability to ask questions of and learn what is important to military personnel throughout the Pentagon's vast workforce.

None of that, of course, is to say that secrecy has no legitimate place in Pentagon policymaking. *See* Editorial, *Patriotism and the Press*, N.Y. Times (June 28, 2006), https://bit.ly/4yOhuU3 (noting instances of holding stories for national security reasons). But as the discussion above makes clear, the ability to pursue government information and to ask public officials questions, to use a hallway conversation to corroborate a tip or learn more about a developing crisis, or to promise confidentiality to sources with information they wish to share with the public, are all essential to a free press and the liberties it safeguards. Under the Pentagon's new Policies, routine reporting on the nation's military might now be grounds for sudden suspension or revocation of a journalist's credentials. The Policies are therefore inconsistent with the press's role in a democracy.

## II. The Interim Policy burdens core newsgathering conduct through its standardless "inducement" prohibition.

The Interim Policy purports to change the Press Policy's prohibition on "solicitation" of government personnel to a proscription against "intentional inducement of unauthorized disclosure," defined as "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or CUI that the journalist knows that the specific Department employee is not authorized to disclosing [sic]." J.A. 257. The Interim Policy conditions press pass "determinations" on the pass holder's compliance with this rule. *Id.* ("This is an administrative standard for PFAC determinations . . . ."). In reality, the inducement prohibition suffers from all the same flaws that led the District Court to enjoin the solicitation provision. In defiance of that ruling, the Pentagon has put in place a new set of rules that once again invite pretextual enforcement triggered by reporting that the government perceives as unfavorable.

The Interim Policy cites "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information" as behavior that "shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." J.A. 257–58. This presumption is only overcome by "evidence that the journalist did not know that the employee was unauthorized to disclose the information"—a standard that

would require members of the press to fulfill the improbable task of proving a negative: that they "did not know" something. J.A. 258.

The conduct the inducement provision purports to punish—the "traditional function of a free press in seeking out information by asking questions," *Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509, 519 (1986)—sits at the heart of the First Amendment. The Supreme Court has made clear that the Constitution protects "routine newspaper reporting techniques," and nothing could be more routine than obtaining information "simply by asking [for it]" from a willing source. *Daily Mail Publ'g Co.*, 443 U.S. at 99, 103; *see also, e.g.*, *Trump v. Trump*, 79 Misc. 3d. 866, 882 (Sup. Ct. N.Y. Cnty. 2023) (failing to find "a single case where any court, whether state or federal, has held that a reporter is liable for inducing his or her source to breach a confidentiality provision"). This Court has specifically recognized the importance of a journalist's ability to offer anonymity to sources as a core newsgathering tool. *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) ("[J]ournalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."). These Pentagon provisions burdening the most basic aspects of journalism are unjustifiable under any First Amendment standard.

The inducement provision is also dramatically out of step with how the law characterizes journalism as a profession. For example, various federal and state

statutes, from freedom of information laws to provisions shielding a reporter's unpublished work product and confidential communications, recognize that the affirmative solicitation of information is a core aspect of newsgathering. *See, e.g.*, 5 U.S.C. § 552(a)(4)(A)(ii) (defining "a representative of the news media" under the Freedom of Information Act as "any person or entity that *gathers information* of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience" (emphasis added)); Minn. Stat. § 595.023 (describing protected individuals under Minnesota reporter's privilege statute as those "engaged in the *gathering*, *procuring*, compiling, editing, or publishing of information for the purpose of transmission, dissemination or publication to the public" (emphasis added)).[5] Moreover, almost all fifty states have recognized a reporter's privilege, reflecting

---

[5] Laws across the country consistently define journalists as persons who, *inter alia*, actively gather information. *See also*, *e.g.*, Tex. Civ. Prac. & Rem. Code § 22.021(2) ("a person . . . who ... gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information"); Fla. Stat. § 90.5015(1)(b) ("a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news"); La. Stat. § 45:1451 ("person regularly engaged in the business of collecting, writing or editing news for publication"); Colo. Rev. Stat. § 13-90-119(1)(c) ("any member . . . [or] employee . . . of the mass media who is engaged to gather, receive, observe, process, prepare, write, or edit news information for dissemination to the public through the mass media"); Nev. Rev. Stat. § 49.275 ("person[] [who in a] professional capacity [is] gathering, receiving or processing information for communication to the public").

the widespread recognition that source anonymity is central to press freedom and publishing important stories for the benefit of the public. *See generally* Reporter's Privilege Compendium, Reporters Comm. for Freedom of the Press, https://perma.cc/7PUL-NMB4.

