**[ORAL ARGUMENT SCHEDULED FOR NOVEMBER 16, 2026]**

**No. 26-5113**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NEW YORK TIMES COMPANY, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF DEFENSE, et al.,

Defendants-Appellants.

---

On Appeal from Final Judgment of the
United States District Court for the District of Columbia
Case No. 25-cv-4218 (Judge Friedman)

---

**REPLY BRIEF FOR APPELLANTS**

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JACK STARCHER
*Attorneys*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ....... 1

ARGUMENT ....... 3

I. The Department's March Policy Does Not Violate the District Court's Summary Judgment Order ....... 3

A. Plaintiffs' response confirms that the district court's compliance order violates black letter law ....... 3

B. The physical access restrictions comply with the district court's summary judgment order ....... 13

C. The revised credentialing provisions comply with the district court's summary judgment order ....... 17

II. The March Policy Is Otherwise Lawful ....... 30

CONCLUSION ....... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**


*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........ 12

*Aviation Consumer Action Project v. Washburn*,
535 F.2d 101 (D.C. Cir. 1976) ........ 15

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........ 32

*Brown v. Califano*,
627 F.2d 1221 (D.C. Cir. 1980) ........ 26

*International Ladies' Garment Workers' Union v. Donovan*,
733 F.2d 920 (D.C. Cir. 1984) ........ 5, 29

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*,
389 U.S. 64 (1967) ........ 4

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019) ........ 14

*NAACP v. Donovan*,
737 F.2d 67 (D.C. Cir. 1984) ........ 9, 10, 13

*Peacock v. Thomas*,
516 U.S. 349 (1996) ........ 5

*Sierra Club v. McCarthy*,
61 F. Supp. 3d 35 (D.D.C. 2014) ........ 6

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 25

*United States v. Christie Indus., Inc.*,
465 F.2d 1002 (3d Cir. 1972) ........ 6, 7

*United States v. Facebook, Inc.*,
136 F.4th 1129 (D.C. Cir. 2025) .......................................................... 6, 7

*United States v. Hansen*,
599 U.S. 762 (2023) ................................................................................ 32

**Rule:**

Fed. R. Civ. P. 65(d)(1)(B)-(C) ............................................................... 4

**Other Authority:**

Order, *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5253 (D.C. Cir. July 16, 2026) ............................................................................................. 31

## GLOSSARY

| | |
|---|---|
| CNSI | Classified National Security Information |
| CUI | Controlled Unclassified Information |
| Department | The Department of Defense, also known as the Department of War |
| PFAC | Pentagon Facility Alternate Credential |

## INTRODUCTION

Plaintiffs filed this lawsuit to challenge certain provisions contained in an October 2025 policy issued by the Department of War. In March 2026, the district court granted plaintiffs' motion for summary judgment, concluding that certain provisions of that policy were so vague as to violate the Fifth and First Amendments because they could be read to cover lawful journalistic practices in addition to the unlawful solicitation of sensitive information they were intended to address. The court therefore issued an order giving plaintiffs all the relief they had asked for: (1) vacating the challenged provisions; (2) enjoining the Department from implementing or enforcing those provisions to deny, suspend, revoke, or not renew plaintiffs' press credentials; and (3) ordering the Department to reinstate press credentials for a list of specified journalists. JA200-203. The Department immediately complied with that order by removing the challenged provisions and reinstating plaintiffs' credentials.

Plaintiffs do not seriously dispute any of this in their response. There is no real question that the Department did everything it was directed to do by the district court's summary judgment order. As explained in the Department's opening brief, the court badly erred in concluding that the

Department's subsequent, revised policy—the March Policy—violated any directive contained in its order vacating the October Policy. In so holding, the court treated its prior decision as prejudging the legality of policies the Department had not yet announced—or worse, as indefinitely freezing in place the media credentialing and access policies that were in place before October 2025.

Plaintiffs nevertheless insist that the new March Policy violated the district court's earlier order. In doing so, plaintiffs quickly leave behind the directives actually contained in the summary judgment order and instead turn to isolated reasoning from the court's summary judgment *opinion*. As explained in the Department's opening brief, plaintiffs' arguments badly misapprehend basic principles of both injunctive relief and administrative law. The court's order enjoining the March Policy as a matter of compliance with its earlier order should be vacated.