Further, the inducement provision exemplifies the type of standardless restriction on First Amendment rights that cannot survive constitutional scrutiny. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), provides one of several controlling precedents. In *City of Lakewood*, the Supreme Court held that portions of a law conferring unbridled discretion on a mayor to deny or impose conditions on the receipt of newsrack permits violated the First Amendment. *Id.* at 772; *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018) (a restriction that is so broad as to "carry with it '[t]he opportunity for abuse'" cannot be tolerated, even in a nonpublic forum (quoting *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987))); *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020) (First Amendment prohibits denying a White House press pass "arbitrarily or for less than compelling reasons" (quoting *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977))).

Here, according to the District Court, the Interim Policy merely "replaces" the solicitation provision that it found to be unconstitutional and continues "to proscribe the same 'lawful journalistic practices' that the vacated provisions

encompassed." *N.Y. Times Co. v. Dep't of Def.*, 830 F. Supp. 3d 1, 10 (D.D.C. 2026). The inducement provision still vests "unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood*, 486 U.S. at 755; *see also Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025) (First Amendment prohibits unbridled discretion even in a nonpublic forum). News organizations regularly publish information the Pentagon has not expressly authorized for release, but no journalist can predict which stories will or will not draw the Pentagon's ire. And even if reporters were inclined to forgo seeking nonpublic information about the government entirely—exactly the sort of "self-censorship" against which the First Amendment is intended to guard, *City of Lakewood*, 486 U.S. at 757—it would be impossible for them to know in advance whether a question to a source or a follow-up query to verify information provided will elicit an answer the Pentagon considers unauthorized. The result is a classic lack of "neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 760.

Because the Policies' standardless sweep encompasses "routine newspaper reporting techniques," *Daily Mail Publ'g Co.*, 443 U.S. at 103, every credentialed journalist would be at risk of revocation at all times and would face impermissible pressure to tailor coverage to avoid risking the anger of the Pentagon's decisionmakers. Indeed, that is why virtually the entire press corps could not sign

the October Press Policy, leaving the building without a sizable contingent of the country's major news organizations for the first time in over 80 years. The Interim Policy continues to target routine newsgathering techniques and makes journalists' everyday work covering one of the most important beats in any newsroom significantly more difficult to carry out. And the fact that it simply repackaged the same "solicitation" proscription under a new label renders it both violative of the District Court's initial injunction and independently unconstitutional.

## CONCLUSION

For the foregoing reasons, amici urge the Court to affirm the District Court's grant of Plaintiffs' summary judgment motion and motion to compel compliance with the summary judgment order.

Respectfully submitted,

/s/ Bruce D. Brown

Bruce D. Brown
*Counsel of Record*
Lisa Zycherman
Gabriel Rottman
Marietta Catsambas
Annie Seminara (*of counsel*)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
bruce.brown@rcfp.org

Dated: September 21, 2026

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because this brief contains 4,921 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).
2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Bruce D. Brown
Bruce D. Brown, Esq.
*Counsel of Record*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

Dated: September 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I caused the foregoing BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 34 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE to be filed with the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Bruce D. Brown

Bruce D. Brown, Esq.
*Counsel of Record*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

## ADDENDUM: STATEMENTS OF INTEREST OF INDIVIDUAL AMICI CURIAE

The Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of working journalists and news organizations.

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association which represents nearly 100 alternative newspapers across North America. There are a wide range of publications in AAN, but all share an intense focus on local news, culture and the arts; an emphasis on point-of-view reporting and narrative journalism; a tolerance for individual freedoms and social differences; and an eagerness to report on issues and communities that many mainstream media outlets ignore. AAN members speak truth to power.