## ARGUMENT

### I. The Department's March Policy Does Not Violate the District Court's Summary Judgment Order.

#### A. Plaintiffs' response confirms that the district court's compliance order violates black letter law.

1. As plaintiffs acknowledge in passing, Resp. 2-3, 13, the summary judgment order the district court entered contained three specific directives: It (1) declared unlawful and vacated portions of the October Policy, describing in detail the particular sentences and phrases it was vacating, JA200-201; (2) enjoined defendants from "implementing or enforcing" those vacated provisions "to deny, suspend, revoke, or not renew" plaintiffs' Pentagon Facility Alternate Credentials (PFACs), JA202; and (3) ordered defendants to immediately reinstate plaintiffs' PFACs, JA202. On appeal, plaintiffs do not seriously dispute that the Department complied with those directives. The October Policy was rescinded; the March Policy does not reimplement any of the language the court vacated; the Department has never sought to "implement[] or enforc[e]" any provision from the October (or March) Policy "to deny, suspend, revoke, or not renew" plaintiffs' PFACs; and plaintiffs' PFACs were reinstated. JA202.

Instead, plaintiffs—like the district court—all but ignore what the summary judgment order actually says, instead seeking to supplement and expand the order's directives by reference to isolated phrases and reasoning in the district court's summary judgment opinion. As the Department explained, blackletter law makes clear that is not how injunctive orders work. A court cannot issue an injunction containing specific, clear prohibitions and then later expand that injunction by relying on stray reasoning in the opinion underlying that order. Plaintiffs offer no response to the settled law establishing that injunctive relief must clearly describe what it enjoins and that *orders*—not reasoning from an opinion—have injunctive force. *See* Fed. R. Civ. P. 65(d)(1)(B)-(C) (order must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required"). As the Supreme Court has held, that rule means that court orders directing parties to take (or refrain from taking) certain action must clearly describe "what the court intends to require and what it means to forbid." *International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). Plaintiffs identify no directive in the summary judgment order that could reasonably be read to prohibit the

Department from issuing any aspect of the March Policy, let alone with the requisite specificity.

Plaintiffs instead rely on precedent standing for the general proposition that courts have inherent authority to interpret and enforce their orders. But none of those precedents support what the district court did here. Plaintiffs cite (Resp. 20, 25) a portion of the Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349, 356 (1996), discussing district courts' ancillary jurisdiction to enforce money judgments via proceedings like attachment, garnishment, and prejudgment avoidance of fraudulent conveyances. But that has nothing to do with what the district court did here. Plaintiffs also repeatedly cite this Court's decision in *International Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984) (per curiam), for the proposition that courts have authority to enforce an "unambiguous mandate" contained in a court order where a party "plainly neglects the terms of [that order]." Resp. 26-27. But plaintiffs identify no "unambiguous mandate" from the court's order that the Department violated. As explained in the Department's opening brief, *Garment Workers* only underscores the court's error here. Br. 47-49.

Plaintiffs alternatively rely on the proposition that courts have inherent authority to "construe and interpret the language" of an order. Resp. 36 (quoting *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014)). But as noted, the district court here did not "construe" or "interpret" any language in its order, nor was there any relevant ambiguity in the court's order that would warrant further construction and interpretation. This was not a case where the order in issue was "not entirely clear" such that "surrounding context" including the "district court opinion" was necessary to understand its meaning. *United States v. Facebook, Inc.*, 136 F.4th 1129, 1132-33 (D.C. Cir. 2025) (applying "general principles of contract law" to resolve ambiguities in consent decree where text provided "conflicting and hard to reconcile" messages).

Plaintiffs' repeated reference (Resp. 26, 31, 40) to the Third Circuit's decision in *United States v. Christie Industries, Inc.*, 465 F.2d 1002 (3d Cir. 1972), illustrates the error. In *Christie*, the Third Circuit considered whether certain conduct violated an injunction the government had obtained against a private company. The court explained that evaluating compliance with an injunction "must begin" with the text of "the preliminary injunction itself." *Id.* at 1006. The text of the order in question

prohibited the sale of "fireworks assembly-kits," which it defined to include five particular components. *Id.* Interpreting the meaning of that prohibition in context, the court concluded that the injunction against the sale of kits covered any shipment in a single package of those five components, even if those components were not sold or marketed as a single "kit." *Id.* at 1007. The court also concluded that the injunction prohibited the sale of a kit containing the five components with immaterial changes to the composition of one or more components (*e.g.*, replacing the "cylinder casings" described in the injunction with non-cylindrical casings). *Id.* But the court concluded that the injunction did not cover the separate shipment of each of the five component parts, noting that the text of the injunction clearly referred to the components as a unit. *Id.* That reading, the court concluded, was consistent with the purpose of the injunction—to prevent the shipment of materials that a child could use to make a firecracker. *Id.*