The Atlantic Monthly Group LLC is the publisher of *The Atlantic* and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its 160-year tradition of publishing award-winning journalism that challenges

assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

Axios Media Inc. is a digital media company with a mission to deliver news in an efficient format that helps professionals get smarter faster across an array of topics, including politics, science, business, health, tech, media, and local news.

Boston Globe Media Partners, LLC publishes The Boston Globe, the largest daily newspaper in New England.

BuzzFeed, Inc. is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu, and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

The Committee to Protect Journalists is an independent, nonprofit organization that promotes press freedom worldwide. CPJ defends the right of journalists to report the news without fear of reprisal. CPJ is made up of about 40 experts around the world, with headquarters in New York City. A board of prominent journalists from around the world helps guide CPJ's activities.

The Daily Beast delivers award-winning original reporting and sharp opinions from big personalities in the arenas of politics, pop-culture, world news and more.

First Amendment Coalition (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

The Intercept Media, Inc. is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

The McClatchy Company, LLC is a publisher of iconic brands such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the *Fort Worth Star-Telegram*. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, California.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and

international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals and speaks to the press and public on media law and First Amendment issues. It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

MediaNews Group is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high-quality local media. It is one of the largest news organizations in the United States, with print and online publications across the country.

MS NOW, previously MSNBC, is a multiplatform news organization that reaches millions across television, online, and through social media. MS NOW's mission is to serve as a trusted destination for domestic and international breaking news and best-in-class opinion journalism.

The National Freedom of Information Coalition is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia. Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and

administrative reforms that ensure open, transparent, and accessible state and local governments and public institutions.

National Newspaper Association is a 2,000-member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

The National Press Club Journalism Institute is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the

visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. (NPR) is a non-profit multimedia organization and the leading provider of non-commercial news, information, and entertainment programming to the American public. NPR's fact-based, independent journalism helps the public stay on top of breaking news, follow the most critical stories of the day, and track complex issues over the long term. NPR reaches approximately 60 million people each week on broadcast radio, podcasts, NPR apps, NPR.org, and YouTube video content. NPR distributes its radio broadcasts through more than 1,000 non-commercial, independently operated radio stations, licensed to more than 260 NPR members and numerous other NPR-affiliated entities.

The New Yorker is an award-winning magazine of general interest, published weekly in print, digital, and online. Its writers regularly use information provided by sources, confidential and non-confidential, to report on matters of state, national, and international importance.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including over 2000 news and magazine publishers in the United States

and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad. Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide. PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

ProPublica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both

through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

Pulitzer Center on Crisis Reporting, based in Washington, DC, was founded in 2006 as a non-profit journalism center dedicated to supporting in-depth engagement with underreported global affairs through sponsorship of quality international journalism across all media platforms and a unique program of outreach and education to schools and universities. The Center supports over 150 international reporting projects each year, working in tandem with major international news outlets.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides trusted intelligence that powers humans and machines to make smart decisions. It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

The Slate Group publishes Slate, a daily online magazine. Slate features articles and podcasts analyzing news, politics and contemporary culture.

The Society of Environmental Journalists is the only North American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The War Horse is an award-winning nonprofit newsroom and the most trusted source for bulletproof reporting on the human impact of military service. It reporting seeks to strengthen democracy by holding power to account and improving the public's understanding of the true cost of military service. The U.S. government spends nearly $1 trillion annually on defense and veterans' affairs, more than twice what it spends on health care, education, infrastructure, and diplomacy combined; yet less than 5% of journalism focuses on military service. This imbalance negatively impacts not only U.S. national security and the viability of the all-volunteer military force, but the everyday lives of veterans, military families, and our nation as a whole. The War Horse team is setting the standard for reporting stories that matter, with diligence and integrity, to rebuild Americans' trust in the press.

The Washington Post (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C. It publishes The Washington Post newspaper and the website www.washingtonpost.com, and produces a variety of digital and mobile news applications. The Post has won Pulitzer Prizes for its journalism, including the award in 2020 for explanatory reporting.