That close parsing of the text of the injunction, referencing purpose and context only to resolve potential ambiguities, bears no relationship to what the district court did here or what plaintiffs urge in their response. *See also Facebook*, 136 F.4th at 1132-34 (engaging in similar close parsing of

consent decree's language, looking to context to resolve ambiguities). Neither plaintiffs nor the court identify anything in the court's summary judgment order that was ambiguous or in need of further interpretation, and nothing in the court's compliance decision purports to interpret any directive contained in the earlier order. This is not, as plaintiffs claim, a question of whether to credit the "narrowest construction" of the summary judgment order. Resp. 35. The Department's position follows from the clear directives contained in that order. The problem is that neither the court nor plaintiffs engage in any construction of the court's order *at all*. Plaintiffs identify no requirement or prohibition in the court's order that they think is sufficiently ambiguous that the Department could be said to have violated it under a different construction.

Finally, plaintiffs do not advance their case by pointing out that the Administrative Procedure Act allows for injunctive relief "where vacatur alone may be insufficient to provide meaningful relief." Resp. 4, 26. That is not in dispute; the summary judgment order the district court entered here granted plaintiffs injunctive relief in addition to vacatur. The problem is that the injunctive relief that the court entered—mirroring what plaintiffs asked for—does not prohibit anything in the March Policy. To the extent

plaintiffs now regret not asking the court for a broader injunction, that after-the-fact regret provides no support for the court's enforcement order.

Of course, had the district court entered a broader injunction along the lines plaintiffs seem to now envision—for example, vacating the October Policy and further enjoining the Department from taking any steps to alter PFAC policies that existed before October 2025, or prohibiting the Department from adopting any policy that bars journalists from engaging in criminal solicitation—that injunction would likely have been impermissibly overbroad and invalid. But this Court need not engage with the outer limits of what the district court here could have ordered the Department to do. It need only look at the order the court actually issued, JA200-203, to confirm that the court's compliance order bears no resemblance to enforcing any prohibition or requirement contained therein.

2. Plaintiffs similarly offer no coherent response to "settled law" establishing that an agency "may respond to an adverse ruling by adopting a revised policy, and it need not seek modification of [an] injunction before it initiates" those efforts. Order 4 (Apr. 27, 2026) (Stay Order) (quoting *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984)). Indeed, as this Court has observed, that course is particularly appropriate where (as here) a

court found the agency's prior action "defective" "based on an interpretation of a prior [agency action]" and the agency seeks to "correct" the defects identified. *NAACP*, 737 F.2d at 72.

Instead, plaintiffs lean into the district court's assertion that the summary judgment opinion implicitly prohibited the Department from issuing a revised policy and instead "required the Department to scrap" the entire effort and "start afresh." Resp. 36, 47 (quoting JA356-357). In support of that assertion, plaintiffs—like the district court—rely entirely on a portion of the court's summary judgment *opinion* declining to allow the October Policy to remain in effect while the Department determined how to redress the defects identified.

As explained, Br. 36-39, that argument is a nonstarter several times over. First, as discussed, nothing in the summary judgment *order* says anything about enjoining the Department from developing and implementing a revised policy. *See supra* pp. 3-5. Second, even if the district court's opinion or order *purported* to prohibit the Department from developing a revised policy, that would have been error under the very "settled law" this Court recognized in its stay order.

Third, even accepting plaintiffs' views that a court could enjoin an agency from issuing a revised policy, and that it could do so via scattered reasoning in an opinion, plaintiffs' argument still falls apart under scrutiny. In the discussion that plaintiffs rely on, the district court refused the Department's request to remand without vacatur—*i.e.*, to leave the October Policy in place while the Department considered how to revise its policies in response to the defects the court had identified. JA241-242. The court's conclusion about whether the October Policy could remain in force while the Department developed a replacement policy says nothing about whether the Department was allowed to develop a replacement policy in the first place. Put another way, the court's conclusion that "defendants [did] not show[] that the Department [wa]s entitled to a remand without vacatur" was given full effect: the October Policy did not remain in effect while the Department developed and issued a revised policy in response to the court's order. JA242. The fact that the Department was able to issue a revised policy quickly does not somehow make the revised policy a "violation" of the court's refusal to remand without vacatur.

Finally, it bears emphasizing the disruptive breadth of plaintiffs' argument. Under plaintiffs' view, every time a district court declines in an

*opinion* to remand without vacatur, any resulting *order* not only vacates the challenged agency action but also implicitly prohibits the agency from issuing any new policy that bears any resemblance to the vacated policy, even if that new policy specifically redresses the defects the court identified. In agency litigation in this Circuit, government parties regularly request remand without vacatur. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). Yet plaintiffs identify no precedent for the position that court decisions refusing to remand without vacatur also implicitly require an agency to entirely "scrap" the challenged agency action entirely and prohibit the agency from taking targeted steps to redress the defects identified. Given the frequency with which remand-without-vacatur issues are litigated in this Circuit, that absence of any precedent is telling.

That absence of any precedent supporting plaintiffs' view also undercuts their assertion that any of this renders an injunction against the government "worth little more than the paper it is printed on" or leaves courts powerless to redress unlawful agency action. Resp. 4-5. This Court made clear more than 40 years ago that agencies are free to respond to an adverse court ruling by revising the enjoined agency action, and that a

district court cannot "enjoin implementation" of that revised action "on the ground that it violated the court's earlier order." *NAACP*, 737 F.2d at 72. That rule has not rendered district courts powerless in that time.

### B. The physical access restrictions comply with the district court's summary judgment order.

1. Nothing in the district court's summary judgment decision says anything about the conditions under which PFAC holders gain physical access to the Pentagon. That is not surprising, because the October Policy that plaintiffs challenged said nothing about physical access. "So the district court's … summary judgment opinion and order did not address" the physical access restrictions that the Department imposed or "similar one[s]." Stay Order 4. Plaintiffs do not dispute that.

Plaintiffs instead point out that the district court's summary judgment order required the Department to reinstate the PFACs of seven enumerated journalists. Resp. 37. But the undisputed record reflects that all of the reporters listed in the order had their PFACs reinstated within days. By "immediately reinstat[ing]" those PFACs, JA202, the Department fully complied with that aspect of the court's order.

With nothing in the district court's order to rely on, plaintiffs turn to a portion of the court's summary judgment opinion assessing whether plaintiffs had demonstrated irreparable harm sufficient to justify an injunction ordering the Department to reinstate their PFACs. *See* JA239-240. In particular, plaintiffs repeatedly (and misleadingly) quote a parenthetical that the district court included in a citation as if it was part of the court's "unambiguous directive": No less than five times (Resp. 13, 25, 27, 37-38), plaintiffs assert that the district court made clear that it ordered the Department to restore plaintiffs' PFACs "and the access that comes with" those credentials. But that language about "the access that comes with" a press credential is from a quote from a parenthetical in a citation to a different district court decision, not a directive or holding of the court itself. JA240 (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)).

Plaintiffs' implicit assertion—that quotations contained in parentheticals in citations in opinions are tantamount to "explicit" (Resp. 38) "order[s]" (Resp. 27) that can be enforced against a party via a motion for compliance or contempt—is manifestly wrong. *See supra* pp. 3-5. But even that assertion does not salvage the district court's compliance order.

Even if the court had ordered defendants to return plaintiffs' credentials and the level of "access that comes with" them, there would be no violation of the order. Plaintiffs' PFACs currently provide them with the same level of physical access that PFACs provide to everyone else, which undisputedly includes the ability to physically access the Pentagon.

Instead, plaintiffs go further and assert that the summary judgment order clearly required the Department to return plaintiffs' PFACs *and* refrain from altering in any way the privileges those credentials conferred before October 2025. In other words, plaintiffs think the district court gave them—and them alone—the right to forever hold PFACs that confer a particular set of privileges, effectively exempting them from any future changes the Department might implement. Nothing in either the court's order or opinion supports that view, and such an injunction would have been drastically overbroad if the court had issued it. *See Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976) (Injunctions "must be narrowly tailored to remedy the specific harm shown.").

2. Plaintiffs' other arguments do not derive from the text of the district court's summary judgment order and thus cannot overcome those fundamental defects. But even on their own terms, those arguments are

unpersuasive. Plaintiffs repeatedly assert that the Department violated the order because, although it returned the PFACs as required, those PFACs are now "essentially worthless" because of other changes effected by the March Policy. Resp. 3, 39. Plaintiffs are, of course, free to challenge the March Policy on its own terms and have done so in a case now on appeal in parallel with this one. But without grounding in the summary judgment order here, these arguments cannot support the court's enforcement order.

Even on their own terms, however, these arguments are misguided. Plaintiffs cite a declaration from the named plaintiff in this case saying that "[i]n [his] view, the new rules and restrictions imposed by the" March Policy "make the reinstated PFACS … essentially worthless." JA311. But the record makes clear that plaintiff's "view" is not founded in reality: A declaration from the Department explains in detail that PFACs continue to offer substantial benefits over other passes, including preclearance to attend Department press events and the ability to gain access to the Pentagon on short notice and without any waiting period. JA321-323.

Plaintiffs alternatively posit that the Department might have violated the district court's order if it had not, in fact, reinstated plaintiffs' PFACs, but instead just given them inactive credentials that "no longer worked at

the Pentagon turnstiles" or, presumably, provided them with any of the other benefits that active PFACs provide. Resp. 43. Even assuming the court could have concluded—as a matter of interpreting the text of its order—that those facts would establish noncompliance with the directive to reinstate plaintiffs' credentials, that is a far cry from what happened here. There can be no dispute that plaintiffs' PFACs are active and that they provide plaintiffs with the same benefits as every other PFAC holder.

### C. The revised credentialing provisions comply with the district court's summary judgment order.

1. The revised credentialing provisions in the March Policy do not violate any directive in the district court's summary judgment order. The provisions of the October Policy the court vacated—provisions the court took care to identify with specificity in its summary judgment order—were immediately withdrawn and were not included in the March Policy. *See* JA264-284 (redline comparing March and October Policies). Nor is there any question that the Department has complied with the court's injunction prohibiting it from "implementing or enforcing" those vacated provisions "to deny, suspend, revoke, or not renew" plaintiffs' PFACs. JA202. Plaintiffs make no suggestion that the Department took any action "to

deny, suspend, revoke, or not renew" plaintiffs' PFACs, let alone as a matter of "implementing or enforcing" the (now vacated) provisions of the October Policy. JA202.

Plaintiffs' lead response to the Department's compliance with the clear requirements of the summary judgment order is to echo the district court's assertion that its underlying *opinion* "expressly forbade the Department" from revising its policy to address the vagueness the court identified. Resp. 28-29; *see* Resp. 36. As explained above, parties cannot violate the spirit of a district court's opinion, and in any event the court's opinion did not "forb[id]" the Department from revising its policy in response to the court's vacatur, "expressly" or otherwise. *Supra* pp. 10-11.

Plaintiffs alternatively claim that the March Policy violated the district court's order because it effectively reinstates the vacated provisions from the October Policy. As explained at length in the Department's opening brief, Br. 40-44, the March Policy did not reinstate the vacated provisions of the October Policy or make only minor wording changes. It made material changes to every aspect of the October Policy that the court found unlawful.

Plaintiffs offer no response whatsoever to most of those changes, namely (1) the removal of any suggestion that general "security or safety concerns"—as opposed to specific, enumerated grounds—could result in adverse action, (2) the addition of a closed list of prohibited conduct, and (3) the removal of Department discretion to decide whether a violation of the policy warrants adverse action on a case-by-case basis.[1] By failing to offer any response to those points from the Department's opening brief, plaintiffs effectively concede that those are material changes that redress many of the concerns the district court identified in its summary judgment opinion.

2. Plaintiffs' arguments about two other changes—the clarification that the March Policy only prohibits the knowing encouragement of specific unlawful acts, and the addition of safe harbors for the kinds of "lawful journalistic practices" the district court identified—only

[1] Plaintiffs say in passing that the March Policy reflects "precisely the standardless, unbridled discretion" that the district court's summary judgment decision forbid. Resp. 33. But plaintiffs do not respond to the fact that the March Policy removes the very "unbridled discretion" the court identified.

underscore that the court's enforcement order bears little relation to the defects that formed the basis for the summary judgment order.

a. Plaintiffs acknowledge in passing (Resp. 31) that the March Policy only prohibits reporters from soliciting information from Department employees if the journalist knows the employee is legally forbidden from disclosing that information.[2] That acknowledgement is fatal to plaintiffs' assertion that the policy simply reimplements the vacated provisions of the October Policy. In granting summary judgment, the district court *rejected* the Department's argument that the October Policy prohibited only soliciting information from Department employees that a journalist knew would be unlawful for the employee to disclose. JA224. The court did not dispute that, "in some narrow circumstances a

[2] Plaintiffs criticize the Department's use of the shorthand "sensitive" to describe the categories of information that employees are prohibited from disclosing—namely, classified national security information (CNSI) and controlled unclassified information (CUI). Whatever confusion plaintiffs feign in their brief is answered on the face of the March Policy: It describes the categories of information that are protected, citing the relevant Executive Orders that establish the standards for defining that information. JA251 (citing Executive Order 13526 and Executive Order 13556). The policy also identifies the specific criminal provisions that Department employees could violate by disclosing that information. JA251.

journalist's conduct could amount to criminal solicitation" but concluded that the October Policy did "not clearly distinguish between any such impermissible solicitation and plainly lawful journalistic practices." JA225. And the court dismissed the Department's representation that it would "only consider solicitation where the disclosure by [Department] personnel would be a criminal act, and only where the criminal act violates one of the statutes explicitly listed in the policy," concluding that even that limitation would not establish that the reporter knew the employee was prohibited from disclosing the information. JA225-226. The March Policy's narrow prohibition on soliciting information that a reporter knows would be unlawful for an employee to disclose makes it materially different from the October Policy and is responsive both to the court's order and its underlying reasoning.

Plaintiffs, like the district court, seek to sweep all of this under the rug because a separate provision in the March Policy creates a rebuttable presumption of scienter when a journalist offers anonymity to a source. Resp. 31. While acknowledging that this is only a presumption, and that the March Policy makes clear it can be overcome with evidence that the reporter did not actually know the information would be unlawful to

disclose, JA257-258, plaintiffs complain that the policy does not provide a "clear path to rebut that presumption" because it does not explain "what evidence will suffice" and "imposes no guardrails to ensure consistent enforcement." Resp. 31-32.

At the outset, these arguments highlight how far afield plaintiffs are from anything contained in the district court's summary judgment order or opinion. The court had no reason in its summary judgment decision to consider scienter requirements, the legitimacy of any presumption, or the procedures and evidentiary standards the Department will apply in evaluating whether any presumption has been rebutted. Plaintiffs are, of course, free to challenge those new policies in a separate lawsuit—as they have in fact done. *See New York Times Co. v. Department of Def.*, No. 26-cv-1690 (D.D.C. filed May 18, 2026). And more concretely, to the extent any of plaintiffs' fears about application of the policy materialize, the March Policy provides both a process for intra-Department review and a recognition that any final adverse decision under the policy will be "a final agency decision subject to judicial review." JA262.

Plaintiffs' characterization of the March Policy is wrong in any event. The policy sets out detailed procedures for all adverse PFAC decisions,

including pre-deprivation notice in writing, the opportunity to submit a "written or oral response explaining or rebutting the factual basis for the proposed" action, a requirement that any final decision must supported by substantial evidence, and the right to seek judicial review of any such decision. JA260-262. As for what evidence a journalist might submit to rebut the presumption, plaintiffs—like the district court—simultaneously assert it is obvious that a journalist might offer anonymity for a variety of reasons and complain that they have "no clue" what a journalist might say to rebut the presumption. Resp. 31. Both cannot be true. Plaintiffs give no reason to think that a journalist will not be able to rebut the presumption by submitting a response explaining that they did not know the information they sought could not lawfully be disclosed, together with an explanation that they offered anonymity for some legitimate reason. *See* JA261.

Moreover, the presumption has no bearing in cases where journalists request the disclosure of information without offering anonymity. For those cases, plaintiffs do not dispute that the policy is clear that only knowing solicitation of unlawful disclosures can ever form the basis of an

adverse PFAC action. That alone makes the March Policy materially different from the October Policy.

b. Plaintiffs' likewise attempt (Resp. 34-35) to explain away the March Policy's statement that six broad categories of journalistic activity "do not constitute 'intentional inducement of unauthorized disclosure.'" JA258. As noted, the district court's summary judgment decision made clear that it found the October Policy unlawful in substantial part because the policy did not make clear that everyday journalistic activity would not be prohibited. The safe harbors directly respond to that concern. Plaintiffs say that, while broad, the safe harbors "explicitly leave open the possibility" that asking questions "could trigger the revocation or denial of a PFAC." Rep. 35. But plaintiffs ignore that the safe harbor only leaves such a "possibility" open where the journalist knows that the employee is not allowed to disclose the information sought. JA258. In other words, any question a journalist asks to any Department employee is covered by the safe harbors so long as the journalist "does not know that the employee is not authorized to disclose" it. JA258.

3. Plaintiffs alternatively suggest that the district court reasonably concluded that the March Policy was unlawful because, although

viewpoint neutral on its face, it was motivated by viewpoint discrimination. *See* Resp. 24, 48. First, as the Department noted in its opening brief, the court said no such thing in its enforcement order and could not have said any such thing in granting summary judgment as to the October Policy. *See* Br. 58. Plaintiffs offer no response, instead simply asserting that "it follows inexorably that" the March Policy "had the same impermissible motive" as the October Policy without citing anything in the court's compliance order or opinion even suggesting as much. Resp. 48.

Second, as the Department explained, Br. 58-59, even if the district court had suggested that the March Policy was viewpoint discriminatory, that conclusion would have been error because the policy expressly provides that "[n]o PFAC determination shall be based on the content, viewpoint, or perceived editorial perspective of an applicant's or holder's journalism." JA257. Plaintiffs fail to even acknowledge that provision, let alone explain how the March Policy can reasonably be considered viewpoint-discriminatory notwithstanding that directive. Courts are not at liberty to infer an improper purpose from circumstantial, indirect evidence where a policy expressly disavows that improper purpose and furthers a legitimate one. Br. 59; *see Trump v. Hawaii*, 585 U.S. 667, 702, 706 (2018);

JA251 (discussing Department's obligation to safeguard CNSI and CUI). That rule is particularly applicable here, where there is nothing to suggest that the credentialing policies were or will be discriminatory in effect either. *See Brown v. Califano*, 627 F.2d 1221, 1234 & n.78 (D.C. Cir. 1980) ("Absent proof of disproportionate impact, we refrain from further investigation … to unearth illegitimate intent.").

Finally, plaintiffs' argument that these points are forfeited is baseless. The Department argued in its opening brief that, to the extent anything in the district court's compliance order could be read to implicitly conclude that the March Policy is viewpoint-discriminatory, any such conclusion is error. Br. 58-59.

That the Department has not focused its challenge on the order invalidating the October Policy is neither surprising nor material. The Department responded to that order by complying with it and issuing the revised March Policy. Having fully complied with the summary judgment order, the Department on appeal does not ask to undo that compliance and return to an earlier policy that, at least according to the district court, could be read to sweep more broadly than the Department intended. Relying on the court's earlier decision to foreclose any defense of the new policy—or,

alternatively, forcing the Department to continue defending the now-superseded October Policy simply to avoid that possibility—would be incompatible with the Department's fundamental authority to revise its policy and would risk burdening parties and courts with unnecessary litigation.

4. None of plaintiffs' remaining arguments advance their case. Plaintiffs repeatedly assert that the new policy was "obviously" or "transparent[ly]" intended to "nullify" the summary judgment order. Resp. 3, 4, 21, 25. There is nothing "obvious" about that assertion. Plaintiffs do not explain how a new policy containing new provisions that directly respond to each of the defects the district court identified does anything to nullify or frustrate the court's summary judgment decision. Indeed, as explained in the Department's opening brief, Br. 19, plaintiffs' position is particularly nonsensical given the principal defects the court identified in entering summary judgment were that the October Policy was too vague and could potentially reach conduct that the Department has disavowed any intention to cover. A revised policy clarifying aspects of an earlier policy that a court held to be impermissibly vague does not seek to "nullify" that holding.

Plaintiffs cite (1) a cover memo issued in conjunction with that policy, which explains that the Department disagreed with the district court's conclusions about how broadly the October Policy could be interpreted, JA245, and (2) a quote from an interview with a special advisor to the Department saying that the March Policy "use[s] more words to say the same thing and to foreclose creative misinterpretations," JA305, 354. But as explained, Br. 46, those statements are entirely consistent with the Department's view that the court read the October Policy more broadly than the Department intended and thus issued the March Policy to address those concerns. *See* JA223-226.

The fact that the March Policy issued quickly after the district court's vacatur of the October Policy (Resp. 42) demonstrates only that the Department was responding to the vacuum created by the court's vacatur of the October Policy. With that policy vacated, the Department quickly announced a new policy to preserve its legitimate interest in the secure operation of the Pentagon and to give clear guidance to PFAC holders about what standards the Department would apply moving forward. Nor does the speed with which the Department issued a revised policy suggest that there was something procedurally improper about the March Policy.

Plaintiffs invoke (Resp. 42) this Court's decision in *Garment Workers* to suggest that the March Policy is invalid because it was developed quickly. But in *Garment Workers*, this Court's order vacating the agency's recission of an earlier rule specifically directed that the agency's prior rule "shall be reinstated and remain in effect unless properly modified pursuant to 'reasoned decisionmaking' consistent with the opinion of this court," *i.e.*, by notice-and-comment rulemaking. 733 F.2d at 921. The court's order here contains no similar directive, and plaintiffs do not suggest that Department changes to its PFAC policies must proceed through notice-and-comment rulemaking or any particular process.

Plaintiffs attack a strawman by saying that, under the Department's view, the March Policy could not violate the district court's injunction "because it did not use the exact same words that had been vacated." Resp. 27. As discussed, the relevant question is not whether the Department used different words, it is whether the Department violated any directive in the court's order. *Supra* pp. 3-5. Even under plaintiffs' broader view of the inquiry, the relevant question is whether the Department's revised policy is responsive to the defects identified in the

court's opinion. Under either version of the inquiry, the court's decision was error. *See supra* pp. 17-21.

**II. The March Policy Is Otherwise Lawful.**

As plaintiffs acknowledge (Resp. 45), the district court's order cannot be sustained based on a conclusion that the March Policy is independently unlawful in any way—either because it is void-for-vagueness for new reasons not addressed in the court's summary judgment order, or because it violates some other right. This Court need not address these issues in this case. Indeed, the legality of the March Policy is being independently litigated by plaintiffs in *New York Times Co.*, No. 26-cv-1690, and the legality of the physical access policies is before this Court in an appeal of a preliminary injunction in that case, *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5253 (D.C. Cir. filed July 6, 2026).

In any event, for the reasons given in the Department's opening brief, the March Policy is lawful. On the physical access requirements, plaintiffs do not dispute that they have no First Amendment right to physically access the Pentagon or that the restrictions the Department has placed on physical access are clear and uniform. Plaintiffs instead summarily reference the arguments they have made in the pending appeal of the

preliminary injunction in their lawsuit challenging the March Policy. Resp. 46. Those arguments fail for the reasons a stay panel of this Court already accepted in granting a stay of that preliminary injunction. Order, *New York Times Co.*, No. 26-5253 (July 16, 2026); *see also* Brief for Appellants, *New York Times Co.*, No. 26-5253 (Aug. 10, 2026); Reply Brief for Appellants, *New York Times Co.*, No. 26-5253 (Sept. 18, 2026).[3]

As for the new credentialing provisions, plaintiffs largely repeat their argument that the March Policy is unconstitutionally vague because it says the same thing as the October Policy. Resp. 46-47. But as discussed above, the March Policy is materially different from the October Policy. *Supra* pp. 17-24.

Plaintiffs alternatively raise a new argument that the district court did not address below: That a journalist's conduct can *never* amount to criminal inducement, even if a reporter intentionally asks an employee to

[3] Plaintiffs' 28(j) letter addressing this Court's recent decision in *Mahoney v. U.S. Capitol Police Board*, No. 24-5207 (D.C. Cir. Sep. 22, 2026), confirms that plaintiffs agree the Pentagon is, at most, a non-public forum. And as explained in the Department's response to that letter in the parallel appeal, *Mahoney* has no bearing on the issues raised in either appeal here. *Mahoney* did not involve a retaliation claim, and what plaintiffs seek here (unescorted access to the Pentagon) bears no resemblance to what the plaintiff sought in *Mahoney*.

disclose information that the reporter knows the employee is criminally prohibited from disclosing. Resp. 33-34, 47-50. The court clearly did not accept that position. JA224-225. And plaintiffs cite no support for the idea that journalists enjoy total immunity under the First Amendment for any conduct that can be described at some level of generality as "journalistic." *See Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972) ("[O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed.").

Plaintiffs cite (Resp. 49) *United States v. Hansen*, 599 U.S. 762, 771, 783 (2023), but as plaintiffs themselves characterize that case, it establishes that the "solicitation or facilitation of a specific unlawful act, undertaken with the intent that the act occur," is not protected speech. Resp. 49. That is exactly what the March Policy prohibits. *See supra* pp. 20-21. Plaintiffs similarly say that "[w]hether Department employees may lawfully answer a question, says nothing about a journalist's right to ask it." Resp. 49. But whether the act a journalist solicited (answering a question) is lawful is directly relevant to the inquiry under *Hansen*. And while the lawfulness of the employee's conduct *alone* does not establish whether the journalist's conduct is protected speech, that is why the March Policy adds a *mens rea*

requirement to ensure it only prohibits a journalist from knowingly soliciting "a specific unlawful act … with the intent that the act occur." Resp. 49.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order to compel compliance.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JACK STARCHER
*Attorneys*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*
*John.e.starcher@usdoj.gov*

October 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,466 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jack Starcher*
Jack Starcher